UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.:  05CV10304WGY

ROBERT GORMLEY,                    *
                                   *
              Plaintiff,           *
                                   *
                                   *
vs.                                *
                                   *
                                   *
WERNER CO. AND                     *
HOME DEPOT U.S.A., INC.,           *
                                   *
              Defendants.          *


**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL
DISCOVERY RESPONSES RELATING TO INCIDENTS AND CLAIMS OF
REAR RAIL FRACTURES IN DEFENDANT'S FIBERGLASS STEPLADDERS**

I.        **INTRODUCTION**

On January 16, 2002 the Plaintiff, Robert Gormley, was working on a ladder

designed, manufactured and sold by Defendant Werner Co. In the course of his work, the

ladder suffered a sudden failure, causing Mr. Gormley to fall and suffer serious injuries.

The failure included fracturing of the right rear rail of the ladder, a Type I, 8-foot

fiberglass stepladder. (See photograph of fracture site on subject ladder attached as

Exhibit "A").

During discovery, Plaintiff requested information and documents relating to

incidents and complaints of such fracturing in Werner's fiberglass stepladders, to which

Defendant Werner responded. (See Defendant's Interrogatory Answers and Responses to

Requests for Production, attached hereto as Exhibits "B" and "C", respectively). In

1

Interrogatory Answer Nos. 10, 11, 12 and 13, and Responses to Document Request Nos. 12, 13, 14, 15 and 16, Defendant purports to unilaterally and improperly limit the scope of discovery on these issues.  Plaintiff seeks an order compelling Defendant to provide complete responses to the discovery requests herein identified.  Plaintiff has agreed to narrow the focus of all such requests to information on rear rail fractures in Defendant's fiberglass stepladders.  The parties have further agreed that should an Order enter for Defendant Werner to further respond to the referenced discovery, Werner will voluntarily produce Mr. Bartnicki to testify at deposition regarding the newly disclosed information.

## II.    **DISCOVERY AT ISSUE**

A.    Interrogatory Nos. 10, 11, 12 and 13.

Interrogatory No. 10:

Please list legal actions filed against Defendant, its agents, servants and/or employees concerning any personal injuries or deaths allegedly associated with a defect or failure relating to the fiberglass 8-foot Werner stepladders, including but not limited to Model FS108 stepladders, including the caption, jurisdiction and filing number; the nature of the injury which was alleged to have occurred; and the model, year and type of product involved.

Response No. 10:

Subject to its objections, Werner Co. refers the Plaintiff to the attached Complaint.

Werner Co. objects to this interrogatory as it seeks information that is not relevant to the Plaintiff's claim in this case that the rear rail on a Model FS108 broke causing the Plaintiff to fall.  Werner Co. further objects to this interrogatory as it is overly broad and unduly burdensome.  Werner Co. objects to producing complaints on other model fiberglass stepladders that do not use the same rear side rail pultrusion as the Model FS108 fiberglass stepladders.

Interrogatory No. 11:

Please list all side rail complaints and/or accident claims received regarding all fiberglass 8-foot Werner stepladders including but not limited to model FS108 stepladders.

<u>Response No. 11:</u>

Subject to its objections, Werner Co. has no record of any complaint alleging a fracture of the rear rail on any 8-foot fiberglass stepladder which uses the same rear side rail pultrusion profile as the Model FS108 stepladder.

Werner Co. objects to this interrogatory as it seeks information that is not relevant to the Plaintiff's claim in this case that the rear rail on a Model FS108 broke causing the Plaintiff to fall. Werner Co. further objects to this interrogatory as it is overly broad and unduly burdensome. Werner Co. objects to producing complaints on other model fiberglass stepladders that do not use the same rear side rail pultrusion as the Model Fs108 fiberglass stepladders.

<u>Interrogatory No. 12:</u>

Please list all side rail complaints and/or accident claims received regarding any fiberglass stepladder which uses the same rear side rail pultrusion profiles as model FS108 stepladders.

<u>Response No.12:</u>

Werner Co. refers the Plaintiff to the attached Complaint.

Werner Co. objects to this interrogatory as it seeks information that is not relevant to the Plaintiff's claim in this case that the rear rail on a Model FS108 broke causing the Plaintiff to fall. Werner Co. objects to producing complaints on other model fiberglass stepladders that do not use the same rear side rail pultrusion as the Model FS108 fiberglass stepladders.

<u>Interrogatory No. 13:</u>

Please list all complaints and/or accident claims received regarding allegations of Longitudinal fracturing along the rear side rails of any Werner-manufactured fiberglass stepladders.

<u>Response No. 13:</u>

Subject to objections, Werner Co. has no record of such a complaint involving any FS108 fiberglass ladder or any fiberglass stepladder which uses the same rear side rail pultrusion profiles as the Model FS108 stepladder.

Werner Co. objects to this interrogatory as it seeks information that is not relevant to the Plaintiff's claim in this case that the rear rail on a Model FS108 broke causing the Plaintiff to fall. Werner Co. further objects to this interrogatory as it is overly broad and unduly burdensome. Werner Co. objects to producing complaints on other model fiberglass stepladders that do not use the same rear side rail pultrusion as the Model FS108 fiberglass stepladders.

      B.     <u>Request For Production Nos. 12, 13, 14, 15 and 16</u>.

<u>Request No. 12</u>:

All complaints and/or accident claims received regarding allegations of longitudinal fracturing along the rear side rails of any Werner-manufactured fiberglass stepladders.

<u>Response No. 12</u>:

Subject to its objections Werner Co. states that is has no record of any complaints alleging longitudinal fracturing on the rear side rails of any Werner Model FS108 Mark II Fiberglass stepladder or any other Werner fiberglass stepladder using the same pultrusion profiles as the Model FS108 stepladder. Werner Co. objects this Request as drafted as it overly broad, unduly burdensome and calls for irrelevant information. Plaintiff alleges in this case that one of the rear rails on a Model FS108 fiberglass stepladder was defective and suffered a longitudinal fracture. To the extent the Plaintiff seeks information on any other complaint or lawsuits. Those complaints are irrelevant.

<u>Request No. 13</u>:

All complaints and/or accident claims received regarding all fiberglass 8-foot Werner stepladders, including but not limited to the model FS108 stepladder.

<u>Response No. 13</u>:

Subject to its objections Werner Co. states that it has no record of any complaints alleging longitudinal fracturing on the rear side rails of any Werner Model FS108 Mark II Fiberglass stepladder or any other Werner fiberglass stepladder using the same pultrusion profiles as the Model FS108 stepladder. Werner Co. objects to this Request as drafted as it is overly broad, unduly burdensome and calls for irrelevant information. Plaintiff alleges in this case that one of the rear rails on a Model FS108 fiberglass stepladder was defective and suffered a longitudinal fracture. To the extent that Plaintiff seeks information on any other complaints or lawsuits. Those complaints are irrelevant.

<u>Request No. 14</u>:

All complaints and /or accident claims received regarding any stepladder which uses the same rear side rail pultrusion profiles as the model FS108 stepladder.

Response No. 14:

Subject to its objections Werner Co. states that it has no record of any complaints alleging longitudinal fracturing on the rear side rails of any Werner Model FS108 Mark II Fiberglass stepladder or any other Werner fiberglass stepladder using the same pultrusion profiles as the Model FS108 stepladder. Werner Co. objects to this Request as drafted as it is overly broad, unduly burdensome and calls for irrelevant information. Plaintiff alleges in this case that one of the rear rails on a Model FS108 fiberglass stepladder was defective and suffered a longitudinal fracture. To the extent the Plaintiff seeks information on any other complaints or lawsuits. Those complaints are irrelevant.

Request No. 15:

All complaints, other than lawsuits, or reports of injuries associated with the use of the product, and alleging a defect or failure associated with the rear side rail.

Response No. 15:

None.

Request No. 16:

All documents relating to legal complaints filed against Defendant relating to personal injuries sustained as a result of using the product, and alleging a defect or failure associated with the rear side rail.

Response No. 16:

Subject to its objections Werner Co. states that it has no record of any complaints alleging longitudinal fracturing on the rear side rails of any Werner Model FS108 Mark II Fiberglass stepladder or any other Werner fiberglass stepladder using the same pultrusion profiles as the Model FS108 stepladder. Werner Co. objects to this Request as drafted as it is overly broad, unduly burdensome and calls for irrelevant information. Plaintiff alleges in this case that one of the rear rails on a Model FS108 fiberglass stepladder was defective and suffered a longitudinal fracture. To the extent the Plaintiff seeks information on any other complaints or lawsuits. Those complaints are irrelevant.

III.    **ARGUMENT**

These interrogatories and document requests merely seek discovery of complaints, accident claims, notices of lawsuits, and reports of injuries associated with fracturing of the rear siderails of Werner's fiberglass stepladders, both prior and subsequent to Plaintiff's incident of January 16, 2002. Defendant has refused to produce all such complaints and notices of this hazard with misplaced objections that the interrogatories and requests are "overly broad and unduly burdensome", and are otherwise "irrelevant". These discovery requests have since been narrowed and are directed to incidents involving the very defect and hazard at issue in this litigation, i.e. incidents of rear rail fractures in fiberglass stepladders, as reiterated to defense counsel in correspondence. (See Letter dated December 1, 2005, attached as Exhibit "D"). As of this date, Defendant has produced only one legal complaint in response. (See Complaint attached as Exhibit "E").

The law is clear that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. Proc. 26(b)(1). Further, the information "need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

A.      Deposition of Defendant Werner Co.

Werner self-servingly and unconvincingly attempts to downplay similarities in complaints involving rear rail fractures in fiberglass stepladders, while ignoring the reality that the common hazard to be addressed is rear rail fracturing. The issue of admissibility, and the specific similarities/differences, is one for the time of trial. Further, access to the requested information is not an issue, since Werner's Complaint Department

maintains paper files as well as detailed computer databases with information including ladder model, nature of damage alleged, location, and status. (Werner Deposition ("Werner Dep."), pp. 184-87, Exhibit "F").

