UNITED STATES DISTRICT COURT
DISTRICT OF MASSCHSUETTS

| | | |
|---|---|---|
| ROBERT GORMLEY | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION |
| VS. | ) | NO: 05CV10304WGY |
| | ) | |
| WERNER LADDER CO., | ) | |
| INC.,  AND HOME DEPOT | ) | |
| U.S.A., INC. | ) | |
| DEFENDANTS | ) | |

## WERNER CO.'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY RESPONSES RELATING TO INCIDENTS AND CLAIMS OF REAR RAIL FRACTURES IN DEFENDANT'S FIBERGLASS STEPLADDERS

Werner Co. ("Werner") opposes the plaintiff's motion to compel as the plaintiff's request for complaints of other incidents involving rear rail fractures in *all* model fiberglass stepladders at any time, manufactured by Werner is overly broad, unduly burdensome and irrelevant. The only Werner model fiberglass stepladders that contain similarly designed rear rails as the subject model stepladder, the FS 100 series, are the model 6000 and 6000S fiberglass stepladders. Any incidents concerning rear rails in other model fiberglass stepladders with differently designed rear rails are not similar and not discoverable. In addition, any incidents that are not similar to the plaintiff's are also not discoverable. Further, Werner conducted a search for other complaints of rear rail fractures in the relevant model FS 100, 6000 and 6000S fiberglass stepladders and produced a complaint. Therefore, Werner has fully responded to plaintiff's interrogatories 10-13 and request for documents 12-16 and the plaintiff is not entitled to any more discovery on this issue.

## INTRODUCTION

The plaintiff alleges that on January 16, 2002, he was working on a Type I, 250 pound duty rating, Werner model FS 108 Mark II Fiberglass Stepladder manufactured in May, 1999 ("the stepladder"). Mr. Gormley testified that he was shrink-wrapping a large sailboat that was on

stands when his accident occurred. Attached hereto as *Exhibit A* is a true and accurate copy of the deposition of Robert Gormely, pp. 48, 49, 50, 72, 73. The deck of the sailboat was approximately 10 feet off of the ground. *Ex. A*, p. 50. Mr. Gormley was standing on the step ladder with his two feet on the third step from the top of the ladder using a shrink-wrapping gun to heat the shrink wrap from the top section of the sailboat when the ladder suddenly went out from underneath him. *Ex. A*, pp. 72, 73, 78, 79. Mr. Gormley testified that his legs shot off to the left of him and he dropped the shrink gun which was attached to a pole when he fell to the ground and caught his pants on fire. *Ex. A*, pp. 72, 73, 85, 86. Mr. Gormley also testified that he landed on the ladder when he fell. *Ex. A*, pp. 73, 85, 86. Gormley says that just before he fell, his chest was at the height of the top of the safety line attached to the deck of the sailboat. *Ex. A*, pp. 72-74.

Plaintiff has provided little information on his claim of defect in the stepladder, stating the "defendant's ladder was defective, in part, because the right rear side rail failed while the ladder was being used as intended and in a foreseeable manner" and that Werner failed "to warn consumers of the unreasonably dangerous and defective condition of the ladder." Attached hereto as *Exhibit B* are Plaintiff's Answers to Interrogatories, Numbers 2 and 16. Plaintiff is currently seeking information and documents relating to incidents of rear rail fractures associated with *all* Werner fiberglass stepladders, both prior to and after the incident date of January 16, 2002. (See p. 2 of Plaintiff's Motion to Compel, *Ex. D* to Motion to Compel).

## ARGUMENT

The plaintiff's revised request is still overly broad, unduly burdensome and irrelevant. Werner has fully responded to plaintiff's interrogatories 10 through 13 and request for documents 12-16.

Under the standard established in Fed. R. Civ. P. 26, information is discoverable either if it is itself admissible evidence or if it is reasonably calculated to lead to the discovery of admissible

evidence. Lohr v. Stanley-Bostitch, Inc., 135 F.R.D. 162, 164 (W.D. Mich. 1991). In

determining the admissibility of other incidents at trial, the party offering the evidence must

establish "substantial similarity" between the incidents offered and the one at bar before such

evidence is admissible. Cameron v. Otto Bock Orthopedic Industry, Inc., 43 F.3d 14, 16 (1st Circ.

1994) (Court excluded evidence of other incidents as irrelevant because they were not based upon

substantially similar circumstances); McKinnon v. Skil Corporation, 638 F.2d 270 (1st Circ.

1981). "While the standard of relevance in the context of discovery is broader than in the context

of admissibility, this often intoned legal tenet should not be misapplied so as to allow fishing

expeditions in discovery." Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992). There

must be a threshold showing of relevance by the plaintiff before Werner is required to "open wide

the doors of discovery and to produce a variety of information which does not reasonably bear

upon the issues in the case." Hofer, 981 F.2d at 380.

       For discovery purposes, the Court must find that the circumstances surrounding the other

incidents are similar enough that discovery concerning those incidents is reasonably calculated to

lead to the uncovering of substantially similar occurrences. Lohr, 135 F.R.D. at 164 (citations

omitted). The proper foundation for discovery of information concerning other accidents in a

products liability case . . . is information suggesting that the incident that is the subject of the

proposed discovery was similar to the plaintiff's accident and that the tool or product involved in

the other incident is similar to the tool or product that injured the plaintiff. 6 Moore's Federal

Practice, §26.46[11][c] (Matthew Bender 3d ed.).

       The discovery standard in obtaining information on other accidents in a products liability

design defect case requires that the other incidents the plaintiff is seeking must be similar to his

accident and the model ladder must also be similar in design to the ladder he was injured on. If

the design of the ladder is different or the circumstances of the accident are different, than the

plaintiff is not entitled to the discovery.  See e.g., Uitts v. General Motors Corp., 62 F.R.D. 560,

562-563 (E.D. Pa.1974) (information regarding recall campaign by manufacturer concerning two

wheel drive vehicles with three point triangular engine mount system because of defective engine

mounts used solely in three point mounting system not relevant to allegedly defective design of

four wheel drive vehicle with four point engine mounting system); Lohr v. Stanley-Bostitch, Inc.,

135 F.R.D. 162, 164-165 (W.D. Mich. 1991) ("[t]he only reason that evidence of other accidents

is admissible at all is that the substantial similarity between the other incidents and the one in

question supports a reasonable inference of the existence of a dangerous condition"; evidence of

accidents involving dissimilar products would not be admissible at trial and discovery of

information concerning such dissimilar accidents would be abuse of discovery process); In re

Richardson-Merrell, Inc., 97 F.R.D. 481, 484 (S.D. Ohio 1983) (in litigation against drug

manufacturer, information relating to manufacturer's experiences with Thalidomide and MER-29,

other drugs that were intended for similar purpose, was not relevant for discovery purposes

because there was no showing experiences of manufacturer with Bendictin were similar to

experiences with Thalidomide or MER-29; information concerning testing for teratogenicity of

Bendictin alone not relevant because teratogenetic action of Bendectin alone not similar to

teratogenetic action of Bendectin in combination with other substances); Hofer v. Mack Trucks,

Inc., 981 F.2d 377, 380-381 (8th Cir. 1992) (design of earlier models was so dissimilar to design

of truck in which plaintiff was injured that plaintiff could uncover no evidence from information

concerning design of those earlier models to support claim design of model in which plaintiff was

injured was defective; information concerning earlier models, therefore, not relevant for discovery

purposes).

   Plaintiff's demand that Werner produce incidents relating to rear rail fractures associated

with all of their numerous model fiberglass stepladders, both prior to and after the incident date of

January 16, 2002, does not meet the similarity requirement as the designs of most of the model fiberglass ladders that Werner makes are completely different from the subject stepladder. As stated in his deposition and in the attached affidavit, Werner Co.'s representative Fred Bartnicki states that the relevant Werner model ladders that contain similarly designed side rails with the subject ladder, the FS 100 series, are the 6000 and 6000S series fiberglass stepladders. Attached hereto as *Exhibit C* is an Affidavit from Fred Bartnicki, paras. 1-4. Attached hereto as *Exhibit D* are true and accurate copies of excerpts from the deposition of Fred Bartnicki, pp. 180, 188, 189. These model ladders are structurally similar and have a similar cross section with the same composite material. *Ex. C*, para. 4, *Ex. D*, pp. 180, 188, 189.

There are numerous other model fiberglass stepladders that Werner manufacturers, including the T6000 and the PT6000, that contain a completely different design from the FS 100, 6000 and 6000S series fiberglass stepladders. *Ex. C*, para. 5, *Ex. D*, pp. 61-65, 190. The rails, including the rear rails to the other model fiberglass stepladders are designed differently in terms of their dimensions including thickness, width and height. *Ex. C*, para. 5, *Ex. D*, p. 65. The ladder steps, tops, rear sections, spreaders, taper, foot pads, shoes and size of the other model fiberglass stepladders are all different from the FS 100, 6000 and 6000S series model fiberglass stepladders *Ex. C*, para. 5, *Ex. D*, p. 190. The horizontal bracing, knee bracing and bottom step bracing of the other model fiberglass stepladders are also different from the FS 100, 6000 and 6000S series model fiberglass stepladders. *Ex. C*, para. 5.

In addition, the Kelley and Stanley lines of fiberglass stepladders that Werner sells are also completely different designs. *Ex. D*, pp. 61-65. Those ladders use different step extrusions, different spreaders, different rear sections, and different tops. *Ex. D*, p. 64. Finally, the rails of the FS 100, 6000 and 6000S series model fiberglass stepladders are also manufactured differently within the cross section of the ladders compared to the other model fiberglass stepladders. *Ex. C*,

para. 5, *Ex. D* p. 65.  Further, plaintiff's own description of the accident does not provide any proof that the rear rails to the ladder were defective in any way.  The plaintiff has not confined his request concerning other incidents that were similar to the plaintiff's as described at his deposition.

