UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHSUETTS

| | |
|---|---|
| ROBERT GORMLEY<br>       PLAINTIFF | ) <br> ) <br> ) |
| VS. | ) <br> ) |
| WERNER LADDER CO.,<br>INC., AND HOME DEPOT<br>U.S.A., INC.<br>       DEFENDANTS | ) <br> ) <br> ) <br> ) |

CIVIL ACTION
NO: 05CV10304WGY

## WERNER CO.'S SUPPLEMENTAL RULE 26 DISCLOSURES

Werner Co. made the following expert disclosures on March 1st and 2nd, 2006.

1.    Fred Bartnicki
      Engineer
      Werner Co.
      Greenville, PA

2.    Dr. Stephen Saris
      Neurologist
      Neurosurgery Associates
      3 Davol Square
      Providence, RI

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of *Werner Co.'s Supplemental Rule 26 Disclosures,* was served upon all counsel of record for each party by facsimile and first class mail on April l(___, 2006.

WERNER LADDER COMPANY
By Its attorneys,

CAMPBELL CAMPBELL EDWARDS & CONROY
PROFESSIONAL CORPORATION

Brian P. Voke (BBO# 544327)
One Constitution Plaza
Boston, MA 02129
(617) 241-3000

3/1/06



**93 Werner Road**          **Engineering FAX (724) 588 - 2448**
**Greenville, PA 16125 - 9499**  **Phone (724) 588 - 2000**

March 1, 2006

Mr. Brian Voke
**Campbell, Campbell, Edwards & Conroy, P.C.**
Attorneys at Law
One Constitution Plaza
3rd Floor
Boston, MA 02129

Dear Mr Voke:

Attached is my expert's report regarding the lawsuit of **Robert Gormley vs. Werner Co.** I have attached a copy of my CV and list of my expert testimony for the last four years as well. Please let me know if you require anything further

Sincerely,

Frederick J. Bartnicki, P.E.
**Werner Co.**

0



**93 Werner Road**
**Greenville, PA 16125 - 9499**

**Engineering FAX (724) 588 - 2448**
**Phone (724) 588 - 2000**

**SUBJECT: Federal Rule 26(b) Expert's Report of Fred Bartnicki, P.E.**
**ACTION: Robert Gormley v. Werner Co.**
**PRODUCT: Model FS108 Mk 2 Fiberglass Stepladder**

<u>Documents Reviewed or Relied Upon in Preparing This Report</u>

I reviewed and/or relied upon the following documents in preparing this report:

- Deposition of Mr. Robert Gormley dated December 6, 2005 with attached exhibits
- Deposition transcript of Lauren Gormley dated December 6, 2005
- Deposition transcript of Richard W. Mahoney dated January 12, 2006
- Deposition transcript of William Brownlow dated December 7, 2005
- Deposition transcript of John H. Covert dated December 7, 2005
- Deposition transcript of James Glynn, III dated December 7, 2005
- Deposition transcript of Stephen Smith dated December 19, 2005
- Deposition transcript of William Weed dated December 19, 2005
- Deposition transcript of Joseph Capilli dated December 19, 2005
- Report of Plaintiff Expert, Stanley Kiska, Integra Engineering, P.C., dated January 25, 2006
- Video testing conducted by Stanley Kiska
- CD of photographs of the inspection and Testing conducted by Stanley Kiska
- Set of color copies of 148 photographs provided by Defense Counsel taken on September 7, 2005
- Depositions of Frederick Bartnicki, P.E., Sr. Engineer, Werner Co., dated November 18, 2005 and December 19, 2005
- Affidavit of Frederick Bartnicki dated January 10, 2006
- Videotape of Testing of exemplar ladder conducted by Frederick Bartnicki on February 23, 2006
- Werner Co.'s Responses to Plaintiff's Interrogatories
- Drawings and other documents produced by Werner in response to Plaintiff's Request for Production of Documents
- Photographs and field notes of Frederick Bartnicki, P.E., generated during the inspection of the subject ladder on November 18, 2005 at plaintiff attorney's office.
- ANSI A14.5-1992 and OSHA standards
- Test reports and other exhibits provided by Werner Co. during Discovery

Circumstances of the Accident

Mr. Robert Gormley was injured on January 16, 2002 while using an 8' fiberglass stepladder to shrinkwrap a large sailboat for storage. The accident occurred in Storage Lot 40 at Marina Bay located at 260 Victory Drive in Boston Harbor. Mr. Gormley was a boatwright at Marina Bay and was assigned to run shrinkwrap crews at the time of his accident. Mr. Gormley described the boat that he was shrinkwrapping at the time of his accident as a large sailboat in excess of 30' in length, possibly as long as 40' that was resting on large sailboat stands with the deck estimated to be 10' above the ground. The Marina Bay repair records provided during Stephen Smith's deposition indicate the boat was likely an Irwin Avanti 34' sailboat. The shrinkwrapping crew that Mr. Gormley supervised at Marina Bay consisted of 8 men according to Mr. Gormley's testimony. The first crew of two, Mike Bray and Larry Monahan, located the boat to be shrinkwrapped, made sure the boat was winterized and prepped it for shrinkwrapping by knocking down all the antennas and bimini tops and canvas. Mr. Gormley did not recall which guys worked in the 2nd and 3rd crews. Other workers at the time were Mike Matranga, and Jim Glynn, another boatwright. The second crew of two would then frame out the shrinkwrap skeleton using 1x3 strapping and 2x3 braces and then run a hemline around the waterline of the boats hull. The hemline held the lower edge of the shrinkwrap in place. The third pair would then put the plastic over the top, make the welds in the plastic at the bow and transom, attach the plastic to the hemline and run the belly straps under the hull to tighten the plastic up. They would also use a heat gun to shrink the plastic and tighten it up. The hull would be done from the ground using a heat gun attached to the end of a telescoping fiberglass pole about 10' to 12' long. The pole had a piece of a bronze shaft attached to the end opposite to where the heat gun was attached for balance. The heat gun is a propane gun that weighs about 5 to 7 lbs., according to Mr. Gormley, and shoots out a flame from a nozzle that is 4" in diameter at the base and flares out to be approximately 12" wide at the end. To shrinkwrap the top above the deck required the stepladder and the pole with the heat gun attached since the framing extended approximately 4' to 5' above the deck and the plastic went over the top of the framing. Mr. Gormley was in the last pair that completed the shrinkwrapping. Joe Capilli was Mr. Gormley's partner. Mr. Capilli's job was to clean up the plastic scraps left from trimming the shrinkwrap while Mr. Gormley inspected the shrinkwrap for holes and tightened up the shrinkwrap using the heat gun. Mr. Gormley had worked on the same boat using the same ladder and pole with the heat gun the day prior to his accident. The following day, January 16, 2002, Mr. Gormley arrived at work approximately 7:00 – 7:15 a.m. He had been at the same boat approximately 15 minutes when his accident occurred at approximately 8:15 to 8:30 a.m. His partner, Joe Capilli was not with Mr. Gormley at the time of his accident because Mr. Gormley asked Mr. Capilli to fetch some supplies. Mr. Capilli had only gone a short distance, 30 or 35 feet, when he heard a yell, a scream and a crash and returned to the boat.

Prior to his accident, Mr. Gormley had positioned the subject ladder around the boat in five different places, each time pushing the ladder with one hand on the pavement to its new position. At each of the five prior positions, the ladder was positioned sideways to the boat because of space limitations due to the proximity of an adjacent boat. For the sixth position, the position where Mr. Gormley's accident occurred, he pushed the ladder so that it was positioned so he could face the boat with the rear legs of the ladder closest to the hull of the boat. He was able to do this since there was approximately 10 feet of space between the adjacent boat and the side of the boat he was shrinkwrapping. He then testified that he climbed to the 6th step of the ladder and began using the pole and heat gun to tighten the shrinkwrap. This he did by making passes back and forth over the plastic in arc-like movements. He was on the ladder approximately 2 minutes when he felt movement in the ladder. He testified that he felt his feet go to the left and as they did so he dropped the heat gun. As he continued to fall, his head and arms went to the right and he became parallel with the ground. He reached out with his left arm to grab the safety rail of the boat that is approximately 2' above the deck of the boat. The safety rail was beneath the plastic. He was able to grab the safety rail with his left hand but was unable to maintain his

grip. Grabbing the safety rail redirected his fall and he fell to the ground with his arms and legs in the air. Mr. Gormley testified that he landed on the ladder during his fall. He also believes he struck the crown of his head on the ground. He ended up lying next to the ladder on the ground with the ladder on its side and the top of the ladder behind his back. The heat gun was close enough to catch the leg of his insulated work suit on fire. He immediately kicked the heat gun away with his leg. Shortly after, Joe Capilli returned to the boat and found Mr. Gormley on the ground. Mr. Capilli then left to get help and returned with Jimmy Glynn and a couple other members of the work crew. They transported Mr. Gormley back to the mechanics shop on a golf cart. Rick Mahoney, the acting service manager, then came down from the office and directed Bill Brownlow to transport Mr. Gormley to the Quincy City Hospital in his car.

