UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.:  05CV10304WGY

| | |
|---|---|
| ROBERT GORMLEY, | * |
| | * |
| Plaintiff, | * |
| | * |
| | * |
| vs. | * |
| | * |
| | * |
| WERNER CO. AND | * |
| HOME DEPOT U.S.A., INC., | * |
| | * |
| Defendants. | * |

## JOINT PRE-TRIAL MEMORANDUM

1. **SUMMARY OF EVIDENCE**

A.    Plaintiff

On January 16, 2002 the Plaintiff, Robert Gormley (D.O.B. 08/13/62), was working on a ladder designed, manufactured and marketed by Defendant Werner Co., and sold by Defendant Home Depot in the spring of 2001.  In the course of his work at Marina Bay in Quincy, Massachusetts, the ladder suffered a sudden failure, causing Mr. Gormley to fall and suffer serious injuries. The failure included fracturing of the right rear rail of the ladder, a Type I, 8-foot fiberglass stepladder. As a result of this incident, Mr. Gormley suffered serious injuries including, but not limited to, left upper extremity damage, thoracic outlet and left shoulder impingement syndrome, and neck pain relating to aggravation of cervical disc disease and arthritis. The fall resulted in chronic and permanent injuries

which, in addition to causing daily pain and disability, have significantly and adversely affected Mr. Gormley's ability to work and earn income.

Mr. Gormley asserts that Werner and Home Depot were negligent in the design, manufacture, sale and distribution of its ladder, and in failing to warn consumers of the unreasonably dangerous and defective condition of the ladder. Also, Defendants breached the implied warranty of merchantability and/or fitness for a particular purpose, when they sold the ladder. Plaintiff's Complaint further asserts claims for unfair and deceptive trade practices pursuant to the Massachusetts Consumer Protection Law, Chapter 93A, which have resulted in severe personal injuries to Mr. Gormley.

Robert Gormley's medical treatment and evaluations subsequent to the date of his injury (January 16, 2002) are significant. On the date of the injury Mr. Gormley was shrink wrapping a boat while working at Marina Bay in Quincy MA when he fell from the ladder as a result of a ladder failure. He received emergency treatment at Quincy Medical Center and followed up with Dr. David Blaustein, a physiatrist, as well as Dr. Birkinfield, a neurosurgeon. He underwent multiple conservative modalities including several courses of physical therapy, steroid injections, and pain management but continued to be symptomatic for cervical pain as well as left shoulder/arm pain and numbness.

An Impartial Medical Examination was completed by Dr. Christopher Rynne on 5/7/2003. It was his opinion at the time that Mr. Gormley sustained an injury to his upper back, neck and shoulder as a result of the 1/16/02 fall. Dr. Rynne stated he would not be capable of returning to his past work as a Boatwright, but would be suitable for sedentary or light work.

2

Dr. David Blaustein's 12/9/2005 report states that Mr. Gormley's cervical and left upper extremity symptoms have remained static. He attributed his neck pain to cervical disc disease and arthritis aggravated by the 1/16/02 fall, and his left upper extremity symptoms were due to thoracic outlet and left shoulder impingement syndrome related to the 1/16/02 fall. He has opined that the fall resulted in chronic and permanent injury to Mr. Gormley's neck and left shoulder girdle. Dr. Blaustein restricted him from lifting greater than 15-20 lbs. on an occasional basis, pushing/pulling 20 lbs, the ability to change position and no overhead lifting.

Mr. Gormley continues to experience significant pain and reduced functional abilities as a result of his injury. He notes increased symptoms in his neck, shoulder and left upper extremity with increases in activity and/or changes in the weather. He has decreased range of motion and strength on the left side and cannot lift overhead. Since the incident he has not been able to perform heavy lifting, work on his car, has sold his boat and paces himself through his activities of daily living.

Due to the incident on January 16, 2002, Mr. Gormley's medical bills relating to the incident are at least $21,333.29. His past lost earnings alone total $151,972.00. Additional economic losses, expected to be the subject of expert testimony, include net economic loss, incorporating Mr. Gormley's prospective residual earning capacity, of $546,370.00.

B.    <u>Defendants</u>

Werner Co. expects to offer the following evidence:

Marina Bay purchased a model FS108 Fiberglass Stepladder on or about May 12, 1999 for use in a commercial marina business. The ladder was manufactured in May 1999.

