UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHSUETTS

| | |
|---|---|
| ROBERT GORMLEY )<br>PLAINTIFF )<br> )<br>VS. )<br> )<br>WERNER LADDER CO., )<br>INC., AND HOME DEPOT )<br>U.S.A., INC. )<br>DEFENDANTS ) | CIVIL ACTION<br>NO: 05CV10304WGY |

**DEFENDANT, WERNER CO.'S MEMORANDUM IN SUPPORT OF A MOTION IN LIMINE TO EXCLUDE OPINIONS OF STAN KISKA AND FOR A RULE 104(a) HEARING**

This is a product liability action which arises out of Robert Gormley's fall from an 8 foot Werner Model FS108 fiberglass step ladder while employed at Marina Bay in Quincy, Massachusetts on January 16, 2002. The ladder was manufactured in 1999 and purchased by Marina Bay in 1999. It was used in a commercial marina business to access hundreds of sailboats and motorboats that were stored at Marina Bay.

Plaintiff identified Stan Kiska, a former Werner co. engineer as his liability expert in this case. Kiska concedes that the bottom right rear rail of the fiberglass step ladder was split in half a distance of 3-6 inches along the bottom of the rail prior to Mr. Gormley's accident.

Werner Co. moves for a Rule 104(a) hearing and to exclude Kiska's opinions on warnings as he is not qualified. Werner Co. also moves to exclude the following opinions identified in Kiska's disclosure (Attached as Exhibit A) as it is clear these opinions are unreliable under <u>Daubert, et al. v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786 (1993) and <u>Kuhmo Tire Company, Ltd. V. Carmichael</u>, 526 U.S. 137, 199 S.Ct. 1167 (1999) and F.R.E.702, the testimony is not based upon sufficient facts or data, the opinion testimony is not the product of reliable principles and methods and Kiska has not applied scientific methods and principles reliably to the facts of this case:

<u>Kiska Opinions</u>

<u>Kiska's Walking Theory</u>

1. A user can inadvertently cause a ladder to walk while using it in a foreseeable manner. Labels on the product failed to warn users that the ladder could suddenly become unstable by the walking phenomenon without their knowledge. (p. 5 fourth, fifth and sixth paragraphs; p. 6 third and fourth paragraphs Kiska Disclosure).

Destabilization of this ladder due to cracking of the rear leg followed by the walking phenomenon caused the ladder to move unexpectedly thus causing Mr. Gormley to fall and suffer serious injuries. (p. 5 sixth paragraph Kiska Disclosure).

As a result of defendant's failure with regard to warnings and instructions Mr. Gormley and his co-worker were not made aware of the particular tendency of the subject model fiberglass step ladder to walk.

Kiska's Reconstruction Theory

2.    Shift in Mr. Gormley's weight from side to side were sufficient to cause the ladder to twist and ultimately force the right rear leg to support a disproportionate amount of load both arial and lateral. This combination was sufficient to cause the right rear leg to begin collapsing. As a result of destabilization of the ladder, Mr. Gormley reacted by dropping his heating tool and grabbing for the safety rail on the boat. This caused the ladder to shift back to the left, with the ladder ultimately falling in that direction to the ground. (p. 4 last paragraph Kiska Disclosure).

Kiska's Rail Shield Theory

3.    Cracking of the legs could have been substantially reduced or eliminated by the defendant's incorporation of rail shields. (p. 5 third paragraph Kiska Disclosure).

Had Mr. Gormley's ladder been equipped with bracing capable of enhancing the ladder's strength and durability protecting against damage, the side rails would likely not have become cracked and prone to shifting under lateral loads. (p. 5 last paragraph Kiska Disclosure).

## Kiska's Walking Theory

Kiska's theory that a use of the subject ladder can inadvertently cause the ladder to walk without the user's knowledge while using the ladder in a foreseeable manner is simply a conclusory statement by Kiska. While Kiska may have conducted video demonstrations where he intentionally manipulated a ladder to move the feet of the ladder, it is clear from Kiska's expert disclosure and his deposition testimony that Kiska's opinion is completely unreliable. Kiska's actions of intentionally walking (moving a step ladder with his feet while standing on the ladder) does not constitute a reliable scientific methodology to support an opinion that a user can inadvertently cause the feet of the ladder to walk without the user knowing it. Further, his video demonstrations do not provide facts or data to support this opinion. Finally, Kiska has not applied any scientific methods and principles reliably to the facts of this case.