The deposition of Fred Bartnicki, Werner's Senior Engineer and its 30(B)(6) designee, which took place on November 18th, 2005, is revealing. Mr. Bartnicki stated that he has investigated four or five allegations of fiberglass rail fractures, testifying in at least three or four such cases. (Id., pp. 52, 181, 187-88). He further testified regarding the similarities in numerous models of fiberglass stepladders -- models 6000, 600s, T6000, and PT6000 – as well as other brand names selling Werner-manufactured ladders, including Keller, Stanley, and All-American. (Id., pp. 59-64, 182). In addition, with regard to fiberglass stepladders generally, the "pultrusion" manufacturing process is the same for all, involving a "fiberglass composite material", formed in a continuous rail which is cut to size depending on the height of the ladder. (Id., pp. 65-67, 102-03, 183-84).

The hazard alleged in the present case is not limited to one specific model and type of ladder, as Defendant asserts. Rather, the hazard of fiberglass rails cracking or fracturing is common to all such stepladders. This is evidenced by one design change, implemented by Werner in its fiberglass stepladders prior to the Gormley incident, to "reinforce the siderails" to prevent and/or repair such cracking. These shields were not specific to any one model or type of ladder, addressing the common hazard known to Werner. (Id., pp. 128-30, 190-91). The subject ladder did not incorporate this safety device.

     B.    <u>Discovery Of Pre-Incident Complaints.</u>

Information concerning the occurrence of prior incidents is discoverable. <u>Weeks v. Remington Arms Co.</u>, 733 F.2d 1485 (11th Cir.1984); <u>Averbach v. Rival Mfg. Co.</u>, 879 F.2d 1196 (3d Cir. 1989). The discovery of prior incidents may lead to the discovery of admissible evidence, and may specifically address any one of the following relevant issues:

    1)    The existence or relative danger of a defect;

    2)    to show the defect caused the incident or injuries in question;

    3)    to show the defendant had notice of the dangerous condition; and

    4)    in connection with certain collateral issues such as qualifications of expert witnesses or for purposes of impeachment.

<u>See</u> <u>e.g.</u>, Wilson v. Bradlees of New England, Inc., 250 F.3d 10 (1st Cir. 2001) (evidence of prior incidents involving flammable fabric admissible regarding notice of hazard); <u>P.B. Mutrie Motor Transportation, Inc. v. Interchemical Corp.</u>, 378 F.2d 447, 450 (1st Cir.1967); <u>Borden v. Florida East Coast Railway Co.</u>, 772 F.2d 750, 755 (11th Cir.1985); <u>Weeks v. Remington Arms Co.</u>, <u>supra</u>; <u>Cooper v. Firestone</u>, 945 F.2d 1103, 1105 (9th Cir.1991).

     C.    <u>Discovery Of Post-Incident Complaints.</u>

In addition, Defendant should be ordered to provide the requested information both prior <u>and</u> subsequent to the incident of May 7, 1994. <u>See</u>, <u>e.g.</u>, <u>Melton v. Deere Co.</u>, 887 F.2d 1241, 1245 (5th Cir. 1989) (evidence concerning accidents post-dating the present incident may shed important light on issue of the product's risk or danger) (abrogated on other grounds); <u>Clark v. General Motors Corp.</u>, 20 Fed.R.Serv. 2d

(Callaghan) 679, 685-6 (D.Mass. 1975) (prior and subsequent complaints are relevant within meaning of Rule 26(b)(1)).

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order compelling Defendant Werner Co. to produce <u>all</u> information and documents regarding receipt or notice of complaints of rear rail fractures associated with fiberglass stepladders manufactured by Werner received by Defendant (1) on or before the subject incident date of January 16, 2002; and (2) after January 16, 2002.

The Plaintiff,
By His Attorneys,


   s/James A. Swartz
Edward M. Swartz
B.B.O. No. 489540
James A. Swartz
B.B.O. No. 556920
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
(617) 742-1900

DATED:  <u>December 20, 2005</u>

## CERTIFICATE OF SERVICE

I, James A. Swartz, do hereby certify that the foregoing document was served on the following counsel on this date and in the manner specified herein:

Electronically Serviced Through ECF:

Brian Voke, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02109

This _20th_ day of December, 2005.

                                        __s/James A. Swartz_____
                                         James A. Swartz



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHSUETTS

|  | | CIVIL ACTION |
|---|---|---|
| ROBERT GORMLEY | ) | NO. 05CV10304WGY |
| | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| WERNER LADDER CO., | ) | |
| INC., AND HOME DEPOT | ) | |
| U.S.A.. INC. | ) | |
| DEFENDANTS | ) | |

## DEFENDANT, WERNER CO.'S ANSWERS TO
## THE PLAINTIFF'S FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1:

Please state the name, business address, and company position of the persons employed by Defendant or any predecessors of Defendant with the most knowledge of the design, development, and testing of Type 1, 8-foot fiberglass stepladders, specifying the area of knowledge for each person listed.

### RESPONSE NO. 1:

The Werner Engineering Department as a whole was responsible for the design and develop and testing of the Werner Model FS108 Mark II stepladder. No single person was responsible for the design. Fred Bartnicki is knowledgeable concerning the design, development and testing of the Werner Model FS108 Mark II Stepladder.

### INTERROGATORY NO. 2:

Please list all tests, including but not limited to tests regarding the rear side rails, conducted either by Defendant or others known to the Defendant on or before



BARTNICKI
Exhibit No. 3
KLS   11 / 18 /05

January 16, 2002, on fiberglass 8-foot Werner stepladders and substantially similar products, stating for each such test:

    a.    the purpose of the test;
    b.    the results of the test;

## RESPONSE NO. 2:

Werner Co. refers to Plaintiff to ANSI A14.5 1992, engineering tests, attachment "A" and advertising literature.

## INTERROGATORY NO. 3:

Please describe what actions, if any, Defendant, its agents and/or employees took at any time prior to January 16, 2002 to avert or to warn against possible damage or injuries that have resulted from known or potential hazards, dangers, defects or defective conditions in fiberglass 8-foot Werner stepladders and substantially similar products.

## RESPONSE NO. 3:

Werner Co. denies that there are any defects or defective conditions in the FS108 Mark II Stepladder. Werner Co. refers the Plaintiff to the design drawings and the labels on the ladder.

## INTERROGATORY NO. 4:

Please state all changes in design of the product's rear side rails from the time it was first marketed until the present time, including:

    a.    the dates of all the changes;
    b.    description of the changes;
    c.    reason(s) for making the changes;
    d.    the name, title and address of the person(s) who authorized the changes.

## RESPONSE NO. 4:

Werner Co. refers the Plaintiff to the design drawings.

2

## INTERROGATORY NO. 5:

Please describe whether Defendant conducted, within the past ten (10) years, any recall campaigns, operations, programs or activities for fiberglass 8 foot-Werner stepladders and substantially similar products, including date(s) and substance of such results.

## RESPONSE NO. 5:

Not applicable.

## INTERROGATORY NO. 6:

Please describe and state the contents (or attach copies hereto) of any and all promotional, instructional, warning, advertising and servicing materials issued, provided or promulgated by Defendant to retailers, distributors or purchases of fiberglass 8-foot Werner stepladders on or before January 16, 2002, including the date(s) each was promulgated.

## RESPONSE NO. 6:

See drawings/labels and advertising literature.

## INTERROGATORY NO. 7:

Please state the warranties (or attach copies hereto) made by Defendant to retailers, distributors or purchasers of fiberglass 8-foot Werner stepladders on or before January 16, 2002, including the full text of such warranties and their date of issue.

## RESPONSE 7:

See drawings/labels and advertising literature.

## INTERROGATORY NO. 8:

Please list all government, trade and company standards governing the design, manufacture, testing, inspection, distribution or sale of fiberglass 8-foot Werner stepladders and substantially similar product(s) on or before January 16, 2002.

**RESPONSE NO. 8:**

See Exhibits.

**INTERROGATORY NO. 9:**

If Defendant has ever been contacted by a representative of any agency, division, department, bureau or commission of the federal or any state, local or municipal government (hereinafter collectively referred to as "government agencies") with respect to any alleged defects or safety hazards of or misrepresentations about fiberglass 8-foot Werner stepladders or any substantially similar products, please describe the date and substance of each communication.

**RESPONSE NO. 9:**

Not applicable.

**INTERROGATORY NO. 10:**

Please list legal actions filed against Defendant, its agents, servants, and/or employees concerning any personal injuries or deaths allegedly associated with a defect or failure relating to the fiberglass 8-foot Werner stepladders, including but not limited to Model FS108 stepladders, including the caption, jurisdiction and filing number; the nature of the injury which was alleged to have occurred; and the model, year and type of product involved.

**RESPONSE NO. 10:**

Subject to its objections, Werner Co. refers the plaintiff to the attached Complaint.

Werner Co. objects to this interrogatory as it seeks information that is not relevant to the plaintiff's claim in this case that the rear rail on a Model FS108 broke causing the plaintiff to fall. Werner Co. further objects to this interrogatory as it is overly broad and unduly burdensome. Werner Co. objects to producing complaints on other model fiberglass stepladders that do not use the same rear side rail pultrusion as the Model FS108 fiberglass stepladders.

4

## INTERROGATORY NO. 11:

Please list all complaints and/or accident claims received regarding all fiberglass 8-foot Werner stepladders including but not limited to model FS108 stepladders.