Therefore, the plaintiff's seeking incidents relating to rear rail fractures in other model fiberglass stepladders without any time limitation, without any valid explanation for his allegations of defect in the rear rails to the stepladder, without confining the request to similarly designed stepladders and to similar incidents as described by the plaintiff at his deposition, is overly broad, irrelevant, unduly burdensome and is an abuse of the discovery process.  The request by the plaintiff will not lead to the discovery of admissible evidence.

Werner conducted a search for other complaints and incidents involving rear rail fractures in the relevant model ladders and they produced a complaint.  (See Plaintiff's *Exhibit B, Responses 10, 12, Exhibit E* to his Motion to Compel).  Werner has produced all other incidents and complaints that they are aware of concerning the relevant model ladders.  The plaintiff should not be entitled to any other complaints concerning fiberglass stepladders that are designed differently, particularly where his allegations of defect have not been adequately disclosed and his request has not been confined to similar incidents.

## CONCLUSION

Werner has fully responded to plaintiff's interrogatories 10 through 13 and request for documents 12-16 and for the foregoing reasons, the plaintiff's motion to compel should be denied.

Werner Co.
By It's attorneys,
CAMPBELL CAMPBELL EDWARDS &
CONROY, PC

Brian P. Voke (BBO# 544327)

6

Adam A. Larson (BBO#632634)
One Constitution Plaza
Boston, MA 02129
(617) 241-3000

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this motion was served upon all counsel of record for each party by first class mail and electronically on January 17, 2006.

Adam A. Larson

SHEET 1  PAGE 1

00001
01  UNITED STATES DISTRICT COURT
02  DISTRICT OF MASSACHUSETTS
03
04
05  _____
                        )
06  ROBERT GORMLEY,       )
07              Plaintiff )
08                        )
09  v.                    )
10                        ) Civil Action
11  WERNER LADDER CO. AND  ) No.: 05CV10304WGY
12  HOME DEPOT U.S.A., INC.,)
13              Defendants )
14                        )
15  _____)
16
17          DEPOSITION OF ROBERT GORMLEY, a witness called on
18  behalf of the Defendant, taken pursuant to the Massachusetts
19  Rules of Civil Procedure, before Ellen Dubie, a Professional
20  Court Reporter and Notary Public in and for the Commonwealth
21  of Massachusetts, at the offices of CAMPBELL CAMPBELL EDWARDS
22  & CONROY, P.C., One Constitution Plaza, Boston, MA, on
23  TUESDAY, DECEMBER 6, 2005, commencing at 10:30 a.m.

---

PAGE 3

00003
01  I N D E X
02  WITNESS                    EXAMINATION BY          PAGE
03  Robert Gormley
04                          (By Mr. Voke)              4
05                          (By Mr. Swartz)          149
06
07  E X H I B I T S
08  NO.                     DESCRIPTION              PAGE
09  1                       Diagram                   53
10  2                       Photograph               110
11  3                       Photograph               112
12  4                       Photograph               116
13  5                       Photograph               117
14  6                       Photograph               129
15  7                       Photograph               131
16  8                       Photograph               131
17  9                       Photograph               131
18                          (Exhibits retained by counsel.)

---

PAGE 2

00002
01  A P P E A R A N C E S
02
03  BRIAN VOKE, ESQUIRE
04  Campbell Campbell Edwards & Conroy, P.C.
05  One Constitution Plaza
06  Boston, MA  02129
07  (617) 241-3000/FAX (617) 241-5115
08      On Behalf of the Defendants,
09          Werner Ladder Co. and Home Depot U.S.A., Inc.
10
11  JAMES A. SWARTZ, ESQUIRE
12  Swartz & Swartz
13  The John & Ebenezer Hancock House
14  1 Marshall StreetB
15  Boston, MA  02108
16  (617) 742-1900/FAX (617) 367-7193
17      On Behalf of the Plaintiff, Robert Gormley.

---

PAGE 4

00004
01  P R O C E E D I N G S
02  ROBERT GORMLEY,
03      a witness called on behalf of the Defendant, having
04  first been satisfactorily identified by the production
05  of his driver's license and duly sworn by the
06  reporter/notary public, testifies and says as follows:
07  S T I P U L A T I O N S
08          All objections except as to the form of the
09  question and all motions to strike are reserved until
10  the time of trial.  The witness will read and sign the
11  transcript.  Notarization of the transcript will be
12  waived.
13      DIRECT EXAMINATION
14      BY MR. VOKE:
15      Q.      Can you state your full name for the record,
16  please?
17      A.      Robert Francis Gormley.
18      Q.      And your date of birth?
19      A.      August 13, 1962.
20      Q.      And where do you live?
21      A.      45 Grandview, it's all one word, Grandview, Ave.,
22  Quincy.
23      Q.      Have you ever given deposition testimony before?
24      A.      Yes -- well, not deposition, no.  I had a hearing

SHEET 12   PAGE 45

00045
01    Q.    What department were you in at Marina Bay?
02    A.    Service department.
03    Q.    Who else was employed in the service department?
04    A.    Jimmy Glynn.
05    Q.    Who?
06    A.    Jim Glynn, G-L-Y-N-N.
07    Q.    Other than Rick Mahoney, Jim Glynn, Joe Cappelli,
08 William Doran, William Brownlow, Bill Weed, and John
09 Covert -- well, let me ask you this first.  Were all
10 those people employees of Marina Bay?
11    A.    No.
12    Q.    Which ones were employees of Marina Bay?
13    A.    All but the last two.
14    Q.    That would be John Covert and Bill Weed?
15    A.    Yes.
16    Q.    Who was Bill Weed employed by?
17    A.    Bill Weed is his own employee.  He owns a sign
18 company that is based at Marina Bay.
19    Q.    And what about John Covert?
20    A.    John Covert is an ex-employee at Marina Bay.  He
21 was a past dockmaster.
22    Q.    For whom?
23    A.    Marina Bay.
24    Q.    Who else worked in the service department at

PAGE 46

00046
01 Marina Bay?
02    A.    At that time?
03    Q.    Yes.
04    A.    Everybody had nicknames.  You'll have to excuse
05 me.  The Neurontin makes me very -- my memory is all
06 over the place with it.  Mike -- big Mike -- God, I
07 forgot his last name.  Well, Mike Matranga.  That's
08 spelled just like it's said.
09    Q.    M-A-T-R-A-N-G-A?
10    A.    Yes.
11    Q.    Where does he live?
12    A.    In Quincy.  He actually lives on his boat at
13 Marina Bay right now.  God, what was big Mike's last
14 name?  Well, there's Larry Monahan.  Larry Monahan
15 was there.
16    Q.    Where does he live?
17    A.    I don't know.
18    Q.    Where did he last live?
19    A.    I don't know.
20    Q.    Does he still work for Marina Bay?
21    A.    No.
22    Q.    Do you know where he works?
23    A.    He works at a -- down Cape Cod.  Hyannis Marine,
24 but I'm guessing.  I'm not supposed to guess.

PAGE 47

00047
01    Q.    You've heard that he works down there?
02    A.    Yes.  God, what was Mike's last name?  That's the
03 best that my memory serves me right now.
04    Q.    Okay.  What was Jim Glynn's job at Marina Bay?
05    A.    He was also a boatwright.  You could probably say
06 he was the lead technician over there.
07    Q.    What about Joe Cappelli?
08    A.    Joe Cappelli was always on the verge of getting
09 fired.
10    Q.    What was his job?
11    A.    Whatever anybody else didn't want to do,
12 basically.
13    Q.    Was he a boatwright?
14    A.    No, I wouldn't say so.
15    Q.    Laborer?
16    A.    Laborer I'd say, yes.
17    Q.    What about William Doran?
18    A.    Bill Doran was the service writer.
19    Q.    What about William Brownlow?
20    A.    He was also the service writer.  Bill Doran left
21 there in -- as a matter of fact, he quit on
22 September 11th, on the day that the towers came down.
23 So he wasn't working there at the time of your
24 accident?

PAGE 48

00048
01    A.    No.
02    Q.    Was Joe Cappelli working there at the time of
03 your accident?
04    A.    Yes.
05    Q.    And Jim Glynn?
06    A.    Yes.
07    Q.    And William Brownlow?
08    A.    Yes.
09    Q.    Now, at the time of your accident, were you
10 working on a boat?
11    A.    Yes.
12    Q.    Which boat?
13    A.    I don't recall.
14    Q.    What size boat?
15    A.    It was a large sailboat.
16    Q.    Were you shrinkwrapping the sailboat?
17    A.    Yes.
18    Q.    If you shrinkwrapped a sailboat would you prepare
19 any paperwork?
20    A.    Yes.
21    Q.    What paperwork would you prepare?
22    A.    There would be a work order.
23    Q.    And what information would be on the work order?
24    A.    The customer's name, contact information, boat

SHEET 13   PAGE 49

00049
01 name, length, and what work was to be performed.
02    Q.    When you say a large sailboat, what do you mean
03 by large?
04    A.    I would say that it was bigger than 30 feet.
05    Q.    If you were going to try to look up that work
06 order to find out which boat you were working on, how
07 would you go about doing that at Marina Bay?
08    A.    I don't know.
09    Q.    Who would you go and see?
10    A.    The service writer, possibly. I don't know.
11    Q.    Do you know how the records were kept?
12    A.    No, I don't.
13    Q.    So if you had a question about a specific job
14 that you had worked on there, and you needed to make
15 reference to a work order, how would you go about
16 doing that?
17    A.    I would go to the service writer.
18    Q.    How were you paid back then?
19    A.    By check.
20    Q.    Were you paid hourly or by the job?
21    A.    Hourly.
22    Q.    How much an hour?
23    A.    I believe I was making 21.50.
24    Q.    Now, this large sailboat, was it up on some

PAGE 50

00050
01 stands?
02    A.    Yes.
03    Q.    What are the stands called?
04    A.    Sailboat stands.
05    Q.    What size would the sailboat stands be?
06    A.    I don't understand the question.
07    Q.    Are there different size stands that are used on
08 sailboats?
09    A.    Yes.
10    Q.    What size would these stands have been?
11    A.    For large sailboats, I guess -- again, I don't
12 know how it would be defined: small, medium, and
13 large. I mean, there's many different sizes and
14 custom stands. So it's hard to describe. I would
15 describe these ones as large sailboat stands.
16    Q.    The largest that were used at Marina Bay?
17    A.    No, I wouldn't say the largest, because the
18 largest were custom made and very tall.
19    Q.    So these would be stock items?
20    A.    Yes, these would be stock items at our Marina,
21 yes.
22    Q.    How high was the deck of the sailboat off the
23 ground?
24    A.    Approximately 10 feet.