Mr. Gormley was 5'-10 ½" tall and weighed approximately 165-170 lbs. on the day of his accident.

<u>Accident Ladder Inspection</u>

I inspected the accident ladder on November 18, 2005 at the offices of Swartz and Swartz, plaintiff's attorney, located at 1 Marshall Street in Boston, Massachusetts. The subject ladder is a Werner Model FS108 Type I 250 lb. duty rated 8' fiberglass stepladder manufactured by Werner Co. in May 1999 at the Greenville facility. The highest standing level is the 6th step from the bottom of the ladder that is 5'-9" above the ground. My inspection consisted of photographing the ladder, taking measurements of various components and conducting Barber-Coleman (Barcol) hardness tests on the ladder side rails. The measurements and Barcol Hardness tests confirmed the ladder was manufactured in compliance with the Werner Co. engineering specifications. The engineering specifications and drawings are attached to this report. Testimony at trial will include my findings during my inspection of the subject ladder and that the subject ladder conformed to these engineering specifications for cross sectional dimensions of the side rails, spreaders and other components, that it was manufactured in accordance with the engineering specifications and that the material properties of the side rails were as intended by Werner Co.

The fiberglass side rails utilized in the FS108 are manufactured by the Continuous Pultrusion Process. An engineered polyester resin mix containing UV additives and pigment is utilized to bind longitudinal glass reinforcement called rovings and continuous strand fiberglass structural mat reinforcements together in a matrix to form a side rail cross section. A polyester surface veil encapsulates the entire composite to ensure a resin rich surface, provide additional UV protection and to prevent glass fibers from protruding through the outer surface of the side rails. The material is a thermoset material, which means that the resin is cured by the addition of heat. This heat is applied to a die that cures or causes the resin to solidify as the resin and glass reinforcements are pulled through the die. The die has openings on either end that allow the material to enter the die on front end and exit the die in the finished shape of the cross section of the side rail. Quality Control processes ensure that the resin is of the proper formulation, that the correct amount and placement of the reinforcements within the matrix are maintained and that the resin cures properly within the die. All materials, resin, pigment, UV additives, fiberglass rovings and structural mat and surface veil are purchased from reputable suppliers with Owens-Corning being a recognizable one by most consumers. After production of the pultruded shapes has occurred, several engineering tests are performed on representative samples from each lot of material. These full section deflection tests, described in the American National Standards Institute (ANSI) A14.5 -1992, consist of loading the sections in bending in various configurations (flanges up and flanges down)to verify their strength characteristics before they are fabricated into ladder side rails and used in a finished ladder. Qualification testing and Run testing is conducted on coupons cut from the flanges and webs of the pultruded shapes initially to verify the initial design (Qualification Testing) of a side rail composite and periodically thereafter (Run Testing) to verify the manufacturing procedures are

as intended.  This Coupon Testing is also specified in the ANSI A14.5-1992 standards.  The mechanical properties of the side rails are contained in the engineering drawings and specifications included as an attachment to this report.  A summary of this information is included in the documents produced by Werner Co. during discovery.

Mr. Gormley testified that the ladder was purchased from Home Depot store in Quincy in the spring of 2001.  Mr. Gormley testified that two identical 8' fiberglass stepladders were purchased at that time per his request.  Purchase records from Marina Bay in Quincy dated May 12, 1999 for 3 - 8' fiberglass stepladders with the same UPC codes as the subject ladder, namely, 051751027570.  Mr. Gormley testified that he was unable to say how many times he used the subject ladder prior to the day of the accident because he used both ladders and was unable to distinguish between the two.  He did testify that his work crew shrinkwrapped approximately 300 boats every year starting in September and October and that his crew had approximately 20 or 30 yet to do when his accident occurred.

According to Mr. Gormley's testimony, the subject ladder was thrown into a dumpster following the accident and later retrieved by one of his coworkers, Mr. Brownlow, the service writer and parts guy at Marina Bay, and taken to his home.  Mr. Brownlow confirmed in his deposition that he pulled what he believed to be the accident ladder from the dumpster later that same day after he returned to work after taking Mr. Gormley to the hospital.  Mr. Gormley then testified that he retrieved the subject ladder in his pickup truck from Mr. Brownlow's garage months after the accident.  The ladder was leaning against the wall of Mr Brownlow's garage with the blue shrinkwrap tape wrapped around it.

A second ladder, similar to the accident ladder, was also discarded in a dumpster months after Mr. Gormley's accident by Marina Bay.  This second ladder had similar damage to the rear rail as the subject ladder.  Mr. William Weed, a sign painter at the marina, testified that he retrieved the ladder from the dumpster with the intent to repair it for his own use.  He testified that Mr. Gormley obtained the ladder from him shortly after he had retrieved the discarded ladder from the dumpster.  Mr. Gormley then took both the accident ladder obtained from William Brownlow and the second ladder obtained from William Weed to John Covert, a former dockmaster at Marina Bay.  Mr. Covert stored the two ladders in his basement.  They remained in his possession until the following spring when Mr. Gormley came to his house and Mr. Covert took photographs of the ladders and then Mr. Gormley left with both the two ladders and the photographs.

The accident ladder is only slightly racked such that the right rear leg is shifted rearward when the ladder is set up.  The left and right spreaders are bent.  The front spreader bar of the right hand spreader is bent outward away from the web of the right front side rail.  The spreader is bent in an "S" configuration.  The left spreader exhibits a slight inward bend to the front spreader bar where the front spreader bar and the inside corner of the left front side rail are adjacent to each other.  Both spreaders are constructed of steel bars with cross-section dimensions approximately 1/8" thick and 1" high.  They are secured to the front side rail webs by ¼" diameter steel rivets.  The subject ladder had rivets that would move slightly in and out with finger pressure in the front section where a diagonal knee brace is secured to the rear of the 2nd step, and diagonal knee braces are secured to the front and rear of the 3rd step.  How these rivets came to be loose is unknown but the condition of the ladder suggests that it was likely thru the abuse of the ladder during service.  The condition of these rivets had no significant effect on the performance of the ladder.

The right-hand rear rail is fractured in the outside web/flange corner beginning at the base of the rail and extending upward approximately 15".  The fracture extending below the bottom horizontal brace exhibits signs of having existed in that condition for an extended period of time.  The fracture surfaces are worn,

"rounded off" and contaminated with dirt and other foreign substances. The end of the right rear side rail flange is worn at the corners indicating that it has been exposed to contact with other surfaces that would not normally be able to contact the rail flange when the side rail is intact.

The left-hand rear rail is fractured in the outside web/flange corner beginning at the base of the rail and extending upward approximately 2".

The plastic top is fractured in the rear flange adjacent to the left side of the paint can hook.

The ladder has the following labels present on the side rails:

- ID Label - P/N 56494-06 – Outside LH front side rail below top step, UPC No. - 051751027570
- Instruction Labels (2) - P/N 55763-01 - Outside LH front side rail below the top step & inside LH front side rail below the 5th step from the bottom.
- Caution Label - P/N 54664-01 – Outside RH front side rail at the 4th step.
- Danger Label (Failure to Read) - P/N 53496-01 – Outside RH front side rail below the top step.
- Danger Label (Top Step) - P/N 51645-01 – Front flange of top step.
- Do Not Climb Back Section Label - P/N 50430-02 – 3rd horizontal brace from the bottom.
- Werner Logo Labels (2) - P/N 50017 – Outside RH & LH front side rails between 3rd and 4th steps from the bottom.
- Made In U.S.A. Label – P/N 54633-01 W – Front flange of 6th step from the bottom.
- Danger Do Not Stand or Sit – Molded into the paint can recess on the top surface of the top cap.
- Code Stamp – 059944G02FFA – May 1999 date of Manufacture – embossed into the inside of the front flange of the bottom step.