The ladder was designed, tested and manufactured in conformance with ANSI A14.5 1992 standards.  The manufacture date for the ladder was May 1999.  The FS108 ladders is a Type I, 250lb duty rated 8 foot fiberglass stepladder.  The highest standing level is the 6th step from the bottom which is 5'9" from the ground.  The ladder was manufactured in compliance with Werner Co. specifications.  The ladder was reasonably designed, tested and manufactured.  The warnings and instructions on the ladder were reasonable and the ladder was reasonably safe for its intended use.  The ladder was used at Marina Bay from May 1999 until January 16, 2002 to access hundreds of boats over the years.

Prior to January 16, 2002 the right rear rail of the ladder was damaged.  The ladder should have been taken out of service.  The plaintiff Robert Gormley knew that it was dangerous to use a damaged stepladder nevertheless, on January 16, 2002 he voluntarily and unreasonably proceeded to use the ladder knowing that the right rear leg was damaged.  The accident occurred in storage lot 40 at Marina Bay at 260 Victory Drive in Quincy.  Mr. Gormley was shrink wrapping a sail boat 30 to 40 feet in length when he tipped the ladder over.  He allegedly grabbed the safety rail on the sailboat to brake his fall.  The sailboat allegedly involved was a 34 foot Irwin called the Avanti owned by James Goldstein.

The subject ladder had two rear legs and two front legs a common industry design that has been manufactured for decades.  The overwhelming majority of stepladders produced in 1999 and today by Werner Co. and other manufacturers are of the 4-legged design not equipped with rail shields.  Rail shields are offered as a means to reinforce the bottom of a stepladder to provide a greater degree of resistance to damage through abuse.  They are also provided as a way to repair a ladder that has been damaged at the bottom

4

end.  They cannot prevent damage.  The downside is that rail shields add weight to the portable stepladder.  This is obviously undesirable as evidenced by Mr. Gormley's own actions of pushing the subject ladder from place to place rather than picking the ladder up and moving it.

The right rear side rail of the ladder was fractured a considerable amount prior to Mr. Gormley's fall.  The majority of the fracture to the right rear side rail, the portion extending from the lower end upwards to the bottom horizontal appears rounded off due to the rubbing of the two fracture surfaces together and from contact with other objects.  They appear substantially contaminated with foreign material and dirt that indicates that the fracture surfaces have been exposed for an extended period of time.

The upper portion of the rear rail fracture appears to have occurred more recently but cannot be excluded from being present prior to Mr. Gormley's accident.  This "cleaner" fracturing may have occurred shortly before the day of his accident, during his use of the ladder just prior to his fall or may also have occurred as a result of him striking the ladder during his fall.

The existence of preexisting damage to the right rear side rail to the extent that an open fracture was present to the level of the bottom horizontal brace would be sufficient to introduce a certain degree of instability in the ladder and contributed to Mr. Gormley's fall.

The extent of the fracturing to the right rear rail was such that it would have been visible and readily obvious even to a normal user conducting a visual inspection of the product.  Mr. Gormley testified in his deposition that the fracture was obvious and clearly visible when viewing a photograph of the accident ladder.

Mr. Gormley testified that he did not inspect the ladder prior to using it on the day of his accident even though the instructions say to inspect the ladder for damaged or missing parts before each use.  Mr. Gormley testified that he read the instructions when Marina Bay purchased and provided the ladders to Mr. Gormley and the other employees of Marina Bay.  He testified that he understood the instructions and the possible consequence of not following the instructions was serious injury or death.

The ladders owned by Marina Bay were used by employees of the four different departments of Marina Bay as well as by customers as testified to by Mr. Brownlow in his deposition.  No regular inspection program was in place at Marina Bay.  The inspection of the ladders was left to the employees and the individual using the particular ladder.  Failure to inspect the ladder prior to use is contrary to the warnings and instructions on the ladder.

Mr. Gormley further testified that an open crack as visible in the ladder as in its present condition was obvious to anyone who inspected the ladder.  Failure to inspect the ladder is a misuse that is contrary to the warnings and instructions on the ladder.  Using a damaged ladder is also contrary to the instructions on the ladder.

The left rear side rail is fractured approximately 2" upward from the lower end.  It is likely that this fracture preexisted Mr. Gormley's accident.  A visual inspection of the subject ladder by a normal user would have revealed the existence of this fracture.  This fracture was not a contributing factor to Mr. Gormley's accident.

The crack in the rear flange of the plastic top cap was likely present at least to some degree prior to the accident.  The top cap of the FS108, when tested by Werner Co. where the top cap is loaded at its midpoint is able to withstand in excess of 900 lbs. The presence of a fracture indicates the ladder was overloaded at some point.  This fracture would only

play a role in Mr. Gormley's accident if he were standing on the top cap at the time of his fall. Standing on the top cap is prohibited by the warnings and instructions on the ladder. If Mr. Gormley was standing on the top cap top cap with a fractured rear flange, this reasonably may have contributed to his loss of balance.