Gormley provided the following description of the accident which contains no evidence the ladder walked:

> Q. Describe to me, as best you recall, how your accident occurred?
> A. Well, I was on the ladder, tightening up the last section of plastic. I felt the ladder give away underneath my feet. My legs shot off to the left. I immediately dropped the pole, which had the gun on it, the propane gun on it. I went to catch myself with my left hand, grabbing onto the safety line. I redirected my body, and I came down with arms and legs in the air. I landed on what I believe to be the ladder, and hitting my head on the ground, like, twisting around. (Gormley Depo p. 73, lines 3-14.)

Kiska also conceded at his deposition that except for his own ladder demonstrations in this case, he was not aware of any tests or studies performed by anyone to support his opinion that a stepladder can walk (move) without the user knowing it. (Kiska depo, p. 91, line 16 to p. 93, line 13).

### Kiska's Reconstruction Theory

Kiska's opinion as to how Gormley's accident occurred is not based upon reliable scientific methods and principles. Further, his reconstruction opinion is not based upon the facts of this case as Gormley's own deposition testimony makes clear that Kiska's reconstruction opinion is without any evidentiary basis.

Gormley described the accident as follows:

Q. And you say you swung around?
A. What happened was is when the ladder gave way underneath me, my legs shot off to the left. I immediately dropped the gun, and I went to catch myself, because at that time, I was sidewards to the ground with my right side down. I went to catch myself with my left arm by grabbing on – it was a reflex to grab onto the safety line to try to catch myself. When I did that it redirected my body, and I came down arms and legs in the air and landed on something.
Q. You said you were sideways in the air and then you grabbed the safety line?
A.    Yes.

(Gormley depo p. 81, line 12 to p. 82, line 1).

Gormley's own testimony establishes that his feet were in the air and off the ladder at the time he grabbed the safety line. Kiska's opinion to the contrary is simply fiction. Moreover, it is clear from a review of Kiska's deposition testimony that he has not used any reliable scientific methodology to arrive at his opinions.

5

(Kiska depo p. 87, line 18 to p. 90, line 11). Kiska's methodology is his own. It is not published and he is unaware of its error rate. (Id.)

**Kiska's Opinion that Rail Shields or Other Bracing Would Have Prevented Gormley's Accident is Unreliable Speculation Unsupported by any Reliable Facts, Data, Testing or Scientific Methodology**

Stan Kiska concedes that the right rear rail of the ladder was split 3-6 inches prior to Mr. Gormley's use of the ladder on the day of the accident. (Kiska Depo p. 7, 8, 9). Kiska has no knowledge as to what caused the crack (split) in the right rear rail of the Gormley ladder. (Kiska Depo p. 50, line 16 to p. 52 line 13). He has done not testing to determine what caused the damage to the right rear rail of the ladder (Kiska depo p. 50-53). He has no knowledge as to whether someone intentionally threw the Gormley ladder or abused the Gormley ladder to damage the right rear rail. (Kiska depo 51-52). Kiska has never studied the use and abuse of fiberglass ladders in the field (Kiska depo p. 54, lines 15-18.

Finally, Kiska's deposition testimony and his expert disclosure make clear that he has never designed or tested a rail shield for any fiberglass step ladder to determine under what circumstance a rail shield may not have prevented a split in the right rear rail of the Gormley ladder. (Kiska depo p. 54, 94-96 and Kiska Disclosure).

Kiska's lack of testing and experience with rail shields combined with his admission that he has no knowledge as to how the right rear rail of the Gormley

6

ladder was damaged render his opinion that a rail shield or other bracing would have prevented the damage to the Gormley ladder as complete speculation. Moreover, it is plain to see that Kiska used no reliable scientific methodology to arrive as his conclusions that the absence of a rail shield or some other bracing would have prevented the damage to the Gormley ladder. Kiska simply does not know how the ladder was damaged and any opinion that a rail shield or other bracing would have prevented the damage to the right rear rail is simply a guess.

## CONCLUSION

For the above reasons, the Court should schedule a Rule 104(a) evidentiary hearing to exclude Kiska's opinions and testimony.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of *Werner Co.'s Memorandum in Support of Motion in Limine to Exclude Opinions of Stan Kiska and for a Rule 104(a) Hearing,* was served upon all counsel of record electronically on April 19, 2006.