## RESPONSE 11.:

Subject to its objections, Werner Co. has no record of any complaint alleging a fracture of the rear rail on any 8-foot fiberglass stepladder which uses the same rear side rail pultrusion profile as the Model FS108 stepladder.

Werner Co. objects to this interrogatory as it seeks information that is not relevant to the plaintiff's claim in this case that the rear rail on a Model FS108 broke causing the plaintiff to fall. Werner Co. further objects to this interrogatory as it is overly broad and unduly burdensome. Werner Co. objects to producing complaints on other model fiberglass stepladders that do not use the same rear side rail pultrusion as the Model FS108 fiberglass stepladders.

## INTERROGATORY NO. 12.:

Please list all complaints and/or accident claims received regarding any fiberglass stepladder which uses the same rear side rail pultrusion profiles as Model FS108 stepladders.

## RESPONSE NO. 12:

Werner Co. refers the plaintiff to the attached Complaint.

Werner Co. objects to this interrogatory as it seeks information that is not relevant to the plaintiff's claim in this case that the rear rail on a Model FS108 broke causing the plaintiff to fall. Werner Co. further objects to this interrogatory as it is overly broad and unduly burdensome. Werner Co. objects to producing complaints on other model fiberglass stepladders that do not use the same rear side rail pultrusion as the Model FS108 fiberglass stepladders.

## INTERROGATORY NO. 13:

Please list all complaints and/or accident claims received regarding allegations of longitudinal fracturing along the rear side rails of any Werner-manufactured fiberglass stepladders.

## RESPONSE NO. 13:

Subject to objections, Werner Co. has no record of such a complaint involving any FS108 fiberglass ladder or any fiberglass stepladder which uses the same rear side rail pultrusion profiles as the Model FS108 stepladder.

Werner Co. objects to this interrogatory as it seeks information that is not relevant to the plaintiff's claim in this case that the rear rail on a Model FS108 broke causing the plaintiff to fall. Werner Co. further objects to this interrogatory as it is overly broad and unduly burdensome. Werner Co. objects to producing complaints on other model fiberglass stepladders that do not use the same rear side rail pultrusion as the Model FS108 fiberglass stepladders.

## INTERROGATORY NO. 14:

Please state whether Defendant contends that the alleged occurrence was caused in whole or in part by some person(s) other than Defendant, including Plaintiff, including the full identify of each such person, firm or corporation and professional relationship to Defendant, if any; and how Defendant contends such other person caused or contributed to cause the alleged occurrence.

## RESPONSE NO. 14:

Werner denies that it caused Plaintiff's accident. Discovery is ongoing.

## INTERROGATORY NO. 15:

Please state the name and address of any and all persons including Plaintiff, from whom Defendant or anyone on Defendant's behalf has obtained any statement concerning the alleged incident, indicating whether such statement was recorded or taped; whether it was reduced to writing; whether it was signed by the person giving such statement; the name and address of the person taking such statement; and the date it was taken.

**RESPONSE NO. 15:**

Not applicable.

## CERTIFICATE OF SERVICE

I, Brian P. Voke, attorney for the Defendant, Werner Co., hereby certify that I have this date, October 17, 2005 served a copy of the attached Answers to the Plaintiff's Interrogatories by forwarding copy of same, via facsimile and first class mail, postage prepaid, on the attorney of record, namely, James Swartz, Esquire, Swartz & Swartz, 10 Marshall Street, Boston, MA 02108.

WERNER CO.
By Its Attorneys

CAMPBELL CAMPBELL EDWARDS & CONROY
PROFESSIONAL CORPORATION

Brian P. Voke, BBO#544327
One Constitution Plaza
Boston, MA 02129
Tel. No. (617) 241-3000
Fax. No. (617) 241-5115

7

## VERIFICATION

Mercer County, Pennsylvania

I, Larry V. Friend, being duly sworn on his oath deposes and says that he is an authorized agent of Werner Co.; that while he does not have personal knowledge of all the facts recited in the foregoing supplemental response to interrogatories, the information contained therein has been collected and made available to him by others, and said response to interrogatories are true to the best of his knowledge and belief based upon the information made available to him; and that therefore the foregoing response to interrogatories are verified on behalf of Werner Co.

Larry V. Friend
Authorized Agent

Subscribed and sworn to before me this 17th day of October, 2005.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Gail A. Jennings, Notary Public
Sugar Grove Twp., Mercer County
My Commission Expires Aug. 12, 2008

Gail A. Jennings
Notary Public
My Commission Expires: Aug. 12, 2008

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHSUETTS

ROBERT GORMLEY )
)
)
PLAINTIFF )
)                    CIVIL ACTION
VS. )                    NO: 05CV10304WGY
)
)
WERNER LADDER CO., )
INC., AND HOME DEPOT )
U.S.A., INC. )
DEFENDANTS )

## DEFENDANT, WERNER CO.'S RESPONSE TO
## THE PLAINTIFF'S FIRST FOR PRODUCTION OF DOCUMENTS

### REQUEST NO. 1:

All component, sub-assembly, and final assembly drawings applicable to the subject model ladder, i.e. Werner model FS108 Fiberglass Stepladder displaying a manufacturing stamp of 05-99 44G02FFA.

### RESPONSE NO. 1:

See drawings.

### REQUEST NO. 2:

All documents relating to the design and development of the product.

### RESPONSE NO. 2

See Exhibits and engineering tests.



BARTNICKI

Exhibit No. 4

KLS  11 / 18 /05

**REQUEST NO. 3:**

All test records applicable to the subject ladder conducted in accordance with applicable ANSI standards, as well as those not covered by ANSI protocols.

**RESPONSE NO. 3**

See engineering tests.

**REQUEST NO. 4:**

All test records applicable to prototypes representative of the construction of the final design of the subject ladder.

**RESPONSE NO. 4**

See engineering tests.

**REQUEST NO. 5:**

All test records which may not have been formally documented, but rather filed within other engineering test files or retained by the engineer or engineers most responsible for product development of the subject ladder.

**RESPONSE NO. 5**

See engineering tests.

**REQUEST NO. 6:**

All quality control records applicable to any components, subassemblies or final assemblies or final assembly of the subject model ladder.

**RESPONSE NO. 6**

See Exhibits.

**REQUEST NO. 7:**

Each and every patent obtained by Defendant with respect to the product and/or any of its component parts.

**RESPONSE NO. 7**

See patents.

**REQUEST NO. 8:**

Each and every trademark application made by Defendant with respect to the product and/or any of its component parts.

**RESPONSE NO. 8**

Werner Co states that it has trademarks for the pinch proof spreaders and the Tool-Tra Top plastic top on the ladder. Werner Co refers the plaintiff to the advertising literature produced. Werner objects to producing the trademark applications as they are irrelevant.

**REQUEST NO. 9:**

All documents relating to the marketing and sale of the product.

**RESPONSE NO. 9**

See drawings/labels and advertising literature.

**REQUEST NO. 10:**

All documents relating to safety recommendations made by Defendant to any consumer and/or retailer concerning the use of the product.

**RESPONSE NO. 10**

See drawings/labels and advertising literature.

**REQUEST NO. 11:**

All customer correspondence relating to the product.

**RESPONSE NO. 11**

Werner Co. objects to this Request as it is overly broad and unduly
burdensome and calls for irrelevant information.

**REQUEST NO. 12:**

All complaints and/or accident claims received regarding allegations of
longitudinal fracturing along the rear side rails of any Werner-manufactured
fiberglass stepladders.

**RESPONSE NO. 12**

Subject to its objections Werner Company states that it has no record of any
complaints alleging longitudinal fracturing on the rear side rails of any Werner
Model FS108 Mark II Fiberglass stepladder or any other Werner fiberglass
stepladder using the same pultrusion profiles as the Model FS108 stepladder.
Werner Co. objects to this Request as drafted as it is overly broad, unduly
burdensome and calls for irrelevant information. Plaintiff alleges in this case that
one of the rear rails on a Model FS108 fiberglass stepladder was defective and
suffered a longitudinal fracture. To the extent the Plaintiff seeks information on
any other complaints or lawsuits. Those complaints are irrelevant.

**REQUEST NO. 13:**

All complaints and/or accident claims received regarding all fiberglass 8-
foot Werner stepladders, including but not limited to the model FS108 stepladder.

**RESPONSE NO. 13**

Subject to its objections Werner Company states that it has no record of any
complaints alleging longitudinal fracturing on the rear side rails of any Werner
Model FS108 Mark II Fiberglass stepladder or any other Werner fiberglass
stepladder using the same pultrusion profiles as the Model FS108 stepladder.
Werner Co. objects to this Request as drafted as it is overly broad, unduly

4

burdensome and calls for irrelevant information. Plaintiff alleges in this case that one of the rear rails on a Model FS108 fiberglass stepladder was defective and suffered a longitudinal fracture. To the extent the Plaintiff seeks information on any other complaints or lawsuits. Those complaints are irrelevant.

## REQUEST NO. 14:

All complaints and/or accident claims received regarding any stepladder which uses the same rear side rail pultrusion profiles as the model FS108 stepladder.

## RESPONSE NO. 14:

Subject to its objections Werner Company states that it has no record of any complaints alleging longitudinal fracturing on the rear side rails of any Werner Model FS108 Mark II Fiberglass stepladder or any other Werner fiberglass stepladder using the same pultrusion profiles as the Model FS108 stepladder. Werner Co. objects to this Request as drafted as it is overly broad, unduly burdensome and calls for irrelevant information. Plaintiff alleges in this case that one of the rear rails on a Model FS108 fiberglass stepladder was defective and suffered a longitudinal fracture. To the extent the Plaintiff seeks information on any other complaints or lawsuits. Those complaints are irrelevant.