PAGE 51

00051
01    Q.    The shrink wrapping that was being done was --
02 was the shrink wrapping being performed in a manner
03 that would permit someone to have access to that boat
04 during the course of the winter?
05    A.    Are we talking about the specific sailboat, or
06 just in general?
07    Q.    Yes, that specific sailboat.
08    A.    No, not that one. Not to the best of my
09 knowledge, no.
10    Q.    So it was being wrapped up so no one would have
11 access to the boat?
12    A.    That's correct.
13    Q.    Some boats are shrink-wrapped where they put a
14 door in, and folks have access in and out throughout
15 the winter?
16    A.    That's correct.
17    Q.    The boat you were working on didn't have such a
18 door?
19    A.    I would say at the time of the accident, no.
20    Q.    And where was the sailboat?
21    A.    In the storage yard at Marina Bay.
22    Q.    Can you describe the storage yard?
23    A.    Level, paved parking lot that is just for parking
24 in the summer and boat storage in the winter. Fenced

PAGE 52

00052
01 in with a gate. Approximately 600 feet by 1,000 feet.
02    Q.    Have you ever taken anyone out there to the
03 storage area and showed them where your accident
04 occurred?
05    A.    No.
06    Q.    Have you seen any photographs of the area where
07 your accident occurred?
08    A.    No.
09    Q.    Would you be able to do that show someone where
10 the boat was?
11    A.    Yes.
12    Q.    Can you draw us a sketch showing where the
13 storage yard is at Marina Bay and where the sailboat
14 was located.
15        (Witness complies.)
16    A.    This is the entrance and boats would be divided
17 up into rows. There are a row of boats facing this
18 way, and boats would run down all the way along the
19 fence here. There would be a row of boats this way
20 another row of boats along the back fence over here,
21 and there would be -- let's see, this was the "A" row;
22 this was the "B" row; this is "C," "D." Another row
23 of boats. I don't know how many would be in a line.
24        So the way it was set up is this would be

SHEET 18. PAGE 69

```
00069
01  down, finding the boat, knocking down the antennas and
02  the biminis?
03      A.      Mike Bray and Larry Monahan.
04      Q.      Who was on the second crew building the frames?
05      A.      I can't remember, because we move them around so
06  that nobody got tired of what they were doing. I
07  don't recall that day.
08      Q.      So we've got Mike Bray and Larry Monahan. We've
09  got Mike Matranga?
10      A.      Uh-huh.
11      Q.      Jim Glynn.
12      A.      Yeah.
13      A.      I don't remember the other person who was on
14  there. I really don't remember his name. Marina Bay
15  had a high turnover ratio of employees. I can't
16  remember who else was on the crew at that time.
17      Q.      So the boat was shrink-wrapped the previous day?
18      A.      No, the frame was put up and the plastic was put
19  over the top and hemmed, and the belly straps on it,
20  and it was ready to be shrunk in the morning.
21      Q.      And whose job was it to shrink?
22      A.      Me.
23      Q.      That was your job. With anybody else?
24      A.      Joe Cappelli.
```

PAGE 70

```
00070
01      Q.      Did he assist you that day?
02      A.      Yes. What happened is when the guys put the
03  plastic over the top, they'd cut off any excess and
04  they'd just leave it under the boat. And Joe and I
05  would show up. Joe would take care of the scraps, as
06  I'm tightening it up making sure that there's no
07  holes, the job's done properly, and I'd check it off
08  the list. It's quality control at the very end of the
09  process.
10      Q.      And what equipment was used to put the plastic
11  over the top by your crew?
12      A.      A ladder.
13      Q.      What kind of ladder?
14      A.      The same that I -- a Werner.
15      Q.      The same one that was involved in your accident?
16      A.      Not the same exact one. We had -- there were
17  other ladders.
18      Q.      Mr. Gormley, what time did you start work on
19  January 16, 2002?
20      A.      Myself or the crew?
21      Q.      You.
22      A.      I usually get there between 7 and 7:15.
23      Q.      What time did you show up that day?
24      A.      To the best of my knowledge, 7 to 7:15.
```

PAGE 71

```
00071
01      Q.      And what time was your accident?
02      A.      8:15, 8:30.
03      Q.      Where were you the night before?
04      A.      With my wife, I was doing my laundry.
05      Q.      You weren't married at the time?
06      A.      No.
07      Q.      Where were you living?
08      A.      With my wife -- she was my girlfriend at the
09  time. With Lauren.
10      Q.      Where were you living?
11      A.      45 Grandview.
12      Q.      Was that a home she owned?
13      A.      No, we rent.
14      Q.      What's your wife's name?
15      A.      Lauren.
16      Q.      What was the weather like on the morning of
17  January 16, 2002?
18      A.      It was cold and dry.
19      Q.      Was there any snow on the ground?
20      A.      No.
21      Q.      Any ice on the ground?
22      A.      No.
23      Q.      And at the time of your accident, were you alone?
24      A.      Yes.
```

PAGE 72

```
00072
01      Q.      And what work had you done on that large sailboat
02  the day prior to your accident?
03      A.      I had tightened up the plastic.
04      Q.      At the bottom hemlines.
05      A.      The entire piece of plastic.
06      Q.      And how did you do that?
07      A.      With the shrinkwrap gun on the pole.
08      Q.      From the ground?
09      A.      Some from the ground; some from the ladder.
10      Q.      Were you using the shrinkwrap gun with the pole
11  off the ladder?
12      A.      Yes.
13      Q.      What is the shrinkwrap pole made out of?
14      A.      Fiberglass.
15      Q.      And what were you doing at the time of your
16  accident?
17      A.      I was tightening up the last section of the
18  plastic.
19      Q.      And where was that?
20      A.      On top of the boat.
21      Q.      Where on the top of the boat?
22      A.      To the best of my knowledge, on the starboard
23  side, which would be the right side of the boat as
24  you're looking at the bow. You know, looking from the
```

SHEET 19   PAGE 73

```
00073
01  back of the boat to the front, it was on the right
02  side, midship, right in the middle.
03      Q.      Describe to me, as best you recall, how your
04  accident occurred?
05      A.      Well, I was on the ladder, tightening up the last
06  section of plastic.  I felt the ladder give away
07  underneath my feet.  My legs shot off to the left.  I
08  immediately dropped the pole, which had the gun on it,
09  the propane gun on it.  I went to catch myself with my
10  left hand, grabbing onto the safety line.  I
11  redirected my body, and I came down with arms and legs
12  in the air.  I landed on what I believe to be the
13  ladder, and hitting my head on the ground, like,
14  twisting around.
15      Q.      Which hand were you holding the pole with the
16  propane gun on it?
17      A.      Both.
18      Q.      And where was the safety line in relation to you
19  when you were holding the pole with your two hands?
20      A.      In front of me.  It was under the plastic.
21      Q.      It was under the plastic?
22      A.      Yes.
23      Q.      Was it at eye level?
24      A.      No.
```

PAGE 74

```
00074
01      Q.      Where was it in relation to your eyes?
02      A.      I would say a foot-and-a-half, 2 feet below.  It
03  was about chest level maybe.
04          (Witness indicating.)
05      Q.      The safety line was about chest level?
06      A.      To the best of my knowledge, yeah.
07      Q.      And so was the safety line below your shoulder or
08  at approximately shoulder height?
09      A.      I don't recall exactly.
10      Q.      What were you doing with the propane gun?
11      A.      I was heating up the plastic so that it would
12  shrink.
13      Q.      At the top of the frame?
14      A.      Not all the way up at the top, no.
15      Q.      How far from the top of the frame?
16      A.      A foot or two.
17      Q.      You were on a ladder?
18      A.      Yes.
19      Q.      Were you working directly above the ladder or to
20  your right or to your left of the ladder?
21      A.      Directly above.
22      Q.      You said your legs shot off to the left?
23      A.      Yes.
24      Q.      And once your legs shot off to the left, only
```

PAGE 75

```
00075
01  then did you drop the pole?
02      A.      Well, it kind of all happened at the same time.
03  You know, once I realized that I was going down, I had
04  no interest in the pole.
05      Q.      How much time elapsed between the time your feet
06  started to go off to the left and you grabbed the
07  safety line?
08          MR. SWARTZ:  Objection.
09      A.      I have no idea.  It was a reflex.
10      Q.      The safety line itself, was that more than one
11  level of the safety line?
12      A.      I don't recall.  It was under the plastic.
13      Q.      Could you see the safety line from where you were
14  working?
15      A.      You couldn't see it, because it was covered with
16  the plastic, but you knew where it was, because that's
17  where the plastic would bend and come down from the
18  ridge.  The ridge would come down and you'd have the
19  edge, and that's where the safety line is.
20          (Witness indicating.)
21      Q.      So you could see the shape of the safety line up
22  against the shrinkwrap?
23      A.      Not up against it; behind it, yes.
24      Q.      Behind it?
```