<u>Accident Site</u>

The accident occurred in a storage yard identified as Lot 40 of Marina Bay located at 260 Victory Drive in Boston Harbor. Mr. Gormley described the storage yard as being a level paved parking lot used for parking in the summer and boat storage in the winter. The yard is approximately 600 feet by 1000 feet surrounded by a fence with a gate at one end. For purposes of this report, if we assume North points toward the top of Mr. Gormley's deposition sketch, the gate is along the East fence at the Northeast corner of the yard. Boats were parked along the fence around the perimeter of the yard and in rows identified by letters within the interior of the yard. Row A was along the fence on the North end of the yard. Row B ran along the fence that was at the East end of the yard closest to the gate. Rows C thru H ran parallel to Row B in a North-South direction. The boats were parked diagonally in each of the rows. Aisles existed between Rows B & C, D & E, and F & G and between H and the West fence to access the boats. Rows C & D, E & F and G & H were adjacent to each other. Mr. Gormley testified that the boat where his accident occurred was either in row G or H at the rear of the yard where the larger boats were located. Marina Bay records show the boat was parked in Row G space 14. The boat being worked on at the time of Mr. Gormley's fall was described by Mr. Gormley as being 30' – 40' long and on sailboat stands with the gunnel or edge of the deck approximately 10' above the ground. Mr. Capilli puts the gunnel height at between 12' and 16' off the ground. Maintenance records provided by Stephen Smith in his deposition describe the boat as being an Irwin Avanti 34' sailboat. Mr. Capilli testified in his deposition that he believed there might have been scattered ice patches or some other form of precipitation on the ground on the day of the accident.

Opinions

My opinions, to a reasonable degree of engineering certainty and probability, are as follows:

- The subject ladder having two rear legs and two front legs a common industry design that has been manufactured for decades. The overwhelming majority of stepladders produced in 1999 and today by Werner Co. and other manufacturers are of the 4-legged design not equipped with rail shields. Rail shields are offered as a means to reinforce the bottom of a stepladder to provide a greater degree of resistance to damage through abuse. They are also provided as a way to repair a ladder that has been damaged at the bottom end. They cannot prevent damage. The downside is that rail shields add weight to the portable stepladder. This is obviously undesirable as evidenced by Mr. Gormley's own actions of pushing the subject ladder from place to place rather than picking the ladder up and moving it.

- The right rear side rail of the ladder was fractured a considerable amount prior to Mr. Gormley's fall. The majority of the fracture to the right rear side rail, the portion extending from the lower end upwards to the bottom horizontal appears rounded off due to the rubbing of the two fracture surfaces together and from contact with other objects. They appear substantially contaminated with foreign material and dirt that indicates that the fracture surfaces have been exposed for an extended period of time.

- The upper portion of the rear rail fracture appears to have occurred more recently but cannot be excluded from being present prior to Mr. Gormley's accident. This "cleaner" fracturing may have occurred shortly before the day of his accident, during his use of the ladder just prior to his fall or may also have occurred as a result of him striking the ladder during his fall.

- The existence of preexisting damage to the right rear side rail to the extent that an open fracture was present to the level of the bottom horizontal brace would be sufficient to introduce a certain degree of instability in the ladder and contributed to his fall.

- The extent of the fracturing to the right rear rail was such that it would have been visible and readily obvious even to a normal user conducting a visual inspection of the product. Mr. Gormley testified in his deposition that the fracture was obvious and clearly visible when viewing a photograph of the accident ladder.

- Mr. Gormley testified that he did not inspect the ladder prior to using it on the day of his accident even though the instructions say to inspect the ladder for damaged or missing parts before each use. Mr. Gormley testified that he read the instructions when Marina Bay purchased and provided the ladders to Mr. Gormley and the other employees of Marina Bay. He testified that he understood the instructions and the possible consequence of not following the instructions was serious injury or death.

- The ladders owned by Marina Bay were used by employees of the four different departments of Marina Bay as well as by customers as testified to by Mr. Brownlow in his deposition. No regular inspection program was in place at Marina Bay. The inspection of the ladders was left to the employees and the individual using the particular ladder. Failure to inspect the ladder prior to use is contrary to the warnings and instructions on the ladder.

- Mr. Gormley further testified that an open crack as visible in the ladder as in its present condition was obvious to anyone who inspected the ladder. Failure to inspect the ladder is a misuse that is contrary to the warnings and instructions on the ladder. Using a damaged ladder is also contrary to the instructions on the ladder.

- The left rear side rail is fractured approximately 2" upward from the lower end. It is likely that this fracture preexisted Mr. Gormley's accident. A visual inspection of the subject ladder by a normal user would have revealed the existence of this fracture. This fracture was not a contributing factor to Mr. Gormley's accident.

- The crack in the rear flange of the plastic top cap was likely present at least to some degree prior to the accident. The top cap of the FS108, when tested by Werner Co. where the top cap is loaded at its midpoint is able to withstand in excess of 900 lbs. The presence of a fracture indicates the ladder was overloaded at some point. This fracture would only play a role in Mr. Gormley's accident if he were standing on the top cap at the time of his fall. Standing on the top cap is prohibited by the warnings and instructions on the ladder. If Mr. Gormley was standing on the top cap top cap with a fractured rear flange, this reasonably may have contributed to his loss of balance.

- Mr. Gormley's fall was a result of his overreaching and then subsequent loss of balance causing the ladder to tip to the left resulting in his fall and subsequent impact with the ladder. Mr. Gormley testified that his feet went to the left. Since his feet were what were in contact with the ladder, the ladder would have to have tipped in the same direction as his feet. With his feet going left his upper body would rotate in a clockwise fashion. This is consistent with Mr. Gormley's testimony that he was in a position parallel with the ground immediately after his feet went to the left.

- Mr. Gormley was likely standing higher than the 6th step on the ladder when he had his accident. The 6th step is 5'-9" above the ground. The deck of the boat is 10' above the ground and the safety railing is another 2' above the deck of the boat. Mr. Gormley testified that his feet moved to the left and then his upper body rotated to the right so that he was parallel with the ground. He then testified that he grabbed the safety railing with his left hand. This accident happened quickly so that as his feet went left his body rotated downward quickly to the right. To get parallel his head would have had to drop to the level of his feet or nearly so. This would put his head at the level of 5'-9" above the ground or 6'-3" below the height of the safety railing. Even if his head was two feet above his feet it is highly unlikely that Mr. Gormley could have reached the safety railing with his body parallel or even nearly parallel. However, given the scenario of Mr. Gormley standing on the top cap of the ladder, it is more likely that he could have grabbed the safety railing to break his fall. His feet would have been 7'- 8" above the ground or 2'-4" below the deck of the boat when he began to fall. If his head was at the level of his feet when he came to the parallel position, the safety railing would only have been 4'-4" above his head. If he was nearly parallel where his head was 2' above the level of his feet that would have placed the safety railing only 2'-4" above his head a distance within reach of Mr. Gormley's grasp.

- Mr. Gormley's and other's abuse of the ladder by pushing it on a paved asphalt surface that had irregularities led to the deteriorating condition of the ladder over time. Mr. Gormley testified that in a season, approximately 300 boats are shrinkwrapped. Mr. Brownlow estimated there were as many as 700 boats to be shrinkwrapped in a season. Approximately 270 - 280 boats

had already been completed that season according to Mr. Gormley's testimony. Each boat required the stepladder to be placed in multiple positions to complete the shrinkwrapping process. Mr. Gormley testified that he had positioned the ladder in 5 different positions prior to his accident on the morning of January 16, 2002. Records from Marina Bay indicate the ladder was purchased in May 1999 rather than spring 2001 as testified to by Mr. Gormley. That means that the subject ladder was exposed to three seasons of boat storage and shrinkwrapping operations with the ladder being pushed along the irregular pavement on thousands of occasions. This severe abuse likely contributed to the deterioration of the subject ladder and the other 8' fiberglass stepladders purchased by Marina Bay

- The use of Marina Bay's ladders by outside customers and a number of different employees from the different departments within Marina Bay without regular inspections of the ladders means that damage to a ladder from any number of ways such as overloads, impact and misuse, would go undetected. The subject ladder was apparently in use in a frequent and demanding environment for over 2-1/2 years without regular inspections being performed. Without a regular inspection program, it cannot be determined what caused the rear rail of the subject ladder and the other similar ladder to fracture.

- Mr. Gormley testified that Marina Bay discarded another similar ladder due to damage to the side rails of a similar nature to that of the subject ladder. This indicates the highly abusive environment in which these ladders were being used.

- Stanley Kiska, plaintiff's expert, has the opinion that the shifting of Mr. Gormley's weight on the ladder caused the ladder to twist and resulted in the collapse of the right rear side rail. He then has the sequence of events that Mr. Gormley reacted by dropping the heat gun and then grabbing for the safety rail of the boat. Mr. Gormley testified that there was movement in the ladder and that his feet went to the left. Mr. Gormley testified that he grabbed for the safety rail after he had fallen to a position almost parallel with the ground. Mr. Kiska's opinion is that Mr. Gormley's motion to grab the safety rail initiated the tipping of the ladder to the left. These are two clearly different scenarios.