Mr. Gormley's fall was a result of his overreaching and then subsequent loss of balance causing the ladder to tip to the left resulting in his fall and subsequent impact with the ladder. Mr. Gormley testified that his feet went to the left. Since his feet were what were in contact with the ladder, the ladder would have to have tipped in the same direction as his feet. With his feet going left his upper body would rotate in a clockwise fashion. This is consistent with Mr. Gormley's testimony that he was in a position parallel with the ground immediately after his feet went to the left.

Mr. Gormley was likely standing higher than the 6th step on the ladder when he had his accident. The 6th step is 5'-9" above the ground. The deck of the boat is 10' above the ground and the safety railing is another 2' above the deck of the boat. Mr. Gormley testified that his feet moved to the left and then his upper body rotated to the right so that he was parallel with the ground. He then testified that he grabbed the safety railing with his left hand. This accident happened quickly so that as his feet went left his body rotated downward quickly to the right. To get parallel his head would have had to drop to the level of his feet or nearly so. This would put his head at the level of 5'-9" above the ground or 6'-3" below the height of the safety railing. Even if his head was two feet above his feet it is highly unlikely that Mr. Gormley could have reached the safety railing with his body parallel or even nearly parallel. However, given the scenario of Mr. Gormley standing on the top cap of the ladder, it is more likely that he could have grabbed the safety

railing to break his fall.  His feet would have been 7'- 8" above the ground or 2'-4" below the deck of the boat when he began to fall.  If his head was at the level of his feet when he came to the parallel position, the safety railing would only have been 4'-4" above his head. If he was nearly parallel where his head was 2' above the level of his feet that would placed the safety railing only 2'-4" above his head a distance within reach of Mr. Gormley's grasp.

Mr. Gormley's and other's abuse of the ladder by pushing it on a paved asphalt surface that had irregularities led to the deteriorating condition of the ladder over time. Mr. Gormley testified that in a season, approximately 300 boats are shrinkwrapped.  Mr. Brownlow estimated there were as many as 700 boats to be shrinkwrapped in a season. Approximately 270 - 280 boats had already been completed that season according to Mr. Gormley's testimony.  Each boat required the stepladder to be placed in multiple positions to complete the shrinkwrapping process.  Mr. Gormley testified that he had positioned the ladder in 5 different positions prior to his accident on the morning of January 16, 2002. Records from Marina Bay indicate the ladder was purchased in May 1999 rather than spring 2001 as testified to by Mr. Gormley.  That means that the subject ladder was exposed to three seasons of boat storage and shrinkwrapping operations with the ladder being pushed along the irregular pavement on thousands of occasions.  This severe abuse likely contributed to the deterioration of the subject ladder and the other 8' fiberglass stepladders purchased by Marina Bay.

The use of Marina Bay's ladders by outside customers and a number of different employees from the different departments within Marina Bay without regular inspections of the ladders means that damage to a ladder from any number of ways such as overloads,

impact and misuse, would go undetected. The subject ladder was apparently in use in a frequent and demanding environment for over 2-1/2 years without regular inspections being performed. Without a regular inspection program, it cannot be determined what caused the rear rail of the subject ladder and the other similar ladder to fracture.

Walking of a stepladder is a conscious effort of the user provided the ladder is erected with all four legs resting in contact with a reasonably level surface. Mr. Gormley testified that all four legs were in contact with the pavement. Given this testimony, along with the testimony that he was on the 6th step, walking of the subject stepladder would require a conscious effort by Mr. Gormley.

A tripod or 3-legged ladder is able to find a position of stability on an irregular surface with greater ease than a 4-legged ladder. However, on a reasonably level surface, a four-legged ladder will have a higher degree of stability compared to a tripod or 3-legged ladder when all four legs are in contact with the ground.

Any ladder can be made to walk depending on the way it is positioned, the type of floor or ground on which it rests and the methods in which forces are applied to the ladder.

Video testing was conducted by Frederick Bartnicki on an exemplar stepladder of the same design. The exemplar differed in the color of the side rails, blue vs. yellow, and the color of the Plastic Top Cap, yellow vs. blue. The testing illustrates the abuse resistance of the ladder, its load carrying capabilities, the load distribution on the four legs of the ladder and the conditions under which a ladder can be made to walk. It also shows that the rear legs carry a lesser amount of load when the ladder is erected and used in a normal fashion and that the rear legs are designed to carry loads much greater than would be expected in normal use.