        WERNER LADDER COMPANY
        By Its attorneys,

        CAMPBELL CAMPBELL EDWARDS & CONROY
        PROFESSIONAL CORPORATION


        */s/Brian P. Voke*
        Brian P. Voke (BBO# 544327)
        One Constitution Plaza
        Boston, MA 02129
        (617) 241-3000

120 Shady Lane
Fayetteville, NY 13066



**ENGINEERING, P.C.**

Office:   315-637-4723
Fax:      315-637-5521

January 25, 2006

James Swartz
Swartz & Swartz
Number Ten Marshall Street
Boston, MA  02108

**Re: Robert Gormley**

Dear Mr. Swartz,

I have performed a non-destructive examination of the subject ladder and have inspected the incident site. I now offer the following report of my findings and opinions. My rate of compensation is $150/hr.

In preparation of this report, I have reviewed the following information generated in discovery in this case:
- Depositions of
    - Fred Bartnicki dated 11/18/05 & 12/19/05,
    - William Brownlow dated 12/7/05,
    - John Covert dated 12/7/05,
    - Joseph Capilli dated 12/19/05,
    - James Glynn dated 12/7/05,
    - Lauren Gormley dated 12/6/05,
    - Robert Gormley dated 12/6/05,
    - Richard Mahoney dated 1/11/06,
    - Stephen Smith dated 12/19/05,
    - William Weed dated 12/19/05,
- Various exhibits pertinent to the aforementioned depositions,
- Werner answers to plaintiff's first set of interrogatories,
- Werner responses to plaintiff's first production requests,
- Deposition notices of Werner & Fred Bartnicki,
- Deposition notice of Robert Collins,
- Deposition notice of Home Depot,
- Plaintiff's responses to Werner's first set of requests for documents,
- Plaintiff's answers to Werner's first set of interrogatories,
- Discovery documents supplied by Werner including
    - Test reports 7086, 7158, 7175, 7393, 7398, 9104
    - Attachment B
    - US Patents 5259480, 310884, 340773,
    - Werner advertising literature
    - Werner drawings for subject product



1

- o OSHA Regulations for ladders 1926-1053
- o ANSI A14.5-1992
- ➢ Mr. Gormley's medical records,

Additionally I have obtained various ladders for review and testing, including Werner's newer version of the subject model, and have had the opportunity to observe another workman at Marina Bay performing the same kind of work that Mr. Gormley was performing at the time of the incident.

## Subject Ladder

The subject ladder is a Werner model FS108 manufactured approximately May 1999 in Werner's Greenville, PA facility and sold by Home Depot in Quincy, MA. It is apparently one of two identical model ladders utilized by the Marina Bay workers. The right rear rail exhibits fractures several inches up from the bottom of the ladder, between the web and primary (rearmost) flange. Other rails also exhibit fracturing to a lesser degree. The other Marina Bay model FS108 observed at your office also exhibited similar types of fractures. Fastener connections between the steps, rails and braces on the front section of the subject ladder are apparently loose, as exhibited in a substantial lack of twist resistance in the front section.

## Background

Mr. Gormley was working as a Boatwright as part of a crew at Marina Bay responsible for preparing dry-docked boats for winter. One of their tasks was to affix a protective layer of shrink-type plastic to the boats. It was during this procedure that Mr. Gormley's incident occurred. At the time, he was on the sixth step of this 8-ft fiberglass ladder placed upon a level asphalt surface. While working to shrink (and thus tighten) the existing plastic further, he sensed the ladder moving out from under him. Sensing a problem, he dropped his heat gun/pole and punched through the plastic in an attempt to grab the safety rail of the boat. Unable to hold on, he and the ladder fell to the ground.

## Werner testing documents

In response to discovery requests, Werner produced a report which included the following tests:

### Walking the Ladder
By shifting his weight a certain way, a 200-lb person was able to intentionally "walk" a ladder a given distance across a concrete floor.

### Pushing the Ladder
A fully open and locked ladder was pushed a distance of 40 feet across a concrete floor.

Open Ladder Dynamic Drop Test
A ladder is repeatedly dropped a given distance, ultimately leading to cracking of the rails, and crack propagation as testing continued.

Closed Ladder Dynamic Drop Test
(Similar to test above with similar results)

The fact that a ladder can be walked (a process during which a four-legged stepladder becomes and remains unstable) such a distance is evidence of the ease with which this can occur. In fact, it happens so easily, that a user can inadvertently cause a ladder to walk while using it in a reasonably foreseeable manner. This is a hazard which Werner fails to address in its warning labels.