## REQUEST NO. 15:

All complaints, other than lawsuits, or reports of injuries associated with the use of the product, and alleging a defect or failure associated with the rear side rail.

## RESPONSE NO. 15:

None.

## REQUEST NO. 16:

All documents relating to legal complaints filed against Defendant relating to personal injuries sustained as a result of using the product, and alleging a defect or failure associated with the rear side rail.

**RESPONSE NO. 16:**

Subject to its objections Werner Company states that it has no record of any complaints alleging longitudinal fracturing on the rear side rails of any Werner Model FS108 Mark II Fiberglass stepladder or any other Werner fiberglass stepladder using the same pultrusion profiles as the Model FS108 stepladder. Werner Co. objects to this Request as drafted as it is overly broad, unduly burdensome and calls for irrelevant information. Plaintiff alleges in this case that one of the rear rails on a Model FS108 fiberglass stepladder was defective and suffered a longitudinal fracture. To the extent the Plaintiff seeks information on any other complaints or lawsuits. Those complaints are irrelevant.

**REQUEST NO. 17:**

All documents relating to the recommended method(s) of use of the product.

**RESPONSE NO. 17:**

See drawings and labels.

**REQUEST NO. 18:**

All documents relating to any testing of the product for possible hazards while being used under foreseeable conditions.

**RESPONSE NO. 18:**

See Exhibits.

**REQUEST NO. 19:**

Copies of all warning and/or instruction labels that appeared on or with the product.

**RESPONSE NO. 19:**

See drawings/labels.

**REQUEST NO. 20:**

All documents relating to the wording and/or preparation of any Technical Data sheets, instructions, manuals or warnings provided to customers by Defendant for the product.

**RESPONSE NO. 20:**

See drawings/labels.

**REQUEST NO. 21:**

Copies of all warranties made by Defendant to retailers, distributors or purchasers of the product on or before January 16, 2002.

**RESPONSE NO. 21:**

See drawings/labels.

**REQUEST NO. 22:**

Copies of all government standards or trade standards applicable on or before January 16, 2002, governing the design, manufacture, testing, distribution and sale of the product.

**RESPONSE NO. 22:**

See Exhibits.

**REQUEST NO. 23:**

Copies of each and every photograph relating to the incident alleged in Plaintiff's Complaint.

**RESPONSE NO. 23:**

None.

**REQUEST NO. 24:**

Copies of all documents relating to any recall campaigns conducted within the last ten (10) years for the product and/or similar products.

**RESPONSE NO. 24:**

None.

**REQUEST NO. 25:**

All statements, signed, unsigned, written or oral, which were given by any persons, including the Plaintiff, who have direct knowledge of the incident.

**RESPONSE NO. 25:**

None.

**REQUEST NO. 26:**

Copies of all policies of liability insurance coverage and excess liability coverage insuring Defendant for personal injury damages arising from the circumstances alleged in Plaintiff's Complaint, including:

a.    the name and address of the insurance company issuing said police;

b.    the number of said policy;

c.    the effective date and expiration thereof;

d.    the amount of said policy;

e.    any annual aggregate limits on said policy and any amount of the annual aggregate that has been exhausted.

**RESPONSE NO. 26:**

Werner Co. is self insured for a million dollars per occurrence.  Excess and/or umbrella coverage was also maintained.

## CERTIFICATE OF SERVICE

I, Brian P. Voke, attorney for the Defendant, Werner Co., hereby certify that I have this date, October 17, 2005 served a copy of the attached Responses to the Plaintiff's Request for Production of Documents by forwarding copy of same, via facsimile and first class mail, postage prepaid, on the attorney of record, namely, James A. Swartz, Esquire, Swartz & Swartz, 10 Marshall Street, Boston, MA 02108.

WERNER CO.

By Its Attorneys

CAMPBELL CAMPBELL EDWARDS & CONROY
PROFESSIONAL CORPORATION

Brian P. Voke, BBO#544327
One Constitution Plaza
Boston, MA 02129
Tel. No.  (617) 241-3000
Fax. No.  (617) 241-5115



**_Swartz & Swartz_**
ATTORNEYS AT LAW
*The John & Ebenezer Hancock House on The Freedom Trail*
NUMBER TEN MARSHALL ST., BOSTON, MASSACHUSETTS 02108
617-742-1900   •   FAX · 617-367-7193

December 1, 2005

**<u>VIA FACSIMILE & FIRST CLASS MAIL</u>**

Brian Voke, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza, 3rd Floor
Boston, MA 02109

     Re:    <u>Robert Gormley v. Werner Ladder Co. and Home Depot USA, Inc.</u>

Dear Attorney Voke:

     Please advise regarding Mr. Bartnicki's availability on or before December 20, 2005 for a telephone deposition as Home Depot's 30(b)(6) designee.

     Further, it remains my understanding that Werner refuses to produce additional complaints and records, including those retained in computerized databases, regarding rear side rail fractures in fiberglass stepladders. The fracture hazard was common among all fiberglass ladder lines, as evidenced by a reinforced "bracing system" for rails manufactured by Werner over the last decade or so. The system has been added to all of its fiberglass stepladders, and to the subject FS100 series ladder only recently, in 2004. Further, other ladder lines and brands manufactured by Werner and using the same pultrusion system for the rails – including Werner 6000, 6000s, T6000 and PT6000 series; Keller; Stanley; and All American – clearly fall within the scope of Plaintiff's discovery requests.

     Plaintiff, therefore, seeks supplementation of Interrogatory Nos. 10, 11, 12 and 13, and Request for Production Nos. 12, 13, 14, 15 and 16. Request is made specifically and only relating to rear rail fractures associated with fiberglass stepladders, both prior to and after the incident date of January 16, 2002.

     Please advise by Tuesday, December 6th, 2005 whether you will agree to reconsider your position and produce the requested information and documents. As agreed, upon receipt of additional discovery responses by agreement or by Court order, you will voluntarily produce Mr. Bartnicki to provide testimony relating to the new production.

     Thank you.

                          Very truly yours,

JAS:sf

                          James A. Swartz

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR DADE
COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION
CASE NO.:
FL. Bar No. 103710 **98-03538**

JULIAN R. GAJATE,

     Plaintiff,

vs.

WERNER CO., a foreign
corporation,

     Defendant.
_____/

### COMPLAINT FOR DAMAGES

    COMES NOW the Plaintiff, JULIAN R. GAJATE, by and through
undersigned counsel, and sues the Defendant, WERNER CO., a foreign
corporation, and states:

### STATEMENT OF JURISDICTION

    1.   That this is an action for damages in excess of FIFTEEN
THOUSAND and 00/100 ($15,000.00) DOLLARS, exclusive of interest and
costs.

### IDENTIFICATION OF PARTIES

    2.   That at all times material hereto, the Plaintiff,
JULIAN R. GAJATE, was a resident of Dade County, Florida.

    3.   That at all times material hereto, the Defendant,
WERNER CO., was a foreign corporation authorized to do business in
the State of Florida and/or doing business in the State of Florida.

    4.   That at all times material hereto, the Defendant, WERNER
CO., (hereinafter referred to as "WERNER"), was responsible for the
design and/or engineering and/or manufacturing of a ladder and
placed said ladder in the stream of commerce which was ultimately



BARTNICKI
Exhibit No. 35
KLS 11/18/05

utilized by the Plaintiff, JULIAN R. GAJATE, in Miami, Dade County, Florida.

### FACTS GIVING RISE TO CAUSE OF ACTION

5.    That on or about May 5, 1994, the Plaintiff, JULIAN R. GAJATE, was climbing a ladder designed and/or engineered and/or manufactured by the Defendant, WERNER.

6.    That while climbing and/or standing on the aforementioned ladder of the Defendant, WERNER, a side rail of said ladder separated causing the ladder to fall due to the negligent manner in which said side rail was designed, engineered and/or manufactured, causing the Plaintiff, JULIAN R. GAJATE, serious and permanent injuries as hereinafter more fully alleged.

### COUNT I
### CLAIM FOR NEGLIGENCE AGAINST WERNER

Plaintiff adopts, realleges and incorporates by reference paragraphs 1 through 6 and further alleges:

7.    That the Defendant, WERNER, owed a duty to the Plaintiff, JULIAN R. GAJATE, and the general public to design and/or engineer and/or manufacture, and place in the stream of commerce, ladders in a reasonably safe condition, without structural defects, and to exercise reasonable care to protect the Plaintiff, JULIAN R. GAJATE, from risks of serious bodily injury.

8.    That the Defendant, WERNER, by and through it agents, servants and/or employees, breached its duty to the Plaintiff, JULIAN R. GAJATE, by committing one or more of the following negligent acts:

a)    Failing to design, engineer and/or manufacture a ladder that was safe for use so that its side rails would not

separate causing the ladder to fall;

    b)   Failing to warn the Plaintiff, JULIAN R. GAJATE, of the hazardous and/or dangerous condition by failing to place warning signs and/or other warning notices on the ladder;

    c)   Failing to inspect and/or discover and/or repair the aforedescribed dangerous condition which proximately caused the injuries suffered by the Plaintiff, JULIAN R. GAJATE, prior to placing said ladder in the stream of commerce;

    d)   Failing to properly design and/or manufacture said ladder so that the side rails were of a quality that would not be prone to separating with use.

    e)   Failing to correct structural problems with their ladders that they knew existed or in the exercise of reasonable care should have known to exist, in that similar occurrences have occurred with WERNER ladders.

    9.   That as a direct and proximate result of the aforesaid described negligence, the Plaintiff, JULIAN R. GAJATE, suffered bodily injury and resulting pain and suffering, physical impairment, disability, permanent scarring, disfigurement, inconvenience, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical treatment, loss of earnings, loss of the ability to earn money and aggravation of a pre-existing condition. The losses are either permanent or continuing in nature and the Plaintiff will suffer such losses and impairments in the future.