PAGE 76

```
00076
01      A.      Yes.
02      Q.      So when you were working with the pole, explain
03  to me how you used the pole to reach areas on the
04  shrinkwrap that you had to heat up?
05      A.      The pole was approximately 10 feet long, maybe 12
06  feet long.  It was one of those poles that expands, so
07  you can put a roller on the end of it to paint with.
08  It has a thread on the end of it.  What I had done is
09  we had attached the gun to one end of it, and to the
10  opposite end we put a piece of bronze shaft that
11  weighed approximately the same as the gun; that way,
12  it was balanced.
13          And what you would do was you would work
14  from the center of gravity on the pole, and swing it
15  around and work in an arc manner, working from the
16  bottom of the wrap up to the top.  There was no need
17  to stretch up very high to get to the very last
18  sections, because when the section you heated up
19  tightened up, it would tighten up the entire piece.
20      Q.      So you would move the pole in an arc?
21      A.      Yes.
22      Q.      And you'd start at the bottom and move from the
23  bottom up to the top?
24      A.      Yes.
```

SHEET 20   PAGE 77

```
00077
01    Q.    And how long would it take you to move the pole
02 from the bottom up to the top, approximately?
03    A.    In sweeps?
04    Q.    In a sweep, yes.
05    A.    Well, you'd sweep once across, twice across.
06 Around a minute, maybe a minute and a half.
07    Q.    To go from the bottom up to the top would take a
08 minute and a half?
09    A.    Yeah, thereabouts, yeah.  It depends.  There's a
10 lot of variables to it.  It depends on how cold it is.
11 Is it raining?  Is it windy?  If it's windy then the
12 flame gets blown away from the plastic, and it makes
13 it difficult to shrink.
14    Q.    Did you have that problem that day?
15    A.    No.
16    Q.    What I'm trying to do is get a picture of how
17 long you would have been moving in your arc, and I
18 think you said about a minute, a minute-and-a-half?
19    A.    Yeah.  Well, you'd work in a series of arcs.
20 You'd make a small arc down low, then the next sweep
21 up, and another one up, then another one up.
22    Q.    Are you constantly moving the pole?
23    A.    Hopefully, yeah, because otherwise you're going
24 to blow holes in it.
```

PAGE 78

```
00078
01    Q.    How long would you keep the burner on any one
02 section of the wrap before you moved it?
03    A.    Again, it's variable.  That's a difficult
04 question to answer.
05    Q.    What's the variable range?
06    A.    If it was a windy day and it's cold out, you'd
07 have to leave it there for maybe five, ten seconds.
08 If it's a nice day with no wind and it's not that
09 cold, you would have to move it along.  You couldn't
10 stay in one spot, period.
11    Q.    Okay.  So what about on this particular day?
12    A.    On this particular day you'd have to move right
13 along.
14    Q.    So you'd constantly have the pole moving?
15    A.    Yes.
16    Q.    And if you stopped the pole, you'd burn through
17 the plastic?
18    A.    Correct.
19    Q.    So it's a constant back-and-forth motion, arcing
20 motion, with the pole?
21    A.    Yes, on that particular boat.
22    Q.    Now, how long had you been working on the boat
23 that day before the accident occurred?
24    A.    Ten, fifteen minutes.
```

PAGE 79

```
00079
01    Q.    Were you working from the ladder?
02    A.    Not all the time, no.
03    Q.    Had you gone up and down the ladder?
04    A.    Yes, I had.
05    Q.    How many times?
06    A.    Six times on that particular boat.
07    Q.    That day?
08    A.    Yes.
09    Q.    How many steps were on the ladder?
10    A.    To the best of my knowledge, eight.
11    Q.    And which step were you standing on?
12    A.    Not the very top, not the next one down, but the
13 third one.
14    Q.    The third step down from the top?
15    A.    Yes.
16    Q.    With the top step meaning the top cap of the
17 ladder?
18    A.    Correct.
19    Q.    Did you have both feet on that step?
20    A.    Yes.
21    Q.    And how long had your feet been on that step?
22    MR. SWARTZ:  Objection.  At what time?
23    MR. VOKE:  The time just prior to the accident.
24    A.    Approximately a minute, maybe two.
```

PAGE 80

```
00080
01    Q.    Had you ever stepped on the top cap of an
02 extension ladder while you were at Marina Bay?
03    A.    No.
04    Q.    You have never done that in your life?
05    A.    No.
06    Q.    Have you ever seen anyone at Marina Bay ever step
07 on the top cap of a ladder?
08    A.    Yes.
09    Q.    On how many occasions?
10    A.    Once, maybe twice.
11    Q.    And who?
12    A.    I couldn't tell you the names.
13    Q.    So you deny ever standing on the top cap of any
14 stepladder while you were employed at Marina Bay?
15    A.    I don't believe I have, no.
16    Q.    How tall are you?
17    A.    Five-ten-and-a-half.
18    Q.    How much do you weigh?
19    A.    Now?
20    Q.    Now.
21    A.    Approximately 190.
22    Q.    How much did you weigh back on January 16, 2002?
23    A.    Approximately 165, 170.
24    Q.    Now, you say that you grabbed on with your left
```

00085
01    Q.    And then you lose your grip and you fall down to
02 where?
03    A.    Well, my legs shot out to the side like this. I
04 went to grab onto the safety line, came down, and it
05 kind of sprung back like this. So I came down arms
06 and legs in the air.
07    (Witness indicating.)
08    Q.    I think you said earlier you landed on the
09 ladder?
10    A.    I believe so, yes.
11    Q.    And at any point in time between the time you hit
12 the -- between the time you lost your balance on the
13 ladder --
14    MR. SWARTZ: Objection.
15    Q.    -- did you see the ladder?
16    A.    No.
17    MR. SWARTZ: Objection.
18    Q.    When was the first time you saw the ladder?
19    A.    When it was delivered from Home Depot.
20    Q.    That was a poor question.
21 Immediately following the accident, when was
22 the first time you saw the ladder?
23    A.    When I was tangled up in it.
24    Q.    At the end of the accident sequence you were

00086
01 tangled up in the ladder?
02    A.    Yes, I'd landed on top of it, and the gun had
03 landed, and landed next to me, and was burning my leg
04 at the same time. So I had the wind knocked out of
05 me. I was trying to gain my senses. I had pushed the
06 ladder off to one side to get to the gun, so I could
07 turn it off before I went up in flames.
08    Q.    Did your clothing catch fire?
09    A.    Yes.
10    Q.    What did you have on?
11    A.    I had on an exposure suit. One of the ones that
12 you zip down, and you zip down the legs to get in it.
13 An insulated jumpsuit.
14    Q.    And did you suffer any burns?
15    A.    No.
16    Q.    What happened to the suit you were wearing?
17    A.    I threw it away.
18    Q.    Now you say you were tangled up in the ladder;
19 what do you mean by that?
20    A.    Well, I had landed on top of it, and I was trying
21 to push it off to one side to get to the gun.
22    Q.    Was the ladder lying on its side?
23    A.    Yes.
24    Q.    Can you draw us a sketch as to the position the

00087
01 ladder was in?
02    A.    I really don't recall.
03    MR. SWARTZ: Do you recall or don't you recall?
04    THE WITNESS: No, I don't, not the exact position
05 of it, no.
06    Q.    Okay. Do you recall where the top cap of the
07 ladder was in relation to you?
08    A.    Yes.
09    Q.    Where was that?
10    A.    It was around my back.
11    Q.    Were you lying on your back on top of the ladder?
12    A.    No, I was laying next to the ladder after the
13 accident. I had landed on it.
14    Q.    You said you landed on the ladder?
15    A.    Yes, I believe I did, yes.
16    Q.    Did you land on the ladder and then fall off it
17 after you landed on it?
18    A.    Yes.
19    Q.    So you were lying on the ground next to the
20 ladder at the very end of the accident?
21    A.    Yes.
22    Q.    Were you lying on your back or on your side or on
23 your stomach; do you recall?
24    A.    I can't say with any certainty. I think I was

00088
01 laying on my back, but -- yes, I was laying on my
02 back.
03    Q.    I think you said earlier you hit your head?
04    A.    Yes.
05    Q.    Where did you hit your head?
06    A.    On the ground.
07    Q.    No, which portion of your head?
08    A.    Oh, on the very top, in the back. It was kind
09 of, I think, pushed down on my head.
10    (Witness indicating.)
11    Q.    The top back portion of your head?
12    A.    Yes.
13    Q.    How many inches down from the top?
14    A.    How many inches down from the top?
15    Q.    From the top of your head. Just an
16 approximation.
17    A.    The area of my head that hit, if you were going
18 to a synagogue, you'd have to put the cap right there.
19 Okay? That's where I hit, up in the top. Right up in
20 here. It wasn't down in the neck. It was on the top
21 of the head more.
22    (Witness indicating.)
23    Q.    Did you have any scrapes?
24    A.    No.

SHEET 38   PAGE 149

00149
01    A.    Yes.
02    Q.    And do you recall also testifying that your legs,
03 I believe you said, shot off to the left at some point
04 after that; do you recall that?
05    A.    Yes.
06    Q.    Between those events, in other words, the giving way
07 and the legs shooting off to the left, what, if anything,
08 did you feel happening to the ladder at that time?
09    A.    The ladder kind of disappeared and went off to the
10 left -- to the right, and I kind of went like that,
11 like my left foot came out.
12          (Witness indicating.)
13    Q.    But, in other words, I want to know, looking at the
14 ladder, you said your legs shot off to the left; is that
15 right?
16    A.    Yes.
17    Q.    Which direction, if you know, if you recall, did the
18 ladder move in one way or the other?
19    A.    I thought the ladder was moving to the right.
20    Q.    Is that the top of the ladder moving to the right?
21    A.    Yes.
22    Q.    I just want to have a clear picture.  The top of
23 the ladder moving to the right?
24    A.    Yes.