- Mr. Kiska states that had Werner incorporated rail shields or a different type of bracing, cracking and weakening of the right rear side rail could have been prevented. Without regular inspections of the ladders, and given the fact that there were several different users of these ladders by both employees within Marina Bay and customers of Marina Bay it is not possible to make this conclusion.

- Walking of a stepladder is a conscious effort of the user provided the ladder is erected with all four legs resting in contact with a reasonably level surface. Mr. Gormley testified that all four legs were in contact with the pavement. Given this testimony, along with the testimony that he was on the 6th step, walking of the subject stepladder would require a conscious effort by Mr. Gormley. Mr. Kiska shows that he was able to walk an exemplar ladder and other ladders while standing on the 6th step but only if he was pulling on a beam that was overhead and slightly ahead of him. Mr. Gormley was not grasping a rigid overhead structure at the time of his fall and at no time did he testify that he was walking the ladder.

- A tripod or 3-legged ladder is able to find a position of stability on an irregular surface with greater ease than a 4-legged ladder. However, on a reasonably level surface, a four-legged ladder will have a higher degree of stability compared to a tripod or 3-legged ladder when all

four legs are in contact with the ground. Stan Kiska was able to walk both styles of tripod ladders he tested in his video. Any ladder can be made to walk depending on the way it is positioned, the type of floor or ground on which it rests and the methods in which forces are applied to the ladder.

- Video testing was conducted by Frederick Bartnicki on an exemplar stepladder of the same design. The exemplar differed in the color of the side rails, blue vs. yellow, and the color of the Plastic Top Cap, yellow vs. blue. The testing illustrates the abuse resistance of the ladder, its load carrying capabilities, the load distribution on the four legs of the ladder and the conditions under which a ladder can be made to walk. It also shows that the rear legs carry a lesser amount of load when the ladder is erected and used in a normal fashion and that the rear legs are designed to carry loads much greater than would be expected in normal use.

- The subject Werner Model FS108 8' fiberglass stepladder was manufactured in accordance with the applicable industry standards of the American National Standards Institute (ANSI) A14.5-1992 and complied with the OSHA standards for ladders. It was also designed and manufactured in accordance with Aluminum Association, American Society for Testing and Materials (ASTM) and Werner standards and that it was acceptable for use in its intended purpose.

- The design of the subject ladder and the design of the side rails of the subject ladder are neither deficient nor defective due to the absence of rail shields. Rail shields are intended to provide an added measure of abuse resistance but will not prevent damage from certain abusive loads.

- The fiberglass side rails are reasonably designed, manufactured and tested and are reasonably safe for their intended use in the subject stepladder.

- The design of the subject ladder and the design of the side rails of the subject ladder are neither deficient nor defective due to the absence of the EDGE or plastic combination bracing utilized on other model stepladders produced by Werner Co. The EDGE or combination plastic bracing utilized on other model stepladders produced by Werner Co is intended to provide an added measure of abuse resistance but will not prevent damage from certain abusive loads.

- The design of the ladder is such that it exceeds the requirements set forth in the ANSI A14.5-1992 requirements for Compression, Step Bending, Side rail Bending, Racking, Rail Torsion and Spreader Testing, Torsional Stability and Front, Rear and Side Stability. These design verification tests specified in the ANSI standards are reliable tests that accurately assess the performance of a stepladder.

- The subject FS108 fiberglass 8' stepladder has spreaders of sufficient strength and rigidity and the ladder itself has sufficient torsional stability and rigidity when used in accordance with the instructions and warnings affixed to the ladder.

- Warnings contained in the Safety Instructions on the subject ladder and of particular interest in this lawsuit are as follows:

    - **Warning:** Failure to follow all instructions may result in serious injury.

- **Inspect for damaged or missing parts before each use.**
- Never use a ladder with missing or damaged parts.
- Check all parts for good condition. Lightly lubricate moving parts occasionally.
- **Read All Labels!**
- Place ladder feet on firm level ground. If used on slippery surfaces, be careful!
- Check that all four feet of the ladder are firmly supported to prevent excessive movements.
- Always face ladder and maintain a firm grip while on it.
- **DO NOT OVER-REACH.** Always keep belt buckle between side rails when climbing or working from ladder. You may lose your balance and/or tip the ladder.
- Use extreme caution pushing or pulling anything while on a ladder. You may lose your balance and/or tip the ladder.
- **ALWAYS USE LADDER AS DESCRIBED ABOVE. NEVER MISUSE OR ABUSE A LADDER.**

- The Caution Label on the subject ladder contains the following warning:

  - Keep body centered between side rails. Do Not Over-Reach.
  - Set all four feet on firm level surface.

- The Danger Label on the side of the subject ladder reads as follows:

  - Failure to read and follow instructions on this ladder may result in injuries or death.

- The Danger Label on the front flange of the top step of the subject ladder reads as follows:

  - Danger Do Not Stand at or above this level. YOU CAN LOSE YOUR BALANCE.

- The Danger Label on the top cap of the subject ladder reads as follows:

  - Danger Do Not Stand or Sit

- The warnings on the ladder were adequate and reasonable for their intended purpose and if followed will not result in inadvertent walking of the ladder. The warnings present on the ladder to instruct on proper inspection and proper set up and use were in compliance with the applicable ANSI A14.5 -1992 standards.

The above are my opinions as of the date shown on this report. If additional information becomes available subsequent to the date of this report in this matter that would significantly affect the conditions under which these opinions were formed, I request the opportunity to revise those opinions.

I intend to utilize the various documents and photographs referred to in my report during my testimony at trial. I also intend to utilize exemplar ladders for courtroom demonstrations to explain the opinions I have outlined above. In addition, I will utilize test reports and the ANSI A14.5-1992 Standards, videotape testing and demonstrations, the engineering drawings and specifications and other documents provided by Werner Co. During discovery, to support my opinions that I expect to testify about at trial. My testimony will include opinions of how the subject ladder complies with the ANSI

3/1/06

A14.5-1992, OSHA and other industry standards using the above documents to support those opinions. I also expect to utilize competitor manufacturer's ladders as part of my testimony offered at trial.

Attached to this report is a copy of my current CV as well a list of expert testimony given in the last four years. I receive no compensation for my accident investigation activities, expert testimony or lawsuit defense beyond my normal compensation as part of my regular salary.