The subject Werner Model FS108 8' fiberglass stepladder was manufactured in accordance with the applicable industry standards of the American National Standards Institute (ANSI) A14.5-1992 and complied with the OSHA standards for ladders. It was also designed and manufactured in accordance with Aluminum Association, American Society for Testing and Materials (ASTM) and Werner standards and that it was acceptable for use in its intended purpose.

The design of the subject ladder and the design of the side rails of the subject ladder are neither deficient nor defective due to the absence of rail shields. Rail shields are intended to provide an added measure of abuse resistance but will not prevent damage from certain abusive loads.

The fiberglass side rails are reasonably designed, manufactured and tested and are reasonably safe for their intended use in the subject stepladder.

The design of the subject ladder and the design of the side rails of the subject ladder are neither deficient nor defective due to the absence of the EDGE or plastic combination bracing utilized on other model stepladders produced by Werner Co. The EDGE or combination plastic bracing utilized on other model stepladders produced by Werner Co is intended to provide an added measure of abuse resistance but will not prevent damage from certain abusive loads.

The design of the ladder is such that it exceeds the requirements set forth in the ANSI A14.5-1992 requirements for Compression, Step Bending, Side rail Bending, Racking, Rail Torsion and Spreader Testing, Torsional Stability and Front, Rear and Side Stability. These design verification tests specified in the ANSI standards are reliable tests that accurately assess the performance of a stepladder.

The subject FS108 fiberglass 8' stepladder has spreaders of sufficient strength and rigidity and the ladder itself has sufficient torsional stability and rigidity when used in accordance with the instructions and warnings affixed to the ladder.

Warnings contained in the Safety Instructions on the subject ladder and of particular interest in this lawsuit are as follows:

- **Warning:**  Failure to follow all instructions may result in serious injury.
- **Inspect for damaged or missing parts before each use.**
- Never use a ladder with missing or damaged parts.
- Check all parts for good condition.  Lightly lubricate moving parts occasionally.
- **Read All Labels!**
- Place ladder feet on firm level ground.  If used on slippery surfaces, be careful!
- Check that all four feet of the ladder are firmly supported to prevent excessive movements.
- Always face ladder and maintain a firm grip while on it.
- **DO NOT OVER-REACH.**  Always keep belt buckle between side rails when climbing or working from ladder.  You may lose your balance and/or tip the ladder.
- Use extreme caution pushing or pulling anything while on a ladder.  You may lose your balance and/or tip the ladder.
- **ALWAYS USE LADDER AS DESCRIBED ABOVE.  NEVER MISUSE OR ABUSE A LADDER.**

The Caution Label on the subject ladder contains the following warning:

- Keep body centered between side rails.  Do Not Over-Reach.
- Set all four feet on firm level surface.

The Danger Label on the side of the subject ladder reads as follows:

- Failure to read and follow instructions on this ladder may result in injuries or death.

The Danger Label on the front flange of the top step of the subject ladder reads as follows:

- Danger Do Not Stand at or above this level.  YOU CAN LOSE YOUR BALANCE.

The Danger Label on the top cap of the subject ladder reads as follows:

- Danger Do Not Stand or Sit

The warnings on the ladder were adequate and reasonable for their intended purpose and if followed will not result in inadvertent walking of the ladder. The warnings present on the ladder to instruct on proper inspection and proper set up and use were in compliance with the applicable ANSI A14.5 -1992 standards.

Mr. Kista's opinion that rail shields or a different type of bracing would have prevented cracking and weakening of the right rear leg is without any scientific or engineering basis. Given that there were numerous users of the ladder it is not possible to determine the cause of the damage to the right rear leg.

Mr. Gormley returned to work in the spring of 2002 and was involved in additional work related accidents including an incident where he fell through a dock.

Dr. Stephen Saris, a neurologist who examined Mr. Gormley on behalf of Warner Co. is expected to testify that Mr. Gormley did not suffer an permanent injury to his neck or his back as a result of the fall and is capable of returning to work. Mr. Gormley does not suffer from thoracic outlet syndrome as alleged by Dr. Blaustein.

2.    **<u>CONTESTED ISSUES OF FACT</u>**

1.    Whether Defendant Werner Co. breached the warranty of merchantability.

2.    Whether Defendant Home Depot breached the warranty of merchantability.

3.    Whether the Defendants were negligent in failing to provide adequate instructions and warnings regarding the use, operation and maintenance of the subject ladder to Plaintiff Robert Gormley.

4.     Whether Defendant Werner Co. was negligent in the design, manufacture, testing, distribution and sale of the subject ladder.