Werner failed to conduct push testing to assess if damage could occur after an extended period of time (as could foreseeably happen over years in service). Such testing likely would have revealed a tendency for rails to become cracked during this reasonably foreseeable user action. Werner, in any event, was well aware of the tendency of its fiberglass stepladders to suffer cracked rails, as evidenced by its development of "rail shields" prior to Mr. Gormley's incident. Such shields were used on other Werner model ladders prior to the incident, and are intended to prevent precisely such damage from occurring.

The Dynamic Drop tests certainly emphasize those areas of a ladder that are most susceptible to damage from foreseeable rough handling, including cracking of the side rails.

Werner did not conduct appropriate testing to evaluate the ladder under all foreseeable conditions of use. Although the testing conducted demonstrates Werner understood that ladders will be subjected to rough handling, it did not learn from the information observed. For example, Werner failed to incorporate rail shields, EDGE bracing or other rail protection.
One report included a coupon testing summary of fiberglass samples manufactured using resin injection as compared to data available (presumably for rails made by submersion in a resin bath), many of which do not compare favorably. Werner failed to conduct side-by-side comparison of ladders manufactured using these two different pultrusion methods to see how they compare in foreseeable abuse-type testing as well. Werner has either failed to conduct such tests or has simply neglected to produce them in discovery.

**Tests conducted relative to this matter**
Tests were conducted on a variety of ladders. Testing demonstrated the propensity of different designs to exhibit destabilization (walking) under load. One test involved a more qualitative climbing demonstration in which I climbed to the highest standing level and shifted my weight from side to side. The other test was more quantitative, in which

a distributed load of 200-lbs. placed at the highest standing level and then a side load was applied which lead to racking, and in some cases destabilization. Measurements were then taken of the degree to which a redundant support remained off the ground upon removal of the side load. The following facts and conclusions were determined from the testing:
- The subject model ladder exhibits less torsional rigidity than heavier duty ladders and therefore less resistance to racking and less resistance to destabilizing and walking.
- Ladders having only three distinct supports (tripod ladders) do not walk.
- Modified tripod ladders (e.g. Little Giant Ultra Step) provide almost as much resistance to walking as a conventional tripod.
- Although tripod ladders can be made to hop, they always appear to re-stabilize.
- The hopping phenomenon exhibited by the tripod ladder in the climbing demonstration can be essentially eliminated by stiffening of the rear leg.
- A subject model having a cracked rear leg exhibits less resistance to twisting and greater degree of instability than a ladder whose leg is not cracked.

**Other Opinions**
As a result of my review of the discovery materials, inspection of the ladder and incident site, measurements and evaluations and based upon my education, training and experience, I have formed opinions in this matter. My opinions are to a reasonable degree of engineering certainty.

In summary, my opinion is that the Werner fiberglass stepladder involved in this incident was defective and negligently designed and sold. The ladder in this case suffered from a lack of durability of the fiberglass legs due to cracking and weakening, particularly of the right rear rail. Labels on the ladder and advertising literature supplied with the ladder fail to convey to users that "fiberglass ladders must be maintained and handled with greater care than wood or aluminum ladders," as stated in the Werner Fiberglass Tech Manual. In fact notes on the topper card that comes with the ladder give quite the opposite impression:
- "Heavy duty industrial use fiberglass stepladder."
- "Heavy duty construction for demanding frequent use."
- "Ideal for heavy maintenance repair and commercial jobs."
- "Rugged bracing on top and bottom steps and horizontals."

The process of shrink-wrapping boats requires that a person move a heat gun (attached to a pole) back and forth over the plastic in order for shrinking of the plastic covering to occur, thus tightening of the plastic against the boat. In performing this operation, a person may be caused to shift his weight from one side to another while on a ladder. Shifts in Mr. Gormley's weight from side to side were sufficient to cause the ladder to twist, and ultimately force the right rear leg to support a disproportionate amount of the load, both axial and lateral. This combination was sufficient to cause the right rear leg to begin collapsing. As a result of destabilization of the ladder, Mr. Gormley reacted by dropping his heating tool and grabbing for the safety rail on the boat. This caused the

ladder to shift back to the left, with the ladder ultimately falling in that direction to the ground.

Cracking and weakening of the right rear side rail of Mr. Gormley's ladder lead to a lack of lateral stiffness of the support legs, specifically the right rear leg. This failure, which was foreseeable and preventable by defendants, was a substantial contributing factor in causing Mr. Gormley's incident. The incident occurred during normal and foreseeable use, due to the right side rail weakening and cracking, rendering the ladder defective and unreasonably dangerous to users such as Mr. Gormley.