**COUNT II**
**CLAIM FOR STRICT**
**LIABILITY AGAINST WERNER CO.**

Plaintiff adopts, realleges and incorporates by reference paragraphs 1 through 6 and further alleges:

10. That the Defendant, WERNER, is strictly liable in tort to the Plaintiff, JULIAN GAJATE, by virtue of the following:

a. The Defendant, WERNER, sold and/or placed into the stream of commerce a product (ladder) in a defective condition unreasonably dangerous to the user or consumer,

b. The Defendant, WERNER, is and was engaged in the business of selling and distributing such a product,

c. The Defendant, WERNER, knew or should have known that said ladder would reach the Plaintiff, JULIAN GAJATE, and other consumers, without any substantial change in the condition in which it was sold.

11. That as a direct and proximate result of the aforesaid described acts and/or omissions, the Plaintiff, JULIAN GAJATE, suffered bodily injury and resulting pain and suffering, physical impairment, disability, permanent scarring, disfigurement, inconvenience, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical treatment, loss of earnings, loss of the ability to earn money and aggravation of a pre-existing condition. The losses are either permanent or continuing in nature and the Plaintiff will suffer such losses and impairments in the future.

### COUNT III
### CLAIM AGAINST WERNER CO.
### FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY,
### FITNESS FOR ORDINARY USE AND FITNESS FOR A PARTICULAR PURPOSE

Plaintiff adopts, realleges and incorporates by reference paragraphs 1 through 6 and further alleges:

12.   That   the   Defendant,   WERNER,   manufactured   and/or distributed a ladder which was sold and/or distributed in the normal course of business and ultimately wound up at the premises whereby the Plaintiff, JULIAN R. GAJATE, worked.

13.   Inherent in the sale and/or distribution of said ladder were implied warranties running from the Defendant, WERNER, to the Plaintiff, JULIAN R. GAJATE, that said ladder was of merchantable quality, fit for the ordinary purpose for which it was sold and/or distributed and fit for the particular purpose for which it was required by the Plaintiff, JULIAN R. GAJATE, to-wit: to be used as a means of access to higher places.

14.   That on the aforementioned date, the Plaintiff, JULIAN R. GAJATE, without knowledge of the defect in the ladder, was severely and permanently injured due to the negligent manner in which said ladder was designed, engineered and/or manufactured.

WHEREFORE, the Plaintiff demands judgment against the Defendant for damages together with lawful costs of this suit.

DATED this ___10th___ day of ___February_____, 1998.

BERNARD H. BUTTS, JR., P.A.
Attorneys for the Plaintiff
1790 West 49th Street, #210
Hialeah, Florida  33012
(305)  821-4581

BY:_____
      Bernard H. Butts, Jr.

1

1    Volume:  I

2    Pages:  1 to 198

3    Exhibits:  1 to 35

4    UNITED STATES DISTRICT COURT

5    DISTRICT OF MASSACHUSETTS

6    CIVIL ACTION

7    NO.: 05CV10304WGY

8    --------------------------------

9    ROBERT GORMLEY,                    )

10                   Plaintiff,         )

11    vs.                               )

12    WERNER LADDER CO. AND             )

13    HOME DEPOT U.S.A., INC.,          )

14                   Defendants.        )

15    --------------------------------

16    DEPOSITION OF WERNER LADDER CO.

17    By its designee FREDERICK BARTNICKI

18    Friday, November 18, 2005

19    9:34 a.m.

20    Held at:

21    Swartz & Swartz

22    10 Marshall Street

23    Boston, MA  02108

24    Reporter:  Kathryn L. Santo

Werner Ladder Co. by Bartnicki

52

1      A.    No, no.

2      Q.    And Werner was out of the case at that

3  point?

4      A.    Yes.

5      Q.    Have you ever provided testimony in cases

6  where there were allegations of Fiberglas rail

7  fractures in stepladders?

8      A.    Yes.

9      Q.    How many times have you done that?

10     A.    I don't know.  I can -- you know, I know

11  I've done it.  I couldn't tell you how many times.

12  Probably a few.  Three or four maybe.

13     Q.    In any of those cases, did you determine

14  that the rail fracture was due to negligence of

15  Werner or a defect in the ladder?

16     A.    No.  I never testified or determined that

17  there is negligence on Werner's part.  It was the

18  rail -- I wouldn't say it was defected, but

19  certainly was -- it was damaged pretty well.  I

20  mean, certainly -- obviously, in every case I've

21  seen, there's been a lot of evidence of abuse.

22     Q.    I don't know.  Obviously, to you.

23     A.    Oh, sure.

24     Q.    I mean, when I say "to you," it was

Werner Ladder Co. by Bartnicki

59

1    Q.   Okay.  In any event, the FS100 ladder --
2  let me ask you this question -- you say FS100?
3    A.   Yes.
4    Q.   Okay.  Is the 6000 series that appears on
5  Exhibit 6 -- do you see where I'm pointing now?
6    A.   Yes.
7    Q.   Is that related to the FS100 series at
8  all?  In other words -- let me ask it this way:  Is
9  it a later rendition of that or model?
10   A.   No.
11   Q.   Are the FS series still sold today?
12   A.   Yes.
13   Q.   Okay.  What are the -- is the subject
14 ladder a Type I 250-pound duty rating?
15   A.   Yes.
16   Q.   Are there differences between what's
17 shown on here, Exhibit 6, the 6000 series and the
18 FS100 series?
19   A.   Yes.
20   Q.   And what are those differences?
21   A.   The color scheme of the ladder is one.
22 Certainly, the customer base, you know, who sells
23 the 6000 versus the FS100.  Not much from a design
24 standpoint difference.

Werner Ladder Co. by Bartnicki

60

1    Q.    Okay.  Is the pricing different?  I'm
2    just looking to the right on this particular
3    exhibit, and it looks like the prices range from
4    $112 actually up to over $200 in some instances,
5    but is that pricing similar to the FS pricing?
6    A.    No.
7    Q.    The FS is cheaper?
8    A.    Well, it's marketed differently, so
9    it's -- you know, it wouldn't have this kind of
10   information the same way presented because it's
11   marketed to a different set of, you know,
12   customers.
13   Q.    The FS100 series, what customer does that
14   market to?
15   A.    I'd say primarily and -- yeah.  Lowe's.
16   Q.    And the 6000 series, who is that marketed
17   to?
18   A.    You see that -- you're going to see a
19   6000 more on the other customers like the Ace
20   Hardwares, the Sherwin-Williams stores.
21   Q.    And are the differences essentially
22   marketing differences?
23   A.    Yes.
24   Q.    And I'm showing you Exhibit 5.  Werner

61

1    has a web site; correct?

2        A.    Yes.

3        Q.    Okay.  And you're aware that there are

4    products, Werner products listed in a catalog on

5    your web site?

6        A.    Correct.

7        Q.    All right.  And does this appear to you

8    to be a printout of at least one page from that web

9    site?

10       A.    Yes.

11       Q.    All right.

12       A.    There's more than one page.

13       Q.    Yes.  I mentioned that this is one page

14   here.

15       A.    Yeah.  I was looking at it.  It looked

16   like it was more, but it's just on heavy paper.

17       Q.    On Exhibit 5, the FS100 series appears on

18   that page; correct?

19       A.    Yes.

20       Q.    All right.  And Werner manufactures and

21   distributes other 8-foot 250-pound duty-rated

22   Fiberglas ladders; correct -- or stepladders, I

23   should say; is that right?

24       A.    Other than the FS --

Werner Ladder Co. by Bartnicki

62

1      Q.   Yes.

2      A.   -- series?  Yes.

3      Q.   Okay.  And that includes the one you're

4  just talking about, the 6000 series; correct?

5      A.   Correct.

6      Q.   And it includes the 6000S series;

7  correct?

8      A.   Correct.

9      Q.   And it includes the T6000 series;

10 correct?

11     A.   Right.

12     Q.   Are there other -- any other 8-foot

13 250-pound duty-rated Fiberglas stepladders that

14 Werner manufactures themselves?

15     A.   Yes.

16     Q.   What are those?

17     A.   We have another one called a PT6000.

18     Q.   Okay.

19     A.   I would say it's more similar to the

20 T6000.  It has steps on both sides.

21     Q.   Any others?

22     A.   Yes.  We have a Keller line of Fiberglas

23 stepladders also.

24     Q.   And the Keller line, how many different

Werner Ladder Co. by Bartnicki

63

1    types of 8-foot Fiberglas stepladders that are

2    rated 250 pounds does Keller sell?

3         A.    Well, it's a Werner --

4         Q.    Okay.  I'm sorry.

5         A.    Werner sells, not Keller.

6         Q.    Sure.

7         A.    We own the Keller name now.

8         Q.    Under the Keller name?

9         A.    Under the Keller name is one series.  I'm

10   not sure if it's the 8700 or the 9700.  I'm not

11   sure which.

12        Q.    And are Keller ladders distributed

13   differently than the Werner labels?

14        A.    Yes.

15        Q.    How so?

16        A.    They're primarily targeted for

17   customer -- you know, a specific customer.

18        Q.    Like?

19        A.    For example, you're not going to see a

20   Keller ladder in a Lowe's store.

21        Q.    Where would you see a Keller ladder?

22        A.    One of our accounts is Menard's.  They're

23   Midwest, big -- they're another kind of a

24   Lowe's-type store, but they're more regional than

Werner Ladder Co. by Bartnicki

64

1   that.  Minnesota is one big location for Menard's.