PAGE 150

00150
01    Q.    And your legs were to the left?
02    A.    Yes.
03    Q.    So what does that mean with respect to the bottom of
04 the ladder?
05          MR. VOKE:  Objection.
06    Q.    Did you have any feeling about what was happening
07 with respect to the bottom of the ladder if the top's
08 moving to the right?
09          MR. VOKE:  Objection.
10    Q.    If you don't feel comfortable, that's okay.  I just
11 want to get as many details as possible.
12          MR. VOKE:  Objection.
13    A.    I was kind of trying to catch myself, but I would
14 imagine that it was going off --
15    Q.    Apart from imagining, what's your best memory?
16          MR. VOKE:  Objection.
17    A.    I can't say.
18    Q.    Okay.  Do you remember the top of the ladder moving
19 to the right?
20    A.    Yes.
21          MR. SWARTZ:  Nothing further.
22          MR. VOKE:  Thank you.
23    (Whereupon the deposition concluded at 2:43 p.m.)

PAGE 151

00151
01 E R R A T A   S H E E T
02 DEPOSITION OF:  ROBERT GORMLEY
03    Upon reading and examining my testimony as herein
04 transcribed, I make the following additions, changes
05 and/or corrections, with the accompanying and
06 corresponding reason(s) for same:
07 Page   Line            Is Amended to Read
08 ___|___|_____
09 ___|___|_____
10 ___|___|_____
11 ___|___|_____
12 ___|___|_____
13 ___|___|_____
14 ___|___|_____
15 ___|___|_____
16 ___|___|_____
17 ___|___|_____
18
19
20              _____
                 ROBERT GORMLEY

PAGE 152

00152
01 S I G N A T U R E   P A G E
02          I, ROBERT GORMLEY, do hereby certify that I
03 have read the foregoing transcript of my testimony given
04 in the aforementioned matter, and further certify that
05 said transcript is a true, accurate and complete record
06 of said testimony.
07          Signed under the pains and penalties of perjury
08 this_____day of_____2005.
09
10              _____
                 ROBERT GORMLEY