Sincerely,

Frederick J. Bartnicki, P.E.
**Werner Co.**
Sr. Engineer

**FREDERICK J. BARTNICKI EXPERT DEPOSITION & TRIAL TESTIMONY WITHIN LAST 4 YEARS**

| Plaintiff Name | Case Name vs. | Last | First | City | State | Location of Claim Court | Case Number | Date Month-Year |
|---|---|---|---|---|---|---|---|---|
| Fahey | Werner & Tru-Value | Fahey | John | Ketchikan | Alaska | Superior Court | IKE-01-93CIVIL | May-02 |
| Ensign | Werner & Lowe's | Ensign | Donald | Toledo | Ohio | US District Court | 3101CV7246 | May-02 |
| West | Werner & Home Depot | West | Michael | Tulsa | Oklahoma | US District Court | CJ200100942 | May-02 |
| West | Werner & Home Depot | West | Michael | Tulsa | Oklahoma | US District Court | CJ200100942 | Jul-02 |
| Smith | Werner & Orchard Supply | Smith | Kimberly | Martinez | California | Contra Costa County Superior Court | C01-01581 | Jul-02 |
| Smith | Werner & Orchard Supply | Smith | Kimberly | Martinez | California | Contra Costa County Superior Court | C01-01581 | Aug-02 |
| Rosolino | Werner & Driller Hardware | Rosolino | James | Portland | Maine | Superior Court | CV-02-36 | Sep-02 |
| Odenthal | Werner & Easterlind | Odenthal | Ronald | St. Louis | Missouri | Circuit Court | 4827018 | Oct-02 |
| Kuhn | Werner & Home Depot | Kuhn | Stephen | La Jolla | California | Superior Court | G1C783574 | Nov-02 |
| Bouyer | Werner | Bouyer | Nathaniel | Baltimore | Maryland | Circuit Court | C-2002-77640-OT | Jan-03 |
| Kuhn | Werner & Home Depot | Kuhn | Stephen | La Jolla | California | Superior Court | G1C783574 | Feb-03 |
| Avdalas | Werner & Creative Paints | Avdalas | Epaminondas | San Francisco | California | Superior Court | 400200 | Apr-03 |
| Fox | Werner & Home Depot | Fox | Gary | Palm Springs | California | Superior Court - Riverside County | INC028843 | Jun-03 |
| Beavers | Werner | Beavers | Bruce | Seattle | Washington | US District Court | CW02-5660 | Jun-03 |
| Cole | Werner & Payless Castaways | Cole | Jeffrey | San Francisco | California | Superior Court | 01A596323 | Jun-03 |
| Weatherly | Werner | Weatherly | William | Houston | Texas | US District Court | 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 | Sep-03 |
| Maresca | Werner | Maresca | Douglas | New York | New York | US District Court - Southern Districts | 02 CIV 8696 | Sep-03 |
| Kessel | Werner | Kessel | Steven | Minneapolis | Minnesota | US District Court | 02-4195 | Jun-04 |
| Sicilia | Werner & JBL Building Matls. | Sicilia | Vincent | Philadelphia | Pennsylvania | Court of Common Pleas - Philadelphia County | 2349 | Mar-04 |
| Musumecci | Werner Co., et. al., et. als. | Musumecci | Frank | Springfield | New Jersey | Superior Court of New Jersey - Hunterdon County | HNT-L-642-02 | |
| Hutchins | Werner Co., A.M. Supply, Inc., Cox Communications, Inc., Mitchell Communications, Inc. | Hutchins | David | Oklahoma City | Oklahoma | US District Court - Western District of Oklahoma | CJ-2003-9842 | Mar-04 |
| Hotard | Werner Co. & EFF/JOHN Corp. | Hotard | Marsha Lee | Baton Rouge | Louisiana | 19th Judicial District Court/Parish of East Baton Rouge | 483571 - Div. - H | May-04 |
| Ins. Co.; Linda | Werner Co.; B&M Constr.; et. al. | Taft | Jerry | Dallas | Texas | District Court of Tarrant County, Texas | 096-189477-01 | Jun-04 |
| Musumecci | Werner Co., et. al, et. als. | Musumecci | Frank | Flemington | New Jersey | Superior Court of New Jersey - Hunterdon County | HNT-L-642-02 | Jun-04 |
| McBride & Son | Werner Co. | McBride & Son | | St. Louis | Missouri | Circuit Court 20th Judicial Circuit of Illinois - St. Clair County | 021-0021 | Oct-04 |
| Maurice | Uniply Roofing; Lynn Ladder Co.; Werner ladder Co. | Maurice | Brian | Hudson | Massachusetts | Essex Superior Court | 2002-1301-C | Apr-04 |
| Hutchins | Werner Co., A.M. Supply, Inc., Cox Communications, Inc. | Hutchins | David | Oklahoma City | Oklahoma | US District Court - Western District of Oklahoma | CJ-2003-9842 | May-05 |
| Derrickson | Werner Co. | Derrickson | Richard | Cherry Hill | New Jersey | Superior Court of New Jersey - Burlington County | L-002792-03 | May-05 |
| Tarr | Werner Ladder Co. | Tarr | Derek | Boston | Massachusetts | US District Court for the District of New Hampshire | 04-CV-00055 | Jun-05 |
| Stoots | Werner Co. and R. D. Werner Co., Inc. | Stoots | Gary | Blacksburg | Virginia | US District Court for the Western District of Virginia Roanoke Division | 7:04-CV-00531 | Aug-05 |
| Stoots | Werner Co. and R. D. Werner Co., Inc. | Stoots | Gary | Blacksburg | Virginia | US District Court for the Western District of Virginia Roanoke Division | 7:04-CV-00531 | Aug-05 |
| Derrickson | Werner Co. | Derrickson | Richard | Mount Holly | New Jersey | Superior Court of New Jersey - Burlington County | L-002792-03 | Oct-05 |
| Picuta | Werner Co. | Picuta | William | Newton Falls | Ohio | Court of Common Pleas - Cuyahoga County, Ohio | 2004 CV 02214 | Jan-06 |

# VITA        **Frederick J. Bartnicki, P.E.**

## EDUCATIONAL BACKGROUND

> Bachelor of Science degree in Civil Engineering - Pennsylvania State University - 1978
  > Coursework included Strength of Materials, Engineering Mechanics, Structural Analysis & Design, Physics, Fracture Mechanics, Statics and Dynamics

> Post Graduate Studies
  > Finite Element Analysis, Failure Analysis, Metallurgy, Welding, Pultrusion Technology, Design of Experiments, Non-Destructive Testing Techniques including Strain Gage Measurement and Analysis, Plastics Part Design, Rapid Prototyping, New Product Development, Blowmolding Technology, Project Management, Engineering Management, Various PC Software Programs

> Professional Certifications
  > Registered Professional Engineer - Pennsylvania - License No. PE032520E
  Continuous registration - 1983 to present

## EXPERIENCE

> 9/2000 - Present        Sr. Engineer - Special Projects - Werner Co. - Greenville PA

Responsible for Design and Development for Special Projects related to End Products within the Product Engineering Department. Duties also include Supervision and Direction of other Engineers, Designers and Technicians related to Project Assignments

> 9/91 - 9/2000        Sr. Product Engineering Manager - Product Engineering - Werner Co. - Greenville, PA

Responsible for Scheduling and Directing and Participating in multiple complex Product Design and Development Projects for End Products and Managing Engineers, Designers and Technicians assigned to various projects within the Product Engineering Department

> 3/84 - 9/91        Sr. Product Engineer - R. D. Werner Co., Inc. & Werner Co. - Greenville, PA

Responsible for Scheduling and Directing and Participating in complex Product Design and Development Projects for End Products and Supervising Engineers, Designers and Technicians assigned to various projects within the Product Engineering Department.

> 3/79 - 3/84        Product Engineer - R. D. Werner Co., Inc. - Greenville, PA

Participated in, Oversaw the Preparation of or Directed Product Design, Testing, Drawings and Specifications, Quality Control Specifications and Procedures functions as part of New Product Development. Developed extensive experience with and knowledge of all Product Lines Produced, Marketed and Distributed by the R. D. Werner company.

## OTHER RESPONSIBILITIES:

> 3/79 - Present        Accident Investigation and Reconstruction and Failure Analysis dealing with matters of Product Liability Litigation

> 3/78 - 3/79        Structural Engineer - Enviro-Systems Division, Zurn Industries, Inc. - Erie. PA

Responsible for Structural Analysis and Design of steel, aluminum and concrete structures for Water and Wastewater Treatment Equipment for Industry and Municipal Concerns. Structures designed included Steel Support Columns, Walkways, Access Bridges and Walkways, Trussed Rake-Arms and Rake-Arm Supports for Structures as large as 240' in diameter. Other duties included Weld design, Supervising Designers in the Preparation of Drawings, Reviewing Contract Specifications, and Fluid Systems Design.

12/09/2002

# Robert Gormley v. Werner Co.
## Summary of Videotape Testing
### Conducted by Frederick J. Bartnicki, P.E.
### Conducted on 2/23/06

I.   **Overview of Product showing ID Label for the exemplar Werner Model 6008 8' fiberglass stepladder**
  - The 6008 is similar to the Werner Model FS108 except for the color of the side rails (blue) and Plastic Top Cap (yellow)
  - The Highest Standing Level is the 6th Step from the bottom and is 5'-9" above the ground
  - The rear section and right rear leg in particular is the focus of the video

II.  **The exemplar ladder is fully opened and all four legs are on the concrete floor**
  - Fred Bartnicki (FJB) Stands on the bottom horizontal immediately above the right rear leg
  - FJB weighs 215 lbs.

III. **Dynamic Loading Test** - The exemplar ladder is setup fully opened with spreaders locked and all four legs on floor
  - FJB climbs to the 6th step and shifts weight while stand in the 6th step then jumps on the step
  - FJB moves down to the 5th step and repeats jumping actions
  - FJB jumps to get the four ladder legs to lift off the floor while on the 6th and 5th steps

IV.  **Lateral Tipping Test** - Right side of the exemplar ladder is placed approximately 16" from a wall
  - FJB climbs ladder to the 4th step and tips the ladder laterally into the wall – the ladder remains supported by the right front and right rear legs
  - FJB climbs the ladder to the 6th step while the ladder remains tipped into the wall
  - FJB climbs down the ladder while tipped into the wall
  - Ladder is placed with all four legs on the floor and fully opened. FJB stands on the bottom horizontal immediately above the right rear leg.