5.     Whether Defendant Home Depot was negligent in the distribution and sale of the subject Werner Co. ladder.

6.     The extent of the Plaintiff's injuries caused by the Defendants' negligence and breaches of warranty.

7.     Whether the subject ladder was defective and unreasonably dangerous.

8.     Whether the Plaintiff's injuries were proximately caused by his accident on January 16, 2002.

9.     Whether Werner Co. negligently designed the ladder.

10.     Whether Werner Co.'s negligence was the proximate cause of any injury to the plaintiff.

11.     Whether the plaintiff was the sole proximate cause of his own injuries.

12.     Whether the plaintiff misused the ladder.

13.     Whether the plaintiff was using the ladder in a reasonably foreseeable manner.

14.     Whether the plaintiff failed to mitigate his damages.

15.     Whether the plaintiff can establish that the ladder was not improperly handled by any intermediate handler.

16.     The nature and extent of plaintiff's injuries and damages.

17.     Whether the plaintiff was negligent in his use of the ladder.

18.     Whether the plaintiff assumed the risks of injury by the manner of his use of the ladder.

19.     Whether the plaintiff voluntarily and unreasonably proceeded to encounter a known danger.

20.     Whether the plaintiff use of the law was misconduct.

21.     Whether the ladder was reasonably designed or manufactured for its intended use.

22.     Whether the plaintiff mitigated his damages.

23.     The manner in which the ladder was erected.

24.     The manner in which the ladder was damaged.

25.     The circumstances of the plaintiff's fall.

26.     The cause and extent of the plaintiff's injuries.

27.     The strength of the ladder.

28.     The plaintiff's damages.

29.     Whether plaintiff's use of the ladder was abnormal.

30.     Whether plaintiff's injuries if any were the result of alterations to the ladder by the plaintiff.

31.     Whether Werner Co. and Home Depot U.S.A., Inc. breached any implied warranty of merchantability.

32.     Whether any breach of any implied warranty of merchantability by Werner Co. and Home Depot U.S.A., Inc. was a proximate cause of any injury to the plaintiff.

33.     Whether the ladder was defectively designed and unreasonably dangerous for its intended use.

34.     Whether any defect in the design of the ladder which rendered it unreasonably dangerous for its intended use was the proximate cause of any injury to the plaintiff.

35.     The nature and circumstances of the plaintiff's accident.

36.     Whether the ladder was defectively manufactured and unreasonably dangerous for its intended use.

37.     Whether any defect in the ladder was the proximate cause of any injury to the plaintiff.

38.     Whether the ladder produced by the plaintiff in this case is the one involved in Robert Gormley's accident.


**3.    JURISDICTIONAL QUESTIONS**

None.

4.    **QUESTIONS RAISED BY PENDING MOTIONS**

Werner Co.'s Motion in Limine to Exclude All Reference to and Evidence of Other Accidents.

Werner Co.'s Motion in Limine to Exclude Evidence of The Edge Bracing Design.

Werner Co.'s Motion to Exclude the Testimony of Stan Kiska

Werner Co.'s Request for a Daubert Hearing Relative to the Proposed Testimony of Stan Kiska.

5.    **ISSUES OF LAW**

None.

6.    **REQUESTED AMENDMENTS TO THE PLEADINGS**

None.

7.    **ADDITIONAL MATTERS TO AID IN DISPOSITION**

None.

8.    **PROBABLE LENGTH OF TRIAL**

Jury trial, 8-9 full days.

9.    **WITNESSES**

A.    Plaintiff's Witnesses.

Robert Gormley
45 Grandview Ave.
Quincy, MA 02170
(Fact)

Lauren H. Gormley
45 Grandview Avenue
Quincy, MA 02170
(Fact)

William Doran
217 Newbury Avenue

Quincy, MA
(Fact)

James Glynn
46 Independence Avenue
Quincy, MA 02169
(Fact)

Joseph D. Capilli
YMCA- 320 Main Street
Brockton, MA 02301-5323
(Fact)

William R. Brownlow
40 Beebe Road
Quincy, MA  02169
(Fact)

William Weed
260 Victory Road
Quincy, MA 02169
(Fact)

Stanley A. Kiska, P.E.
Integra Engineering, P.C.
120 Shady Lane
Fayetteville, NY 13066
(Expert)

Amy Vercillo, M.S., C.R.C., C.D.M.S., L.R.C.
Rehabilitation and Re-Employment, Inc.
115 Cedar Street
Providence, RI 02093
(Expert)

Ernest Kendall, Ph.D.
Commonwealth Research Group, Inc.
P.O. Box 7
78 Winthrop Road
Brookline, MA 02446
(Expert)