Cracking of the legs could have been substantially reduced or eliminated by defendant's incorporation of rail shields, available for this model ladder only as an option by Werner at the time the subject ladder was manufactured. The use of a boot-type foot as utilized by Werner competitors (ex: Husky brand by Tricam) and Werner's EDGE (Energy Diffusing GEometry) system used on current Werner fiberglass stepladders are other alternatives that would have provided better protection than the type of foot and bracing utilized on the subject ladder. Such devices were feasible and readily available prior to Mr. Gormley's incident.

This ladder's design is further deficient in that it has a redundant rear section support. The redundant support system coupled with a ladder's inherent torsional flexibility allows such fiberglass stepladders the ability to walk, sometimes without the foreknowledge of a user. This design deficiency is duly noted in advertising literature distributed by Werner's retailers for their tripod ladder designs as follows:
➢ "With only 3 legs (a tripod ladder) is more stable that a four legged stepladder. There is no rocking and no walking even on uneven or out of level surfaces."

The walking phenomenon can begin by normal and reasonably foreseeable weight shifts by the user, which can cause a stepladder to rack. Once that occurs, walking by the ladder is initiated by a subsequent weight shift by the user in the opposite direction.

A fiberglass stepladder's propensity to racking is a function of its torsional stiffness. The less torsional rigidity it has, the more likely it is to be inadvertently become destabilized and begin walking.
➢ Labels on the product fail to warn users that ladders could suddenly become destabilized by the walking phenomenon without their knowledge.
➢ Destabilization of this ladder due to the cracking of the rear leg, followed by the walking phenomenon caused the ladder to move unexpectedly, thus causing Mr. Gormley to fall and suffer serious injuries.
➢ Torsional stiffness of the subject ladder was also compromised by looseness of fastener joints, particularly those between front section rails, steps and braces, an occurrence wholly foreseeable by Werner.

Had Mr. Gormley's ladder been equipped with bracing capable of enhancing the ladder's strength and durability by protecting it against damage, the side rails would likely not have become cracked and prone to shifting under lateral loads. Such bracing

was feasible and available prior to Mr. Gormley's incident. Bracing of this nature was only added by Werner subsequent to Mr. Gormley's incident.

Labeling and advertising failed to adequately warn and instruct that fiberglass ladders must be maintained and handled with greater care than wood or aluminum ladders.

As a result of defendant's failure with regard to warnings and instructions, Mr. Gormley and his coworkers were not made aware of the particular tendency of the subject model Werner fiberglass stepladder to walk.

Recognizing the tendency of the subject model ladder toward walking, Werner should have put a greater emphasis on designing and marketing products which substantially reduce or eliminate walking, like Little Giant's Ultra Step and the Werner FTP (fiberglass tripod ladder) series.

It is my opinion to a reasonable degree of engineering certainty that Werner's and Home Depot's manufacturing, marketing and sale of a ladder that was not sufficiently durable, had an inherent tendency to become destabilized without the foreknowledge of the user, and was not provided with adequate warnings and instructions regarding its safe use, were substantial causes of Mr. Gormley's incident and severe injuries.

The ladder was defective and unreasonably dangerous to users such as Mr. Gormley. The defects and unreasonably dangerous hazards in the ladder existed at the time the ladder was designed, manufactured and left the control of Werner and Home Depot. As a direct and proximate result of the defects in the ladder, Mr. Gormley suffered injuries as set forth in medical records and discovery materials.

At the time of trial, I anticipate utilizing various exemplar ladders as well as results of my testing documented in photographs and on video for the purpose of supporting my conclusions in this matter.

I reserve the right to supplement this report should additional information become available.

Please contact me if I can be of further assistance.

Sincerely,

*[signature]*

Stanley A. Kiska, PE
President

FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2006 APR 19 P 1:40

U.S. DISTRICT COURT
DISTRICT OF MASS.

APPENDIX A

Robert Gormley

v.   CASE NO. 05cv10304WGY

Werner Co. and
Home Depot U.S.A.

NOTICE OF FILING WITH CLERK'S OFFICE

Notice is hereby given that the documents, exhibits or attachments listed below have been manually filed with the Court and are available in paper form only:

1. Deposition transcript of Stan Kiska 3/28/06
2. Deposition transcript of Robert Gormley 12/5/05

The original documents are maintained in the case file in the Clerk's Office.

4/19/06
Date

Werner Co.
Attorney for Defendant

Brian P. Voke 544327
Campbell Campbell Edwards & Conroy
One Constitution Plz.
Boston, MA 02129