2        Q.   Are there any other labels that -- under

3   which Werner sells the same types of ladders, that

4   is, the 8-foot Fiberglas ladders?

5        A.   Stanley.

6        Q.   Any others?

7        A.   No.

8        Q.   Where are Stanley ladders distributed?

9        A.   Wal-Mart stores.

10       Q.   And the ladders that are under these

11  different labels -- you mentioned Stanley, Keller,

12  and, of course, Werner -- are the designs

13  essentially the same?  In other words, for an

14  8-foot Type I 250-pound load capacity Fiberglas

15  stepladder, say, for the different labels or maybe

16  some different colors, are they the same design,

17  essentially?

18       A.   No.  Keller and Stanley lines are

19  different designers.

20       Q.   How are they different?

21       A.   Well, they use different step extrusions,

22  different spreaders, different rear sections,

23  different tops.  I mean, they're very different.

24  More than just the color schemes, things like that.

Werner Ladder Co. by Bartnicki

65

1      Q.   Are the rails manufactured in a different

2   way?

3      A.   In a different way?  I mean, the process

4   is all pretty much the same.  Is there differences

5   within the cross section, the composite?  Yeah.  I

6   think so there is, yeah.  I believe there is.

7      Q.   When you make a rail for a Keller

8   ladder -- "you" being -- I'm asking Werner.  When

9   Werner makes a rail for a Keller ladder, would they

10  make that rail in a different way for a Werner

11  ladder?  I'm talking just specifically about the

12  rail.

13         MR. VOKE:  Objection.

14      A.   I believe it's a different design rail,

15  yes.

16      Q.   How so?

17      A.   Different dimensionally, thickness,

18  width, height.

19      Q.   Specifically, how is it different?  What

20  is -- let's take the --

21      A.   I don't know.

22      Q.   -- subject ladder.

23      A.   Okay.

24      Q.   And that model, FS100, what would be the

Werner Ladder Co. by Bartnicki

66

1    closest equivalent in the Keller line for the

2    FS100?

3        A.    Like I said, it's either that model 97 or

4    87 series.

5        Q.    And there's a pultrusion process that's

6    used to make these rails; correct?

7        A.    Yes.

8        Q.    Is that any different for those two

9    ladders?

10        A.    The process isn't, no.

11        Q.    Okay.  And with regard to the -- same

12    question with regard to the subject ladder, the

13    FS100 and Stanley ladders, is the pultrusion

14    process the same for both of those for the

15    railings?

16        A.    Well, the process is the same, I mean, as

17    far as how you make it.  Now, what the rail

18    consists of is likely different.  Right offhand,

19    I'm not -- I'm not sure exactly what rails those

20    ladders used, but I believe they're different than

21    these.

22        Q.    Do you know that, or are you guessing?

23        A.    I believe they are.

24        Q.    They're both Fiberglas?  They're all

Werner Ladder Co. by Bartnicki

67

1   Fiberglas; correct?

2       A.   Well, they're -- yeah.  They're a

3   Fiberglas composite material.

4       Q.   Are Fiberglas ladders made at particular

5   manufacturing facilities for Werner?  And what I

6   mean by that is -- let me ask it this way:  Werner

7   has a number of manufacturing facilities around the

8   country; is that fair to say?

9       A.   Yes.

10      Q.   How many?

11      A.   Five.

12      Q.   Where are those located?

13      A.   Merced, California; Chicago; Greenville,

14  Pennsylvania; Anniston, Alabama; and Carrollton,

15  Kentucky.

16      Q.   Are Fiberglas -- 8-foot Fiberglas

17  stepladders manufactured in all those facilities?

18      A.   No.

19      Q.   Which ones?

20      A.   Chicago and Merced.

21      Q.   And has that been the case for the last

22  ten years, let's say?

23      A.   No.

24      Q.   How long has that been true?

Werner Ladder Co. by Bartnicki

73

1      A.   Yes.

2      Q.   What does this patent reference?

3      A.   Well, this is a patent on a

4  horizontal brace -- actually not horiz -- it's a

5  combination brace.  It's a combination foot

6  bracket, diagonal brace, component for a

7  stepladder.  And it's a -- I think in this case,

8  it's a molded part.

9      Q.   And what was the purpose of this

10  particular invention?

11      A.   It's unique, a unique way to construct a

12  ladder, incorporating this molded component in the

13  bottom portion of the front section and rear

14  sections and -- I don't know.  It was unique in

15  that it incorporated a -- it had the shoe pad, the

16  shoe, and a diagonal brace all molded in as one

17  component that would be assembled in a ladder,

18  versus assembling all those parts separately.

19      Q.   Was this device ever used on ladders, by

20  the way?

21      A.   Yes.

22      Q.   When did Werner first use this on

23  ladders, this device?

24      A.   Well, right around -- it would have been

Werner Ladder Co. by Bartnicki

74

1    the -- right around 1997.

2         Q.   Was it used for Fiberglas ladders?

3         A.   Yes.

4         Q.   Is -- was it used on the subject ladder?

5         A.   No.

6         Q.   Why not?

7         A.   Because it wasn't designed for that --

8    use on that ladder.  It was designed for another

9    ladder at different dimensions.

10        Q.   Did Werner ever look to design this

11   product with dimensions to fit the ladder like the

12   subject ladder?

13        A.   Yes.

14        Q.   And did it ever incorporate this into

15   the subject -- or the same model as the subject

16   ladder?

17        A.   Yes.

18        Q.   When did that occur?

19        A.   About -- I believe in 2004.

20        Q.   What was the reason that Werner

21   incorporated this product into ladders like the

22   subject ladder in 2004 instead of doing it earlier?

23        A.   Demand by the customer.

24        Q.   And Werner, in manufacturing this -- what

Werner Ladder Co. by Bartnicki

75

1  would you call it, by the way, in lay terms, this

2  particular product?

3      A.   We refer to it as a "combination brace."

4  Sometimes, it's referred to as an "edge brace."

5      Q.   And Werner manufactured this brace in

6  part because it knew that ladders experience

7  horizontal as well as vertical forces while in use;

8  correct?

9      A.   The design was conducted, knowing that

10 those kind of forces were involved in the testing

11 of ladders and in use of ladders, yes.

12     Q.   And this brace was designed, in fact, to

13 better respond to the horizontal forces that may be

14 experienced by the ladder; correct?

15     A.   "Better respond"?  I don't know for

16 better respond.  There is certainly another way to

17 respond to it.  Certainly, it was intended to

18 design to be able to take lateral loads and --

19 certainly.

20          I mean, you have to do, you know, certain

21 tests like cantilever or bending requirement and

22 lateral forces be placed on the ladder, pretty

23 extensive forces, and the design had to take into

24 account those kind of forces, yes.

Werner Ladder Co. by Bartnicki

76

1      Q.    Could I just direct your attention to

2   Page 5 of 13 in that exhibit, Exhibit -- I'm

3   sorry -- Exhibit 11.  Do you see where it says

4   "Background of Invention"?

5      A.    Yup.  I see that.

6      Q.    Would you just read those three

7   sentences, please.

8      A.    Ladders experienced horizontal as well as

9   vertical forces while they are used.  To better

10  respond to the horizontal forces that may be

11  experienced by the ladder, knee braces have been

12  used to connect the bottom step horizontal with the

13  rail.  The present invention is directed to an

14  improved knee brace that has been combined with a

15  rail support and preferably a foot to better

16  respond to horizontal forces and increase

17  manufacturing efficiency.

18     Q.    Do you agree with that?

19     A.    Well, I guess to some extent, yeah.  You

20  know, horizontal forces being abusive-type forces

21  impact, yeah.

22     Q.    Does the word "abusive" appear anywhere

23  in those three sentences, sir?

24     A.    No.

Werner Ladder Co. by Bartnicki

77

1    Q.   And as an inventor, did you object to any

2   of the language used in this background of the

3   invention section?

4         MR. VOKE:  Objection.

5    A.   No.  I don't object to that.

6    Q.   Is there a different purpose, or are

7   there different purposes for Fiberglas ladders

8   versus aluminum ladders?

9    A.   Oh, yes.

10    Q.   Would you explain what those are.

11    A.   Primarily, the electrical applications.

12   Fiberglas ladders are -- you know, they employ

13   nonconductive side rails, Fiberglas rails, so the

14   ladder is a nonconductive ladder, whereas aluminum

15   is highly conductive.  That's the primary

16   difference between.

17    Q.   Okay.

18    A.   I mean, weathering characteristics are

19   different between, certainly, Fiberglas and

20   aluminum, but a Fiberglas weathers well compared

21   to, like, a wood ladder, for example, that would

22   rot or decay.

23    Q.   Well, with regard to weathering

24   characteristics, comparing Fiberglas to aluminum,

Werner Ladder Co. by Bartnicki

102

1  mentioned "pultrusion process." What is that?

2      A.   That's a process that's used to make the

3  Fiberglas ladders' side rails.

4      Q.   Okay. What is that process? Would you

5  describe that?

6      A.   It's a continuous process. It involves a

7  means of getting reinforcements, which are glass

8  reinforcements. They're drawn through a dye after

9  being either saturated with a resin, either in a

10  resin bath, or by means of an injection system.

11          And the reinforcements are then brought

12  through a dye that is heated. The heating of the

13  dye creates a chemical reaction in the resin to

14  solidify it. And as it exits the dye, the dye is

15  the -- is a steel tool that's utilized to make

16  whatever shape of pultrusion you're making, either

17  a channel or an I-beam or whatever.

18          And as it exits the dye, it's a solid.

19  And then -- you know, its, basically, a long

20  continuous process that you're continuously pulling

21  this glass reinforcements through the resin bath

22  and through the dye. And then when it exits, it's

23  a finished pultrusion that is then cut the length,

24  and those cut lengths are then fabricated in the

Werner Ladder Co. by Bartnicki

103

1  rails and made into ladders.