SHEET 39  PAGE 153

```
00153
01  C E R T I F I C A T E   P A G E
02  COMMONWEALTH OF MASSACHUSETTS
03  COUNTY OF MIDDLESEX, SS
04                  I, Ellen Dubie, a Professional Court Reporter
05  and Notary Public in and for the Commonwealth of
06  Massachusetts, do hereby certify that the foregoing
07  deposition of ROBERT GORMLEY, having been duly sworn,
08  on TUESDAY, DECEMBER 6. 2005, is true and accurate to
09  the best of my knowledge, skill, and ability.
10                  In witness whereof, I have hereunto set my
11  hand and Notary Seal this    day of          , 2005.
12
13                  ELLEN DUBIE, Notary Public
14                  My Commission Expires:  March 9, 2012
15
16  PLEASE NOTE:  THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
17  DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY
18  MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION
19  OF THE CERTIFYING REPORTER.
20
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.: 05CV10304WGY

ROBERT GORMLEY,                    *
                                   *
            Plaintiff              *
                                   *
vs.                                *
                                   *
WERNER LADDER CO. AND               *
HOME DEPOT U.S.A., INC.,            *
                                   *
            Defendants             *


## PLAINTIFF'S ANSWERS TO DEFENDANT, WERNER LADDER CO.'S FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1

Identify each person by name, employer, address and telephone number who has either used the ladder or had possession of the ladder from the time it left the hands of its manufacturer to the date these interrogatories are answered and state the approximate dates when each said person was in possession of the ladder.

### ANSWER NO. 1

Plaintiff objects to this interrogatory as it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the foregoing objections, and subject thereto, Plaintiff states the ladder was purchased by William Doran, 217 Newbury Avenue, Quincy, MA at Home Depot in the Spring of 2001. The ladder was purchased for Plaintiff's employer Marina Bay, 333 Victory Road, Quincy, MA and stayed in possession of Marina Bay until the incident on January 16, 2002. Plaintiff, Robert Gormley, 45 Grandview Ave., Quincy, MA 02170, used the ladder at that time. The ladder is currently in possession of Plaintiff's counsel.

## INTERROGATORY NO. 2

State each respect in which you allege that the ladder was defective, describing separately:

    a.  The precise nature of each defect;

    b.  Each aspect of the design of the ladder which you contend was defective;

    c.  The manner in which you allege that the ladder was defectively manufactured;

    d.  The manner in which you allege that the ladder was defectively inspected and tested;

    e.  Each warning and instruction which should have been given and each warning which was not adequately given; and

    f.  The precise manner in which each alleged defect caused or contributed to cause your alleged injury or loss.

## ANSWER NO. 2 (a-f)

Plaintiff objects to this interrogatory as it requires him to render expert legal and medical opinions, which are areas reserved for expert testimony. Plaintiff further objects as this interrogatory seeks information protected from discovery by the attorney-client privilege and work product doctrine. Without waiving the foregoing objections, and subject thereto, Plaintiff states it is not possible to give a complete answer to this interrogatory at this time as discovery is still in its early stages. Subject to further discovery and investigation, defendant's ladder was defective, in part, because the right rear side rail failed while the ladder was being used as intended and in a foreseeable manner. Plaintiff further refers defendant to Plaintiff's complaint and to the documents and photographs produced in connection with defendant's request for production.

## INTERROGATORY NO. 3

State each and every fact on which you rely to support your responses to subparts (a) through (f) on Interrogatory 2.

## ANSWER NO. 3

See Answers to Interrogatory Nos. 2 and 5.

## INTERROGATORY NO. 4

Identify each and every document which contains information on which you rely to support your responses to subparts (a) through (f) of Interrogatory 2.

## INTERROGATORY NO. 8

Identify each person by name, employer address and telephone number who was at the scene of the incident at any time on the date of the incident.

## ANSWER NO. 8

The following individuals were at the scene of the incident and/or have knowledge of the incident:

Rick Mahoney
333 Victory Road, Quincy, MA 02169 (current as of date of incident)

Jimmy Glynn
46 Independence Avenue, Quincy, MA 02169

Joe Cappelli
20 Woodman Terrace, Hanson, MA 02341 (current as of date of incident)

William Doran
217 Newbury Avenue, Quincy, MA 02171

William Brownlow
40 Beebe Road, Quincy, MA  02169

Bill Weed
260 Victory Road, Quincy, MA 02169

John Covert
39 Coniston Street, Roslindale, MA 02131

Plaintiff reserves the right to supplement this answer.

## INTERROGATORY NO.9

Identify each employer by name, address and telephone number you have had since January 1, 1990 and with respect to each, state the dates, the nature of your employment, and your experience, if any, working with ladders.

## ANSWER NO. 9

Plaintiff objects to this interrogatory as it is not reasonably limited in time or scope, is unduly burdensome and is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the foregoing objections, and subject thereto, Plaintiff states that he was employed by the landscaping company Gardener's Guild in Marshfield, MA from approximately 1991 to 1995. He was then employed by Flagship Marinas, Marina Bay, 333 Victory Road,

Quincy, MA 02171 from approximately 1995 to 2002 as a Boatwright.  He is currently employed by Association of Blind Citizens, 55 North Franklin Street, Holbrook, MA 02343. While employed by Flagship Marina, I worked with ladders on most days.

## INTERROGATORY NO. 10

Identify each person by name, employer, address and telephone number who has knowledge or information relative to the injuries and losses for which you seek recovery in this case.

## ANSWER NO. 10

See Answer to Interrogatory No. 8 above and Plaintiff's Automatic Disclosure.  Plaintiff also states:

Lauren H. Gormley
45 Grandview Avenue, Quincy, MA 02170

Plaintiff also refers defendant to individuals identified in his medical records, which are produced in connection with defendant's request for production.  Plaintiff reserves the right to supplement this answer.

## INTERROGATORY NO. 11

Identify each person by name, employer, address and telephone number who has knowledge or information relative to the incident and/or the subject ladder.

## ANSWER NO. 11

See Answer to Interrogatory No. 10 above.

## INTERROGATORY NO. 12

Identify each person who may testify in this matter on your behalf as an expert witness and with respect to each witness:

- a.  State the subject matter on which he or she is expected to testify;
- b.  State the substance of the facts or opinions to which he or she is expected to testify; and
- c.  Summarize the grounds for each opinion.

## ANSWER NO. 12 (a-c)

No decisions as to trial experts have been made at this time.  Plaintiff reserves the right to supplement this answer in accordance with the Scheduling Order and the Federal Rules of Civil Procedure.

5

**INTERROGATORY NO. 13**

Identify every hospital, clinic and other health care institution at which you received care since January 1, 1990 and with respect to each state the dates and nature of the care you received.

**ANSWER NO. 13**

Plaintiff objects to this interrogatory as it is not reasonably limited in time or scope, is unduly burdensome and is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the foregoing objections, and subject thereto, Plaintiff treated for injuries including, but not limited to, a torn rotator cuff and nerve damage in his left arm and shoulder, as well as thoracic outlet syndrome, from January 16, 2002 to the present at the following medical providers: Dr. Renee Goetzler, Carney Hospital, Quincy Medical Center, Dr. David Blaustein, Dr. Charles Fathalla, Dr. Richard Hawkins, Weymouth MRI/ Dr. Owen McConville, Dr. Allen Curtis, Massachusetts General Hospital Physical Therapy, Dr. Christopher Rynne, Dr. Ronald Birkenfeld, Dr. Spangler, Rehabilitation Specialists and Spine, Sports and Rehabilitation. Plaintiff further refers defendant to his medical records, produced in connection with defendant's request for production.

**INTERROGATORY NO. 14**

Identify every physician, psychiatrist, psychologist and therapist from whom you have received treatment, counseling or therapy since January 1, 1990 and with respect to each state the dates and nature of the care, treatment, counseling or therapy you received.

**ANSWER NO. 14**

See Answer to Interrogatory No. 13 above.

**INTERROGATORY NO. 15**

Identify each school or other educational institution that you have attended, and state the date you attended each.

**ANSWER NO. 15**

Plaintiff graduated from North Quincy High School in 1980. He graduated from Massasoit Community College in Brockton, MA with an Associates in Business Management in August, 2005.

**INTERROGATORY NO. 16**

Describe each act or omission that you contend constituted negligence on the part of Werner Co. or on the part of any of its officers, agents or employees.

**ANSWER NO. 16**

Plaintiff objects to this interrogatory as it requires him to render expert legal and medical opinions, which are areas reserved for expert testimony. Plaintiff further objects as this interrogatory seeks information protected from discovery by the attorney-client privilege and work product doctrine. Without waiving the foregoing objections, and subject thereto, Plaintiff states that defendant Werner and its agents were negligent in the design, manufacture, sale and distribution of its ladder, and in failing to warn consumers of the unreasonably dangerous and defective condition of the ladder. Also, Werner breached the implied warranty of merchantability and/or fitness for a particular purpose, when it sold the ladder. Plaintiff further refers defendant to Plaintiff's Complaint and to the documents and photographs produced in connection with defendant's request for production.

**INTERROGATORY NO. 17**

Identify each person who provided medical care or assistance to you at the scene of the incident and describe the nature of the care and assistance.

**ANSWER NO. 17**

See Answer to Interrogatory No. 13 above.

**INTERROGATORY NO. 18**

Identify any advertising materials that you relied on in using the ladder in the manner that you were using it at the time of the incident.

**ANSWER NO. 18**

Plaintiff is not aware of any such advertising materials.

**INTERROGATORY NO. 19**

State whether you contend that the ladder did not conform to any industry, governmental or other organizational standards, laws, codes, recommended practices, regulations, or procedures at the time that it left the control of its manufacturer and if so, describe:

   a.  each such standard, law code, recommended practice, regulation or procedure;

   b.  the precise manner in which the ladder was not in conformity with each standard, law, code, recommended practice, regulation or procedure;

   c.  the precise manner in which the alleged nonconformity contributed to cause the incident and your alleged injuries and damages.

7

## INTERROGATORY NO. 24

Identify by name, address, employer and telephone number each person who has provided a written or recorded statement relative to the ladder and/or the incident.

## ANSWER NO. 24

Other than statements detailed in Plaintiff's medical records, Plaintiff is unaware of any additional written or recorded statements.

## INTERROGATORY NO. 25

State the date and manner in which you first provided notice to Werner Co. of your breach of warranty claims to which reference is made in the Complaint.

## ANSWER NO. 25

Plaintiff refers defendant to correspondence mailed on November 12, 2004 and other documents produced in connection with defendant's request for production.

## INTERROGATORY NO. 26

Identify any photographs, diagrams, sketches, plans or other documents which depict or describe the scene of the incident and/or the manner in which the ladder was erected immediately prior to the incident.

## ANSWER NO. 26

Plaintiff objects as this interrogatory seeks information protected from discovery by the attorney-client privilege and work product doctrine.

## INTERROGATORY NO. 27

State the following with respect to sale of the ladder:

   a.  name, address and telephone number of each person(s) who purchased or sold the
       ladder;

   b.  the date of each purchase and sale of the ladder.

## ANSWER NO. 27 (a-b)

William Doran, 217 Newbury Avenue, Quincy, MA purchased the ladder at Home Depot in the Spring of 2001.

## INTERROGATORY NO. 28

Identify your employer at the time of your accident, including your immediate supervisor and all persons whom you worked with on the day of your accident.

## ANSWER NO. 28

At the time of the incident I was employed by Flagship Marinas, Marina Bay, 333 Victory Road, Quincy, MA 02171. My immediate supervisor was Rick Mahoney. Plaintiff refers defendant to Answer to Interrogatory No. 8 above for further information responsive to this interrogatory.

Signed under the pains and penalties of perjury this 12 day of September, 2005.

Robert Gormley

As to Objections:

Edward M. Swartz
BBO No. 489540
James A. Swartz
BBO No. 556920
Jonathan Sweet
BBO No. 634775
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
(617) 742-1900

## CERTIFICATE OF SERVICE

I, James A. Swartz, do hereby certify that the foregoing document was served on the following counsel on this date and in the manner specified herein:

VIA FIRST CLASS MAIL:

Brian Voke, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza, 3rd Floor
Boston, MA 02109

This ___5___ day of October, 2005.

James A. Swartz

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHSUETTS

| | |
|---|---|
| ROBERT GORMLEY ) | |
| PLAINTIFF ) | |
| ) | CIVIL ACTION |
| VS. ) | NO: 05CV10304WGY |
| ) | |
| WERNER LADDER CO., ) | |
| INC.,  AND HOME DEPOT ) | |
| U.S.A., INC. ) | |
| DEFENDANTS ) | |

## AFFIDAVIT OF FREDERICK BARTNICKI

I, Frederick Bartnicki, being duly sworn on my oath, depose and state as follows:

1.      I am a registered professional engineer in the Commonwealth of Pennsylvania.  I have a B.S. in Civil Engineering from Penn State University.

2.      I have worked as an engineer designing and testing all types of ladders and ladder components for the defendant Werner Co., 93 Werner Road, Greenville, PA, for the last 26 years, including fiberglass stepladders.  I am currently a senior engineer at Werner Co.

3.      I was deposed in the above-captioned action and testified on behalf of Werner Co. including providing testimony concerning the design of the subject model FS 100 fiberglass stepladder which I am familiar with.

4.      The Werner model fiberglass stepladders that contain similarly designed side rails are the FS 100, 6000 and 6000S series fiberglass ladders.  These model ladders are structurally similar and have a similar cross section with the same composite material.

5.      Other model fiberglass stepladders that Werner manufactures contain a completely different design from the FS 100, 6000 and 6000S series fiberglass ladders.  The rails, including the rear rails to the other model fiberglass stepladders  are designed differently in terms of their dimensions including thickness, width and height.  The ladder steps, tops, rear sections, spreaders, taper, foot pads, shoes and size of the other model fiberglass stepladders are all

different from the FS 100, 6000 and 6000S series model fiberglass ladders. The other model fiberglass stepladders also contain different duty and load ratings from the FS 100, 6000 and 6000S series model fiberglass stepladders. The horizontal bracing, knee bracing and bottom step bracing of the other model fiberglass stepladders are also different from the FS 100, 6000 and 6000S series model fiberglass ladders. Finally, the rails of the FS 100, 6000 and 6000S series model fiberglass ladders are also manufactured differently within the cross section of the ladders compared to the other model fiberglass ladders.

SWORN UNDER THE PAINS AND PENALTIES OF PERJURY

FREDERICK BARTNICKI

DATE: _01/10/06_

Subscribed and sworn before me this 10th day of January, 2006.

Notary Public

My Commission Expires  Sept. 4, 2007

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Sharon A. Williams, Notary Public
Sugar Grove Twp., Mercer County
My Commission Expires Sept. 4, 2007
Member, Pennsylvania Association Of Notaries

# Gormley
## vs.
## Werner Ladder and Home Depot

## Werner Ladder Co. by Bartnicki

### Volume 1

November 18, 2005
pp 1-198

**JonesReporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 1

1                                            Volume:  I

2                                            Pages:  1 to 198

3                                            Exhibits:  1 to 35

4                 UNITED STATES DISTRICT COURT

5                 DISTRICT OF MASSACHUSETTS

6                                      CIVIL ACTION

7                                      NO.: 05CV10304WGY

8       --------------------------------

9       ROBERT GORMLEY,                     )

10                     Plaintiff,           )

11      vs.                                  )

12      WERNER LADDER CO. AND                )

13      HOME DEPOT U.S.A., INC.,             )

14                     Defendants.          )

15      --------------------------------

16            DEPOSITION OF WERNER LADDER CO.

17        By its designee FREDERICK BARTNICKI

18           Friday, November 18, 2005

19                 9:34 a.m.

20                 Held at:

21             Swartz & Swartz

22            10 Marshall Street

23            Boston, MA  02108

24        Reporter:  Kathryn L. Santo

Werner Ladder Co. by Bartnicki

Page 58

1      A.   Depends on the retail establishment.