V.   **Rear Tipping Test – Exemplar ladder is tipped onto its rear legs - FJB climbs ladder to the 4th step and pulls on rope secured to a wall to tip ladder onto the rear legs**

VI.   **Testing of Exemplar ladder with legs resting on digital bathroom scales - The scales are activated and FJB places the exemplar ladder onto the scales with each leg of the ladder resting on a scale.  The load values are recorded after FJB climbs onto each of the steps**

| Step Climbed to by FJB | Rt. Front Side Rail | Lt. Front Side Rail | Rt. Rear Side Rail | Lt. Rear Side Rail |
|---|---|---|---|---|
| | Scale #1 | Scale #2 | Scale #3 | Scale #4 |
| Bottom | 109.2 | 106.6 | 10.2 | 16.4 |
| 2nd | 100.0 | 98.2 | 18.0 | 19.8 |
| 3rd | 74.6 | 95.8 | 34.6 | 19.8 |
| 4th | 96.4 | 75.0 | 25.2 | 44.0 |
| 5th | 77.4 | 79.0 | 40.0 | 43.8 |
| 6th | Error in activation of left rear scale | | | |
| 6th | 58.8 | 73.8 | 56.0 | 49.4 |

Note* - Scales record highest readings while ladder is being climbed. Dynamic effects will result in loads not adding up to the same value in each test.

VII.   **Testing of Exemplar ladder with legs resting on digital bathroom scales - The scales are activated and FJB places the exemplar ladder onto the scales with each leg of the ladder resting on a scale.  The load values are recorded after FJB climbs to the 6th step and two others climb onto the 3rd and bottom steps**
  ➤ **FJB – 215 lbs. /Climber #2 – 214 lbs/Climber #3 – 290 lbs.**

| Step Climbed | Rt. Front Side Rail | Lt. Front Side Rail | Rt. Rear Side Rail | Lt. Rear Side Rail |
|---|---|---|---|---|
| | Scale #1 | Scale #2 | Scale #3 | Scale #4 |
| Climber #3 - Bottom Step | 288.8 | 330.0+ | 77.6 | 57.4 |
| Climber # 2 -3rd | | | | |
| FJB - 6th | | | | |

*Note – Maximum scale reading 330#.  Displays ERR when load exceeds 330 lbs..

VIII. **Rear Tipping Test** – Exemplar ladder is tipped onto its rear legs - FJB climbs ladder to the 4th step and pulls on rope secured to a wall to tip ladder onto the rear legs - Digital scales under each rear leg

| FJB on 4th Step | Right Rear Leg – Scale #3 | Left Rear Leg – Scale #4 |
|---|---|---|
| Test #1 | 84.2 | 140.2 |
| Test #2 | 127.8 | 100.6 |

IX. **Rear Section Load Test** – Exemplar ladder placed on four scales with one leg on each scale. FJB climbs onto bottom horizontal brace immediately above the right rear leg

| FJB on Bottom Horizontal above Right Rear Leg | Left Rear Leg Scale #3 | Left Rear Leg Scale #4 |
|---|---|---|
| | 175.4 | 39.8 |

X. **Ladder Walking Demonstrations** – Front of ladder closest to Camera
   ➤ FJB climbs ladder to the 6th step. Feet evenly spaced but not touching the ladder side rails – Unable to walk ladder by shifting weight side-to-side
   ➤ FJB standing on 6th step. Feet evenly spaced and touching the ladder side rails – Able to walk ladder by shifting weight side-to-side
   ➤ FJB climbs down ladder to the 5th step. Feet evenly spaced but not touching the ladder side rails – Unable to walk ladder by shifting weight side-to-side
   ➤ FJB standing on the 5th step. Feet evenly spaced and touching the ladder side rails – Able to walk ladder by shifting weight side-to-side

XI. **Ladder Walking Demonstrations** – Left Side of ladder closest to Camera
   ➤ FJB climbs ladder to the 5th step. Feet evenly spaced but not touching the ladder side rails – Unable to walk ladder by shifting weight side-to-side

&gt; **FJB standing on 5th step. Feet evenly spaced and touching the ladder side rails – Able to walk ladder by shifting weight side-to-side**

**XII.  Ladder Walking Demonstrations – Rear of ladder closest to Camera**
&gt; **FJB climbs ladder to the 5th step. Feet evenly spaced but not touching the ladder side rails – Unable to walk ladder by shifting weight side-to-side**
&gt; **FJB standing on 5th step. Feet evenly spaced and touching the ladder side rails – Able to walk ladder by shifting weight side-to-side**

**XIII. Dynamic Loading Test - The exemplar ladder is setup fully opened with spreaders locked and all four legs on floor**
&gt; **FJB climbs to the 6th step and shifts weight while stand in the 6th step then jumps on the step**
&gt; **FJB moves down to the 5th step and repeats jumping actions on step**
&gt; **FJB climbs to the 6th step and jumps to get the four ladder legs to lift off the floor**
&gt; **FJB climbs down from the ladder**

## INDEPENDENT MEDICAL CONSULTATION ON ROBERT GORMLEY

**CHIEF COMPLAINT**:  Mr. Gormley is a 43-year-old man seen for an independent medical examination.

**HISTORY**:  This middle-aged man was well until about four years ago (January 16, 2002) when he alleges serious and chronic personal injuries as a consequence of an injury at work.

At that time, he fell approximately 8 feet from a ladder.  During his fall, his back hit the ladder. He developed pain immediately that persists until this time.  He denies any significant neck or back problems prior to that event.  He denies any spinal imaging prior to that event.  Apart from a minor back injury many years prior that got completely better with conservative treatment, he had never seen a healthcare provider for neck or back problems.  He claims headaches, neck problems, and back problems as a consequence of the event.  His back is the worst.

The pain is primarily in his back, though it does radiate to a moderate extent down the left leg. His right leg feels well.  The sciatic pain travels down the ventral thigh and occasionally into the leg or foot.  It is mild-to-moderate, though sometimes severe.  It has generally been stable over the past two years.  Strength is normal in the left leg, though he has intermittent numbness and tingling diffusely in the leg on exertion.

He has pain primarily in his neck, though it occasionally travels down the left ventral arm to the dorsal forearm.  His right arm feels well.  The pain also involves the left pectoral area and shoulder.  It is mild-to-moderate, though sometimes severe.  He denied ever seeing a healthcare provider for neck problems prior to this event.  He denies any neck imaging prior to this event. His strength is normal in the left arm and hand, though he does have numbness in the thumb, ring, and small fingers.  It has generally been the same since onset.

He claims severe headaches as a consequence of this event.  He had an occasional headache prior to that, but the accident made this a severe and persistent problem.

Prior treatments have been extensive.  He has undergone physical therapy that provides transient relief.  He has not been to a chiropractor.  He has had a cortisone injection into his left shoulder that provided no relief.  He takes Neurontin, naproxen, and Soma.  He takes an occasional Percocet but feels he takes less than one per day.  He has seen surgeons, but no surgery was recommended.  His activities of daily living are independent.  He is able to drive the car.  He has trouble with physically demanding tasks such as lifting heavy objects or shoveling.  He claims his wife does those for him.

He was out of work for several months after this event.  He returned temporarily, but was unable to continue.  He has worked intermittently since that time.  He last worked about five months ago at a temporary position.  He is not working at this time, but he is looking for job as a teacher.

**OCCUPATION:** He is unemployed at this time.

**PERSONAL INFORMATION:** He is married, and has no children.

Page 2 of 3
Tuesday, January 17, 2006
ROBERT GORMLEY

**FAMILY INFORMATION:** His parents are both alive, and no health problems are noted.

**DRUG ALLERGIES: NKDA.**

**HABITS:** He does not smoke, but drinks on occasion.

**CURRENT MEDICATIONS:**
Naproxen.
Soma.
Neurontin.
Percocet.

**REVIEW OF SYSTEMS:** There were multiple complaints referable to virtually all components of the review of systems. Please see my patient registration record, that I reviewed carefully, for a detailed account.

**PRIOR SURGICAL HISTORY:** He has undergone right wrist surgery for what sounds like a tendon tear.

**EXAMINATION:**

**CONSTITUTIONAL**
He is a well-appearing man who comes in by himself. Vital signs and measurements were: Height 5 feet 10 inches, weight 187 pounds, temperature 99.9 degrees, blood pressure 173/117, respirations 14 and regular, and heart rate 101.

He had moderate-to-severe pain behavior. He did something I have not seen in my over 25-year career. When I examined his left biceps muscle, he grabbed his arm in discomfort and swore. He continued to hold it through much of the clinic visit. He had three out of five Waddell signs tested for. He had generalized over-reaction, non-anatomic neurological signs, and a positive palpation test. He had a negative torso rotation and negative distraction test.

**GENERAL MEDICAL ASSESSMENT**
Carotid artery examination revealed no evidence of bruit or other abnormality. Heart rhythm was normal without extra sounds or murmurs. There was no abnormality of the peripheral vascular system and the right radial pulse was strong. Breath sounds were clear without rales, rhonchi, or wheezes. The abdomen was soft and non-tender. No masses were palpated.

**NEUROLOGICAL**
Mental status exam was normal. Orientation was normal, and memory was intact. Attention span and concentration were normal. Receptive and expressive speech was normal. Fund of knowledge was normal.