David M. Blaustein, M.D.
114 Whitwell Street
Quincy, MA 02169
(Expert)

Home Depot U.S.A., Inc.
2455 Paces Ferry Road
Atlanta, Georgia
(Defendant)

Werner Co.
93 Werner Road
Greenville, Pennsylvania
(Defendant)

Frederick Joseph Bartnicki
36 Fredonia Road
Greenville, Pennsylvania 16125
(Defendant witness)

Richard W. Mahoney
36 Sunny Brook Circle
North Waterboro, Maine
(Fact)

John H. Covert
39 Coniston Street
Roslindale, MA 02131
(Fact)

Will Shalit
11 Brent St.
Dorchester, MA 02170
(Fact)

Stephen G. Smith
Marina Bay
333 Victory Road
Quincy, MA
(Fact)

Plaintiff's Treating Health Care Providers
(as disclosed in previously produced medical records)
(Medical)

Laura Podolski, PT
Quincy Medical Center
114 Whitwell Street
Quincy, MA 02169
(Medical)

Keeper of Records
Renee Goetzler, M.D.
Carney Hospital
2100 Dorchester Avenue
Dorchester, MA 02124

Keeper of Records
Quincy Medical Center
114 Whitwell St.
Quincy, MA 02169

Keeper of Records
Charles Fathalla, M.D.
146 Pleasant Street
Attleboro, MA 02703

Keeper of Records
Weymouth MRI
420 Liberty Parkway
Weymouth, MA 02189

Keeper of Records
Allen Curtis, M.D.
235 Cypress Street, Suite 300
Brookline, MA 02445

Keeper of Records
MGH Physical Therapy
15 Parkman Street
Boston, MA 02116

Keeper of Records
Massachusetts General Hospital
55 Fruit Street
Boston, MA 02114

Keeper of Records
Christopher Rynne, M.D.
780 Main Street, #1C
South Weymouth, Ma 02190

Keeper of Records
Ronald Birkenfeld, M.D.
Milton Hospital Medical Office Building
100 Highland Street

Milton, MA 02186

Keeper of Records
Rehabilitation Specialists
6 Fort Street, 2nd Floor
Quincy, MA 02169

Keeper of Records
Spine, Sports and Rehabilitation.
150 Parking Way, Suite 2
Quincy, MA 02169

Plaintiff reserves the right to present testimony of any and all witnesses by means of a deposition.  At present, the testimony of Werner Co., Home Depot and Frederick Bartnicki are likely to be presented via deposition.  Plaintiff further reserves the right to call witnesses listed by defendants, to call rebuttal witnesses and to supplement this

B.      <u>Defendants' Witnesses.</u>

Gary Goldstein
284 Lake Avenue
Newton, MA

Fred Bartnicki
Werner Co.
Greenville, PA

Dr. Stephen Saris
Providence, RI

Kim Kelley
Marina Bay
Quincy, MA

Richard Hawkins, MD

Robert Campbell, Jr.
Commercial Wharf Associates
One Constitution Plaza
Boston, MA 02129

Dr. Owen R. McConville
Weymouth, MA
(South Shore Orthopedic Specialists)

Dr. Charles Fathalla

146 Pleasant Street
Attleboro, MA
(Orthopedic Surgery & Sports Medicine)

Weymouth MRI Records Keeper

Dr. Steven W. Medwid
Weymouth MRI
420 Libbey Industrial Parkway
Weymouth, MA

Dr. David Blaustein

Stephen Smith
Marina Bay
Quincy, MA

Kim Kelley
Marina Bay
Quincy, MA

Robert Gormley
45 Grandview Ave.
Quincy, MA 02170
(Fact)
(Werner Co. may read portions of witness's deposition transcript at trial)

Lauren H. Gormley
45 Grandview Avenue
Quincy, MA 02170
(Fact)

William Doran
217 Newbury Avenue
Quincy, MA
(Fact)

James Glynn
46 Independence Avenue
Quincy, MA 02169
(Fact)

Joseph D. Capilli
YMCA- 320 Main Street
Brockton, MA 02301-5323
(Fact)

William R. Brownlow
40 Beebe Road
Quincy, MA  02169

William Weed
260 Victory Road
Quincy, MA 02169

David M. Blaustein, M.D.
114 Whitwell Street
Quincy, MA 02169
(Expert)

Richard W. Mahoney
36 Sunny Brook Circle
North Waterboro, Maine
(Fact)

John H. Covert
39 Coniston Street
Roslindale, MA 02131
(Fact)

Will Shalit
11 Brent St.
Dorchester, MA 02170

Stephen G. Smith
Marina Bay
333 Victory Road
Quincy, MA
(Fact)