2      Q.   And that pultrusion process generally

3  that you've described is used for Fiberglas

4  ladders, in general?

5      A.   Yes.

6      Q.   And then once that process takes place,

7  depending on the size of the ladder, like 8-foot or

8  their 6-foot ladders, they would be cut to the

9  right size; is that right?

10     A.   Yes.

11     Q.   Before they're cut, how long are these

12  rails?

13     A.   It's -- like I say, it's continuous, so

14  it's --

15     Q.   Okay.

16     A.   -- whatever the distance is between the

17  saw and the dye.

18     Q.   Would any instructions or warnings of the

19  ladder appear on the ladder itself?

20     A.   Yes.

21     Q.   Would they appear anywhere else?

22     A.   Well, there's instructions and standards.

23  I mean, an ANSI standard show a number of -- you

24  know, representative warnings and instructions are

128

1      A.   You know, I don't know enough information

2    just looking at this picture to make that

3    determination.

4      Q.   Did Werner devise any methods to

5    reinforce Fiberglas side rails?

6      A.   I don't understand your question.

7      Q.   Does Werner sell any devices that are

8    sold separately that are intended to reinforce

9    Fiberglas side rails?

10     A.   Yes.

11     Q.   How long has Werner done that?

12     A.   Go back maybe 15 years.

13     Q.   Fifteen years ago, what device or devices

14   did Werner come up with for that purpose?

15     A.   We have devices called "rail shields."

16     Q.   And those were developed 15 years ago?

17     A.   Yeah.  I'm not sure exactly, but that

18   sounds about right.

19     Q.   Okay.  Those were marketed by Werner

20   prior to January of 2002; is that fair to say?

21     A.   Yes.

22     Q.   And are those rail shields also sold as

23   part of certain ladders instead of -- in other

24   words, instead of a separate component that had to

Werner Ladder Co. by Bartnicki

129

1   be purchased?

2        A.   Yes.

3        Q.   And how long has Werner sold such a line?

4        A.   Probably about the same period of time.

5        Q.   And those rail shields are intended to

6   reinforce side rails; correct?

7        A.   They offer some additional abuse

8   resistant to the ladder, yes.

9        Q.   Are they design to reinforce the side

10  rails?

11       A.   Sure.

12       Q.   And they're also sold to repair a ladder

13  if a crack occurs; is that fair to say?

14       A.   Yeah.  In some -- you know, some --

15  certainly, with some limitations.

16       Q.   Well, what is the concern about cracks?

17  Why would those need to be repaired?

18       A.   Well, if a rail is cracked, it's --

19  obviously, the structural integrity compromised.

20  When you have a ladder, you don't know how strong

21  it's going to be if it's cracked.

22       Q.   Can a cracked rail lead to a failure, an

23  injury?

24       A.   It could, yes, if it's severe enough.

Werner Ladder Co. by Bartnicki

130

1           MR. SWARTZ:  Can we mark these as the

2     next exhibits.

3               (Documents marked as Bartnicki

4        Exhibits 18 through 22 for identification)

5        Q.   I'm showing you first what's been marked

6     as Exhibit 18.  Do you recognize that as

7     information from the Werner web site regarding

8     Fiberglas rail shields?

9        A.   Yes.

10       Q.   Okay.  And Werner was aware that cracks

11    can occur in Fiberglas rails: correct?

12       A.   Sure.

13       Q.   In fact, Werner's been aware of that, as

14    long as you've been with the company; correct?

15       A.   Yes.

16       Q.   And I'm showing you what's been marked --

17    I'll also show you what's been marked as Exhibits

18    19, 20, 21, 22 and just ask you if you recognize

19    what's depicted in those photographs.

20       A.   This was the -- what's called the "edge

21    brace," the "combination brace."  It's -- also,

22    there's a plastic rail shield incorporated in that

23    design as well.

24       Q.   Okay.

Werner Ladder Co. by Bartnicki

132

1    the bottom of the rail.

2        Q.   And it's -- in the photograph, there's a

3    reference to the "edge professional bracing

4    system."  Is that essentially a marketing term used

5    by Werner for what you just described?

6        A.   Yes.

7        Q.   And one purpose of that edge professional

8    bracing system is to enhance the strength and

9    durability of the ladder on the rail; correct?

10       A.   I'd say yes.  That's correct, yes.

11       Q.   And the bracing system helps absorb and

12   defuse the energy caused by the rigors of heavy

13   use; correct?

14       A.   Yes.

15       Q.   Did Werner ever put this bracing system

16   on ladders such as the subject ladder?

17       A.   I don't understand what you're asking me

18   there.

19       Q.   The model is FS100?

20       A.   The FS108?  Did we ever put it on any

21   FS108?  Yes.

22       Q.   Okay.  And when was that first done?

23       A.   I responded to that earlier, the same

24   question.  It was, like, 2004, I believe.

Werner Ladder Co. by Bartnicki

133

1     Q.   Is this system now on all those ladders

2  that are marked -- that are manufactured by Werner?

3     A.   All the FS100s?

4     Q.   Yes.

5     A.   Yes.  I believe so, yes.

6     Q.   Is there any reason why technically that

7  could not have been done back in 2000 and 2001?

8     A.   No.  It could have been done back in

9  2000, 2001.

10     Q.   Does Werner sell a product called a

11  "tripod stepladder"?

12     A.   Yes.

13     Q.   What is a tripod stepladder?

14     A.   It's a three-legged stepladder.

15     Q.   What is the -- are there certain

16  advantages over a tripod stepladder compared to

17  stepladders such as the one in the instant case?

18     A.   Yes.

19     Q.   What are those advantages?

20     A.   I guess, probably, the most obvious one

21  is if you're going to set the ladder up in a

22  corner.  For example, with a single leg in the

23  middle, you can get into the corner deeper, and

24  therefore, maybe be closer to your work that way

Werner Ladder Co. by Bartnicki

180

1      A.   No.

2      Q.   And the subject ladder --

3      A.   FS108?

4      Q.   Yes.

5      A.   No.

6      Q.   And that's still sold as an FS108 today?

7      A.   Yes.

8      Q.   All right.  Are there other ladders in

9  here that are structurally, essentially the same?

10     A.   Yes.  The 6000, 6000S are very similar.

11     Q.   Any others?

12     A.   No.

13     Q.   And the 6000 and 6000S Fiberglas

14  stepladders appear on Page 2 of the catalog;

15  correct?

16     A.   Yes.

17     Q.   And is there anything different about the

18  FS series ladders sold today, compared to the 6000

19  and 6000S?

20     A.   Again, color.

21     Q.   Other than color, anything else?

22     A.   No.

23     Q.   And in this catalog on Page 51 towards

24  the end, there are certain stepladder accessories

181

1    that are offered by Werner; correct?

2        A.    61?

3        Q.    51.

4        A.    Yes.

5        Q.    Those include Fiberglas rail shields;

6    correct?

7        A.    Yes.

8        Q.    Are you -- you testified earlier in the

9    day that you've been involved in investigating

10   claims previously where there were allegations of

11   cracking or splitting along the side rail of

12   Fiberglas ladders; is that fair to say?

13       A.    Well, I've been involved in

14   investigations where my investigation revealed that

15   there was cracking or splitting of a rail.

16       Q.    And how many of those have there been?

17       A.    I don't know.  A handful maybe.

18       Q.    Four or five?

19       A.    Yeah.

20       Q.    Over the course of what years?

21       A.    25, 26.

22       Q.    Prior to 2002?

23       A.    Which -- prior to 2002?  What do you

24   mean?

Werner Ladder Co. by Bartnicki

182

1    Q.   The claims you're referencing.

2    A.   What -- I don't understand the question.

3    Q.   You said there were a handful; correct?

4    A.   Yeah.  And then you asked me over 25, 26

5    years.  And then you said prior to 2002?

6    Q.   Yes.

7    A.   Was the ladder made before then or --

8    what do you mean?

9    Q.   Your investigation.

10   A.   Oh.  When I did my investigation?

11   Q.   Yes.

12   A.   Yeah.  It would have been over that time

13   period somewhere.

14   Q.   You mentioned other product lines like

15   Keller and Stanley.  Is there another line called

16   "All American"?

17   A.   There was.

18   Q.   During what years was that?

19   A.   I believe we discontinued that in 2001,

20   so prior to 2001.  I'm not sure of the time period

21   in there.  Let's see.  '90s.  I'd say maybe about

22   ten years, in there.

23   Q.   Why did Werner stop making those

24   particular ladders?

Werner Ladder Co. by Bartnicki

183

1      A.    Basically, as a marketing decision,
2   abandoned it.

3      Q.    Where were those ladders sold?

4      A.    One big customer was Costco.

5      Q.    Any others that you can think of?

6      A.    There were others, but I can't think of
7   who they were at this point.

8      Q.    Does Werner still sell the ladders at
9   Costco, or Werner-manufactured ladders, I should
10  say?

11     A.    I believe so, yes.

12     Q.    Under what label?

13     A.    That -- I'm not sure if they're selling
14  the Werner or the FS or the FE, the off-brand type
15  label or what.  I don't -- I don't recall right
16  now.

17     Q.    Now, you testified already about
18  pultrusion system used for the subject ladder.  Do
19  you recall that?

20     A.    Yes.  I recall that.

21     Q.    All right.  And there are other ladders
22  that use the same pultrusion system; correct?

23     A.    Sure.

24     Q.    What ladders are those?

Werner Ladder Co. by Bartnicki

184

1      A.    5900, 6000, T6000, basically any

2   Fiberglas ladder in our catalog.  All of them.

3   They all use the pultrusion system if they're a

4   Fiberglas ladder, whether it's step or extension

5   ladder.