2      Q.   Approximately?
3      A.   Boy. I'd say you're probably looking at
4   between 69 bucks and 99 bucks, somewhere in there,
5   depending where you would buy the ladder.
6          MR. SWARTZ: Mark these as the next two
7   exhibits.
8          (Documents marked as Bartnicki
9          Exhibits 5 and 6 for identification)
10     Q.   I guess starting out, they were marked --
11  I'm showing you now marked Exhibits 5 and 6. If we
12  could actually just start with 6 initially. That
13  says -- it says at the top, "Suggested Retail Price
14  List 2005," and Werner's name appears at the top;
15  correct?
16     A.   Yes.
17     Q.   All right. And down -- have you seen
18  price lists like this before?
19     A.   Yes.
20     Q.   Okay. And down -- this ladder, the
21  subject ladder, is that a 6000 series ladder?
22     A.   No.
23     Q.   What series is it?
24     A.   It's an FS100.

Page 59

1      Q.   Okay. In any event, the FS100 ladder --
2   let me ask you this question -- you say FS100?
3      A.   Yes.
4      Q.   Okay. Is the 6000 series that appears on
5   Exhibit 6 -- do you see where I'm pointing now?
6      A.   Yes.
7      Q.   Is that related to the FS100 series at
8   all? In other words -- let me ask it this way: Is
9   it a later rendition of that or model?
10     A.   No.
11     Q.   Are the FS series still sold today?
12     A.   Yes.
13     Q.   Okay. What are the -- is the subject
14  ladder a Type I 250-pound duty rating?
15     A.   Yes.
16     Q.   Are there differences between what's
17  shown on here, Exhibit 6, the 6000 series and the
18  FS100 series?
19     A.   Yes.
20     Q.   And what are those differences?
21     A.   The color scheme of the ladder is one.
22  Certainly, the customer base, you know, who sells
23  the 6000 versus the FS100. Not much from a design
24  standpoint difference.

Page 60

1      Q.   Okay. Is the pricing different? I'm
2   just looking to the right on this particular
3   exhibit, and it looks like the prices range from
4   $112 actually up to over $200 in some instances,
5   but is that pricing similar to the FS pricing?
6      A.   No.
7      Q.   The FS is cheaper?
8      A.   Well, it's marketed differently, so
9   it's -- you know, it wouldn't have this kind of
10  information the same way presented because it's
11  marketed to a different set of, you know,
12  customers.
13     Q.   The FS100 series, what customer does that
14  market to?
15     A.   I'd say primarily and -- yeah. Lowe's.
16     Q.   And the 6000 series, who is that marketed
17  to?
18     A.   You see that -- you're going to see a
19  6000 more on the other customers like the Ace
20  Hardwares, the Sherwin-Williams stores.
21     Q.   And are the differences essentially
22  marketing differences?
23     A.   Yes.
24     Q.   And I'm showing you Exhibit 5. Werner

Page 61

1   has a web site; correct?
2      A.   Yes.
3      Q.   Okay. And you're aware that there are
4   products, Werner products listed in a catalog on
5   your web site?
6      A.   Correct.
7      Q.   All right. And does this appear to you
8   to be a printout of at least one page from that web
9   site?
10     A.   Yes.
11     Q.   All right.
12     A.   There's more than one page.
13     Q.   Yes. I mentioned that this is one page
14  here.
15     A.   Yeah. I was looking at it. It looked
16  like it was more, but it's just on heavy paper.
17     Q.   On Exhibit 5, the FS100 series appears on
18  that page; correct?
19     A.   Yes.
20     Q.   All right. And Werner manufactures and
21  distributes other 8-foot 250-pound duty-rated
22  Fiberglas ladders; correct -- or stepladders, I
23  should say; is that right?
24     A.   Other than the FS --

16 (Pages 58 to 61)

Werner Ladder Co. by Bartnicki

Page 62

1  Q.  Yes.
2  A.  -- series?  Yes.
3  Q.  Okay.  And that includes the one you're
4  just talking about, the 6000 series; correct?
5  A.  Correct.
6  Q.  And it includes the 6000S series;
7  correct?
8  A.  Correct.
9  Q.  And it includes the T6000 series;
10 correct?
11 A.  Right.
12 Q.  Are there other -- any other 8-foot
13 250-pound duty-rated Fiberglas stepladders that
14 Werner manufactures themselves?
15 A.  Yes.
16 Q.  What are those?
17 A.  We have another one called a PT6000.
18 Q.  Okay.
19 A.  I would say it's more similar to the
20 T6000.  It has steps on both sides.
21 Q.  Any others?
22 A.  Yes.  We have a Keller line of Fiberglas
23 stepladders also.
24 Q.  And the Keller line, how many different

Page 63

1  types of 8-foot Fiberglas stepladders that are
2  rated 250 pounds does Keller sell?
3  A.  Well, it's a Werner --
4  Q.  Okay.  I'm sorry.
5  A.  Werner sells, not Keller.
6  Q.  Sure.
7  A.  We own the Keller name now.
8  Q.  Under the Keller name?
9  A.  Under the Keller name is one series.  I'm
10 not sure if it's the 8700 or the 9700.  I'm not
11 sure which.
12 Q.  And are Keller ladders distributed
13 differently than the Werner labels?
14 A.  Yes.
15 Q.  How so?
16 A.  They're primarily targeted for
17 customer -- you know, a specific customer.
18 Q.  Like?
19 A.  For example, you're not going to see a
20 Keller ladder in a Lowe's store.
21 Q.  Where would you see a Keller ladder?
22 A.  One of our accounts is Menard's.  They're
23 Midwest, big -- they're another kind of a
24 Lowe's-type store, but they're more regional than

Page 64

1  that.  Minnesota is one big location for Menard's.
2  Q.  Are there any other labels that -- under
3  which Werner sells the same types of ladders, that
4  is, the 8-foot Fiberglas ladders?
5  A.  Stanley.
6  Q.  Any others?
7  A.  No.
8  Q.  Where are Stanley ladders distributed?
9  A.  Wal-Mart stores.
10 Q.  And the ladders that are under these
11 different labels -- you mentioned Stanley, Keller,
12 and, of course, Werner -- are the designs
13 essentially the same?  In other words, for an
14 8-foot Type I 250-pound load capacity Fiberglas
15 stepladder, say, for the different labels or maybe
16 some different colors, are they the same design,
17 essentially?
18 A.  No.  Keller and Stanley lines are
19 different designers.
20 Q.  How are they different?
21 A.  Well, they use different step extrusions,
22 different spreaders, different rear sections,
23 different tops.  I mean, they're very different.
24 More than just the color schemes, things like that.

Page 65

1  Q.  Are the rails manufactured in a different
2  way?
3  A.  In a different way?  I mean, the process
4  is all pretty much the same.  Is there differences
5  within the cross section, the composite?  Yeah.  I
6  think so there is, yeah.  I believe there is.
7  Q.  When you make a rail for a Keller
8  ladder -- "you" being -- I'm asking Werner.  When
9  Werner makes a rail for a Keller ladder, would they
10 make that rail in a different way for a Werner
11 ladder?  I'm talking just specifically about the
12 rail.
13 MR. VOKE:  Objection.
14 A.  I believe it's a different design rail,
15 yes.
16 Q.  How so?
17 A.  Different dimensionally, thickness,
18 width, height.
19 Q.  Specifically, how is it different?  What
20 is -- let's take the --
21 A.  I don't know.
22 Q.  -- subject ladder.
23 A.  Okay.
24 Q.  And that model, FS100, what would be the

17 (Pages 62 to 65)

Werner Ladder Co. by Bartnicki

Page 178

1  this customer? I'm looking at Exhibit 32.
2      A.  Because it exhibited significant
3  weathering.
4      Q.  How did Werner come across this ladder?
5  Why was it returned to Werner?
6      A.  I think for that purpose, to evaluate a
7  ladder that's been weathered.
8      Q.  Is this about --
9      A.  One that exhibits effects that appear to
10 be significant, at least from a visual standpoint.
11 It was fading and things like that.
12     Q.  Was the evaluation done in conjunction
13 with litigation?
14     A.  No.
15     Q.  Was there any cracking in the rails of
16 this ladder?
17     A.  I -- I don't see anything noted on there,
18 but I couldn't say, one way or the other.
19     Q.  Do you expect that would be noted, if
20 there was?
21     A.  Yeah, I would.  If there's something
22 significant about it, yeah.  I think that that
23 would be noted.
24     Q.  Exhibit 33, is that the ANSI standard

Page 179

1  that applies to the subject ladder with regard to
2  testing?
3      A.  Yes.
4      Q.  Since -- the manufacturer of the subject
5  ladder have the ANSI standards changed in any
6  respect, with respect to, specifically testing the
7  rails?
8          (Interruption)
9      A.  No.
10     Q.  Is that the 2005 -- I just handed you a
11 document, 2005 Werner catalog.
12     A.  Yeah.  It looks to be the catalog, yes.
13 At least a format that we use, yeah.
14     Q.  That's a catalog that's available on your
15 web site; correct?
16     A.  Probably.  I haven't looked at it lately,
17 but yeah.  I assume so.
18     Q.  And if I could direct your --
19         MR. SWARTZ:  First, why don't we mark
20 that as the next exhibit.
21         (Document marked as Bartnicki
22         Exhibit 34 for identification)
23     Q.  In Exhibit 34, does the 2005 rendition of
24 the subject ladder appear in that catalog?

Page 180

1      A.  No.
2      Q.  And the subject ladder --
3      A.  FS108?
4      Q.  Yes.
5      A.  No.
6      Q.  And that's still sold as an FS108 today?
7      A.  Yes.
8      Q.  All right.  Are there other ladders in
9  here that are structurally, essentially the same?
10     A.  Yes.  The 6000, 6000S are very similar.
11     Q.  Any others?
12     A.  No.
13     Q.  And the 6000 and 6000S Fiberglas
14 stepladders appear on Page 2 of the catalog;
15 correct?
16     A.  Yes.
17     Q.  And is there anything different about the
18 FS series ladders sold today, compared to the 6000
19 and 6000S?
20     A.  Again, color.
21     Q.  Other than color, anything else?
22     A.  No.
23     Q.  And in this catalog on Page 51 towards
24 the end, there are certain stepladder accessories

Page 181

1  that are offered by Werner; correct?
2      A.  61?
3      Q.  51.
4      A.  Yes.
5      Q.  Those include Fiberglas rail shields;
6  correct?
7      A.  Yes.
8      Q.  Are you -- you testified earlier in the
9  day that you've been involved in investigating
10 claims previously where there were allegations of
11 cracking or splitting along the side rail of
12 Fiberglas ladders; is that fair to say?
13     A.  Well, I've been involved in
14 investigations where my investigation revealed that
15 there was cracking or splitting of a rail.
16     Q.  And how many of those have there been?
17     A.  I don't know.  A handful maybe.
18     Q.  Four or five?
19     A.  Yeah.
20     Q.  Over the course of what years?
21     A.  25, 26.
22     Q.  Prior to 2002?
23     A.  Which -- prior to 2002?  What do you
24 mean?

46 (Pages 178 to 181)

Werner Ladder Co. by Bartnicki

Page 186

1    Q.   Have you seen printouts of complaint
2   reports from a computer?
3    A.   Yeah.
4    Q.   And what are on those reports?
5    A.   Typically, the plaintiff's name, the
6   person who's making the complaint, model, nature of
7   maybe damage to the product, and then a location.
8   And then if there's some resolution, whether or not
9   it's open, closed, you know, status of it.
10    Q.   Are you aware that in this litigation,
11   request was made for complaints relating to
12   fracturing of rear side rails on Fiberglas ladders?
13    A.   I know there's been an inquiry about the
14   complaints. I don't know the nature -- the
15   specific nature of that inquiry. My understanding
16   was similar ladders with similar type -- you know,
17   with fracturing of the rear section.
18    Q.   And did you yourself conduct a search for
19   those complaints?
20    A.   No.
21    Q.   Who did?
22    A.   Someone in legal department.
23    Q.   If you were going to look for one of
24   those complaints, where would you go?  The

Page 187

1   computer?
2    A.   Go to the legal department. Ask them.
3    Q.   Do you have access to those computer
4   records yourself if you wanted to look?
5    A.   Not generally, no. Somehow, you have to
6   go through legal, generally. I mean, I don't
7   keep -- I don't keep that records, nor do I -- I
8   don't really have direct access to that. I would
9   go through the legal department.
10    Q.   When you say you "go through the legal
11   department," can you sit at your computer and look
12   at them?
13    A.   No.
14    Q.   You can get a printout if you want?
15    A.   Yeah. I could, yeah. From legal, yes.
16    Q.   What complaints are you aware of
17   regarding fracturing in Fiberglas ladders?
18    A.   I am aware of the one that we provided.
19    Q.   Are you aware of any others?
20    A.   Of Fiberglas ladders, in general?
21    Q.   Yes.
22    A.   Yeah. I'm aware of others that have
23   occurred on other types of Fiberglas ladders, yeah.
24    Q.   How many such complaints are there of

Page 188

1   those?
2    A.   Well, personally, from my personal
3   experience, the ones I've investigated, about two
4   or three.
5    Q.   And how about others that you haven't
6   personally investigated?
7    A.   I never really did a search that way.
8   I'm aware of the other one that's on a similar
9   ladder to this.
10    Q.   When you say "similar ladder to this,"
11   what do you mean?
12    A.   An FS100 or a 6000.
13    Q.   Did you look for complaints in
14   preparation for your deposition today relating to
15   fractures in side rails for other ladders using the
16   same pultrusion system?
17    A.   Right. Yes.
18    Q.   You did?
19    A.   Yes.
20    Q.   Personally?
21    A.   No, but that was -- that was my
22   understanding what the legal department found.
23   They certainly asked me, would I have similar
24   rails, and I provided them that information, and

Page 189

1   they conducted the search.
2    Q.   What's your definition of a "similar
3   rail"?
4    A.   It has a similar cross section made with
5   the same composite --
6    Q.   And --
7    A.   -- and the side rail.
8    Q.   And those particular ladders would be
9   which ones?
10    A.   6000 and the FS108, 6008 -- F --
11    Q.   You said FS108, which is the subject
12   model; correct?
13    A.   Right. And the 6008 or --
14    Q.   6008?
15    A.   Yeah.
16    Q.   Other than the FS108 and 6008, any
17   others?
18    A.   I think, generally, anything within the
19   6000 series or the FS100 series, really would have
20   the same side rail.
21    Q.   Apart from what you think, do you know
22   whether complaints were searched for those -- for
23   all ladders and the FS100 series and all ladders in
24   the 6000 series?

48 (Pages 186 to 189)

Werner Ladder Co. by Bartnicki

Page 190

1    A.   Yes.
2    Q.   Did Werner conduct a search for
3 complaints for any other series ladder or model
4 ladder?
5    A.   No.  I don't believe so.
6    Q.   Why not?
7    A.   Because the rails are different.  It's a
8 different design, totally different ladder.
9    Q.   What's different about it, about the
10 other ladder?
11    A.   Gee, everything.  I mean, rails, steps,
12 tops, spreaders, foot pads, shoes.  Everything is
13 everything.  Size of the ladder, spread, taper.
14    Q.   Does Werner make rail shields for these
15 other types of Fiberglas ladders that you talked
16 about?
17    A.   Yeah.
18    Q.   And that's to strengthen the rails;
19 correct? -- in part?
20    A.   Well, it's not going to strengthen the
21 rail.  It's going to strengthen the ladder, the
22 system, you know.  It's going to provide more abuse
23 resistance or provide a means to repair an already
24 damaged ladder, if it's in a condition that can be

Page 191

1 repaired and still be used.
2    Q.   And that's with regard to fracturing of a
3 side rail; correct?
4    A.   Correct, yes.
5    Q.   And that issue is addressed by these rail
6 shields, regardless of the model of the ladder;
7 correct?
8    A.   Yes.  Right.  It's not -- right.  It's
9 not model dependent.
10        MR. SWARTZ:  Why don't we mark this as an
11 exhibit.
12        (Document marked as Bartnicki
13        Exhibit 35 for identification)
14    Q.   I'm showing you what's been marked as
15 Exhibit 35.  Is that the complaint that you were
16 referring to earlier?
17    A.   Yes.
18    Q.   And what were the allegations in this
19 case?
20    A.   I don't know.
21    Q.   Were there allegations of fracturing of a
22 side rail?
23    A.   Well, there's -- apparently, that -- I
24 mean, that was one of the end results of the

Page 192

1 accident, was fracturing in the side rail.  That
2 was the condition of the ladder when we -- you
3 know, whatever investigation we did on it, there
4 was some fracturing into the side rail, yes.
5 Whether or not that was the allegation that was the
6 cause, I don't know.
7    Q.   You don't know?
8    A.   No.
9    Q.   Why did you use this particular complaint
10 in this case?
11    A.   Because it's on a similar-type ladder,
12 and it involved fracturing of a side rail.
13    Q.   And what was the outcome of this case?
14    A.   It was settled out of court.
15    Q.   When?
16    A.   Within the last five years.  2000, 2001,
17 somewhere in there.
18    Q.   The complaint itself was filed in
19 February of 1998; correct?  Looking at the last
20 page.
21    A.   Yes.
22    Q.   Was your deposition taken in this case?
23    A.   No.
24    Q.   And this case is being the plaintiff as

Page 193

1 Gajate, G-A-J-A-T-E; correct?
2    A.   Correct.
3        (Pause)
4    Q.   What happened in this case; do you know,
5 to the plaintiff?
6    A.   No.  Specifically, no.  Suffered injury.
7 I can see that, but I don't know what his physical
8 injuries were.
9    Q.   How did the incident happen; do you know?
10    A.   Not specifically, no.  Just that -- I
11 believe there's -- involved him impacting the
12 ladder during his fall, but other than that, I
13 don't recall anything else.
14    Q.   Have you been to the site of the
15 accident?
16    A.   This one?
17    Q.   Yes.
18    A.   No.
19    Q.   And "this one," just to be clear -- okay.
20 "This one," you're pointing to Exhibit 35?
21    A.   35.
22    Q.   Okay.
23    A.   No.
24    Q.   How about in the subject case, the

49 (Pages 190 to 193)

Werner Ladder Co. by Bartnicki

Page 198