**Cranial nerve II:** To confrontational testing, there was no peripheral field abnormality. Visual acuity was intact to reading small print.
**Cranial nerve III, IV, VI:** Extraocular movements are full without nystagmus.
**Cranial nerve V:** Facial sensation is symmetric.
**Cranial nerve VII:** Facial movement is symmetric.

Page 3 of 3
Tuesday, January 17, 2006
ROBERT GORMLEY

**Cranial nerve VIII:** Hearing is symmetric.
**Cranial nerve IX, X:** Palate elevates in the midline.
**Cranial nerve XI:** Shoulder shrug is strong bilaterally.
**Cranial nerve XII:** Tongue is midline.

Motor exam of the limbs was intact. There was full power and tone, and no fasciculations or abnormal movements were noted.

**UPPER LIMBS:** Deltoid power (C5) was 5/5 bilaterally, brachioradialis power (C5,6) was 5/5 bilaterally, biceps power (C6) was 5/5 bilaterally, triceps power (C7) power was 5/5 bilaterally, long finger flexors (C8) were 5/5 bilaterally, and hand intrinsics (C8, T1) power were 5/5 bilaterally.

**LOWER LIMBS:** Quadriceps power (L4) was 5/5 bilaterally, anterior tibialis (L4,5) and extensor hallucis power (L5) were 5/5 bilaterally, and plantar flexion (S1) was normal bilaterally.

Sensory examination with a pinwheel was unremarkable with no focal deficit in a peripheral nerve or root distribution. Reflexes were normal and symmetric in the upper and lower limbs.

**BACK**
Examination of the back revealed no abnormality. Muscle tension was normal. He had no pain with palpation.

**NECK**
Examination of his neck revealed no abnormality. The alignment seemed normal. Range of motion seemed normal. I examined muscle tension, and there was no spasm. Pressing on the left trapezius or rhomboid caused him to wince in discomfort.

**RECORD REVIEW:** He did not come with any records.

**IMAGING REVIEW:** He did not come with any imaging studies.

**ASSESSMENT:** Mr. Gormley is a middle-aged man who claims serious and chronic personal injuries after an event several years ago. I will be unable to complete this report until I have reviewed the records and/or pertinent imaging studies.

Stephen Saris, M.D.

Tuesday, January 17, 2006
ROBERT GORMLEY

# RECORD REVIEW ON ROBERT GORMLEY

On October 19, 1984, Mr. Gormley was seen at Quincy City Hospital. He had fallen and dislocated his right shoulder. He relocated it himself.

On October 26, 1985, he was seen at Quincy City Hospital. He described a numb feeling in his left shoulder. The diagnosis is described as a chronic dislocation of the left shoulder.

On December 23, 1985, he was seen at Quincy City Hospital. He cut his left arm at work with a knife.

On December 29, 1985, he was seen at Quincy City Hospital. He had a superficial laceration to his left wrist.

On January 19, 1986, he was seen at Quincy City Hospital. He was treated for a finger laceration.

On January 25, 1994, he was seen in the emergency department. He described of abdominal pain and diarrhea. He was felt to have colitis and was discharged.

On May 20, 1999, he was seen in the Quincy City Hospital Emergency Room. He complained of left eye pain and blurred vision. He was felt to have an orbit abrasion.

On December 11, 2000, he was seen at the Quincy City Hospital. He complained of walking into an object. He was knocked out. He was felt to have a contusion and neck sprain.

**On January 16, 2002, Mr. Gormley alleges serious and chronic personal injuries as a consequence of a fall from a ladder at work.**

On January 16, 2002, he was seen at the Quincy City Hospital. He had back pain after an eight feet fall from a ladder. Neurological examination was non-focal. Thoracic spine x-rays were normal. He was felt to have a soft tissue injury. He was sent home with medication.

On April 8, 2002, Dr. Fathallah saw him. He had been working with shrink-wrapping boats. He fell and injured his upper back. He felt an MRI would not be helpful. Conservative treatment was recommended.

**On April 19, 2002, a cervical MRI showed diffuse, degenerative change.**

**On April 19, 2002, a thoracic MRI was normal.**

**On June 20, 2002, he was seen at Quincy City Hospital. Electrodiagnostic studies were performed of the upper limbs and were completely normal.**

On October 15, 2002, a left shoulder MRI showed a full-thickness tear of the supraspinatus tendon.

On November 8, 2002, Dr. McConville saw Mr. Gormley. The diagnosis was cervical spondylosis and a left rotator cuff tear. Electrodiagnostic studies were reportedly normal. MR imaging of the cervical and thoracic spine reportedly showed bulging disks. He did not feel his symptoms were suggestive of rotator cuff pathology. Lidocaine injection was recommended.

On December 10, 2002, Mr. Gormley underwent successful injection of contrast into his left glenohumeral joint for an arthrogram. There was no obvious abnormality.

On December 12, 2002, Dr. McConville called Mr. Gormley on the telephone. The arthrogram had not showed significant pathology.

On February 18, 2003, Dr. Curtis saw him. He felt that he had a rhomboid contusion and a possible rotator cuff injury.

On April 25, 2003, Mr. Gormley was seen at the Physical Therapy Clinic of the Massachusetts General Hospital. He described shoulder blade, occipital, and right arm pain. He was begun on a strengthening program. He was unable to tolerate most of the exercises.

On May 7, 2003, Dr. Rynne saw him. He is an Orthopedic Surgeon. He has written an independent medical evaluation. He is felt to have a soft tissue injury with symptoms of radiculopathy. He felt that this was a consequence of his injury at work. MR imaging of the shoulder was negative. Additional cervical work-up was suggested. Dr. Rynne felt he was exaggerating his symptoms.

**On June 7, 2003, a cervical spine x-rays were performed and were normal.**

**On June 7, 2003, a cervical MRI showed diffuse and mild-to-moderate degenerative change.**

**On July 24, 2003, a cervical MRI was performed and was normal. There was no change compared to the prior exam.**

**On July 24, 2003, a lumbosacral MRI showed degenerative change.**

On November 20, 2003, Dr. Birkenfeld saw him. He is a Neurosurgeon. He felt that his MRI showed degenerative change. He did not feel that he had a radicular syndrome. He felt that little would be gained by continuing therapy.

On December 4, 2003, Dr. Gormley saw him. Mr. Gormley continued to have pain and other problems. He felt he might have a thoracic outlet or impingement syndrome.

On June 8, 2004, he was seen at a Rehabilitation Clinic. He had two years of problems following an event at work. He was felt to have traction injuries with left shoulder and neck problems. Conservative treatment was recommended.

On June 8, 2004, Mr. Gormley filled out a pain diagram. He described pain in the bilateral occipital area, dorsal neck, left shoulder blade, upper left arm, and left hand.

On August 24, 2004, Mr. Gormley was seen at Quincy City Hospital. A right hand burn is described.

On September 2, 2004, Dr. Blaustein saw him. He felt that Mr. Gormley was at a medical end result. Neck x-rays were recommended.

On September 2, 2004, Dr. Blaustein saw him. He was wearing Philadelphia collar and shoulder harness. He felt he was at a medical end result.

On April 5, 2005, Dr. Blaustein saw him. I believe he is a physiatrist. Mr. Gormley continued to have problem with his left shoulder. Physical therapy was recommended.

**ASSESSMENT:** The below statements are made to a reasonable degree of medical certainty.

Mr. Robert Gormley alleges serious and chronic personal injuries as a consequence of an event at work about four years ago. While it is reasonable to assume muscular or ligamentous injuries after the event as described, in a healthy middle-aged man these would have healed within days, weeks, or months. Any pain or other problems after April 2002 are not related in any way to the events of January 2002.

The basis for my opinion is that in spite of his complaints of pain involving headaches, his neck, his left arm, and back; there is no evidence of a spinal injury that could account for them. He has undergone numerous neurological examinations, including my own that have been normal. His general assessment suggests symptom magnification. He has undergone multiple imaging studies of the cervical, thoracic, and lumbar spine that have been normal. He has undergone normal electrodiagnostic testing.

From the standpoint of any spinal injuries incurred in January 2002, he is at a medical end result. No additional treatments will help him. He may return to normal activities immediately without restrictions of any kind. Such a return would in no way be injurious to his health. He has 0% functional impairment, 0% disability, and 0% whole body impairment.

It should be noted that there were several issues in regard to his shoulders. As a neurosurgeon, I am not competent to comment on them in any way.

I would appreciate the opportunity to review the imaging studies of his cervical, thoracic, and lumbar spine. In the presence of normal reports, it is unlikely that these would change my assessment in any meaningful manner.