Keeper of Records
Renee Goetzler, M.D.
Carney Hospital
2100 Dorchester Avenue
Dorchester, MA 02124

Keeper of Records
Quincy Medical Center
114 Whitwell St.
Quincy, MA 02169

Keeper of Records

Charles Fathalla, M.D.
146 Pleasant Street
Attleboro, MA 02703

Keeper of Records
Weymouth MRI
420 Liberty Parkway
Weymouth, MA 02189

Keeper of Records
Allen Curtis, M.D.
235 Cypress Street, Suite 300
Brookline, MA 02445

Keeper of Records
MGH Physical Therapy
15 Parkman Street
Boston, MA 02116

Keeper of Records
Massachusetts General Hospital
55 Fruit Street
Boston, MA 02114

Keeper of Records
Christopher Rynne, M.D.
780 Main Street, #1C
South Weymouth, Ma 02190

Keeper of Records
Ronald Birkenfeld, M.D.
Milton Hospital Medical Office Building
100 Highland Street
Milton, MA 02186

Keeper of Records
Rehabilitation Specialists
6 Fort Street, 2nd Floor
Quincy, MA 02169

Keeper of Records
Spine, Sports and Rehabilitation.
150 Parking Way, Suite 2
Quincy, MA 02169

10.    **PROPOSED EXHIBITS**

A.    Plaintiff's Exhibits

Exhibit 1.    Photographs/video of subject ladder.

Exhibit 2.    Subject ladder

Exhibit 3.    Photographs/video of exemplar fiberglass stepladder(s)

Exhibit 4.    Exemplar fiberglass stepladder(s)

Exhibit 5.    Exemplar ladder accessories.

Exhibit 6.    Exemplar ladder bracing

Exhibit 7.    Exemplar ladder rail shields and rail boots.

Exhibit 8.    Photographs of scene of incident

Exhibit 9.    Medical records of plaintiff

Exhibit 10.    Medical bills of plaintiff

Exhibit 11.    Expert (Kiska) testing/photos/video

Exhibit 12.    Certified Life Tables

Exhibit 13.    Select exhibits to Bartnicki deposition
Exhibit 14.    Werner design drawings

Exhibit 15.    Werner test reports

Exhibit 16.    Werner description of manufacturing process

Exhibit 17.    Representative Werner marketing documents

Exhibit 18.    Werner Co. engineering drawings (Bartnicki Exhibit 12)

Exhibit 19.    Engineering drawings (Bartnicki Exhibit 13)

Exhibit 20.    Fiberglass Ladder Technical Manual 2001/2002 (Bartnicki Ex. 14)

Exhibit 21.    Photocopy of Fiberglass Ladder Technical Manual (Bartnicki Exhibit 15)

Exhibit 22.    Printout from Werner Co.'s web site entitled "Werner Ladder-Accessories" (Bartnicki Exhibit 18)

Exhibit 23.    Printout from Amazon.com web site (Bartnicki Exhibit 23)

Exhibit 24.    Werner 6008, Resin Injected Prototype Testing document (Bartnicki Exhibit 28)

Exhibit 25.    Testing A., Werner 6008 F.R.P. Stepladder to ANSI A14.5 document (Bartnicki Exhibit 29)

Exhibit 26.    Test report dated July 27, 1993 (Bartnicki Exhibit 26)

Exhibit 27.    Werner 6006 ANSI A14.5 Complete Series Testing document ( Bartnicki Exhibit 27)

Exhibit 28.    Test Report Number: 7393 (Bartnicki Exhibit 30)

Exhibit 29.    Test Report Number: 7398 (Bartnicki Exhibit 31)

Exhibit 30.    Test Report Number: 9104 (Bartnicki Exhibit 32)

Exhibit 31.    Werner 2005 Climbing Products Catalog (Bartnicki Exhibit 34)

Exhibit 32.    Drawing of Marina Bay storage yard (Gormley Exhibit 1)

Exhibit 33.    Drawing of sail boat by James Glynn (Glynn Exhibit 1)

Exhibit 34.    Drawing of sail boat by Joseph Capilli (Capilli Exhibit 1)
Exhibit 35.    Printout of Werner Co.'s web site entitled "Werner Ladder-Products" (Bartnicki Exhibit 5)

Exhibit 36.    Document entitled "Suggested Retail Price List 2005" (Bartnicki Exhibit 6)

Exhibit 37.    Internet printout entitled "OSHA Regulations (Standards- 29CFR): Ladders." (Bartnicki Exhibit 7)

Exhibit 38.    Advertising of Model FS100 & FS100S Series stepladders (Bartnicki Exhibit 24)

Exhibit 39.    Complaint for Damages in Julian R. Gajate v. Werner Co. case (Bartnicki Exhibit 35)

Exhibit 40.    Documents evidencing Plaintiff's past income

2.    <u>Defendants' Exhibits</u>

Werner Co. may use one or more of the following as exhibits at trial.  By listing any exhibit, Werner Co. does not agree to its admissibility and reserves its right to object to any exhibit.