6      Q.    Is there a separate complaint department

7   at Werner?

8      A.    No.

9      Q.    Is there someone at Werner who has

10  specific responsibility for complaints?

11     A.    In what way?  I don't understand what

12  you're asking.

13     Q.    Is there somebody who, at Werner, is

14  responsible for overseeing complaints that come

15  into Werner about defects or potential defects in

16  ladders?

17     A.    Ultimately, I'd say our legal department

18  takes care of complaints.

19     Q.    When you say --

20     A.    Now, in -- certainly, it involves other

21  groups.  I mean, if there's a complaint that's

22  called in, our customer service department is going

23  to address it, initially.  Should it require some

24  further comment or, you know, inquiries, it would

Werner Ladder Co. by Bartnicki

185

1  be directed to the legal department.  And legal,

2  oftentimes consults with engineering on the nature

3  of the complaint.  So, you know, it's a number of

4  departments.

5      Q.  Did the complaints get logged in a

6  computer?

7      A.  Well, I guess it depends on the nature of

8  the complaint and whether or not it can be resolved

9  immediately or if it requires further evaluation or

10 not.

11     Q.  For complaints that require further

12 evaluation, are they logged into a computer?

13     A.  Some would be, yes.

14     Q.  And that computer database is maintained

15 where?  In Pennsylvania?

16     A.  Yes.

17     Q.  And who's responsible for overseeing that

18 database?

19     A.  The legal department.

20     Q.  And that would be Mr. Werner, Eric

21 Werner?

22     A.  Ultimately, yes.  I'm sure he doesn't do

23 that personally, but yes.  Ultimately, that would

24 fall under his jurisdiction.

Werner Ladder Co. by Bartnicki

186

1    Q.   Have you seen printouts of complaint

2  reports from a computer?

3    A.   Yeah.

4    Q.   And what are on those reports?

5    A.   Typically, the plaintiff's name, the

6  person who's making the complaint, model, nature of

7  maybe damage to the product, and then a location.

8  And then if there's some resolution, whether or not

9  it's open, closed, you know, status of it.

10    Q.   Are you aware that in this litigation,

11  request was made for complaints relating to

12  fracturing of rear side rails on Fiberglas ladders?

13    A.   I know there's been an inquiry about the

14  complaints.  I don't know the nature -- the

15  specific nature of that inquiry.  My understanding

16  was similar ladders with similar type -- you know,

17  with fracturing of the rear section.

18    Q.   And did you yourself conduct a search for

19  those complaints?

20    A.   No.

21    Q.   Who did?

22    A.   Someone in legal department.

23    Q.   If you were going to look for one of

24  those complaints, where would you go?  The

Werner Ladder Co. by Bartnicki

187

1    computer?

2        A.    Go to the legal department.  Ask them.

3        Q.    Do you have access to those computer

4    records yourself if you wanted to look?

5        A.    Not generally, no.  Somehow, you have to

6    go through legal, generally.  I mean, I don't

7    keep -- I don't keep that records, nor do I -- I

8    don't really have direct access to that.  I would

9    go through the legal department.

10       Q.    When you say you "go through the legal

11   department," can you sit at your computer and look

12   at them?

13       A.    No.

14       Q.    You can get a printout if you want?

15       A.    Yeah.  I could, yeah.  From legal, yes.

16       Q.    What complaints are you aware of

17   regarding fracturing in Fiberglas ladders?

18       A.    I am aware of the one that we provided.

19       Q.    Are you aware of any others?

20       A.    Of Fiberglas ladders, in general?

21       Q.    Yes.

22       A.    Yeah.  I'm aware of others that have

23   occurred on other types of Fiberglas ladders, yeah.

24       Q.    How many such complaints are there of

Werner Ladder Co. by Bartnicki

188

1    those?

2        A.    Well, personally, from my personal

3    experience, the ones I've investigated, about two

4    or three.

5        Q.    And how about others that you haven't

6    personally investigated?

7        A.    I never really did a search that way.

8    I'm aware of the other one that's on a similar

9    ladder to this.

10       Q.    When you say "similar ladder to this,"

11   what do you mean?

12       A.    An FS100 or a 6000.

13       Q.    Did you look for complaints in

14   preparation for your deposition today relating to

15   fractures in side rails for other ladders using the

16   same pultrusion system?

17       A.    Right.  Yes.

18       Q.    You did?

19       A.    Yes.

20       Q.    Personally?

21       A.    No, but that was -- that was my

22   understanding what the legal department found.

23   They certainly asked me, would I have similar

24   rails, and I provided them that information, and

Werner Ladder Co. by Bartnicki

189

1    they conducted the search.

2        Q.    What's your definition of a "similar

3    rail"?

4        A.    It has a similar cross section made with

5    the same composite --

6        Q.    And --

7        A.    -- and the side rail.

8        Q.    And those particular ladders would be

9    which ones?

10       A.    6000 and the FS108, 6008 -- F --

11       Q.    You said FS108, which is the subject

12   model; correct?

13       A.    Right.  And the 6008 or --

14       Q.    6008?

15       A.    Yeah.

16       Q.    Other than the FS108 and 6008, any

17   others?

18       A.    I think, generally, anything within the

19   6000 series or the FS100 series, really would have

20   the same side rail.

21       Q.    Apart from what you think, do you know

22   whether complaints were searched for those -- for

23   all ladders and the FS100 series and all ladders in

24   the 6000 series?

Werner Ladder Co. by Bartnicki

190

1      A.    Yes.

2      Q.    Did Werner conduct a search for

3   complaints for any other series ladder or model

4   ladder?

5      A.    No.  I don't believe so.

6      Q.    Why not?

7      A.    Because the rails are different.  It's a

8   different design, totally different ladder.

9      Q.    What's different about it, about the

10  other ladder?

11     A.    Gee, everything.  I mean, rails, steps,

12  tops, spreaders, foot pads, shoes.  Everything is

13  everything.  Size of the ladder, spread, taper.

14     Q.    Does Werner make rail shields for these

15  other types of Fiberglas ladders that you talked

16  about?

17     A.    Yeah.

18     Q.    And that's to strengthen the rails;

19  correct? -- in part?

20     A.    Well, it's not going to strengthen the

21  rail.  It's going to strengthen the ladder, the

22  system, you know.  It's going to provide more abuse

23  resistance or provide a means to repair an already

24  damaged ladder, if it's in a condition that can be

Werner Ladder Co. by Bartnicki

191

1    repaired and still be used.

2        Q.   And that's with regard to fracturing of a

3    side rail; correct?

4        A.   Correct, yes.

5        Q.   And that issue is addressed by these rail

6    shields, regardless of the model of the ladder;

7    correct?

8        A.   Yes.  Right.  It's not -- right.  It's

9    not model dependent.

10           MR. SWARTZ:  Why don't we mark this as an

11   exhibit.

12              (Document marked as Bartnicki

13               Exhibit 35 for identification)

14       Q.   I'm showing you what's been marked as

15   Exhibit 35.  Is that the complaint that you were

16   referring to earlier?

17       A.   Yes.

18       Q.   And what were the allegations in this

19   case?

20       A.   I don't know.

21       Q.   Were there allegations of fracturing of a

22   side rail?

23       A.   Well, there's -- apparently, that -- I

24   mean, that was one of the end results of the

Werner Ladder Co. by Bartnicki

192

1   accident, was fracturing in the side rail.  That

2   was the condition of the ladder when we -- you

3   know, whatever investigation we did on it, there

4   was some fracturing into the side rail, yes.

5   Whether or not that was the allegation that was the

6   cause, I don't know.

7        Q.   You don't know?

8        A.   No.

9        Q.   Why did you use this particular complaint

10  in this case?

11       A.   Because it's on a similar-type ladder,

12  and it involved fracturing of a side rail.

13       Q.   And what was the outcome of this case?

14       A.   It was settled out of court.

15       Q.   When?

16       A.   Within the last five years.  2000, 2001,

17  somewhere in there.

18       Q.   The complaint itself was filed in

19  February of 1998; correct?  Looking at the last

20  page.

21       A.   Yes.

22       Q.   Was your deposition taken in this case?

23       A.   No.

24       Q.   And this case is being the plaintiff as

Werner Ladder Co. by Bartnicki

195

1    Q.    Have you spoken with anyone at Home Depot

2  about the incident?

3    A.    No.

4        MR. SWARTZ:  Why don't we go off the

5  record.

6        (Discussion off the record)

7        MR. SWARTZ:  There are certain areas of

8  inquiry that the plaintiff wishes to go into which

9  the plaintiff understands at this time the witness

10  isn't prepared to discuss.  And those areas include

11  a number of areas, first of all, that were required

12  in deposition today and which were objected to by

13  Mr. Voke and where the witness was instructed not

14  to answer.

15        In addition to that, the plaintiff

16  intends to file the appropriate motions with the

17  Court on discovery of prior complaints.  The

18  plaintiff -- it's the plaintiff's contention that

19  the scope of the prior complaints produced has been

20  improperly limited, and the plaintiff will seek

21  production of those additional documents and

22  additional information.

23        It's further plaintiff's understanding

24  that should the Court order additional information

Werner Ladder Co. by Bartnicki

196

1  along those lines that Mr. Bartnicki will be

2  voluntarily produced by defense counsel on those

3  subject matters.  Is that accurate?

4          MR. VOKE:  That's correct.

5          MR. SWARTZ:  With that, the deposition is

6  suspended.

7          MR. VOKE:  Just note my objection to the

8  suspension.

9              (Whereupon, the deposition was

10                 suspended at 3:59 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24