```
1   PLEASE ATTACH TO THE DEPOSITION OF:
2   FREDERICK J. BARTNICKI
3   DATE TAKEN:  Friday, 11/18/05
4   CASE:  Gormley V Werner Ladder Company, et al.
5         ERRATA SHEET
6   PAGE    LINE    CHANGE        REASON
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15       I have read the foregoing transcript of
16  my deposition, and except for any corrections or
17  changes noted above, I hereby subscribe to the
18  transcript as an accurate record of the statements
19  made by me.
20
21  Executed this _____ day of _____, 2005.
22
23  _____
24  FREDERICK J. BARTNICKI
```

51 (Page 198)

Werner Ladder Co. by Bartnicki

198

1    PLEASE ATTACH TO THE DEPOSITION OF:

2    FREDERICK J. BARTNICKI

3    DATE TAKEN:  Friday, 11/18/05

4    CASE:  Gormley V Werner Ladder Company, et al.

5                        ERRATA SHEET

6    PAGE       LINE      CHANGE                    REASON

7    36         23        Bajer to Bayer

8    38         1         TRYZYNAKA to TRYZYNKA

9    47         7         Plotner to Plotner

10   52         18        defected to defective

11   64         19        designers to designs

12   72         1         PIN to PAINT

13   83         16        Lob to Ladder

14   84         6         buildinga to built into a

15          I have read the foregoing transcript of

16   my deposition, and except for any corrections or

17   changes noted above, I hereby subscribe to the

18   transcript as an accurate record of the statements

19   made by me.

20

21   Executed this _14th_ day of _December_, 2005.

22

23   _____

24   FREDERICK J. BARTNICKI

Gormley v. Wiener

FOB dep dated 11/18/05

78

1                          ERRATA SHEET

2    PAGE              LINE                    CORRECTION

3    _106_             _11_          MORE to here

4    _113_             _8_           manually to a manual

5    _114_             _14_          divide to PROVIDE

6    _117_             _12_          catings to COATINGS

7    _129_             _8_           resistant to resistance

8    _148_             _9_           71518 to 7158

9    _148_             _13_          connected to conductor

10   _157_             _22_          add "without" before "ultimate"

11   _165_             _12_          roll of to relative

12   _168_             _14 &15_      high to "I"

13   _171_             _18_          from to some

14   ___               ___           ___

15   ___               ___           ___

16   ___               ___           ___

17   ___               ___           ___

18   ___               ___           ___

19   ___               ___           ___

20   ___               ___           ___

21   ___               ___           ___

22   ___               ___           ___

23   ___               ___           ___

24   ___               ___           _Frederick J Bartoli_