*Signed under the pains and penalty of perjury this 17th day of January 2006.*

Stephen Saris, M.D.

cc:    Mr. Brian Voke
       Inga Blaustein, Campbell Edwards, and Conroy
       1 Constitution Plaza, 3rd Floor
       Boston, MA 02129

# DR. STEPHEN SARIS

Education:

| | |
|---|---|
| 1966-1972 | Roxbury Latin School<br>Boston, Massachusetts |
| 1972-1974 | Boston University, Boston, MA<br>Six Year Program, Liberal Arts and Medicine<br>B.S. Degree; Magna Cum Laude |
| 1974-1975 | Edinburgh University, Faculty of Arts<br>Edinburgh, Scotland |
| 1975-1979 | Boston University School of Medicine<br>Boston, MA<br>M.D. Degree |
| 1978 | Edinburgh University, Faculty of Medicine<br>Edinburgh, Scotland |

Postdoctoral Training:

| | |
|---|---|
| 1979-1980 | Surgical Intern, Beth Israel Hospital<br>Harvard Medical School<br>Boston, Massachusetts |
| 1980-1981 | Fellow in Neurosurgery, Massachusetts<br>General Hospital<br>Harvard Medical School<br>Boston, Massachusetts |
| 1981-1985 | Resident in Neurosurgery, Duke Hospital<br>Duke Medical School<br>Durham, North Carolina |

Licensure and Certification:

| | | |
|---|---|---|
| 1989-present | Massachusetts | license number: 71248 |
| 1993-present | Rhode Island | license number: 8444 |

Hospital Appointments:

| | |
|---|---|
| 1985-1989 | Senior Staff Fellow<br>Clinical Neurosurgery Section<br>National Institute of Neurological<br>Disorders and Stroke<br>National Institutes of Health |

Bethesda, Maryland

| | |
|---|---|
| 1986-1989 | Staff Neurosurgeon<br>Bethesda Naval Hospital, Naval Medical Center<br>National Capital Region<br>Bethesda, Maryland |
| 1989-1992<br>Active | New England Medical Center<br>Department of Neurosurgery<br>750 Washington St.<br>Boston, MA 02111 |
| 1992-1993 | New England Medical Center<br>Department of Neurosurgery<br>750 Washington St.<br>Boston, MA 02111 |
| 1993-Present<br>Active | Rhode Island Hospital<br>Department of Neurosurgery<br>593 Eddy Street<br>Providence, RI 02903 |
| 1993-present<br>Courtesy Staff | Newport Hospital<br>Department of Surgery/Division of Neurosurgery<br>11 Friendship Street, Newport, RI 02840<br>Orest Zaklynsky, M.D., Department Chief |
| 1994-present<br>Consulting Staff | Women & Infants' Hospital<br>Department of Surgery/Division of Neurosurgery<br>101 Dudley Street, Providence, RI 02905<br>Blake Cady, M.D., Department Chief |
| 1996-present<br>Consulting Staff | Westerly Hospital<br>Department of Surgery/Division on Neurosurgery<br>25 Wells Street, Westerly, RI 02891<br>John T. Auth, M.D., Department Chief |
| 1996-present<br>Consulting Staff | Sturdy Memorial Hospital<br>Department of Surgery/Division of Neurosurgery<br>211 Park Street, P.O. Box 2963<br>Attleboro, MA 02703<br>Bruce S. Auerbach, M.D., Department Chief |
| 1997-present<br>Associate Active | St. Joseph Hospital, Fatima Unit<br>Department of Surgery/Division of Neurosurgery<br>200 High Service Avenue<br>North Providence, RI 02904<br>Allan A. DiSimone, M.D., Department Chief |
| 1999-present<br>**Division Chief** | St. Joseph Hospital<br>Fatima Unit<br>Division of Neurosurgery |

| 1999-present<br>Active Staff | Roger Williams Medical Center<br>Department of Surgery / Division of Neurosurgery<br>825 Chalkstone Avenue<br>Providence, RI 02908<br>Harold Wanabo, M.D., Department Chief |
|---|---|
| 1999-present<br>Active Staff | Landmark Medical<br>Department of Surgery/ Division of Neurosurgery<br>115 Cass Avenue Woonsocket, RI 02895<br>Frank Detoire, M.D., Department Chief |

## Academic Appointments

| 1989 -1992 | Assistant Professor<br>Department of Neurosurgery<br>New England Medical Center<br>Tufts University School of Medicine<br>Boston, Massachussets |
|---|---|
| 1992-1993 | Associate Professor<br>Department of Neurosurgery<br>New England Medical Center<br>Tufts University School of Medicine<br>Boston, Massachussets |
| 1993-1999 | Associate Professor<br>Department of Neurosurgery<br>Rhode Island Hospital<br>Brown University School of Medicine<br>Providence, RI |

## Committees, Positions

| 1993-1994 | Acting Director, New England Gamma Knife Center |
|---|---|
| 1994-1999 | Director, Rhode Island Brain Tumor Clinic |
| 1993-1999 | Director, Rhode Island Neuro-Oncology Board |
| 1998-present | Neurosurgery Subcommittee, Radiation Therapy Oncology Group (RTOG) |

## Teaching Responsibility:

| 1994-present | Brown Neurosurgical Residency Program |
|---|---|

## Memberships:

| | |
|---|---|
| 1980 | American Board of Medical Examiners, Diplomate |
| 1986 | Congress of Neurosurgery |
| 1988 | American Board of Neurological Surgery, Diplomate |
| 1989 | Research Society of Neurological Surgery |
| 1990 | American Association of Neurological Surgeons |
| 1990 | Tumor Section<br>American Association of Neurological Surgeons |
| 1991 | American Society of Clinical Oncology |
| 1993 | Spine Section<br>American Association of Neurological Surgeons |

Editorial boards:

*I have reviewed papers for the following journals*

- Cancer Research
- Cancer
- Neurosurgery
- Journal of Biological Response Modifiers
- Journal of Immunotherapy
- Journal of Neurosurgery

Bibliography:

*refereed clinical and scientific articles*

1. **Saris SC**: Chorea caused by caudate infarction. Arch Neurol 40:590-591,1983
2. **Saris SC**, Vavoulis G, Linder J, Friedman A: Fibrosarcoma of the heart metastatic to the brain. Neurosurg 13:327-329,1983
3. **Saris SC**, Bigner SA, Bigner DD: Intracerebral transplantation of a human glioma line in immunosuppressed rats. J Neurosurg 60:582-588,1984
4. Bullard DE, **Saris SC**, Bigner DD: Internal carotid artery injections in 40-99 gram Fischer rats: Technical note and evaluation of blood flow by various techniques. Neurosurg 14:406-411,1984
5. **Saris SC**, Nashold BS Jr: Dorsal root entry zone coagulation for post-amputation pain. J Neurosurg 62:72-76,1985
6. **Saris SC**, Silver J, Vieira J, Nashold BS Jr: Sacral rhizotomy for perineal pain. Neurosurg 19:789-793,1986
7. **Saris SC**, Rawlings CE III, Muraki A, Friedman A: Syringomyelia in a man with sarcoidosis. Neurosurg 16:805-807,1986
8. **Saris SC**, Patronas N, Loriaux L, Cutler GB, Niemann L, Chrousos G, Doppman J, Oldfield EH: Pituitary CT scanning in Cushing Syndrome. Radiology 162:775-777,1987
9. **Saris SC**, Shook D, Blasberg R, Doppman J, Dedrick R, Lutz R, Blacklock JR, Bankiewicz K, Oldfield EH: Intracarotid drug delivery with diastole-phased, pulsed infusion. J Neurosurg 67:721-725,1987
10. **Saris SC**, Wright DC, Oldfield EH, Blasberg RG: Intravascular streaming and variable delivery to

## *chapters*

1. **Saris SC,** Bigner DD: Experimental Neuro-oncology, Chapter 24 in Foundations in Neurosurgery. Crockard A, Hayward R, Hoff J (eds), Blackwell Scientific Publications, London, England. pp 392-416, 1985

2. Bronec P, **Saris SC**, Nashold BS Jr: Dorsal Root Entry Zone Coagulation, In Operative Surgery, Symonds L (ed), Butterworths, London/Boston, 1990 (in press)

3. Heilman C, **Saris SC**: Malignancies of the brain. In Primary Malignancies, Cameron R. (ed), Lange Series, Chaper 54, pp 435-443.

4. Roth P, **Saris SC**: Neurologic Emergencies. In Primary Malignancies, Cameron R. (ed), Lange Series, 1994, Chapter 11, pp 53-59.

5. Harling OK, Zamenhof RG, Yanch JC, Choi R, **Saris SC**, et al: Boron neutron capture and radiation synovectomy research at the M.I.T research reactor. In Boron neutron capture therapy.