Exhibit 1.    Rail Shield

Exhibit 2.    Lynn Ladder Fiberglass Stepladder

Exhibit 3.    Louisville Ladder Fiberglass Stepladder

Exhibit 4.    Greenbull Ladder Fiberglass Stepladder

Exhibit 5.    Werner Fiberglass Stepladder

Exhibit 6.    Subject ladder

Exhibit 7.    Summary of Bartnicki Tests

Exhibit 8.    Marina Bay Records

Exhibit 9.    Photographs of the subject ladder

Exhibit 10.    Photographs of the Scene

Exhibit 11.    Summary of Medical Tests

Exhibit 12.    ANSI A14.5

Exhibit 13.    Portions of Quincy Hospital Records

Exhibits 14.    Photographs of Competition Ladders

Exhibit 15.    Werner Drawings

Exhibit 16.    Rail Sheild Photographs

Exhibit 17.    Werner Test Reports

Exhibit 18.    Werner Ladder Labels.

Exhibit 19.    ANSI Labels

Exhibit 20.    Employer's First Report of Injury (January 16, 2002)

Exhibit 21.    Ladder Damage Chart

Exhibit 22.    Photographs of Subject Ladder

Exhibit 23.    Bartnicki Video(s)

Exhibit 24.    Marina Bay Cancelled Check for Purchase of Ladder

Exhibit 25.    Marina Bay Purchase Order for Purchase of Ladder

Exhibit 26.    Marina Bay Manual Check Request

Exhibit 27.    Marina Bay Accounts Payable Records

Exhibit 28.    Marina Bay Records

Exhibit 29.    OSHA Form 1031 (May 23, 2002) (Smith Ex. 5)

Exhibit 30.    Smith Deposition (Ex. 4)

Exhibit 31.    Smith Deposition (Ex. 6, 7, 8, 9)

Exhibit 32.    MRI Films

Exhibit 33.    X-Ray Films

Exhibit 34.    Portions of MGH Physical Therapy Records

Exhibit 35.    Portions South Shore Orthopedic Specialists Records

Exhibit 36.    Portions Orthopedic Surgery & Sports Medicine Records (Fr.
Charles Fathalla)

Exhibit 37.    Employer's First Report of Injury (November 20, 1998)

Exhibit 38.    Dr. Renee Goetela Record (November 20, 1998)

Exhibit 39.    Marina Bay Incident Report (November 20, 1998)

Exhibit 40.    Plaintiff's Income Tax Returns

Exhibit 41.    Medical Charts

Exhibit 42.    Medical Diagrams

Exhibit 43.    Plaintiffs income tax returns

Exhibit 44.    Employer's First Report of Injury December 11, 2000

Exhibit 45.    Richard Hawkins M.D. Report of July 27, 2002

Exhibit 46.    Worker's Compensation Records

Exhibit 47.    Quincy Medical Center Records

Exhibit 48.    Dr. Blaustein Records

Exhibit 49.    Scales

Exhibit 50.    Medical Chart

Exhibit 51.    Photos of scene

Exhibit 52.    Photos of sailboats on stands

Exhibit 53.    Videos of ladder demonstrations and testing

Exhibit 54.    Photos of Louisville step ladder

Exhibit 55.    Photos of Lynn Ladder step ladder

Exhibit 56.    Photos of Greenbull step ladder

Dated:  <u>April 18, 2006</u>


The Plaintiff,
By His Attorneys,


<u>    s/Joseph A. Swartz    </u>
Edward M. Swartz
B.B.O. No. 489540
Joseph A. Swartz
B.B.O. No. 489640
Jonathan D. Sweet
B.B.O. No. 634755
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
(617) 742-1900


The Defendants,
By Their Attorney,


<u>    s/Brian Voke    </u>
Brian Voke
B.B.O. No. 544327
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02109
(617) 241-3000

## **CERTIFICATE OF SERVICE**

I, Joseph A. Swartz, Esq. do hereby certify that the foregoing document was served on the following counsel on this date and in the manner specified herein:

Electronically Serviced Through ECF:

Brian Voke, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02109

This 18th day of April, 2006.

__s/Joseph A. Swartz_____
Joseph A. Swartz