UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.:  05 CV 10304 LTS

ROBERT GORMLEY,                    *
                                   *
              Plaintiff            *
                                   *
vs.                                *
                                   *
WERNER LADDER CO. AND              *
HOME DEPOT U.S.A., INC.,           *
                                   *
              Defendants           *


**PLAINTIFF'S OPPOSITION TO DEFENDANT WERNER CO.'S MOTION
IN LIMINE TO EXCLUDE OPINIONS OF STAN KISKA AND FOR A RULE
104(a) HEARING**

Plaintiffs oppose the defendant's "Motion in Limine to Exclude Opinions of

Stan Kiska and for a Rule 104(a) Hearing" on the grounds that Mr. Kiska is qualified

to testify as an engineering expert in this case and his opinions are the product of reliable

scientific principles and methodology applied to the facts of this case.

**I.      Introduction**

On January 16, 2002 the Plaintiff, Robert Gormley, was working on a ladder

designed, manufactured and marketed by the defendant Werner Co., and sold by the

defendant Home Depot in the spring of 2001.  In the course of his work as a Boatwright

at Marina Bay in Quincy, Massachusetts, the ladder suffered a sudden failure, causing

Mr. Gormley to fall and suffer serious injuries. The failure included fracturing of the right

rear rail of the ladder, a Type I, 8-foot fiberglass stepladder.  As a result of this incident,

Mr. Gormley suffered serious injuries including, but not limited to, left upper extremity

damage, thoracic outlet and left shoulder impingement syndrome, and neck pain relating to aggravation of cervical disc disease and arthritis. The fall resulted in chronic and permanent injuries which, in addition to causing daily pain and disability, have significantly and adversely affected Mr. Gormley's ability to work and earn income.

Plaintiff identified Stanley A. Kiska, P.E. as a liability/engineering expert, disclosed his report to counsel and produced him for a deposition. **See Mr. Kiska's CV (Exhibit A); Mr. Kiska's Expert Report (Exhibit B); Mr. Kiska's Deposition (Exhibit C).** Mr. Kiska's opinions are admissible because he is a qualified ladder expert (formerly employed in such capacity by the defendant) and his testimony is based on reliable scientific principles and methodology applicable to the particular facts of this case. Defendant's arguments to the contrary go to the weight, not the sufficiency, of his opinions.

## II.    Standard of Review

Federal Rule of Evidence 702 provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  This rule applies not only to testimony based on scientific knowledge, but also to testimony of engineers and other experts that is based on technical or specialized knowledge.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  In applying the rule, the trial court acts as a "gate-keeper," ensuring that

any scientific or technical expert testimony is not only relevant, but also reliable.  See

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).

   In Daubert, the U.S. Supreme Court identified several factors to consider on the

issue of reliability of expert testimony, including: "the verifiability of the expert's theory

or technique, the error rate inherent therein, whether the theory or technique has been

published and/or subjected to peer review, and its level of acceptance within the scientific

community."  Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 80-81 (1st Cir.

1998).  These factors, however, do not function as a "definitive checklist or test," but

form the basis for a flexible inquiry into the overall reliability of a proffered expert's

methodology.  Id.  The above list of factors "neither necessarily nor exclusively applies to

all experts in every case."  Kumho Tire, 526 U.S. at 141.

   In addition to reliability, the evidence presented by the expert must satisfy the

standard of relevancy.  See Kumho Tire, 526 U.S. at 152 (stating that the purpose of

Daubert' s "gatekeeping" requirement is to ensure the reliability and relevancy of expert

testimony). The expert's testimony should "assist the trier of fact to understand the

evidence or to determine a fact in issue -- Rule 702's 'helpfulness' standard requires a

valid scientific connection to the pertinent inquiry as a precondition to admissibility."

Daubert, 509 U.S. at 591-92.

   The Court's role as a gatekeeper does not replace the traditional adversary system

and the place of the jury within the system.  See Daubert, 509 U.S. at 596.  As the

Daubert Court noted, "[v]igorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence." Id. (citing Rock v. Arkansas, 483 U.S. 44, 61

(1987)).  The First Circuit has added that, in determining the admissibility of expert testimony, a district court has considerable leeway in determining reliability, but it is the jury's role to determine credibility and the appropriate weight that should be given to the testimony.  <u>Ford v. Nationwide Mut. Fire Ins. Co.</u>, 62 Fed. Appx. 6, 9 (1st Cir. 2003).

Experts properly may rely on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion.  <u>See</u> <u>Cooper v. Nelson</u>, 211 F.3d 1008, 1020 (7th Cir. 2000).  A rigid general acceptance requirement would be at odds with the liberal thrust of the rules of evidence and their general approach of relaxing the traditional barriers to opinion testimony.  <u>Daubert</u>, 509 U.S. at 588.

## III.     Argument

A.     <u>Stanley Kiska, P.E. is qualified to testify as an expert witness in this case.</u>

Stanley A. Kiska, P.E. earned his degree in mechanical engineering in 1985 from Grove City College where he studied a variety of different composite materials, including fiberglass.  Kiska Dep. at 119:5-17.  Mr. Kiska completed his postgraduate studies in material science, finite element analysis, and elemental stress analysis at Youngstown State University.  Kiska CV at 1**.**  Mr. Kiska undertook seminar training in the design of aluminum alloys, the statistical design of experiments, ANSYS finite element stress analysis, and product safety sign and labeling systems.  <u>Id.</u>**.**  Mr. Kiska is a licensed professional engineer.  <u>Id.</u>

After earning his degree, Mr. Kiska was employed by the defendant Werner Co. for sixteen (16) years.  Kiska Dep at 96:2.  During this time, the defendant often sent Mr. Kiska off-site to visit manufacturing facilities and to investigate claims of defective

ladders, some of which involved broken rail shields (like the ladder in this case).  <u>Id.</u> at

55:7-56:10; 96:9-15.  As part of his duties, Mr. Kiska was involved in a variety of areas

of manufacturing and testing ladders for the defendant.  <u>Id.</u> at 95:15-23.  Mr. Kiska was

also involved in providing warning labels for the defendant's ladders.  <u>Id.</u> at 97:16-98:2.

Mr. Kiska has been found qualified to testify in over a dozen other cases regarding ladder

safety for both plaintiffs and defendants.  <u>Id.</u> at 42:15-22.  Mr. Kiska is currently

employed as an engineering consultant for Integra Engineering, P.C..

     Defendant's blanket statement that Mr. Kiska is not qualified to render an opinion

on ladder safety in this case is baseless.  To the contrary, Mr. Kiska is uniquely qualified

to opine on the safety of the defendant's ladder, especially considering his former

employment in that capacity with the defendant.

     B.    <u>Mr. Kiska's opinions are the product of reliable scientific principles and methodology applied to the facts of this case.</u>

     As set forth in his report and as explained in his deposition, Mr. Kiska completed

a thorough review of all pertinent deposition transcripts in the case and all pertinent

written discovery materials including defendant's internal test reports, design

information, advertising literature, and applicable OSHA regulations and ANSI

standards.  Kiska Report at 1-2.  Mr. Kiska also examined the nature and extent of the

fiberglass rail fracturing in the subject ladder and he obtained exemplar ladders for

examination and testing, including the defendant's newer model of the subject ladder.  <u>Id.</u>

at 2.  Mr. Kiska also observed another workman at Marina Bay performing the same task

(shrink-wrapping) that plaintiff was performing when he was injured.  <u>Id.</u>  Mr. Kiska

specifically analyzed the results of the defendant's own safety test reports that reflect its

internal failure analysis and durability testing for the subject model ladder.  <u>Id.</u> at 2-3.

Mr. Kiska relied on those test results and noted a variety of deficiencies in the

defendant's testing protocols, in particular, the defendant's failure to conduct sufficient

testing to address a "walking" phenomenon noted by the defendant when the ladder was

used under foreseeable circumstances**.** Id. at 3.  Mr. Kiska also conducted a battery of

tests on the exemplar ladders including a determination of their comparative propensity to

destabilize (i.e., "walk") under load.  Id.  Based on all of the foregoing, and as set forth in

much more detail in his report attached hereto, Mr. Kiska opined that within a reasonable

degree of engineering certainty the subject ladder was not sufficiently durable, had an

inherent tendency to become destabilized, and was not provided with adequate warnings

regarding its safe use.  Id. at 4-6.

The defendant challenges three specific areas of Mr. Kiska's overall opinion.

1.    Destabilization

First, defendant argues that Mr. Kiska's ladder destabilization (i.e., "walking")

opinion is conclusory and unsupported.  To the contrary, as set forth in the expert report

and in his deposition, Mr. Kiska relied on his own and on the defendant's own qualitative

and quantitative testing which demonstrated a propensity of different designs (including

those substantially similar to the subject ladder) to exhibit destabilization, or walking,

under load.  Mr. Kiska's qualitative testing also involved climbing to the highest level of

the ladder and shifting his weight from side to side in a manner similar to how the

Plaintiff shifted his weight while performing his duties as a Boatwright at Marina Bay.

Mr. Kiska completed the quantitative test by placing a 200 pound load at the highest

standing level and then applying a side load.  Measurements were then taken of the

degree to which a redundant support remained off the ground upon removal of the side

load.  Relying on the results of these tests and his review of the discovery materials, inspection of the subject ladder and worksite, and the defendant's own internal testing, Mr. Kiska concluded that the ladder was defectively designed, manufactured, sold and labeled.

Defendant's argument that the destabilization opinion is unsupported flies in the face of the foregoing testing and analyses set forth in the expert report, which includes the defendant's own internal testing results for the so-called walking phenomenon.  At best, defendant's argument goes to the weight that should be afforded to Mr. Kiska's testimony, rather than its admissibility.  See Chapman v. Bernards, Inc., 167 F.Supp.2d 406, 421 (D.Mass. 2001); Huber v. JLG Industries, Inc., 344 F.Supp.2d 769, 774 (D. Mass. 2003) (stating that although experts' testimony could have been more precise, they based their conclusions upon their own observations of the device in question and "[w]hile not based on exhaustive studies, their approaches were sound given the rather discrete question each was asked to consider.").

2.    Accident Reconstruction

Defendant next argues that Mr. Kiska's opinion as to how the accident occurred lacks an evidentiary basis because it is inconsistent with the plaintiff's version of how the incident occurred.  This is utterly without merit.

Defendant cites the plaintiff's deposition testimony that the ladder gave way under his feet, that his feet "shot out to the left," that he tried to catch himself by grabbing a safety line on the boat, and that he then fell down sideways onto the ladder.  Mr. Kiska based his analysis on this same version of events.  Indeed, defense counsel asked Mr.

Kiska about his understanding of how the incident occurred.  Mr. Kiska testified that plaintiff

> didn't come down right away with the ladder.  You know, he attempted to catch himself on a part of the boat, and it appears as though there was separation between he and the ladder, and then at some point in time, he fell off and then hit the ladder on the way down. So that's what makes the issue a little bit more complicated with regard to his falling directly with the ladder as compared to following an instant later.

Kiska Dep. at 21:12-20.  Mr. Kiska also states in his report the factual basis underlying the manner in which the accident occurred, all of which are materially consistent with plaintiff's deposition testimony and in no way render Mr. Kiska's inadmissible.

In the same vein, defendant insists that Mr. Kiska did not use any reliable scientific methodology to reconstruct the accident.  On the contrary, Mr. Kiska reviewed and relied on the plaintiff's deposition and the depositions of the other witnesses, he visited the scene of the accident in order to observe other workers performing the same shrink-wrapping job while standing on an exemplar ladder, he performed an accurate recreation of the incident, and he undertook various destabilization and durability tests of exemplar ladders and examined the damaged rail of the subject ladder.  It should be noted that some of the destabilization tests done by Mr. Kiska were similar to those undertaken by the defendant itself prior to the incident as part of its internal attempt at safety analysis.

Defendant also complains that Mr. Kiska's methodology lacks a known error rate and has not been subjected to a published peer review process.  This assertion, while perhaps meaningful in some other contexts, is totally immaterial to the question of admissibility under the Daubert standard here due to the specificity of the facts of this case.  In particularized cases such as this that involve unique product failure factors that

combine to cause an accident, courts recognize that there can be no known error rate and that published peer reports are impractical.  Seatrax, Inc. v. Sonbeck Int'l Inc.,200 F.3d 358, 372 (5th Cir. 2000); Huber v. JLG Industries, Inc.,344 F.Supp.2d 769, 774 (D. Mass. 2003).  Here, Mr. Kiska's methodology was necessarily so case-sensitive that it rendered impractical (if not impossible) any determination of an error rate or establishment of a peer review prior to testing.

     3.    <u>Rail Shields</u>

Last, defendant claims that Mr. Kiska can not form a reliable opinion because he does not know what caused the damage to the right rear rail of the ladder.  To the contrary, Mr. Kiska relied on defendant's expert report and the defendant's own internal test reports to conclude that Marina Bay's reasonably foreseeable ladder use and movement of the ladders in an open condition is what precipitated the cracking in the subject fiberglass ladder.  Kiska Dep. at 50:10-15.  To reach this conclusion, Mr. Kiska relied on the testing done by the defendant and their position on the issue.  Id. at 51:3-4. While it is may very well be the case that no one will be able to absolutely determine the precise date and cause of the initial crack in the ladder, that is irrelevant to Mr. Kiska's status as an expert witness.  His opinion derives from fiberglass ladders generally and lack of warning labels to notify users of defects.

Defendant also asserts that Mr. Kiska should not be allowed to testify because he has never studied the use or abuse of fiberglass ladders in the field.  Once again, these previous tests were unlikely to occur in the setting of the events in issue.  Due to the specificity of the facts of this case, Kiska relied on his previous education, training, and expertise to determine the effects of use and abuse of fiberglass ladders.  Kiska Dep. at

33:7-24.  To this end, Mr. Kiska has testified in a number of different cases involving aluminum, wood, and fiberglass stepladders and even investigated claims involving fiberglass ladders for defendant.  Id. at 43:8-9; 55:1-10.

Defendant also asserts that because Mr. Kiska has not tested a rail shield for a fiberglass stepladder, his testimony should be excluded.  Again, Mr. Kiska's testimony is based on his overall knowledge of ladders, including fiberglass ladders, rail shields and warning labels.  It is his position that fiberglass ladders require more care than wood or aluminum.  Since a reduction of this care can lead to fracturing, additional warning labels are required.  Once the fracturing occurs, fiberglass stepladders become more dangerous. Rail shields will help protect the ladder's rails from fracturing.  A ladder expert does not necessarily have to have designed or tested a rail shield for any fiberglass ladders to reach these conclusions.

## IV.    Conclusion

Defendant's arguments all go to the weight, not the sufficiency, of Mr. Kiska's opinions and methodologies.  Compare Cummings v. The Standard Register Company, 265 F.3d 56, 65 (1st Cir. 2001); Chapman v. Bernard's Inc., 167 F.Supp.2d 406, 421 (D.Mass. 2001).

Moreover, many of the defendant's arguments are nothing more than blanket assertions that ignore material facts and information contained in Mr. Kiska's lengthy expert report and in his 119 page deposition.  The defendant's motion is nothing more than a boilerplate challenge to the opinion of a qualified expert who undertook a detailed failure analysis using methodologies virtually identical to those employed by the defendant itself in the course of its own internal safety testing procedures.

For the above and foregoing reasons, the defendant's motion and request for evidentiary hearing should be denied.

<div style="margin-left: 50%;">

The Plaintiff,
By His Attorneys,


_s/Jonathan D. Sweet
Edward M. Swartz
B.B.O. No. 489540
Joseph A. Swartz
B.B.O. No. 489640
Jonathan D. Sweet
B.B.O. No. 634755
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
(617) 742-1900

</div>

DATED:  June 1, 2006


## CERTIFICATE OF SERVICE

I, Jonathan D. Sweet, Esq. do hereby certify that the foregoing document was served on the following counsel on this date and in the manner specified herein:

Electronically Serviced Through ECF:

Brian Voke, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02109

This 1st day of June, 2006.

<div style="margin-left: 50%;">

__s/Jonathan D. Sweet
Jonathan D. Sweet

</div>

# Stanley A. Kiska, P.E.

## EDUCATION / TRAINING / AFFILIATIONS

Bachelor of Science, Mechanical Engineering, 1985, Grove City College, Grove City, Pennsylvania

Post Graduate studies in Material Science, Finite Element Analysis and Experimental Stress Analysis, Youngstown State University, Youngstown, OH

Seminar training in Design of Aluminum Alloys, Statistical Design of Experiments, ANSYS Finite Element Stress Analysis, Product Safety Sign and Labeling Systems

Licensed Professional Engineer

Member:     National Society of Professional Engineers (NSPE)
            American Society of Mechanical Engineers (ASME)


## EXPERIENCE

**2001 – Present          Engineering Consultant – Integra Engineering, P.C.**

Providing product design and evaluation services involving climbing products. Conducting product and accident site investigations in personal injury lawsuits. Providing testing and written report services as needed to convey expert opinions and to substantiate accident reconstruction theories. Participating as an independent engineering consultant on two American National Standards Institute (ANSI) committees.


**1985 – 2001          Product Engineer / Senior Product Engineer - Werner Co.**

Responsible for new product development as well as redesign of existing climbing products. Participated in design / testing of numerous products over a sixteen-year period. Awarded four US patents.

Directed the activities of draftsmen, test technicians and less experienced engineers on design projects, ensuring product compliance with all design and performance requirements outlined by applicable safety codes. Supervised the manufacturing and testing of minimum-section prototypes in order to obtain Underwriter's Laboratory (UL) product listings.

Engineering liaison to Manufacturing and Quality Control Departments; ensuring timely introduction of new components and assemblies to the manufacturing process.

Served as company representative / expert witness in depositions and trials in the defense of personal injury claims involving aluminum, fiberglass and wood ladder and scaffolding products.

**Comprehensive List of Expert Testimony**

**Jeremias Vargas vs. Werner Co.**
**CV 045138**
**Model D6232-2 Fiberglass**
**Deposition: December 7, 2005; Long Island, NY**
Attorney Frank Braunstein
Frank Laine, PC
Long Island, NY


**Jennifer Brooking vs. Cazenovia College**
**Wooden Loft Bed and Ladder**
**Trial: April 27, 2005; NYS Court, Delaware County Courthouse; Delhi, NY**
**Judge Michael V. Coccoma**
Attorney John Casey
Dreyer, Boyajian & Tuttle
Albany, NY


**James Robb vs. Davidson Ladder**
**Model Dixie 15 Wooden Stepladder**
**Deposition: October 2004; Philadelphia, PA**
Attorney Robert Bauer
Abraham, Bauer and Spalding
Philadelphia, PA


**Thomas Jones vs. Keller Ladder**
**Model 936 Aluminum Stepladder**
**Deposition: July 2004; Syracuse, NY**
Attorney Paul Grieco
Landskroner & Grieco
Cleveland, OH


**Vincent & Yolanda Spencer vs. R.D. Werner Co. Inc & The Frizzell Corporation**
**Model D1532-2 Aluminum extension ladder**
**Depositions: May 20, 2004 and June 22, 2004; Boston, MA**
Attorney David Heinlein
Heinlein & Beeler, PC
S. Natick, MA


**City of Geneva, NY and M. Hubbard Construction Co. vs. Taulman Composting Systems,**
**Inc, The Taulman Co. and Davis Water & Waste, Inc.**
**Unknown Model Aluminum straight ladder**
**Trial: April 27, 2004; Canandaigua, NY; Ontario County Courthouse (State court); Judge**
**James R. Harvey**
Anthony Rupp
Rupp, Baase, Psalzgraf et. al.
Buffalo, NY

**Gilbert Evangelisto vs. Green Bull Ladder**
**Model 20406 Fiberglass trestle ladder**
**Trial; January 2003; Philadelphia, PA**
Attorney Lawrence Silverman
Silverman, Berheim & Vogel
Philadelphia, PA


**Victor Bigun vs. Werner Co.**
**Model 356 Aluminum stepladder**
**Deposition?; 2001-2003?; Utica, NY**
Attorney Peter Cambs
Cambs Law Firm
Camillus, NY



120 Shady Lane
Fayetteville, NY  13066

Office:    315-637-4723
Fax:    315-637-5521

**ENGINEERING, P.C.**

January 25, 2006

James Swartz
Swartz & Swartz
Number Ten Marshall Street
Boston, MA  02108

**Re: Robert Gormley**

Dear Mr. Swartz,

I have performed a non-destructive examination of the subject ladder and have inspected the incident site. I now offer the following report of my findings and opinions. My rate of compensation is $150/hr.

In preparation of this report, I have reviewed the following information generated in discovery in this case:
- ➢ Depositions of
  - ○ Fred Bartnicki dated 11/18/05 & 12/19/05,
  - ○ William Brownlow dated 12/7/05,
  - ○ John Covert dated 12/7/05,
  - ○ Joseph Capilli dated 12/19/05,
  - ○ James Glynn dated 12/7/05,
  - ○ Lauren Gormley dated 12/6/05,
  - ○ Robert Gormley dated 12/6/05,
  - ○ Richard Mahoney dated 1/11/06,
  - ○ Stephen Smith dated 12/19/05,
  - ○ William Weed dated 12/19/05,
- ➢ Various exhibits pertinent to the aforementioned depositions,
- ➢ Werner answers to plaintiff's first set of interrogatories,
- ➢ Werner responses to plaintiff's first production requests,
- ➢ Deposition notices of Werner & Fred Bartnicki,
- ➢ Deposition notice of Robert Collins,
- ➢ Deposition notice of Home Depot,
- ➢ Plaintiff's responses to Werner's first set of requests for documents,
- ➢ Plaintiff's answers to Werner's first set of interrogatories,
- ➢ Discovery documents supplied by Werner including
  - ○ Test reports 7086, 7158, 7175, 7393, 7398, 9104
  - ○ Attachment B
  - ○ US Patents 5259480, 310884, 340773,
  - ○ Werner advertising literature
  - ○ Werner drawings for subject product

1

- o  OSHA Regulations for ladders 1926-1053
- o  ANSI A14.5-1992
➢  Mr. Gormley's medical records,

Additionally I have obtained various ladders for review and testing, including Werner's newer version of the subject model, and have had the opportunity to observe another workman at Marina Bay performing the same kind of work that Mr. Gormley was performing at the time of the incident.

## Subject Ladder

The subject ladder is a Werner model FS108 manufactured approximately May 1999 in Werner's Greenville, PA facility and sold by Home Depot in Quincy, MA. It is apparently one of two identical model ladders utilized by the Marina Bay workers. The right rear rail exhibits fractures several inches up from the bottom of the ladder, between the web and primary (rearmost) flange. Other rails also exhibit fracturing to a lesser degree. The other Marina Bay model FS108 observed at your office also exhibited similar types of fractures. Fastener connections between the steps, rails and braces on the front section of the subject ladder are apparently loose, as exhibited in a substantial lack of twist resistance in the front section.

## Background

Mr. Gormley was working as a Boatwright as part of a crew at Marina Bay responsible for preparing dry-docked boats for winter. One of their tasks was to affix a protective layer of shrink-type plastic to the boats. It was during this procedure that Mr. Gormley's incident occurred. At the time, he was on the sixth step of this 8-ft fiberglass ladder placed upon a level asphalt surface. While working to shrink (and thus tighten) the existing plastic further, he sensed the ladder moving out from under him. Sensing a problem, he dropped his heat gun/pole and punched through the plastic in an attempt to grab the safety rail of the boat. Unable to hold on, he and the ladder fell to the ground.

## Werner testing documents

In response to discovery requests, Werner produced a report which included the following tests:

### Walking the Ladder

By shifting his weight a certain way, a 200-lb person was able to intentionally "walk" a ladder a given distance across a concrete floor.

### Pushing the Ladder

A fully open and locked ladder was pushed a distance of 40 feet across a concrete floor.

Open Ladder Dynamic Drop Test
A ladder is repeatedly dropped a given distance, ultimately leading to cracking of the rails, and crack propagation as testing continued.

Closed Ladder Dynamic Drop Test
(Similar to test above with similar results)

The fact that a ladder can be walked (a process during which a four-legged stepladder becomes and remains unstable) such a distance is evidence of the ease with which this can occur. In fact, it happens so easily, that a user can inadvertently cause a ladder to walk while using it in a reasonably foreseeable manner. This is a hazard which Werner fails to address in its warning labels.

Werner failed to conduct push testing to assess if damage could occur after an extended period of time (as could foreseeably happen over years in service). Such testing likely would have revealed a tendency for rails to become cracked during this reasonably foreseeable user action. Werner, in any event, was well aware of the tendency of its fiberglass stepladders to suffer cracked rails, as evidenced by its development of "rail shields" prior to Mr. Gormley's incident. Such shields were used on other Werner model ladders prior to the incident, and are intended to prevent precisely such damage from occurring.

The Dynamic Drop tests certainly emphasize those areas of a ladder that are most susceptible to damage from foreseeable rough handling, including cracking of the side rails.

Werner did not conduct appropriate testing to evaluate the ladder under all foreseeable conditions of use. Although the testing conducted demonstrates Werner understood that ladders will be subjected to rough handling, it did not learn from the information observed. For example, Werner failed to incorporate rail shields, EDGE bracing or other rail protection.
One report included a coupon testing summary of fiberglass samples manufactured using resin injection as compared to data available (presumably for rails made by submersion in a resin bath), many of which do not compare favorably. Werner failed to conduct side-by-side comparison of ladders manufactured using these two different pultrusion methods to see how they compare in foreseeable abuse-type testing as well. Werner has either failed to conduct such tests or has simply neglected to produce them in discovery.

**Tests conducted relative to this matter**
Tests were conducted on a variety of ladders. Testing demonstrated the propensity of different designs to exhibit destabilization (walking) under load. One test involved a more qualitative climbing demonstration in which I climbed to the highest standing level and shifted my weight from side to side. The other test was more quantitative, in which

3

a distributed load of 200-lbs. placed at the highest standing level and then a side load was applied which lead to racking, and in some cases destabilization. Measurements were then taken of the degree to which a redundant support remained off the ground upon removal of the side load. The following facts and conclusions were determined from the testing:

> The subject model ladder exhibits less torsional rigidity than heavier duty ladders and therefore less resistance to racking and less resistance to destabilizing and walking.
> Ladders having only three distinct supports (tripod ladders) do not walk.
> Modified tripod ladders (e.g. Little Giant Ultra Step) provide almost as much resistance to walking as a conventional tripod.
> Although tripod ladders can be made to hop, they always appear to re-stabilize.
> The hopping phenomenon exhibited by the tripod ladder in the climbing demonstration can be essentially eliminated by stiffening of the rear leg.
> A subject model having a cracked rear leg exhibits less resistance to twisting and greater degree of instability than a ladder whose leg is not cracked.

### Other Opinions

As a result of my review of the discovery materials, inspection of the ladder and incident site, measurements and evaluations and based upon my education, training and experience, I have formed opinions in this matter. My opinions are to a reasonable degree of engineering certainty.

In summary, my opinion is that the Werner fiberglass stepladder involved in this incident was defective and negligently designed and sold. The ladder in this case suffered from a lack of durability of the fiberglass legs due to cracking and weakening, particularly of the right rear rail. Labels on the ladder and advertising literature supplied with the ladder fail to convey to users that "fiberglass ladders must be maintained and handled with greater care than wood or aluminum ladders," as stated in the Werner Fiberglass Tech Manual. In fact notes on the topper card that comes with the ladder give quite the opposite impression:

> "Heavy duty industrial use fiberglass stepladder."
> "Heavy duty construction for demanding frequent use."
> "Ideal for heavy maintenance repair and commercial jobs."
> "Rugged bracing on top and bottom steps and horizontals."

The process of shrink-wrapping boats requires that a person move a heat gun (attached to a pole) back and forth over the plastic in order for shrinking of the plastic covering to occur, thus tightening of the plastic against the boat. In performing this operation, a person may be caused to shift his weight from one side to another while on a ladder. Shifts in Mr. Gormley's weight from side to side were sufficient to cause the ladder to twist, and ultimately force the right rear leg to support a disproportionate amount of the load, both axial and lateral. This combination was sufficient to cause the right rear leg to begin collapsing. As a result of destabilization of the ladder, Mr. Gormley reacted by dropping his heating tool and grabbing for the safety rail on the boat. This caused the

ladder to shift back to the left, with the ladder ultimately falling in that direction to the ground.

Cracking and weakening of the right rear side rail of Mr. Gormley's ladder lead to a lack of lateral stiffness of the support legs, specifically the right rear leg. This failure, which was foreseeable and preventable by defendants, was a substantial contributing factor in causing Mr. Gormley's incident. The incident occurred during normal and foreseeable use, due to the right side rail weakening and cracking, rendering the ladder defective and unreasonably dangerous to users such as Mr. Gormley.

Cracking of the legs could have been substantially reduced or eliminated by defendant's incorporation of rail shields, available for this model ladder only as an option by Werner at the time the subject ladder was manufactured. The use of a boot-type foot as utilized by Werner competitors (ex: Husky brand by Tricam) and Werner's EDGE (Energy Diffusing GEometry) system used on current Werner fiberglass stepladders are other alternatives that would have provided better protection than the type of foot and bracing utilized on the subject ladder. Such devices were feasible and readily available prior to Mr. Gormley's incident.

This ladder's design is further deficient in that it has a redundant rear section support. The redundant support system coupled with a ladder's inherent torsional flexibility allows such fiberglass stepladders the ability to walk, sometimes without the foreknowledge of a user. This design deficiency is duly noted in advertising literature distributed by Werner's retailers for their tripod ladder designs as follows:
> "With only 3 legs (a tripod ladder) is more stable that a four legged stepladder. There is no rocking and no walking even on uneven or out of level surfaces."

The walking phenomenon can begin by normal and reasonably foreseeable weight shifts by the user, which can cause a stepladder to rack. Once that occurs, walking by the ladder is initiated by a subsequent weight shift by the user in the opposite direction.

A fiberglass stepladder's propensity to racking is a function of its torsional stiffness. The less torsional rigidity it has, the more likely it is to be inadvertently become destabilized and begin walking.
> ➤ Labels on the product fail to warn users that ladders could suddenly become destabilized by the walking phenomenon without their knowledge.
> ➤ Destabilization of this ladder due to the cracking of the rear leg, followed by the walking phenomenon caused the ladder to move unexpectedly, thus causing Mr. Gormley to fall and suffer serious injuries.
> ➤ Torsional stiffness of the subject ladder was also compromised by looseness of fastener joints, particularly those between front section rails, steps and braces, an occurrence wholly foreseeable by Werner.

Had Mr. Gormley's ladder been equipped with bracing capable of enhancing the ladder's strength and durability by protecting it against damage, the side rails would likely not have become cracked and prone to shifting under lateral loads. Such bracing

5

was feasible and available prior to Mr. Gormley's incident. Bracing of this nature was only added by Werner subsequent to Mr. Gormley's incident.

Labeling and advertising failed to adequately warn and instruct that fiberglass ladders must be maintained and handled with greater care than wood or aluminum ladders.

As a result of defendant's failure with regard to warnings and instructions, Mr. Gormley and his coworkers were not made aware of the particular tendency of the subject model Werner fiberglass stepladder to walk.

Recognizing the tendency of the subject model ladder toward walking, Werner should have put a greater emphasis on designing and marketing products which substantially reduce or eliminate walking, like Little Giant's Ultra Step and the Werner FTP (fiberglass tripod ladder) series.

It is my opinion to a reasonable degree of engineering certainty that Werner's and Home Depot's manufacturing, marketing and sale of a ladder that was not sufficiently durable, had an inherent tendency to become destabilized without the foreknowledge of the user, and was not provided with adequate warnings and instructions regarding its safe use, were substantial causes of Mr. Gormley's incident and severe injuries.

The ladder was defective and unreasonably dangerous to users such as Mr. Gormley. The defects and unreasonably dangerous hazards in the ladder existed at the time the ladder was designed, manufactured and left the control of Werner and Home Depot. As a direct and proximate result of the defects in the ladder, Mr. Gormley suffered injuries as set forth in medical records and discovery materials.

At the time of trial, I anticipate utilizing various exemplar ladders as well as results of my testing documented in photographs and on video for the purpose of supporting my conclusions in this matter.

I reserve the right to supplement this report should additional information become available.

Please contact me if I can be of further assistance.

Sincerely,

Stanley A. Kiska, PE
President

6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT GORMLEY,                )
                              )
              Plaintiff        )
                              )
v.                            )    Civil Action
                              )    No.: 05CV10304WGY
WERNER LADDER CO., INC., AND   )
HOME DEPOT U.S.A., INC.,       )
              Defendants       )
                              )
                              )

        DEPOSITION OF STANLEY A. KISKA, JR., a witness called on
behalf of the Defendant, taken pursuant to the Federal Rules
of Civil Procedure, before Ellen Dubie, a Professional Court
Reporter and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of CAMPBELL CAMPBELL EDWARDS &
CONROY, P.C., One Constitution Plaza, Boston, Massachusetts,
on TUESDAY, MARCH 28, 2006, commencing at 10:25 a.m.

C.J. REPORTING
A5 Colonial Drive, No. 7
Andover, Massachusetts  01810
978.409.9090
www.cjreporting.com

A P P E A R A N C E S


BRIAN P. VOKE, ESQUIRE
Campbell Campbell Edwards & Conroy, P.C.
One Constitution Plaza
Boston, MA  02129
(617) 241-3000/FAX (617) 241-5115
On Behalf of the Defendant, Werner Ladder Company.


JAMES A. SWARTZ, ESQUIRE
Swartz & Swartz
Ten Marshall Street
Boston, MA  02108
(617) 742-1900/FAX (617) 367-7193
On Behalf of the Plaintiff, Robert Gormley.

3

```
                  I N D E X

WITNESS            EXAMINATION BY            PAGE

Mr. Stanley A. Kiska, Jr.

                   (By Mr. Voke)               4




             E X H I B I T S


NO.                DESCRIPTION               PAGE

1-1ZZZ             Photographs                 4

2-2CCC             Photographs                 4

3                  Diagram                    63

4                  Videotape                  73

5A-C               Expert's Notes             76

6                  Expert's Report            87

7                  Product Description        93

8A-C               Expert's Notes             97

9                  Folder of Notes           105
```

```
1           (Exhibit Nos. 1 and 2 marked for identification.)
2                      P R O C E E D I N G S
3                      STANLEY A. KISKA, JR.,
4        witness called on behalf of the Defendant, having
5        first been satisfactorily identified by the production
6        of his driver's license and duly sworn by the
7        reporter/notary public, testifies and says as follows:
8                      S T I P U L A T I O N S
9            All objections except as to the form of the
10       question and all motions to strike are reserved until
11       the time of trial.  The witness will read and sign the
12       transcript.  Notarization of the transcript will be
13       waived.
14           MR. VOKE:  Reserve all objections except as to
15       the form.  Reserve motions to strike.  Thirty days to
16       read and sign.
17                      DIRECT EXAMINATION
18       BY MR. VOKE:
19       Q.   Would you state your full name for the record,
20       please?
21       A.   Stanley Anthony Kiska, Jr.
22       Q.   Your date of birth?
23       A.   September 1, 1963.
24       Q.   Your address?
```

1        A.    120 Shady Lane, Fayetteville, New York 13066.

2        Q.    Okay.  And are you employed?

3        A.    Yes.

4        Q.    And what is the nature of your business?

5        A.    I'm self-employed as a consulting engineer.

6        Q.    And you operate under a corporate name?

7        A.    Yes.

8        Q.    And what is that?

9        A.    Integra Engineering, P.C.

10       Q.    I had the stenographer premark the exhibits.

11       We've got Exhibit No. 1, which is a printout of a disk

12       that was sent to me from your counsel.  That's

13       Exhibit 1.  Can you just identify that generally for

14       me and tell me what those are?

15       A.    These appear to be photographs that I took during

16       my inspection of the site of the accident and, later,

17       the subject ladder at counsel's office.

18       Q.    And Exhibit No. 2, can you just identify that for

19       us, please, generally?

20       A.    These are photographs that I took of various

21       ladders that I used for testing in this case.

22       Q.    Okay.

23       A.    And, obviously, some of the photos depict the

24       ladders being tested.

```
 1    Q.    Now, would you tell me what ladder was involved

 2    in Mr. Gormley's accident?  What type of ladder?

 3    A.    It was a fiberglass stepladder.

 4    Q.    Okay.  And does it have a duty rating?

 5    A.    250 pounds.

 6    Q.    Okay.  What type?

 7    A.    Type 1 heavy-duty.

 8    Q.    And among the photographs that are in Exhibit

 9    No. 1 there are your photographs of the ladder

10    purportedly involved in Mr. Gormley's accident?

11    A.    Correct.

12    Q.    Okay.  And you inspected the ladder?

13    A.    Yes, I have.

14    Q.    When did you do that at, approximately?  I don't

15    need to know a specific date right now.

16    A.    I believe it was approximately January of last

17    year.

18    Q.    Of 2005?

19    A.    Correct.  My notes in my file would indicate

20    that.

21    Q.    Sometime around there; is that right?

22    A.    Correct.

23    Q.    Okay.  And how many occasions have you inspected

24    the ladder?
```

fra

1        A.    Just that one.

2        Q.    And did you review the deposition testimony of

3        Mr. Gormley?

4        A.    I did.

5        Q.    And the other folks who were deposed in this

6        case?

7        A.    I did.

8        Q.    Can you tell us what damage there was to the

9        right rear leg of the Gormley ladder before

10       Mr. Gormley climbed up on it on the day of his

11       accident?

12       A.    There was -- I cannot determine exactly how much

13       fracturing existed in the rail, but I do know that

14       there was several inches up from the bottom between

15       the web and the flange or fracture.

16       Q.    How can you make that determination?

17       A.    At least some portions of that fraction appear to

18       have been pre-existing, based upon contamination

19       within the fracture, and just the general appearance

20       from the fracture surfaces rubbing on one another.

21       Q.    Can you show me what you mean by referring to the

22       photographs that are marked Exhibit 1?

23             (Witness reviews document.)

24       A.    There are various photos, some intermittently and

```
 1
 2        some in a series that depict closeups of the right
 3        rear rail.
 4        Q.   Okay.  You have in front of you a photograph that
 5        you pulled out, marked Exhibit 1ZZZ.
 6        A.   Okay.
 7        Q.   How much -- well, let me ask you this.  Of that
 8        photograph you have in your hand, was that the way
 9        that the rail looked before Mr. Gormley climbed up on
10        it on the day of his accident?
11             MR. SWARTZ:  Objection.
12        A.   I guess I don't understand what you mean by the
13        way that it looked.
14        Q.   Well, it's split, isn't it?  Isn't there a split
15        in the rail?
16        A.   Yes, yes, yes.
17        Q.   So the rail was split before he got climbed up on
18        it on the day of his accident?
19        A.   Yes.
20        Q.   And you said earlier that it was split several
21        inches; correct?
22        A.   Yes.
23        Q.   And can you quantify it any more than several
24        inches?
```

| | |
|---|---|
| 1 | A.    Well, certainly, for sure, it seems as though it |
| 2 | was   split at least somewhere in the neighborhood of 3 |
| 3 | to 6 inches, and possibly more. |
| 4 | Q.    Okay.  And when you mean "split," it's the |
| 5 | condition that's depicted on the photograph marked |
| 6 | 1ZZZ? |
| 7 | A.    Separation between the sides of the rail, yes. |
| 8 | Q.    Okay.  And that would be the right rear rail? |
| 9 | A.    Yes. |
| 10 | Q.    Mr. Kiska, can you go through the photographs |
| 11 | marked as Exhibit 1 and show us one or two examples of |
| 12 | the contamination that you said you saw on the |
| 13 | fracture site that provided support for your opinion |
| 14 | that the rail was split before Mr. Gormley climbed up |
| 15 | on it on  the day of his accident? |
| 16 | (Witness reviews document.) |
| 17 | A.    In looking at photos 1ZZZ, 1AAAA and 1BBBB, that |
| 18 | depicts the bottom few inches of the ladder, and based |
| 19 | upon the appearance of the fiberglass fibers and the |
| 20 | discoloration from  contamination, those are clearly |
| 21 | older portions of the fracture.  There are portions |
| 22 | above that that are also fractured that don't have the |
| 23 | appearance, the kind of  contamination and so forth |
| 24 | described as on the other couple of inches of ladder. |

1   So what that tells me is some of this is older

2   fracture, some of this is newer fracture, the

3   distinction being some of the upper fracture is

4   probably newer, but also probably preexisting the

5   accident to some degree.  But certainly the stuff at

6   the very bottom where the -- it's clear that the

7   fracture initiated at the bottom and worked its way up

8   the rail, and that's why the appearance gets

9   progressively older looking as you get to the bottom

10  of the ladder.

11  Q.   Can you tell us what damage, if any, occurred to

12  the right rear rail of the ladder while Mr. Gormley

13  was on the ladder?

14  A.   Definitively?

15  Q.   Yes.

16  A.   I don't know that anyone can quantify that, you

17  know, to the degree of saying it was this many inches.

18  Q.   Is there any evidence that the rail -- strike

19  that.

20       Is there any evidence that the split in the

21  right rear rail increased while Mr. Gormley was

22  standing on the ladder just before his fall?

23  A.   Well, in that it's a newer-looking fracture,

24  certainly.  I mean, that is more recent than the other

1     fracture, which is clearly older.

2     Q.    So you can make distinctions between fractures

3     that are newer or older, depending upon the

4     contamination within the fracture area?

5     A.    That's certainly one method by which, yeah.

6     Q.    What other method is there?

7     A.    Well, again, going back to -- you know, a lot of

8     it's just basically experience working with ladders

9     that are fractured and knowing that as you continue to

10    stress the area, the fractures can open up.  And, you

11    know, not having been there at the accident site

12    actually watching the ladder in use and the accident

13    occur, you know, I cannot, nor can anybody,

14    definitively say this is exactly how far it was

15    fractured before the accident and this is how much it

16    fractured in the accident.

17    Q.    Can you tell us whether the right rear rail was

18    fractured by anyone handling the ladder after the

19    accident?

20    A.    I don't know.

21    Q.    And is there any way to make that determination?

22    A.    I don't believe so.

23    Q.    Okay.

24    A.    I mean, at best, all anybody can do is make an

1    estimation based upon details provided by those who

2    actually handled the ladder.

3    Q.    What is the length of the split in the right rear

4    rail when you inspected the ladder, approximately?

5    A.    I believe it was in the neighborhood of about 15

6    inches, between my notes and the photographs,

7    depicted.

8    Q.    I want to focus on the ladder immediately

9    following Mr. Gormley's accident.  Can you tell us, in

10   your opinion, where the ladder was in relation to

11   Mr. Gormley immediately following the accident?

12   A.    I believe he said that he struck the ladder on

13   the way down.  Now, whether he remained on the ladder

14   or adjacent to the ladder thereafter, I don't know.

15   But certainly clearly within arm's reach of the ladder

16   following the accident.

17   Q.    Do you know what portions -- strike that.

18   Can you tell us what portions of the ladder

19   Mr. Gormley struck when he landed on the ladder?

20   A.    I believe he testified that he struck the top

21   portion of the ladder.

22   Q.    He struck the top portion ladder, meaning what?

23   A.    Meaning he made reference to thinking he had

24   fallen on the area of the plastic top, which is

1    clearly damaged now.

2    Q.    You believe Mr. Gormley testified in his

3    deposition that he landed on the plastic top?

4    A.    I believe so.

5    Q.    Can you rule out whether Mr. Gormley landed on

6    the right rear rail of the ladder during the accident

7    sequence?

8    A.    Well, I don't believe that he struck it with any

9    degree of force, if at all, because I don't see any

10   evidence of the kind of damage that's typical from a

11   person falling on the leg of a ladder.  Given that

12   lack of evidence present in the ladder and his

13   testimony of where he felt he fell, it seems pretty

14   clear that he did not fall on that right rear leg of

15   the ladder with any degree of force, if at all.

16   Q.    Okay.  Can you tell us whether the right rear

17   rail split any more because of Mr. Gormley impacting

18   the ladder?

19   A.    I don't believe it did.

20   Q.    Can you tell us in which direction the ladder

21   moved; that is, did it move to the left or to the

22   right when it fell?

23   A.    Mr. Gormley's testimony is that it fell to the

24   left.

1    Q.    And do you accept that testimony?

2    A.    May I refer to my notes?

3    Q.    Go right ahead.

4          (Witness reviews document.)

5    A.    I see nothing that would lead me to believe

6    otherwise and to contradict his recollection of the

7    ladder falling left.  So I accept his recollection on

8    that.

9    Q.    So if the ladder fell to the left, does that mean

10   the ladder was in a position where the right side of

11   the ladder lifted up in the air and moved towards the

12   left, rotating counterclockwise?

13         MR. SWARTZ:  Objection.

14   A.    I don't understand your question.  I'm sorry.

15   Q.    You say the ladder fell to the left.  Does that

16   mean the left-hand side of the ladder toppled over

17   towards the ground?

18   A.    Correct.

19   Q.    And in order for the ladder to topple over to the

20   left, there would have to be some type of force

21   causing the ladder to move in that direction; correct?

22   A.    Yes.

23   Q.    Okay.  And the direction of that force would be

24   what, sir?

1    A.   The force of Mr. Gormley on the ladder and his

2    actions on the ladder, specifically his shifting of

3    his weight.

4    Q.   And if the right rear leg buckled while

5    Mr. Gormley was on the ladder and Mr. Gormley simply

6    standing on the ladder, you would expect the ladder to

7    just tip over to the right, would you not?

8    A.   I believe that in the process of his using the

9    ladder, there was a buckling and rotation of the

10   ladder that initiated with the right rear leg.

11   Q.   Okay.  But can you answer my question?  And my

12   question to you, sir, is if the right rear leg buckled

13   while Mr. Gormley was simply standing on the ladder,

14   wouldn't you expect the ladder to tip to the right?

15   A.   I did initially, yes.

16   Q.   Okay.  So if we buckle the right rear leg of the

17   ladder, we would expect the ladder to tip towards the

18   right?

19   A.   If you had a complete buckling where there was no

20   support whatsoever, that's a possibility, yes, as if

21   you would take the leg out completely.

22   Q.   Correct.

23   A.   Right.

24   Q.   If you took the right rear leg support out of the

1    ladder, you would expect the ladder to tip to the

2    right; correct?

3    A.    If you lose support at that point, yes, there

4    will be a tipping to that direction.

5    Q.    Now, where was Mr. Gormley standing on the ladder

6    immediately before his accident?

7    A.    At the highest allowable standing level.

8    Q.    Which is what step?

9    A.    Six from the bottom.

10    Q.    And were both feet on the same step?

11    A.    Yes.

12    Q.    What testimony is there, sir, that Mr. Gormley

13    was shifting his weight from his left foot to his

14    right foot immediately before the accident?

15    A.    Clearly, based upon his description of his

16    actions on the ladder just before the collapse.

17    Q.    Okay.  And where is that in his deposition?  Can

18    you cite that testimony for us?

19    A.    I don't have that memorized, but I'll paraphrase.

20    I believe he said that he had his pole with the heat

21    gun, and he was working in an arc-type pattern going

22    back and forth over the top of the shrink plastic in

23    order to get it to tighten up on the boat.

24    Q.    So you interpret that testimony to mean that he

1    was shifting his weight on the ladder from his left
2    foot to his right foot?
3    A.    Absolutely.
4    Q.    Are you relying on any other testimony to support
5    your opinion that Mr. Gormley was shifting his weight
6    from his left foot to his right foot on the ladder,
7    other than his testimony that he was moving the heat
8    gun in an arc?
9    A.    Again, going from memory of this description of
10   what he was doing.  I mean, we can go back to his
11   deposition if we need to get into more detail.  But it
12   seems clear to me, from trying to repeat that action
13   myself, that one would have to shift their weight back
14   and forth in order to maintain stability.
15   Q.    Did you take any measurements at all at any time
16   while anyone was up on a ladder with a heat gun to
17   determine whether there was any change in the forces
18   on the ladder if someone's moving a heat gun in the
19   direction of an arc, as Mr. Gormley testified to?
20   A.    No.
21   Q.    Is it your opinion in this case that Mr. Gormley
22   walked the ladder at any time before the accident?
23   A.    I believe that that phenomenon is a part of this
24   accident, yes.

1       Q.    What is the basis for that opinion?

2       A.    Based upon my examination of the ladder, my

3       familiarity with these types of ladders in general,

4       and Mr. Gormley's description of what happened in the

5       accident.

6       Q.    What about Mr. Gormley's description of the

7       accident supports an opinion from you that the ladder

8       walked?

9       A.    His description of what happened in the accident,

10      where the ladder ended up, what he had told apparently

11      one of the other witnesses who testified in this case

12      with regard to describing what happened in the

13      accident.

14      Q.    Define what you mean by "walked."

15      A.    That's a process by which a four-legged

16      stepladder goes from a position where all four legs

17      are supported to a situation where one of the legs

18      becomes unsupported, the ladder walks in that

19      direction, and then racks, and another leg then

20      teeter-teeters to then another leg being unsupported,

21      and so forth.

22      Q.    And what test -- can you cite to me specifically

23      any testimony from Mr. Gormley, in his deposition,

24      that supports your opinion that the ladder walked

1    before Mr. Gormley's accident?

2    A.    I don't recall whether or not Mr. Gormley stated

3    it specifically in his deposition, but one of the

4    other witnesses say that Mr. Gormley told him that the

5    ladder walked.  And that was what I was just referring

6    to with regard to that specific description.

7    Q.    That's the only information you have on the issue

8    of the ladder walking?

9    A.    With regard to deposition testimony?

10   Q.    Yes.

11   A.    Again, I don't know if Mr. Gormley said it

12   specifically in his deposition, but at least in one

13   other deposition, the deponent said that Mr. Gormley

14   told him that the ladder walked on him while he was

15   using it.

16   Q.    Is there any physical evidence that the ladder

17   walked before Mr. Gormley's accident?

18   A.    Well, I can say that four-legged ladders in

19   general are prone to walking, and the more flexible

20   that they are with regard to their resistance to

21   twisting, as this one clearly was, this ladder would

22   have been prone to walking.

23   Q.    Is there any physical evidence that you can point

24   to show us -- strike that.

```
 1              Is there any physical evidence you can point
 2       to that establishes the Gormley ladder walked before
 3       Mr. Gormley's accident?
 4              MR. SWARTZ:  Just to clarify.  You said "before."
 5       At the time of or just before the happening?
 6              MR. VOKE:  Just before his accident.
 7       A.    Again, as I described, characteristics on the
 8       ladder make it prone to walking, but I can't say that
 9       this is -- this is my proof that the ladder did walk
10       at this time, no.
11       Q.    How can you -- strike that.
12              Is there any physical evidence that would
13       permit you to rule out that Mr. Gormley simply lost
14       his balance and kicked the ladder out to the left?
15       A.    Was your question with regard to physical
16       evidence?
17       Q.    Yes.
18       A.    With regard to the direction that he went and
19       everything, yeah.  I mean, if he -- if he had -- if
20       the ladder had simply just tipped on its own because
21       he lost his balance, I would expect him to fall in
22       that same direction and away from the ladder,
23       possibly.  But that's -- I mean, otherwise, I can't
24       really point to anything on the ladder and say this is
```

```
 1        definitively why that's the situation.
 2        Q.    So from the physical evidence itself, you can't
 3        rule out that the ladder simply was kicked out to the
 4        left by Mr. Gormley because he lost his balance;
 5        correct?
 6             MR. SWARTZ:    Objection.
 7        A.    I don't believe so.
 8        Q.    Can you clarify that?  You don't believe what?
 9        A.    You asked me if I could rule that out, I think.
10        Q.    You don't believe you can rule it out, based upon
11        the physical evidence?
12        A.    Well, part of the issue is he didn't come down
13        right away with the ladder.  You know, he attempted to
14        catch himself on a part of the boat, and it appears as
15        though there was separation between he and the ladder,
16        and then at some point in time, he fell off and then
17        hit the ladder on the way down.  So that's what makes
18        the issue a little bit more complicated with regard to
19        his falling directly with the ladder as compared to
20        following an instant later.
21        Q.    Is there any testimony from Mr. Gormley that the
22        ladder tipped to the right first and then tipped back
23        to the left?
24        A.    His recollection was a perception that the ladder
```

1    tipped to the left.  And that's, I think, his first

2    acknowledgment that something was wrong, that the

3    ladder was not beneath him anymore, so to speak.

4    Q.    So you're not aware of any deposition testimony

5    from Mr. Gormley that the ladder tipped to the right

6    first?

7    A.    Correct.

8    Q.    Okay.  And is there any physical evidence that

9    the ladder tipped to the right first?

10    A.    Well, certainly the fracturing of the right rear

11    rail would have weakened it in its ability to resist

12    lateral forces.  And based upon my experience with

13    this and similar ladders and their propensity to walk,

14    I've concluded that it was precipitated by a racking

15    and a collapse of that right rear leg that let the

16    left rear leg off the ground, and a subsequent shift

17    by Mr. Gormley caused it then to tip towards that

18    unsupported leg and ultimately the ladder tipping over

19    to the left.

20    Q.    My question, sir, is there any physical evidence

21    in your examination of the ladder to suggest that the

22    ladder tipped to the right first before it tipped to

23    the left, as Mr. Gormley testified in his deposition?

24    A.    Only what I've already described.

1       Q.    And what is that?

2       A.    Which is the weakened condition of the right rear

3       leg, the looseness of the fasteners in the front

4       section, and so forth.

5       Q.    The weakened condition of the right rear leg just

6       in and of itself doesn't support any scientific

7       opinion that the ladder shifted to the right at the

8       time of Mr. Gormley's accident and then to the back to

9       the left; correct?

10      MR. SWARTZ:  Objection.

11      A.    I disagree.

12      Q.    Okay.  Tell me what about the condition of the

13      right rear leg supports your opinion that the ladder

14      shifted to the right and then back to the left at the

15      time of Mr. Gormley's accident.

16      A.    Again, it comes back to the walking issue as

17      we've referred to earlier, and that's a situation

18      where there's at least one leg that's completely

19      unsupported, and before that -- and for that tipping

20      to the left to that unsupported leg, the ladder would

21      have been previously, just before that instant, racked

22      to the other side such that there was some support of

23      the right rear leg, but incomplete support because of

24      the collapse due to the fracturing that already

1     existed in that rail.  And the shift of Mr. Gormley's

2     weight, again, continuing with what he was doing,

3     caused it to shift back to that unsupported left leg

4     and fall over.

5     Q.   I know you say that, but what is the evidence

6     that we have in the case other than your say-so?

7     A.   We have what Mr. Gormley told to other witnesses

8     who were at the Marina Bay shortly after the accident,

9     the physical evidence on the ladder, my testing of

10    exemplar ladders all support a situation where the

11    ladder did indeed collapse to the right at that

12    fractured leg in the process of walking and racking,

13    shifting back then to the left onto the unsupported

14    left leg and falling over to the left.

15    Q.   You say the ladder collapsed to the right first

16    and then shifted to the left?

17    A.   The collapse consisted of a racking due to his

18    weight shift and a walking of the ladder.  And when it

19    walked, it came down on that right rear leg that was

20    fractured.  So it lacked the degree of lateral support

21    that it would have had had it not been fractured.

22    Q.   You said that the right rear leg collapsed?

23    A.   There was a partial collapse.

24    Q.   Okay.  And after the right rear leg partially

1    collapses while Mr. Gormley is on the ladder, what is

2    the force that then causes the ladder to move to the

3    left?

4    A.    It's Mr. Gormley shifting his weight while he's

5    working.

6    Q.    Okay.  And where is the evidence that Mr. Gormley

7    shifts his weight at any point to cause the ladder to

8    move to the left other than your say-so?

9          MR. SWARTZ:  Objection.

10    A.    Clearly from his description of what he was doing

11    at the time.

12    Q.    And that's what you referred to as his testimony

13    where he is moving the heat gun in an arcing motion?

14    A.    Correct.

15    Q.    Anything else?

16    A.    I don't believe so.

17    Q.    You said you have some -- you did some testing

18    that supports your opinion that the right rear leg

19    partially collapsed and then the ladder shifted to the

20    left, and what testing was that?

21    A.    The testing that was depicted in a videotape that

22    I sent to counsel.

23    Q.    Why don't you describe what testing you are

24    referring to.

1    A.    Where shifting of one's weight on the ladder

2    causes the ladder to rack, and when it does rack, it

3    applies more load to one of the rear legs than the

4    other, because one of the rear legs will be off the

5    ground and the other one will be on the ground,

6    basically taking twice as much weight as normal, or

7    more.

8    Q.    What evidence is there that the ladder was racked

9    at any point in time while Mr. Gormley was up on the

10    ladder before his accident?

11    A.    To me, it's the most -- it's the scenario that

12    most accurately represents consistently the physical

13    evidence and Mr. Gormley's recollection of what

14    happened at the time of the accident.

15    Q.    And what testimony of Mr. Gormley's are you

16    referring to?

17    A.    With regard to how the ladder was suddenly not

18    supporting him any further and that it had suddenly

19    moved to one side and over it went.

20    Q.    Isn't that consistent with someone simply

21    overreaching and losing their balance and kicking a

22    ladder off to the left?

23        MR. SWARTZ:    Objection.

24    A.    No, that doesn't seem to be what he described.

1      Q.   So it's not consistent with -- strike that.
2      The ladder tipping over to the left is not consistent
3      with Mr. Gormley losing his balance and kicking the
4      ladder out to the left?
5           MR. SWARTZ:   Objection.
6      A.   I don't believe so, no.
7      Q.   And you've never testified in the past --
8      A.   Excuse me.   You're talking about his tipping the
9      ladder over because of overreaching.   Is that what you
10     referred to?
11     Q.   No.  He lost his balance and tipped the ladder
12     over to the left.   Isn't that a reasonable explanation
13     for how the ladder tipped over to the left?
14          MR. SWARTZ:   Objection.
15     A.   Well, movement of the ladder caused him to lose
16     his balance, and ultimately the ladder goes over to
17     the left, but it wasn't because of overreaching.
18     Q.   Is the ladder tipping over to the left consistent
19     with Mr. Gormley losing his balance and tipping the
20     ladder to the left, yes or no?
21     A.   Only because the ladder was already racked and
22     unsupported on the left rear leg.   I think that's the
23     distinction that we need to make here, because I
24     really --

1    Q.    Can you answer my question?  I know you want to

2    answer your questions, but I'd like you to answer my

3    question.  And the question I had was, with the ladder

4    tipping over to the left, isn't that consistent with

5    Mr. Gormley losing his balance and tipping the ladder

6    over to the left?

7        MR. SWARTZ:    Objection to the form of that

8    question, and Mr. Kiska can provide a complete answer

9    as he sees appropriate.

10   A.    No, I don't believe that Mr. Gormley lost his

11   balance until the ladder was already tipping.

12   Mr. Gormley's loss of balance was because of the

13   ladder tipping over, not the cause of the ladder

14   tipping over.

15   Q.    Okay.  So from a scientific standpoint, sir, a

16   stepladder tipping over to the left is not consistent

17   with a user on the ladder losing their balance and

18   tipping the ladder over to the left; correct?

19   A.    Well, that depends.  Is the ladder that you're

20   describing, does it have four points of contact or

21   three points of contact?

22   Q.    Can you just answer my question, please?

23   A.    No, I cannot.  Your question presumes other

24   factors which are not covered in your question.  So I

1    can't overgeneralize to answer your question.

2    Q.   Okay.  So you can't -- if a ladder tips over in

3    an accident to the left, you can't say what caused the

4    ladder to tip over unless you know where all four feet

5    of the ladder are before the accident occurs; correct?

6         MR. SWARTZ:  Objection.

7    A.   That can certainly factor in to it.

8    Q.   Wasn't that what you just said, that you had to

9    assume that the feet were in a certain position before

10    you could make a determination as to whether a ladder

11    tipping over to the left was caused by a user losing

12    their balance?

13         MR. SWARTZ:  Objection.

14    A.   Well, certainly it depends upon what the person

15    is doing at the time and where the feet are.  That's

16    what I'm trying to convey.

17    Q.   Okay.  And just so we know, from a scientific

18    standpoint, just a stepladder tipping over to the

19    left, you can't determine from that alone whether the

20    user lost his or her balance and caused the ladder to

21    tip over to the left?

22         MR. SWARTZ:  Objection.

23    A.   Well, based upon Mr. Gormley's testimony, he

24    states that the ladder --

```
 1        Q.   I'm not talking about Mr. Gormley.  I'm talking
 2    about a user on a ladder with the ladder tipping over
 3    to the left.
 4        A.   Okay.  So we're not even talking about this
 5    ladder in this case, we're talking about some other
 6    ladder?  Just so I -- I want to make sure I understand
 7    your question.
 8        Q.   Correct.
 9        A.   Okay, because my mindset was all about this
10    accident and Mr. Gormley's ladder, but you want me now
11    to presume --
12        Q.   Let's just take an FS108 stepladder --
13        A.   A brand-new one?
14        Q.   A brand-new one that tips over to the left.
15    Isn't a stepladder that falls over to the left
16    consistent with a user losing their balance and
17    causing the stepladder to fall to the left?
18            MR. SWARTZ:   Objection.
19        A.   I guess it depends upon if the ladder is
20    supported on all four feet; it depends on what the
21    user is doing at the time of the tipping.  And these
22    are other factors that come into answering the
23    question.
24        Q.   Anything else?
```

1      A.   I mean, that's what comes to mind right now.

2      Q.   What testimony is there from Mr. Gormley that all

3      four feet of the ladder were not on the ground just

4      before he lost his balance and fell?

5      A.   He doesn't address that specifically.  I don't

6      think it was asked specifically of him in the

7      deposition.

8      Q.   So you don't know whether all four feet were on

9      the ground or not, do you?

10     A.   I was not there, obviously.

11     Q.   You'd have to be there to make that

12     determination, in other words?

13          MR. SWARTZ:   Objection.

14     A.   Other than using facts in evidence, my knowledge

15     of such products, and making deductions based upon

16     that information.

17     Q.   And it's your opinion in the case that

18     Mr. Gormley's ladder, the right rear leg partially

19     collapsed, causing that ladder to shift to the right

20     initially; correct?

21     A.   What I'm saying is that in his use of the ladder,

22     as described, the ladder racked such that the right

23     rear leg was carrying the weight, the left rear leg

24     was off the ground, and in the process of doing that,

1    the right rear leg collapses because of its fractured
2    condition.  That's what initiates the accident.
3    Q.    Okay.  And the physical evidence to support that
4    is what, sir?
5    A.    Again, the condition of the ladder, his
6    description of what he was doing, and his recollection
7    of what happened at the accident.
8    Q.    What about the condition of the ladder supports
9    that opinion?
10   A.    Well, in its new condition, the ladder is prone
11   to walking in the first place.  But in its current
12   condition with all the looseness of the fasteners and
13   so forth, it was even more prone to walking than one
14   that was in a new condition.  That, in addition to the
15   fracturing of the rear rail which preexisted the
16   accident, caused that part of the ladder to be less
17   rigid and collapse to some degree under the additional
18   load of the racked ladder, plus the lateral loading of
19   his shifting his weight.
20   Q.    What about the condition of the ladder following
21   the accident supports your opinion that the right rear
22   leg partially collapsed and caused the ladder to shift
23   to the right?
24   A.    Again, it comes back to the condition of the

```
1       ladder.
2       Q.    What about the condition of the ladder?
3       A.    The looseness of the fasteners, the fracturing of
4       the right rear leg, Mr. Gormley's description of what
5       he was doing, and my experience with four-legged
6       stepladders in general.
7       Q.    So you're saying now that the right rear leg, it
8       fractured more during the course of the accident?
9       A.    To some degree, it probably did.
10      Q.    And what do you base that on?
11      A.    My experience with fiberglass ladders and
12      fractured rails.
13      Q.    What about your experience with fiberglass
14      ladders and fractured rails?  What are you referring
15      to?
16      A.    In working with ladders that have fractured
17      rails, certainly, again, the fracture starts typically
18      at the unprotected sawn end, and it progresses up the
19      rail.  Again, as we've looked at the photographs, the
20      evidence clearly demonstrates that the lower portions
21      of the fracture are older and the upper portions are
22      newer.  And in placing loads on those kinds of
23      ladders, that's how the fracturing progresses,
24      propagates up the rail.
```

```
1    Q.   All right.  What testing have you done to support
2         your opinion in this case that the right rear rail
3         fractured further than it already was while
4         Mr. Gormley was on it just before this accident?
5    A.   Well, from the testing that I conducted, I made
6         measurements of the rail.  And, again, I used a ladder
7         that I intentionally cut with a saw.  So it's a little
8         bit different than one that has a progression of a
9         crack going up the side.  But even there, there was
10        some additional evidence of additional fracturing due
11        to its use during that testing that certainly
12        corroborates with what I've described to you, and the
13        evidence that's already here that was a progression
14        fracture that started at the bottom and it worked its
15        way up the rail.
16   Q.   Other than the testing that you referred to where
17        you cut a rail with a saw, have you done any other
18        testing that you believe supports your opinion that
19        the fracture in the right rear rail increased while
20        Mr. Gormley was on the ladder?
21   A.   Well, I mean, that's also just from the
22        scientific principles of stress analysis in that
23        you've got a fractured areas, it's a stress riser
24        condition, and when you apply loads to an area that's
```

1    already fractured, if the loads are sufficient, the

2    fracturing will continue to spread.

3    Q.   Perhaps you didn't hear my question.  I asked

4    about testing, not stress analysis.

5    A.   As far as testing, my testing in this case was

6    essentially limited to what was depicted in the video.

7    Q.   The top cap on the Gormley ladder, is that

8    cracked?

9    A.   Yes.

10    Q.   Okay.  And can you make a determination from

11    simply looking at the top cap as to when that fracture

12    occurred?

13    A.   I don't think I can say definitively, no.

14    Q.   And what was the direction of force that caused

15    that crack in the top cap?  Can you say that?

16         MR. SWARTZ:  Objection.

17    A.   Well, it could have occurred either one of two

18    ways, either from a bending or a buckling.

19    Q.   Okay.  And what would be the direction of the

20    force if it was a bending?

21    A.   Parallel with the fracture.

22    Q.   Okay.  And what would be the direction of the

23    force if it was a buckling?

24    A.   Initially perpendicular to the fracture.

PAGE 36

```
00036
01  Q.  And can you tell us whether that top cap was
02  cracked before Mr. Gormley's accident?
03  A.  I don't believe I can, no.
04  Q.  Was there any physical evidence to determine when
05  that crack occurred?
06  A.  I don't know.
07  Q.  Can you tell us the amount of force that would be
08  required in order to crack that top cap?
09  A.  It depends upon the preexisting condition of the
10  top cap.  And the reason I say that is, I know that in
11  the past there have been issues at Werner with regard
12  to the integrity of the top caps, based upon the
13  manufacturing method.  So, you know, that actual
14  amount of force required to cause a fracture will be
15  influenced upon the physical characteristics of the
16  top cap prior to the loading.
17  Q.  Okay.  Well, what were the physical
18  characteristics of that top cap on Mr. Gormley's
19  ladder?
20  A.  I haven't done any testing on the material.
21  Q.  Where was Mr. Gormley in relation to the ladder
22  immediately following his accident?
23  A.  Again, as we talked about earlier, it would
24  appear that he was within arm's reach of the ladder,
```

ig    978.409.9090

1    or possibly even still in contact with the ladder

2    following the accident.

3    Q.    Now, the fact sheet --

4         MR. VOKE:  Let's go off the record.

5         (Discussion off the record.)

6    Q.    Mr. Bartnicki, what is the model ladder involved

7    in this accident?

8         MR. SWARTZ:  Mr. Kiska.

9    Q.    Excuse me.  Mr. Kiska, what is the ladder

10   involved -- the model of the ladder involved in this

11   accident?

12   A.    I believe it's the Werner FS108.

13   Q.    And does that ladder, in your opinion, comply

14   with ANSI standards?

15   A.    It's my understanding that does it, yes.

16   Q.    Okay.  And are there any other national standards

17   concerning the design of fiberglass stepladders other

18   than the ANSI standards?

19   A.    There are various OSHA Standards that refer to

20   ladders in general, but from my recollection, there

21   isn't anything in OSHA that's not covered in ANSI.

22   Q.    Okay.  So the ladder involved in Mr. Gormley's

23   accident, as designed and manufactured, would have

24   complied with ANSI standards and OSHA standards;

1    correct?

2    A.    As designed and manufactured, in theory, yes.

3    Q.    And it's your opinion that the ladder, as

4    designed and manufactured, was defective; correct?

5    A.    Yes.

6    Q.    Okay.  And tell me what you claim are the defects

7    in the design of the FS108 stepladder.

8    A.    Well, I've come to realize that four-legged

9    stepladders in general are prone to walking.

10   Secondly, with regard to the fiberglass composite, it

11   is apparent that fiberglass stepladders require

12   additional care above and beyond what those of wooden

13   or metal stepladders require; and as a result, they

14   are prone to damage, specifically cracking of the

15   fiberglass, because this particular design was lacking

16   in sufficient bolstering of the ends of the rails.

17   Q.    When did you arrive at these opinions?

18   A.    For this particular case?

19   Q.    Well, when did you arrive at these opinions that

20   you just described for us?

21   A.    We're talking about this particular case?

22   Q.    We're talking about this particular ladder.

23   A.    I can't say specifically -- when you say "this

24   specific ladder," are you talking about this design,

1       or Mr. Gormley's ladder?

2       Q.    Well, we're talking about the FS108 ladder

3       involved in Mr. Gormley's accident.  You have just

4       said, in your opinion, it's defective in design, and

5       my simple question to you is, when did you arrive at

6       these opinions?

7       A.    During the course of my work in this case.

8       Q.    Did you ever have these opinions that the FS108

9       stepladder was defectively designed prior to working

10      on the Gormley case?

11      A.    I don't believe that I really considered that

12      prior to my work in the Gormley case.

13      Q.    Okay.  And is it your opinion that a four-legged

14      stepladder is a defective design?

15      A.    In that there's the hidden defect of walking,

16      which is not addressed to in the labeling to users.

17      Q.    So it's just the labeling?

18      A.    It's a design defect that's best addressed by

19      altering the design.  Labeling is just a last-ditch

20      effort, so to speak, in trying to address the problem.

21      Q.    Okay.  And how would you to address the problem?

22      A.    By changing the design.

23      Q.    How would you change the design?

24      A.    To something that more closely represents or

1    approaches the design of a tripod ladder where you

2    have primarily three points of support rather than

3    four.

4            Additionally, there are other things that

5    can help in bolstering the design, which is platform-

6    type ladders where you have a more rigid structure,

7    more even distribution of the loading, and they tend

8    to be far less prone to walking than this type of a

9    ladder.

10   Q.   If you can walk a ladder, is the ladder

11   defective?

12   A.   I guess it depends upon what kind of a ladder

13   you're talking about.

14   Q.   So would -- how would the --

15   A.   Well, let me back up.  Let me back up.  I guess

16   it depends upon what your definition of walking is

17   compared to mine.

18   Q.   Okay.  Well, we're going to use your definition

19   of walking.

20   A.   Okay.

21   Q.   If you can walk a ladder, a stepladder, is it

22   effectively designed?

23   A.   It depends upon the degree of walking.

24   Q.   What degree of walking makes a stepladder

1    defective?

2    A.    Well, certainly, shifting of one's weight on the

3    ladder can cause the feet of the ladder to become

4    unsupported to a substantial degree.

5    Q.    What does "substantial degree" mean?

6    A.    Anything more that -- again, it's not a point --

7    there's a gray area.  But just to throw out a number,

8    something more than half of an inch, or an inch.

9    Q.    And how do you arrive at that number?

10   A.    Based upon my use of various products, testing,

11   climbing tests, other quantitative testing that I've

12   done on different products.

13   Q.    In this case?

14   A.    In this case and in other cases, yes.

15   Q.    What other cases have you done testing on to

16   support the proposition that a stepladder that can

17   walk more than half an inch or an inch is defective in

18   design?

19   A.    I'm currently working on another case that

20   involves a six-foot fiberglass stepladder.

21   Q.    What brand is that is that?  Is that a Werner?

22   A.    Yes, it is.

23   Q.    So your opinion that a stepladder can walk

24   wouldn't be confined to just a fiberglass ladder,

1      would it?

2      A.    No.

3      Q.    It would involve any stepladder?

4      A.    Correct.

5      Q.    Whether it's made out of wood or aluminum;

6      correct?

7      A.    Yes.

8      Q.    So every stepladder that's been manufactured in

9      the United States that could walk in a similar fashion

10     to you say the FS108 can walk, is defectively

11     designed?

12          MR. SWARTZ:   Objection.

13     A.    It's a hidden defect that's not conveyed to the

14     user.

15     Q.    Have you ever testified in any stepladder cases

16     previously?

17     A.    Yes.

18     Q.    Okay.   In how many stepladder cases have you

19     testified, approximately?

20     A.    Any kind of stepladder?

21     Q.    Yes.

22     A.    It's probably been more than a dozen anyway.

23     Q.    Okay.   And what manufacturers?

24     A.    Werner, certainly.   I think there was one Keller

1    case.  There was one other Greenbull case, I believe.

2    Q.    Have you ever testified that any Warner

3    stepladders were reasonably designed?

4    A.    I'm sure I have in the past, yes.

5    Q.    And what models?

6    A.    Again, I haven't memorized all my testimony, so

7    specifically what I said, I don't know.  But, I mean,

8    I've testified in a number of different cases

9    involving aluminum, wood, and fiberglass stepladders.

10   Q.    Okay.  Well, what model lines?  Do you recall

11   any of the model lines that you've testified about?

12   A.    350 series, 360 series.  I'm trying to remember

13   some of the fiberglass ladder lines.  I can't -- as I

14   sit here, I don't remember all the different model

15   lines, but they involved ladders of different heights,

16   ladders of different duty ratings, certainly, wood,

17   aluminum, fiberglass.

18   Q.    Okay.  Have you ever given any opinions that an

19   FS108 ladder was reasonably designed?

20   A.    I don't recall.

21   Q.    You may have while you were at Werner?

22   A.    I don't recall.

23   Q.    But you may have while you were at Werner?

24   A.    Werner would probably have a better record of

1    that than I do.

2    Q.    Did you ever criticize the design of the FS108

3    ladder while you were at Werner?

4    A.    I don't have a recollection of that, no.

5    Q.    Did you have any involvement with the FS108

6    ladder while you were at Werner?

7    A.    I believe I've watched some testing that was

8    conducted of the ladder, but with regard to the

9    details of the design, no.

10    Q.    What testing did you watch?

11    A.    ANSI testing.

12    Q.    Did you participate in the testing?

13    A.    I don't have a recollection of that.  I mean, I

14    remember seeing ladders tested, watching ladders

15    tested.  But whether or not I was actually a

16    participant in conducting the test or not, I don't

17    have a recollection of that.

18    Q.    Do you have any involvement in the design of any

19    fiberglass ladders while at Werner?

20    A.    I worked at certain aspects of fiberglass ladders

21    in the past for Werner.

22    Q.    What aspects of what ladders?

23    A.    Evaluating hardware, conducting tolerance

24    stackups, things of that nature.

```
 1      Q.    What models?
 2      A.    I don't recall specifically.  I want to say they
 3      were heavier duty ladders, but I don't recall model
 4      numbers.  It's been a number of years.
 5      Q.    How many cases do you have against Werner now?
 6            MR. SWARTZ:  Objection.
 7      A.    Cases where I'm actually involved with having
 8      done inspections and things of that nature, I think
 9      only this one and another one.
10      Q.    Have you been disclosed in any other case?
11      A.    I don't know.
12      Q.    Have you done an expert report?
13      A.    I think only in this case, and the one other case
14      I just referenced I've done a report.  As I sit here
15      right now, that's all that's coming to mind is just
16      these two.  I mean, there were some resolved cases.
17      There's at least one resolved case that was a Werner
18      case, which I'm sure they know about.  I believe I
19      wrote a report on that one.  But I'm not working on
20      that.  Obviously, I'm not working on that one anymore.
21      Q.    What case is that?
22      A.    I don't know if I'm prohibited from talking about
23      that.  I know that --
24            MR. SWARTZ:  Well, if you don't know, then --
```

1   Q.   Well, if it involved Werner, I'm entitled to know

2   what case -- you were involved in another case and

3   it's closed.

4   A.   Well, Werner is certainly in a position to tell

5   you that.  I want to avoid talking about any cases

6   were I'm prohibited from talking about them.

7   Q.   Are you aware of some type of injunction against

8   you from talking about a case?

9   A.   There's been at least one situation where I was

10  told that the aspects of the case and the agreement of

11  the closure of the case was that there was to be no

12  disclosure whatsoever about details of the case.

13  Now, I don't know if that applies to the one case I'm

14  thinking about or just another one.  I don't know.

15  But, obviously, you're in communication with Werner

16  more so than I am, so I would think that if there's

17  any information that you require with regard to cases

18  that I've been involved in with Werner where they knew

19  it, they can tell you about it.

20  Q.   So you don't want to tell me what the other case

21  is that's closed that you worked against Werner on?

22  A.   That's correct.

23  Q.   Okay.  Well, I want to know what it is, and

24  there's no basis for not telling me.  Tell me what the

```
1      case was.
2           MR. SWARTZ:  Let's go off the record for a
3      moment.
4           (Discussion off the record.)
5      Q.   Mr. Kiska, are you going to tell us the name of
6      the case?
7      A.   I don't want to -- I don't want to say anything
8      that I'm -- I don't want to talk about any cases that
9      I'm not supposed to talk about.  I don't mean any
10     disrespect, Mr. Voke, but I don't want to -- I presume
11     that the case is settled.  I believe it settled.  I
12     have got nothing to do with it anymore.  As I recall,
13     I wrote a report in this matter.  Werner knows about
14     it, and Werner can give you the details of the case.
15     It was a case down in Louisiana.
16     Q.   A closed case?
17     A.   I'm sorry, no.  I think it -- I said Louisiana.
18     I think it's -- I think it was a case down in Texas.
19     Q.   So you have a case where you testified against
20     Werner that's a closed case?
21     A.   I didn't testify in that case.
22     Q.   You wrote a report against Werner Ladder?
23     A.   I believe I did write a report in that case.
24     Q.   It was down in Louisiana.  And what kind of
```

```
 1    ladder was it?
 2    A.    I think it was -- I think it was -- I now think
 3    it was Texas.  And it was a Werner fiberglass ladder.
 4    Q.    A stepladder?
 5    A.    Correct.
 6    Q.    Okay.  And what was that nature of your criticism
 7    of the ladder in that case?
 8    A.    Again, I'm not sure what the settlement agreement
 9    was on that case, whether it involves my not
10    disclosing anything about it.  I don't know.
11    Q.    Okay.  Well, we're going to go see the judge on
12    this at some point.  I'm going to seek costs from you
13    if you're not going tell us that you have another case
14    against Werner that involved a stepladder, a
15    fiberglass stepladder.
16    A.    Mr. Voke, I'm sure that if you ask Werner about
17    this case, they can tell you about the case.
18    Q.    I'm here asking you, Mr. Kiska.  I ask the
19    questions; you answer them.  You're not being
20    cooperative.
21          MR. SWARTZ:  Just for the record, it's not an
22    issue of him being cooperative.  He is concerned about
23    confidentiality agreements and other issues that may
24    exist in that case and that he should have an
```

```
 1      opportunity to check on it.
 2           MR. VOKE:  Well, he can come back here at his own
 3      expense when I ask the Court to order.
 4      Q.   Now, you said it's your opinion that the FS108
 5      stepladder is defectively designed because there's no
 6      warning saying that fiberglass requires more care than
 7      wood or metal; correct?
 8      A.   Yes.
 9      Q.   And that's an opinion that you arrived at while
10      working on this case, the Gormley case; correct?
11      A.   Yes.
12      Q.   Okay.  And you never had that opinion while you
13      were working at Werner, did you?
14      A.   I wasn't aware of that statement when I was
15      working at Werner.
16      Q.   Oh, you weren't aware that fiberglass requires
17      more care than wood or metal while you were working at
18      Werner?
19      A.   That was never made plain to me while I was
20      there.
21      Q.   Oh, okay.  You said that the FS108 was defective
22      and it needed sufficient bolstering of the ends of the
23      rails?
24      A.   Obviously, you're paraphrasing; but, yes, it's
```

1    defective in that the ends of the rails aren't
2    sufficiently bolstered.
3    Q.    Meaning what?
4    A.    Protected from fracturing due to reasonably
5    foreseeable use.
6    Q.    Reasonably foreseeable use or abuse?
7    A.    Use.
8    Q.    And what's reasonably foreseeable use that will
9    crack the rails on an FS108 stepladder?
10   A.    Well, it seems to me, from reading
11   Mr. Bartnicki's deposition and from reviewing the test
12   reports that were supplied, that Werner feels that
13   Marina Bay's use of these ladders and moving them
14   around in an open condition is what precipitated the
15   cracking in Mr. Gormley's ladder.
16   Q.    Well, what caused the cracking in Mr. Gormley's
17   ladder, in your opinion?
18   A.    I don't know what initiated the cracking, and I
19   don't disagree with what Werner's position is on what
20   could have caused the cracking, apparently, from
21   Mr. Bartnicki's deposition.
22   Q.    I want to know -- so you have no opinion as to
23   what caused the cracking in the right rear rail of
24   Mr. Gormley's ladder; correct?

```
1              MR. SWARTZ:  Objection.
2     A.    I haven't done any testing specifically in that
3     regard.  I'm relying on Warner's testing and Warner's
4     position on that.
5     Q.    So given that you don't know what caused the
6     cracking in the right rear rail of Mr. Gormley's
7     ladder, how do you know the right rear rail wasn't
8     abused by somebody at Marina Bay?
9              MR. SWARTZ:  Objection.
10    A.    I don't know the history of this ladder.  It's my
11    understanding that there are a number of people who
12    had access to it, in addition to Mr. Gormley.  So I
13    can't speak to in detail with regard to how this
14    ladder was treated, other than what I've gotten out of
15    the discovery documents.
16    Q.    For example, you don't know whether someone at
17    Marina Bay intentionally threw the Gormley ladder in
18    order to cause that right rear rail to be damaged;
19    correct?
20             MR. SWARTZ:  Objection.
21    A.    No, I don't.
22    Q.    You don't know whether the damage was caused by a
23    customer of Marina Bay damaging the rail; correct?
24             MR. SWARTZ:  Objection.
```

```
 1      A.    No, I don't.

 2      Q.    And you haven't done any testing either to

 3      determine how that damage occurred to the right rear

 4      rail, that is, with the split at the base of the rail?

 5      A.    I know that once the crack initiates, additional

 6      loadings can cause the crack to propagate.

 7      Q.    Okay.  But in terms of the initiation of the

 8      crack in the right rear rail, you don't know how that

 9      occurred?

10      A.    It would appear as though it happened from their

11      use of the ladder.  I don't -- I wasn't actually there

12      watching the ladder, obviously.  I don't know for sure

13      exactly how it happened.

14      Q.    Okay.  And you haven't done any testing to

15      determine whether sliding the ladder on the ground in

16      an upright and open position is sufficient to cause

17      damage to the right rear rail over time; correct?

18      A.    Personally, no, I have not.

19      Q.    Are you aware of anyone that has done that type

20      of testing?

21      A.    Werner has apparently done some testing in that

22      regard, but they haven't taken it to the next degree,

23      which is repeated use in that fashion.

24      Q.    So you're not aware of anyone who has done any
```

1   testing to support the opinion that the right rear leg

2   would have had a fracture initiating at the base of

3   the leg from someone simply sliding the ladder on an

4   asphalt surface?

5   A.   I don't disagree that that's a distinct

6   possibility, but I have not, nor am I aware of any

7   testing that pursues that possibility and proved it.

8   Q.   And you say that you would bolster the ends of

9   the rails.  And how would you do that to correct what

10  you perceive to be a defect in the design of the

11  ladder?

12  A.   Either with rail shields or some type of boot to

13  support the ends of the rails.

14  Q.   How big would the rail shields be?

15  A.   I think, to be on the safe side, they should be

16  several inches long.  The more support -- the more

17  support that you provide, the hardier the design is

18  going to be.

19  Q.   So the rail shields should be several inches

20  long?

21  A.   Ideally.

22  Q.   Is a ladder -- a fiberglass stepladder designed

23  without a rail shield defective, in your opinion?

24  A.   Given the fact that they require use and care

1    above and beyond what the normal wooden ladder or

2    aluminum ladder would, yes.

3    Q.    Why wouldn't you just encase the entire rail in

4    plastic; wouldn't that prevent any damage to the

5    fiberglass?

6    A.    When you say "any damage," I mean, I don't think

7    that, you know, depending upon what the ladder is

8    subjected to.  You know, obviously, if you drive over

9    it with a truck, it's still going to become damaged,

10   whether you've got a rail shield that's up the entire

11   length of the rail or none whatsoever.

12   Certainly, the more bolstering you do of the ladder

13   rail, the more it's going to be able to endure the

14   kind of use that's expected in the field.

15   Q.    Okay.  Have you ever undertaken any studies as to

16   the use and abuse of fiberglass ladders that are out

17   in the field?

18   A.    Not personally, no.

19   Q.    And from an engineering standpoint, wouldn't you

20   want to encase as much of the rails of the ladder in

21   some type of plastic shield?

22   A.    Well, it's important to address the areas where

23   the fracturing initiates, which is typically the

24   unprotected sawn ends.

```
1      Q.   Okay.  Well, how many other -- how many other
2      ladders have you seen where there was a cracked rail
3      in a Werner fiberglass ladder with a crack running up
4      from the base?
5      A.   At least a couple other ones.
6      Q.   Where?
7      A.   Well, there was a case that I investigated
8      briefly a number of years ago out in California.  It
9      was the Brad Key case for Werner, and that one
10     exhibited fractures at the rear rails, I recall.
11     Q.   The Brad Key case.  Did you write a report in
12     that case?
13     A.   I don't believe so.
14     Q.   Did you tell Werner that there was a defect on
15     that ladder?
16     A.   I just reported what I found with regard to the
17     fractured rails.  I had taken photographs of the
18     ladder and so forth.
19     Q.   And did you provide some type of report to
20     Werner?
21     A.   Just a verbal description of what I'd seen, and
22     that was about it.
23     Q.   Do you have a file?
24     A.   No.
```

```
 1      Q.    Did you tell Werner they ought to change the
 2      design of the ladder?
 3      A.    I didn't -- my investigation in that case was
 4      very preliminary.  It was a situation where I was
 5      asked to go out to California to investigate a number
 6      of different cases, and the claims department added a
 7      number of other cases in the area to my list of ones
 8      to look into; and, you know, from their request, that
 9      was what I did.  I went, I looked at the ladder, made
10      measurements, and took photographs.
11      Q.    You said in place of a rail shield a boot could
12      be used.  What do you mean by a boot?
13      A.    What comes to mind is I believe it's the Husky
14      brand, which I want to say is made by Tricam.  They
15      utilize a ladder shoe that's made out of plastic that
16      covers the ends of the side rails that incorporates a
17      foot of rubber pad for slip resistance as well.  That
18      would provide -- something of that nature would
19      provide additional protection of the fiberglass rail
20      above and beyond what the FS108 provides.
21      Q.    Okay.  Is there any industry standard that
22      requires rail shields?
23      A.    I don't believe so.
24      Q.    When were rail shields first used on any ladder?
```

```
 1          A.   As I sit here right now, I could only estimate.
 2     But it goes back a number of years.
 3          Q.   Okay.  Who was the first manufacturer to use a
 4     rail shield?
 5          A.   I don't know.
 6          Q.   And what was the year that they were first used?
 7          A.   I told you, as I sit here right now, I can't -- I
 8     can't give you that answer definitely.
 9          Q.   Well, you said it goes back a number of years.
10     What year are you talking about?  Can you give us a
11     range?
12          A.   As far back as I can remember working for Werner,
13     I had worked for them starting in 1985.  I have a
14     recollection of there being rail shields available
15     sometime along that line.  Whether or not -- whether
16     right at 1985 or sometime shortly thereafter.  But I
17     would say for at least the last 10, 15 years at
18     Werner, rail shields were available as an accessory.
19     That's my recollection as I sit here right now,
20     without having done additional research to try and
21     address the question.
22          Q.   Okay.  So at least, in your mind, rail shields
23     were available in the 1980s?
24          A.   Quite possibly, yes.
```

1      Q.    Quite possibly?

2      A.    That's what I said.

3      Q.    In other words, you don't know?

4      A.    If I were to make a guess, I would say yes.  But

5      I don't know for sure, just sitting here right now,

6      without having done the research.

7      Q.    And when were rail shields -- well, strike that.

8      Are there ladders -- strike that.

9            Are there fiberglass ladders sold today by

10     manufacturers that don't have rail shields?

11     A.    Yes.

12     Q.    Who?

13     A.    Well, certainly Werner isn't using a rail shield

14     per se on a number of their fiberglass ladder models.

15     They have this new system that's called the edge

16     bracing which does provide additional support to the

17     bottom of the ladders.  It's not a shield, as

18     described earlier, that was available as an accessory

19     on this and other model ladders.

20     Q.    Okay.  So the edge bracing, in your opinion,

21     that's defective?

22     A.    Well, it's certainly as protective of the

23     fiberglass itself as a rail shield would be, but it's

24     certainly -- it's certainly better than just a one-

1      piece diagonal brace at the bottom of the fiberglass
2      ladder in this case.
3      Q.    Okay.  So if you had simply edge bracing on the
4      FS108 ladder, would that make the ladder reasonably
5      safe, in your opinion?
6      A.    Well, certainly it's a step in the right
7      direction to helping to protect the fiberglass rail.
8      A rail, again, is a material that requires care above
9      and beyond which normal wooden and aluminum ladders
10     require.  But that still doesn't address walking
11     issues.
12     Q.    So even if the FS108 ladder had an edge bracing
13     on it, it would be defective, in your opinion?
14     A.    Yes.
15     Q.    What is the type of shield that you say ought to
16     be on the FS108 ladder?  Do you have a photograph of
17     it?
18     A.    I believe that Werner depicts in their catalogs a
19     variety of different rail shields that are available
20     for different ladders.
21     Q.    Well, why don't you -- why don't you point out to
22     me which ones you say would have to be on the FS108
23     ladder to make it reasonably safe.
24     A.    I don't have a catalog with me right now.  But as

1    described before, something that provides several

2    inches of protection is going to be much, much better

3    than one that doesn't have any protection, really,

4    whatsoever.

5    Q.    Okay.  What should the shield be made out of?

6    A.    Obviously, the more durable the material, the

7    better the protection it is going to be able to

8    provide.

9    Q.    Okay.  What material do you say that the shield

10   should be made out of?

11   A.    Could be made out of metal, like aluminum.  Could

12   be made out of a durable plastic, reasonably rigid.

13   Could be manufactured out of fiberglass.

14   Q.    Okay.  And what thickness should the rail shield

15   be if it's plastic?

16   A.    It depends on the type of plastic.  It depends

17   upon the duty rating of the ladder, to some degree.

18   Q.    Okay.  Well, the rail shield that you say that

19   should be on the FS108, do you say it should be made

20   out of metal, plastic, or fiberglass?

21   A.    I think I said it could be made out of either of

22   those.

23   Q.    Okay.  And what type of impact resistance should

24   it be designed to withstand?

1    A.    Repeated dropping of the ladder; to some degree

2    the consideration that while it's in the back of

3    somebody's pickup truck, something can get dropped on

4    it, which means, you know, maybe taking a weight of

5    some kind and dropping it from different distances

6    from different angles to see how well the rail shield

7    can protect the ladder, things of that nature.

8         (Lunch recess taken.)

9    BY MR. VOKE:

10   Q.    When we broke for lunch, we were talking about

11   rail shields.  The rail shield that you say ought to

12   be on the FS108 ladder, Mr. Kiska, should that

13   completely encircle the rail; that is, cover all of

14   the fiberglass on the rail?

15   A.    It's most important that it covers the interfaces

16   between the webs and flanges, those corners, so to

17   speak.

18   Q.    Okay.  Should it be -- so the rail shield does

19   not have to cover all of the fiberglass on the rail

20   over any given distance for the length of your rail

21   shield in order for it to be a reasonable design?

22   A.    I think that's similar to what's, you know, in

23   the Werner catalogs that we talked about earlier.

24   Q.    I don't have that and I haven't seen it.

1    A.    Those are -- again, those are rails, from my
2    recollection, they are channel-shaped.  They basically
3    cover the outer edges.
4    Q.    Why don't you -- let me get you a piece of paper
5    and you can draw for us the shield that you say ought
6    to be on the Gormley ladder.
7    A.    Do you want me to go ahead and --
8    Q.    Yeah, you can go right ahead.
9         (Witness complies.)
10   A.    I've drawn a profile, a cross-section of a rear
11   rail, and I've taken and drawn around it another
12   profile that I'm representing as one possibility in
13   the construction of a rail shield.
14         Similarly, there were other designs, as I
15   alluded to earlier, that I believe were manufactured
16   by other ladder manufacturers where this other portion
17   -- and I'll do it with a dashed line.  They
18   incorporate a boot.  As I recall, it protects even
19   more of the rail.  Obviously, that's good, too.
20   Q.    Okay.  Can you just draw the section showing the
21   rail and the other -- with a label to the rail and a
22   line depicting the shield?
23   A.    I'm sorry?
24   Q.    Would you just draw a line -- this section, the

```
1     segmented section, appears to be a cross-section of
2     the rail of the ladder; correct?
3     A.    Yeah, the one with the crosshatch.
4     Q.    Okay.  Can you just put a line to that and write
5     "rail."
6          (Witness complies.)
7     Q.    And then the shield portion, would you just draw
8     a line depicting what you're referring to as the
9     shield?
10         (Witness complies.)
11    Q.    Okay.  And the dotted line where it appears to
12    connect out to the end of the shield, that is what,
13    sir?  That's part of a boot design?
14    A.    It's something that -- again, it serves the same
15    general purpose as a rail shield, only I believe some
16    of these other designs they go a little bit more
17    around even the inside parameter, which obviously the
18    more surface you protect, the better, but the
19    important thing is bolstering the corner areas of the
20    rail where the fracturing initiates.
21         MR. VOKE:  Let's mark that as the next item,
22    please.
23         (Exhibit No. 3 marked for identification.)
24    Q.    Can you sign and date this, please.
```

1      A.    (Witness complies.)

2            MR. SWARTZ:  What number is that?

3            MR. VOKE:   Three.

4      Q.    And if the rail shield does not protect the

5      inside of the rail, does that make the rail shield

6      defective?

7      A.    Not necessarily, no.  Certainly the more

8      protection you provide, the better; but the important

9      thing is to -- to protect the outer portions of the

10     rail.

11     Q.    Okay.  So a rail shield that just protected the

12     outer portions of the rail would be a reasonable

13     design, in your opinion?

14     A.    Yes.

15     Q.    And you said the rail shield should be several

16     inches high?

17     A.    The more the better, but at least a few inches

18     from the bottom.

19     Q.    Okay.  What would be the minimum in order to make

20     it a reasonable design?

21     A.    You know, again, going back to what I believe I

22     had seen in the Werner catalogs, they go probably four

23     inches long, maybe even more.  That seems to be

24     reasonable.

1     Q.   Okay.  So a rail shield that went up four inches
2     would be a reasonable design?
3     A.   Probably.  Obviously, the more the better.  I
4     mean, it's not -- I don't think it's a matter of, you
5     know, if it's three and three-quarters, does that make
6     a difference; or is it -- you know, where's the cutoff
7     point?  I don't really believe that there is one.
8     Obviously, the more that you put on there, the better
9     it's going to be.
10    Q.   Okay.  Is there any limit on the length of the
11    shield you would use?
12    A.   I mean, we're talking about a portion of the rail
13    that's -- you know, other than -- depending on what
14    kind of bracing you have at the bottom.  It's a
15    cantilever section.  So obviously, if you can run the
16    shield up past the point of support, that's going to
17    be even better yet, but, you know, at least several
18    inches to protect the fiberglass itself from the kinds
19    of things that will cause it to start to fracture at
20    the bottom.  And, again, depending on the kind of
21    bracing that you have, if you have edge bracing along
22    with this where you have a good amount of support on
23    the inside of that cantilever portion, that's all the
24    better yet.

```
1       Q.    What if you don't have the edge bracing, what's
2       the -- what would be the maximum distance you would
3       put a rail shield on to cover the rail?
4       A.    If you don't have edge bracing, then it would be
5       prudent probably to run the rail shield even further.
6       But it seems to me that the edge bracing does provide
7       good support at the bottom of the ladder.  So I think
8       it will probably be better to have the good edge
9       bracing there in addition to a shorter rail shield
10      than a rail shield that runs a substantial length of
11      the rail.
12      Q.    And would you have rail shield on all four rails?
13      A.    It would be the prudent thing to do, yes,
14      absolutely.
15      Q.    So if there weren't rail shields on all four
16      rails, a design would be defective, in your opinion?
17      A.    Yes.
18      Q.    You mentioned that a platform-type of structure
19      or a tripod ladder would be a preferable design to a
20      four-legged stepladder.  Do you recall that?
21      A.    Yes.
22      Q.    Okay.  And you said that a four-legged stepladder
23      was a defective design because it could walk; correct?
24      A.    Correct.
```

```
 1        Q.   All right.  And so if you have your way, you'd
 2     have all the four-legged stepladders taken out of
 3     circulation and have people use tripod ladders or
 4     three-legged ladders; correct?
 5             MR. SWARTZ:  Objection.
 6        A.   At the very least, I would inform them of the
 7     hidden dangers of a four-legged ladder.  But ideally,
 8     yes, a more stable design would be much, much better.
 9        Q.   Which would include taking the four-legged
10     stepladder out of circulation?
11        A.   Yeah, and changing that to something more like a
12     tripod or a modified tripod.
13        Q.   Sir, is it your opinion that there are any
14     manufacturing defects in the Gormley ladder as opposed
15     to the design?
16        A.   No, I have not determined that there were, no.
17        Q.   Okay.  So you're unaware -- strike that.
18     As far as you are concerned, from the work you have
19     done on this case, the Gormley ladder was manufactured
20     in compliance with Werner's own internal standards?
21        A.   As far as I know, yes.
22        Q.   For example, you don't have any criticism with
23     respect to the material used to make the fiberglass?
24        A.   We're talking about the fiberglass, we should
```

```
1          talk about the manufacturing method, which I raised in
2          my report.
3          Q.   Are you critical of the manufacturing method for
4          the fiberglass?
5          A.   Well, to the degree that was indicated in some of
6          the test reports that I saw in discovery.  There's an
7          indication that, unless I'm misreading the report,
8          that rails made with the resin injection process
9          didn't perform up to the average level of a rail from
10         the resin bath method or the immersion method.
11         Q.   What is the method used for the Gormley ladder?
12         A.   Well, it's my understanding from the discovery
13         information that this was a rail made with the resin
14         injection method.  I haven't been able to establish
15         that from my own personal inspection of the ladder.
16         Werner is in a better position to verify that.  But
17         from the documents, I feel like the way that that was
18         brought up that that was a possibility that this was a
19         resin injection as compared to the immersion method.
20         Q.   And you say that which method is better?
21         A.   Well, from the test data that was provided by
22         Werner in the discovery, it appears as though there's
23         a performance drop off in the resin injection
24         manufactured material.
```

1       Q.   What documents are those you are referring to?

2       A.   They're within the file folders here.  Would you

3       like me to pull them out?

4       Q.   I would like you to pull out the document, yes,

5       that you're referring to where you say that the resign

6       injection method has a performance drop off compared

7       to a resin bath method for the pultrusion.

8            (Witness complies.)

9       A.   I have duplicate copies in my file, but just to

10      make things easier, I'll use the one that's already

11      been marked as Bartnicki Exhibit No. 8, dated

12      11/18/05.

13      Q.   Okay.  So separate and apart from Bartnicki

14      Deposition Exhibit No. 8, can you tell us whether

15      there are any performance differences between a rail

16      made from the resin injection pultrusion method versus

17      the bath pultrusion method?

18      A.   Aside from this particular document, no, I don't

19      have any other evidence to that effect.

20      Q.   Have you ever done any analysis of the resin

21      injection method of pultrusion versus the bath

22      pultrusion in terms of the performance of the

23      fiberglass that is created from those two different

24      methods?

1    A.    No.

2    Q.    Do you have any experience in that area?

3    A.    I've seen both methods in place, but, again, I

4    haven't done extensive testing to compare the two.

5    Q.    Have you done any testing to compare the two?

6    A.    I've done testing on various ladders, some of

7    which may have been one method or the other, but I was

8    unaware at the time of the testing specifically what

9    they were, and I have not endeavored to pursue that.

10   Q.    So you haven't done any testing to compare the

11   two methods; correct?

12   A.    No.  Personally, no.

13   Q.    With respect to the Gormley ladder itself, do you

14   have an opinion as to whether there's any defect in

15   the fiberglass itself used in that ladder?

16   A.    No, I do not.

17   Q.    You don't believe that there's any defect in the

18   fiberglass?

19   A.    I don't have any evidence of that, no.

20   Q.    Are you critical of the fasteners that were used

21   in the design of this ladder, the Gormley ladder?

22   A.    Well, generally, from the standpoint that the

23   design overall has allowed the section to loosen up

24   substantially over the period of time it was in

1    service.

2    Q.    Is it your opinion that the design is defective

3    because of the type of fasteners used?

4    A.    I haven't -- I haven't studied it extensively to

5    determine whether or not one rivet type over another

6    would have been a better design option with regard to

7    how the section would wear over a period of time,

8    whether a semi-tubular or solid rivet in that front

9    section.  All I know is right now the condition of the

10   ladder is such that the front section is extremely

11   loose.

12   Q.    Okay.  And is that a defect in the ladder, in

13   your opinion?

14   A.    Well, it could be.  It appears that the front

15   section was attached primarily using semi-tubular

16   rivets.  So I don't know the degree to which they were

17   crimped to begin with, and if that had a bearing on

18   whether or not the section is loose or not.

19   So in that regard, I don't have an opinion.

20   Q.    When you say the front of the ladder, you mean

21   the steps?

22   A.    Yeah, the steps and the rails.

23   Q.    Okay.  And you say that they are extremely loose?

24   A.    Yes.

1    Q.   And when did that occur?
2    A.   Well, it's my opinion that it happened over a
3    period of time.  But I don't know to what degree there
4    was looseness when it was first manufactured as
5    compared to now.
6    Q.   Okay.  And you don't have an opinion as to
7    whether the fasteners are a reasonable design or a
8    defective design?
9    A.   Well, there are other things you can do,
10   additional bracing and so forth on the ladder to help
11   alleviate that.  And, again, the design of the
12   fasteners may be such that they are sufficient as long
13   as they are crimped properly.
14   Q.   And you don't know whether they are crimped
15   properly or not?
16   A.   I wasn't able to determine that, and I don't have
17   the Werner specifications with regard to what they are
18   supposed to be.
19   Q.   Let's talk about walking of the stepladder,
20   particularly the Gormley stepladder.  Did you do some
21   testing in this case?
22   A.   Yes.
23   Q.   Okay.  And you videotaped that?
24   A.   Correct.

```
 1      Q.    Okay.  And that's on your videotape that's here?
 2      A.    No, that was a videotape that was provided
 3      previously.
 4      Q.    Okay.  You provided us a copy.  Is this a copy of
 5      the tape you provided to us?
 6      A.    Yes.  Apparently this also includes what's on
 7      that video as well.  I wasn't sure whether it did or
 8      not.
 9            MR. VOKE:  Let's go ahead and mark this tape as
10      the next deposition exhibit.
11            (Exhibit No. 4 marked for identification.)
12      Q.    The tape that's been marked as Exhibit No. 4 is
13      all the walking that you purportedly did on any
14      stepladder in this case, is that video -- on the
15      videotape marked as Exhibit 4?
16      A.    Everything that I did?
17      Q.    Yes.
18      A.    No.
19      Q.    Okay.  What's not on the videotape?
20      A.    I conducted climbing tests on Exemplar ladders
21      prior to actually doing the testing and videotaping.
22      Q.    You have some videotape where you're holding onto
23      a beam and you're walking and you're moving the feet
24      of the ladder on Exhibit 4; correct?
```

1      A.    What label is this?  Four?  That's correct, yes.

2      Q.    Okay.  Why were you using a beam?

3      A.    It was a means to support myself to keep from

4      falling off the ladder.

5      Q.    Okay.  And so you felt that if you didn't hold on

6      and you made walking -- you made the ladder move, that

7      you would fall off the ladder?

8      A.    That was a distinct possibility, obviously, yes.

9      Q.    Okay.  And is it your opinion that in

10     Mr. Gormley's case that he walked the ladder without

11     falling off it?

12     A.    No.  It's my position that he unintentionally

13     walked the ladder, and that's what caused him to lose

14     his balance and fall.

15     Q.    Okay.  Was there any damage to the spreaders on

16     Mr. Gormley's ladder?

17     A.    Minimal damage, yes.

18     Q.    Did you measure it?

19           (Witness reviews document.)

20     A.    I know I made note of it in my inspection.

21     Yeah, I measured -- I believe it's the right-hand side

22     rail -- the right-hand spreader assembly, excuse me,

23     of the ladder, and I noticed bowing in both parts to a

24     degree of approximately a sixth of an inch of

```
 1        permanent deflection.
 2        Q.   Can you say one way or another whether anyone
 3        straightened out those spreaders to any extent after
 4        Mr. Gormley's accident?
 5        A.   No, I cannot.
 6        Q.   Now, did the water -- strike that.
 7        Did the ladder walk before the right rear leg
 8        partially collapsed?
 9        A.   I believe it did, yes.
10        Q.   Okay.  And the basis for that is what?
11        A.   That the walking of the ladder causing all the
12        weight to come down on the right rear leg and the
13        subsequent collapse is what left then the left rear
14        leg unsupported, and when he shifted his weight to the
15        left, that's what caused it to go to the left, because
16        you've got a leg now that's completely unsupported on
17        either side.
18        Q.   What bracing do you say should have been on the
19        ladder in addition to what's already there?
20        A.   Well, certainly additional bracing at the bottom
21        in the way of edge bracing, combined with the rail
22        shields or something of the like to protect the
23        fiberglass would have helped substantially; and, in
24        general, anything that would help to make the ladder
```

1    more rigid.  Certainly the tripod type of design that

2    we had spoke of earlier where you don't have a

3    redundant support in the back.

4    Q.    Redundant meaning it's not needed?

5    A.    Correct.

6    Q.    Have you done any studies in this case to support

7    any of your opinions?

8    A.    I've done testing, which has been documented.

9    Q.    The testing is on the videotape marked Exhibit 4?

10   A.    Yes.  And I have some notes from my testing as

11   well, which were provided.

12        MR. VOKE:  Why don't we mark those.  Let's mark

13   it as a group exhibit, like 5A, B, and C.

14        (Exhibits Nos. 5A through 5C marked for

15   identification.)

16   Q.    And these are the notes concerning all your

17   testing?

18   A.    Of what I measured, yes, I believe so.

19   Q.    Tell me what the different tests are that you

20   conducted in this case.

21   A.    Climbing tests.  And what I would call an induced

22   walking test where weights are placed on the ladder

23   and a side force is induced to cause the ladder to

24   start to rack such that one rear leg ends up off the

1       ground.

2       Q.    Let me ask you this.  What side forces were on

3       Mr. Gormley's ladder immediately prior to him falling?

4       A.    I can only estimate, obviously, but whatever

5       force is sufficient to cause the ladder on one side to

6       come very close to raising off the ground just enough

7       to allow racking to occur and then restabilize.

8       Q.    Where did the force come from?

9       A.    From the movement of his feet, from the

10      distribution of his weight from side to side as he's

11      conducting his work on a boat.

12      Q.    Where is there any testimony that he moved his

13      feet at all while he was on the sixth step?

14      A.    Again, this comes back to what we talked about

15      before in that in the process of going through the

16      motions that he described in his deposition, his feet

17      naturally would have -- his weight naturally would

18      have shifted back and forth to some degree between his

19      feet.

20      Q.    Have you ever measured that?

21      A.    No, I have not.

22      Q.    Is it capable of being measured?

23      A.    Yes, it is.

24      Q.    How would you go about doing that?

1    A.    One possible way is to place the ladder on top of
2    some kind of a measuring device, either load cells or
3    scales of some kind, and monitor the change in the
4    weight from one scale to another as one shifts one's
5    weight back and forth.  That's one relatively crude
6    way of doing it.
7    Q.    And have you been able to quantify in any way the
8    side force that you say was on Mr. Gormley's ladder
9    immediately before he fell?
10    A.    No, I have not attempted to do that.
11    Q.    And what's the minimum amount of side force that
12    would be necessary in order to cause the ladder to
13    rack and one leg to come up off the ground, as you
14    described it?
15    A.    I mean, it would depend upon the situation.  It
16    depends upon the distribution of weight on any
17    particular part of that step at a given time, because
18    that's going to change.
19    Q.    How can you rule out in this case that
20    Mr. Gormley didn't just tip the ladder over to the
21    left?
22    A.    Because in his deposition, he refers to it moving
23    one way and then another before he finally comes over.
24    Q.    Oh, he does?

```
 1      A.    Yes, he does.

 2      Q.    Where is that?

 3      A.    Looking at pages 149 and 150 of his deposition.

 4      Q.    Okay, Exhibit 5A, just explain what these figures

 5      are, please.

 6      A.    This involves testing on three different ladders.

 7      The first one involves the Werner FTP6208, which is a

 8      tripod ladder.  The second one involves a modified-

 9      type tripod made by Little Giant.  And then the third

10      one is a Type 1A stepladder made by Werner and the

11      Model 6208.

12      Q.    Okay.  And what does the figure 47.3 represent?

13      A.    Force to cause that tripod ladder to tip in the

14      orientation shown.

15      Q.    And this is with a lateral load on the side of

16      the ladder?

17      A.    Correct, as depicted in the videotape we talked

18      about.

19      Q.    At what step?

20      A.    On the sixth step, I believe, from the bottom.

21      Again, depicted in the video.

22      Q.    Okay.  And the 47.3, that's the amount of force

23      required to get the ladder to tip?

24      A.    Yes.
```

```
 1        Q.    47.3 pounds?

 2        A.    Right.

 3        Q.    Of a lateral load on which side of the ladder?

 4        A.    Well, this is the left side, as you can see here

 5        from the picture.  These markings represent the

 6        footprints of the three supports.

 7        Q.    Okay.  And you've got the 40.2 pounds.  That

 8        refers to what, sir?

 9        A.    Again, the same kind of test, same ladder, same

10        weight distribution on the ladder, but a different

11        orientation of the load application.

12        Q.    And then you have the Little Giant ladder.  You

13        have 35.8 pounds force to cause that to tip?

14        A.    Yes, sir.

15        Q.    And then you have 34.5 in a different direction

16        of load?

17        A.    Correct.  May I -- no, actually that's the same

18        direction of load but a slightly different setup of

19        the ladder.  Again, depicted on the videotape, I

20        believe.

21        Q.    Okay.  And then you have a Werner 6208, and

22        you've got 39 pounds?

23        A.    That's correct.

24        Q.    And then we go to -- you've got a Werner FS108,
```

1    and it says, "Modified as depicted in photos."  How is

2    the ladder modified?

3    A.    This was an exemplar ladder that I purchased that

4    has the edge-style bracing on it as compared to the

5    knee bracing that is on the subject ladder.  And what

6    I did was, I had attempted to modify the rear bracing

7    on the Exemplar ladder to more closely mimic the type

8    of bracing that's on the subject ladder.

9    Q.    Okay.  So did you ever have an FS108 ladder that

10   was designed in the same manner as the Gormley ladder

11   for purposes of testing in this case?

12   A.    No.  I understand that those are no longer

13   available.

14   Q.    So you took an existing ladder and modified it?

15   A.    Correct.

16   Q.    Okay.  And you took the edge bracing off?

17   A.    The photos of -- I had photos of the ladder, what

18   it looks like afterwards.  But basically what I did

19   was, for the rear section, I took the edge bracing off

20   that goes from the rear horizontal to the leg, and I

21   replaced that with a metal brace similar to what's on

22   the subject ladder.  I left the foot portion of the

23   brace, which is integral to the edge bracing on the

24   bottom, and, again, I modified that to be something

1    more similar to what's on the subject ladder.

2    Q.    Okay.  And with a modified FS108 ladder, you got

3    34.5 pounds of --

4    A.    Yes, I tested -- I'm sorry.

5    Q.    -- of the load on the sixth step in order to get

6    it to tip from -- is that from left to right?

7    A.    Yes.  One is to left, and one is to the right.

8    Two separate tests.

9    Q.    So you got 31.8 and 34.2?

10   A.    Well, that's a different test than this test.

11   This was tested -- these are two different tests on

12   this condition of the ladder, and then two different

13   tests on this condition of the ladder.

14   Q.    This is with a cut rail?

15   A.    Correct.

16   Q.    So you cut the rail.  How high did you cut the

17   rail up?

18   A.    It's depicted in the photos that I took of it.  I

19   think it was something like -- it was near the bottom

20   horizontal, I believe.

21   Q.    How high did you make the cut?

22   A.    It was to a distance less than, I believe, what's

23   actually on the subject ladder.

24   Q.    So what distance, approximately?

1    A.    Again, it's in the photos.

2    Q.    You measured it in the photos?

3    A.    I believe I did, yeah.  There's a scale in place.

4    Q.    So is it more than six inches, the cut?

5    A.    Yes, it was.  I believe so.

6    Q.    Okay.  And so when you cut along the flange of

7    the right rear rail of an FS108 ladder and then you

8    applied a side load of 34.2 pounds on the left side --

9    A.    Yes.

10    Q.    -- you needed that much force to get the ladder

11    to tip?

12    A.    On the right-hand side, yes.

13    Q.    Okay.  And was that with any weight on the

14    ladder?

15    A.    Yes.

16    Q.    200 pounds on the ladder?

17    A.    Yes.

18    Q.    On the sixth step?

19    A.    Correct.

20    Q.    And if you put the weight on the right side, it

21    was 31.8 pounds of lateral force on the sixth step in

22    order to get the ladder to tip?

23    A.    Well, you said if you put the weight on, right.

24    If you apply the weight lateral -- if you apply the

1    lateral to the right.

2    Q.    Okay.  So at least from your testing, there was

3    not much difference between the amount of lateral load

4    required in order to tip the ladder even with the cut

5    rail?

6    A.    In the one direction as compared to the -- yeah,

7    especially with the left, certainly they're very

8    close.

9    Q.    Okay.  All right.  And then we've got Exhibit 5C,

10    you've got another FS108 ladder here.  This has no

11    modifications to it?

12    A.    That is correct.  That was just a point of

13    reference for two FS108s that I bought before I made

14    any modifications to them.

15    Q.    And what are these numbers?

16    A.    Again, loads to tip with 200 pounds on the sixth

17    step, and then --

18    Q.    What's the right-hand column with the

19    measurements 1 7/8, 1 3/4, 1 29/32.  What are those?

20    A.    Right.  Those were measurements of the gap that

21    existed underneath the applicable rear leg following

22    the test.

23    Q.    So you mean you racked the ladder in order to get

24    one leg up in the air?

```
1        A.    Well, I applied side force and that caused the
2        ladder to rack under the weight that was on the
3        ladder.
4        Q.    Okay.  Now, when you modified an FS108 ladder and
5        cut the flange on the right rear rail, did you then
6        climb the ladder at any point in time?
7        A.    Yes, as depicted on the video.
8        Q.    Did it tip over when you climbed it?
9        A.    It did start to move and walk under my movement.
10       Q.    How do you know that?
11       A.    It's on the videotape.
12       Q.    Could you tell when you were up on the ladder?
13       A.    That's where I was holding onto the beam above.
14       Q.    Okay.  Now, all of your testing, then, is
15       referred to in Exhibits 5A through C and on the video
16       that you've done in this case?
17       A.    Again, I had done some climbing tests previously,
18       but by in large, this is the bulk of my testing.
19             THE WITNESS:  Can we take a restroom break at
20       this point?
21       MR. VOKE:  Sure, go ahead.
22             (Recess taken.)
23       BY MR. VOKE:
24       Q.    Mr. Kiska, how high was the rail that you say
```

```
1    that Mr. Gormley grabbed onto during his accident

2    sequence?

3    A.    I never measured the actual boat that he was on.

4    So I have measurements to the tops of the boats of

5    some of the ones that were there at the time of my

6    inspection.  And from there, I think we have estimates

7    in the deposition from Mr. Gormley how high the rail

8    was above his boat.  And I think he also estimated how

9    high the top of the boat was that he was working on.

10   So I don't have a direct measurement of my own is what

11   I'm saying.

12   Q.    So you haven't factored that into any of your

13   opinions in the case?

14   A.    I certainly think I've referenced it in my

15   report.

16   Q.    Is the height of the rail significant to you at

17   all in any of your opinions in the case?

18   A.    Certainly it was within reach from where he was

19   standing.

20   Q.    Can you tell us what you believe, based upon all

21   the testimony, the height of that rail was above the

22   ground?

23   A.    Well, if it was -- again, going from what I

24   recall reading in the depositions, I think the rail is
```

1    something in the neighborhood of a foot and a half or

2    maybe two feet above the top of the boat.  If that's

3    the case and the boat is -- if the boat is 10 feet off

4    the ground, plus another foot and a half, that's

5    11 1/2.  If he's standing on the sixth foot of an

6    eight-foot stepladder, that puts the top of his head

7    very near 12 feet.  So that's certainly, you know,

8    somewhere close to his head, I believe.

9    Q.    Did you look at a second stepladder in this case?

10   A.    There was a second stepladder in Mr. Swartz's

11   office at the time of my inspection, and I really only

12   glanced at it.  I didn't go over it in any detail.

13   Q.    Did you photograph it?

14   A.    No, I did not.

15   Q.    Are you relying on that stepladder in any way in

16   this case?

17   A.    No, I am not.

18   Q.    Now, with respect to this case, you prepared a

19   report, and this is a copy of it; correct?

20   A.    Yes, sir.

21         (Witness reviews document.)

22         MR. VOKE:  Mark that for identification, please.

23         (Exhibit No. 6 marked for identification.)

24   Q.    I'm going to read the last paragraph on Page 4,

```
1     going over to Paragraph 5.  It says, quote, "The
2     process of shrink-wrapping boats requires that a
3     person move a heat gun (attached to a pole) back and
4     forth over the plastic in order for shrinking of the
5     plastic covering to occur, thus tightening of the
6     plastic against the boat.  In performing this
7     operation, a person may be caused to shift his weight
8     from one side to another while on a ladder."
9             Now, this is the sentence I want you to
10    focus on:  "Shifts in Mr. Gormley's weight from side
11    to side were sufficient to cause the ladder to twist,
12    and ultimately force the right rear leg to support a
13    disproportionate amount of the load, both axial and
14    laterally."
15            I want you to focus on this next sentence as
16    well:  "This combination was sufficient to cause the
17    right rear leg to begin collapsing."  And the next
18    sentence focus on:  "As a result of destabilization of
19    the ladder, Mr. Gormley reacted by dropping his
20    heating tool and grabbing for the safety rail on the
21    boat."  Focus on the next one as well:  "This caused
22    the ladder to shift back to the left with the ladder
23    ultimately falling in that direction to the ground."
24            What is the scientific methodology, sir, you
```

```
1       used to arrive at those opinions in those sentences I
2       just read from page 4 and 5 of your report marked as
3       Exhibit 6?
4            (Witness reviews document.)
5       A.   Cumulatively, my review of the evidence in this
6       case, my testing of Exemplar ladders, my inspection of
7       the subject ladder, and my experience with four-legged
8       fiberglass stepladders in general.  I come to this as
9       the most reasonable conclusion as to explain what
10      happened in this accident.
11      Q.   And what is the rate of error in your methodology
12      you've used?
13           MR. SWARTZ:  Objection.
14      A.   I've not attempted to measure that.  It's a
15      matter of considering all possible scenarios and
16      choosing the one that best fits the evidence in place.
17      Q.   Is the methodology you've used published
18      anywhere?
19      A.   This is what's commonly done in my line of work.
20      Q.   Is it published anywhere, your methodology?
21      A.   No, not that I'm aware of.
22      Q.   Could you reproduce this accident?
23      A.   I would imagine that's possible, yes.
24      Q.   How would you go about reproducing it?
```

1    A.    Well, the first thing I would do is -- well, one

2    possibility is to use the subject ladder, which again

3    could still be climbed, but again would probably

4    exhibit that -- well, certainly would exhibit that

5    same -- those same characteristics when those forces

6    were applied.  Alternatively, you could try and create

7    an exemplar ladder to duplicate the conditions that

8    currently exist on the subject ladder, but that would

9    certainly require a lot more effort, given the

10    looseness of the fasteners that we talked about

11    earlier.

12    Q.    Did you climb the Gormley ladder at some point in

13    time?

14    A.    No, I did not.

15    Q.    Are you critical with respect to the warnings on

16    the Gormley ladder?

17    A.    Yes, I am.

18    Q.    Okay.  And what criticisms do you have with

19    respect to the warnings?

20    A.    Well, primarily, number one is the fact that, as

21    stated in the Werner literature, specifically I

22    believe it's called the Fiberglass Tech Manual, that

23    document emphasizes the need for users to use greater

24    caution and care when using fiberglass ladders.

1    That's certainly something that's not conveyed on the

2    labeling of this ladder, the subject ladder.

3          Additionally -- and this comes back to the

4    hidden hazard of the redundant rear-section support in

5    that shifting your weight on this type of ladder, it

6    may become destabilized and start to walk such that

7    you now have, instead of four points of contact, three

8    points of contact, and that teetering, so to speak,

9    can occur unbeknownst to a user while he's in the

10   process of performing his tasks, can cause the ladder

11   to tip over and fall, causing him to fall as well.

12   Q.   You said the FS108 ladder can walk; that is, the

13   legs of the ladder can move unbeknownst to the user;

14   correct?

15   A.   Yes.

16   Q.   What's the basis for that statement?

17   A.   My own personal experience and based upon what

18   Mr. Gormley described both in his document and what he

19   told other people in his deposition, excuse me, and

20   what he told other people.

21   Q.   Have you done any studies to determine whether a

22   FS108 ladder can walk without the user knowing that?

23   A.   I've done a number of tests on both this ladder

24   and other ladders, ladders more rigid than the FS108.

1    Q.    Have you done any studies having an FS108 ladder

2    or any other stepladder with the user on it and having

3    the ladder walk without the user realizing it?

4    A.    No, I have not.

5    Q.    Are you aware of any studies published by anyone

6    that stepladders walk without users knowing it?

7    A.    No, I am not.  But clearly, the Werner company is

8    aware of the issue of four-legged ladders walking.  I

9    mean, so whether or not they did the study or they got

10   the information someplace, that's certainly clear.

11   And that's another point of evidence that I point to

12   as -- in support of four-legged ladders walking.

13   Q.    And what's the basis for that last statement of

14   yours that Werner is aware that ladders of this type

15   walk while people are on it?

16   A.    There was a document that I believe was marked as

17   an exhibit during Mr. Bartnicki's deposition.  Would

18   you want to pull that out now?

19   Q.    I would, yes, please.

20   A.    Looking at Bartnicki No. 23.

21   Q.    And what are you referring to with respect to

22   Bartnicki Exhibit 23?

23   A.    This is some advertising literature that was

24   printed from Amazon.com for a fiberglass tripod ladder

1    manufactured by Werner, and specifically I'm referring

2    to Page 2 under -- from the manufacturer there's a

3    product description.

4          MR. VOKE:  Let's go ahead and mark this, please.

5          (Exhibit No. 7 marked for identification.)

6    Q.    And the language you're referring to, sir, is on

7    page 2 of Kiska Exhibit No. 7, and it's under the

8    description -- product description, and it's the

9    language, "There is no rocking and no walking even on

10   uneven or out-of-level surfaces"?

11   A.    Something to that effect.  I can't see the

12   document from where you're holding it, and I've not

13   memorized it, but that sounds about right.

14   Q.    Was there any -- was Mr. Gormley using the ladder

15   on an uneven or unlevel surface?

16   A.    No.

17   Q.    Okay.  Do you have any other criticisms with

18   respect to the warnings on the FS108 ladder?

19   A.    As I've looked at it relative to this case, I

20   think I've addressed everything that was touched upon

21   in my report.  I'm just looking back through it right

22   now to see if there's anything I've overlooked.  But

23   certainly primarily it's the propensity to walk.

24   Q.    As an engineer, do you --

1    A.    And, again, the issue with fiberglass requiring

2    more care.

3    Q.    Okay.  As an engineer, do you evaluate the design

4    of a ladder with one accident involving one individual

5    in mind, or do you evaluate the design of the ladder

6    with the overall design of the ladder and its use out

7    in the general public?

8    A.    Well, certainly you have to consider how the

9    product is going to be used, to the best of your

10    ability, and that's something that's going to factor

11    in, obviously, into your evaluation.

12    Q.    So it took the Gormley accident for you to come

13    up with an engineering evaluation of the FS108 ladder?

14        MR. SWARTZ:    Objection.

15    A.    Well, Mr. Swartz contacted me with the request to

16    evaluate this particular product and relative to this

17    particular accident.  That's how I came to be involved

18    with this case.

19    Q.    So you evaluated the design of the product

20    relevant to Mr. Gormley's accident?

21    A.    Yes, I did.

22    Q.    Okay.  And you had an opportunity to evaluate the

23    design of the FS108 ladder when you were employed by

24    Werner company, did you not?

1      A.    To some degree, relative to how it performed with

2      certain ANSI tests that I witnessed, yes.

3      Q.    Didn't you form an overall opinion as to the

4      reasonableness of the design of the FS108 ladder while

5      you were at Werner?

6      A.    I suspect I did to some degree, given my -- the

7      degree to which I was involved with the project,

8      which, as we stated earlier, was limited primarily to

9      observations of testing.

10     Q.    So that's your experience with fiberglass

11     products, fiberglass stepladders at Werner; it was

12     limited to just observing some ANSI testing?

13     A.    No, it was not.

14     Q.    What did it involve?

15     A.    I was involved with, again, changes to and

16     projects involving details of the drawings and other

17     hardware specifications with regard to different

18     fiberglass products.  I was involved with assisting

19     with testing of a variety of different fiberglass

20     products and things of that nature.  I have talked

21     with various quality control people and observed

22     manufacturing processes of the fiberglass ladders made

23     by Werner company.

24     Q.    Over how many years did you do this work you've

```
1       just described?
2       A.    I was with Werner for 16 years, and my
3       involvement was periodical.  It wasn't -- or periodic.
4       Excuse me.  It wasn't every day that I was working
5       with fiberglass per se, but over a period of years.  I
6       had involvement in a variety of different areas, as
7       mentioned.
8       Q.    So over what span are we talking about?
9       A.    Over the 16 years that I was with the company,
10      and particularly -- again, even after I was off-site
11      for the last eight, I had made visits to the different
12      manufacturing facilities.
13      Q.    So you worked on-site for sixteen years and off-
14      site for eight years?
15      A.    On-site for eight, off-site for eight.
16      Q.    Okay.  Now, have you told us all the work that
17      you have undertaken in this case at some point or
18      another during the deposition today?
19      A.    For the most part I believe I have.  I mean,
20      certainly my report is -- you know, speaks for itself.
21      I've got my videotaping and my other notes here, you
22      know, some of which we've gone over in more detail
23      than others, but --
24      Q.    Where are the rest of your notes?  Let's take a
```

```
1         look at those.
2         A.    Well, again, these are -- these are from my
3         testing.  They are notes from my product inspection.
4         I think these are all relative to my product and site
5         inspection, which I was estimating it was January '05.
6         Apparently it looks like --
7         Q.    November '04?
8         A.    Yeah.
9              MR. VOKE:  Let's go ahead and mark these notes as
10        the next item.
11             (Exhibit Nos. 8A through 8C marked for
12        identification.)
13        Q.    Before we get to your notes of your inspection
14        marked as Exhibit 8, I've got a couple of questions
15        for you.
16        While you were at Werner, did you ever provide any
17        input to any of the warnings or instructions on any
18        stepladder?
19        A.    I believe I did.
20        Q.    And what ladders would those have been?
21        A.    Most of my input on newer labels came from my
22        involvement with the articulated ladder project,
23        although I was involved with various minor changes to
24        other labels from time to time on other products as
```

1    well other than the articulated ladder as far as
2    ladder products, stepladder products.
3    Nothing comes to mind specifically regarding, you
4    know, a particular model.
5    Q.    Were you asked to give your input into the
6    warnings and instructions on any fiberglass stepladder
7    while you were employed at Werner?
8    A.    Not that I recall.
9    Q.    Were you asked to provide your input on any
10    wooden stepladders while you were at Werner?
11    A.    I'm sorry, let me --
12    Q.    Go ahead.
13    A.    Let me back up.  I know from time to time
14    different documents would be circulated through the
15    department for review.  Now, whether or not those
16    included labels for products like the fiberglass
17    stepladders, I'm not sure.  I'm not sure, as I sit
18    here right now.
19    Q.    So as far as you know, you have no experience
20    providing any evaluation or input on any warnings or
21    instructions on any fiberglass ladder -- stepladder
22    that Werner produced at any time?
23    A.    Again, I don't have a specific recollection, as I
24    sit here right now, one way or the other.

1    Q.    And you don't have any memory at any point in

2    time of criticizing any of the warnings or

3    instructions on any Werner fiberglass stepladder while

4    you were at Werner?

5    A.    I had been critical of the labeling on the ladder

6    products in general to Mr. Sulecki, who was the vice

7    president of engineering at the time, I believe, that

8    I was with Werner.

9    Q.    What criticisms did you have with respect to any

10    fiberglass stepladders while you were at Werner to

11    Mr. Sulecki?

12    A.    Just a concern that we could do better with

13    regard to the labeling that was on the products.

14    Q.    And by "we could do better," I assume you had

15    some specific recommendations for Mr. Sulecki?

16    A.    Well, at that time, it was a matter of I was

17    attempting to initiate an investigation that we

18    could -- we could do corporately, collectively as an

19    engineering body into that particular aspect of ladder

20    design, to which Mr. Sulecki responded that he

21    preferred just to follow the ANSI recommendations at

22    that point, and unless ANSI made any recommendation

23    changes, we were unlikely to make any changes to our

24    labeling.  And he kind of left it at that.

1    Q.    And what specific recommendations, if any, did

2    you make to Mr. Sulecki about changes in your warnings

3    or instructions on any fiberglass stepladders?

4    A.    We didn't get into substantial detail at that

5    point.  Basically, it was, you know, an attempt on my

6    part to initiate something more detailed, which never

7    happened.

8    Q.    You wanted to initiate something more detailed?

9    A.    I wanted to have engineering, as a whole, or at

10   least the product group, assigned to look into the

11   labeling that's on the products and what could we do

12   to improve upon it.

13   Q.    And you never came up with any recommendations at

14   any point while you were at Werner for any improvement

15   on any warning or instruction on any fiberglass

16   stepladder; correct?

17   A.    No, I did not.

18   Q.    Can you read these notes to me here?

19        (Witness reviews document.)

20   A.    Okay.  The date was November 10, 2004.  I made

21   note here of the code stamp that was on the ladder,

22   obviously, the model number.  I made note of where I

23   observed cracking on the ladder, and in some cases the

24   degree to which the cracking was visible.

```
1       Q.    Well, let's start off on the right-hand column

2    here.  You've got -- it says "newer," with an arrow.

3    And it looks like below that you have 6 inches?

4       A.    Yes.

5       Q.    Is this the right rear rail you're referring to?

6       A.    Correct.

7       Q.    So you've got 6 inches of the split in the rail

8    that you believe was older, and then above that you've

9    got "newer split"?

10          (Witness reviews document.)

11      A.    Right.

12      Q.    Okay.  You've got a question below -- is that a

13   question mark, or did you erase it below the six?

14      A.    No, that's a question mark.  What I'm indicating

15   here is obviously between the bottom 3 inches is

16   definitely, from its appearance, something that's much

17   older.  The stuff that's above 6 inches is newer,

18   certainly within, you know, the last couple of weeks

19   probably that the ladder was in service; and then in

20   between, obviously something in between those.  That's

21   the question mark.

22      Q.    Okay.  And then it says "none v-i-s"?

23          (Witness reviews document.)

24      A.    Right.  None visible.  There are two corners on
```

```
 1        each of the rear rails:  this is the inside corner;
 2        that's the outside corner.
 3        Q.   Okay.  And then over on the left-hand side here,
 4        it says "cracking."  Is all of this referring to the
 5        right rear rail?
 6             (Witness reviews document.)
 7        A.   Starting from the left of the page here, this is
 8        the left rear rail, then going kind of clockwise, left
 9        front rail, right front rail, right rear rail.
10        Q.   Okay.  So on the left rear rail, was there any
11        cracking there?
12        A.   Yes.  None visible on the inside corner in a
13        range of about zero to 2 -- 2.7 inches up from the
14        bottom, zero, up to about 2.7 inches above the back of
15        the left rear.
16        Q.   And on the left front rail, is there any cracking
17        there?
18        A.   Yes.  About a little more than a half of an inch
19        on the inside corner -- well, actually, that's the
20        inside as you're looking from the side of the ladder.
21        The inside is the one that's furthest away from the
22        user.  The outside is the one that's closest to the
23        user as he's climbing the ladder.  And that's
24        respectively about half an inch on the one, and about
```

1      almost four-tenths of an inch on the other.

2      Q.    What about on the right front rail?

3      A.    None visible on the right front corner, and about

4      three-quarters of an inch on the back corner.

5      Q.    Okay.  What are these measurements you have below

6      that with what looks like sections of rail cut out?

7      A.    These were my measurements of the four ladder

8      rails and the spreader arms, their profiles and so

9      forth.

10     Q.    Okay.  And then you have five-plus.  What's this

11     here?

12          (Witness reviews document.)

13     A.    Yeah, five-plus readings taken, range listed.  In

14     other words, for each of these different

15     characteristics, I made at least five readings over

16     the -- over some portion of the rail, and I recorded

17     what the high and low of the range were.

18     Q.    And then below this it says "Spreaders quite

19     loose," and what else is said there on Exhibit -- is

20     it 8A?  Excuse me.

21          (Witness reviews document.)

22     A.    It reads, "Spreaders quite loose at center link

23     and at side rail, due partially to egged holes,

24     particularly front and particularly on the right."  So

1       particularly on the front section and particularly on

2       the right side.

3       Q.    Egged holes meaning what?

4       A.    That where the actual profile of the hole, the

5       shape of the hole has opened up over a period of time.

6       Q.    Okay.  Let's go to Exhibit 8B.  What is this

7       referring to?

8       A.    This was -- these are some notes that I took

9       during my site examination that same day.  It depicts

10      in here rows of boats, some measurements taken to the

11      heights of the deckings on some of the boats that were

12      there.

13      Q.    Okay.  And what's the measurement you had?  Is

14      this the first one, 10 feet high?

15      A.    Yes.

16      Q.    And then it says what?

17      A.    I estimated the length of the boat was about 33

18      feet from bow to stern.

19      Q.    And you've got another one 10 feet up?

20            (Witness reviews document.)

21      A.    Yes.

22      Q.    Were they all 10 feet up off the ground?

23      A.    These ones right here were.

24      Q.    What does this say down here?

1      A.    It just notes that today -- I think on this day

2      that I inspected the ladder there were about 16 boats

3      on each side of these rows.

4      Q.    Then you've got -- it says 30.  That would have

5      been on the right?

6      A.    Yes, there were some other boats on -- there was

7      another boat that was about 30 feet long, and it was

8      in a range of about 10 to 11 feet up to the edge on

9      those.

10     Q.    So all the sailboats were a minimum of 10 feet up

11     off the ground, the deck?

12     A.    Approximately.

13     Q.    What's this third page, Exhibit 8C?

14     A.    Again, this goes back to inspection of the

15     product, and we talked about this earlier, your

16     question about did I notice any damage to the

17     spreaders, and this was the measurements I made there.

18     Q.    Let me see the rest of your notes, please.

19     A.    These are some notes from depositions that I

20     read.  Well, you can look through the file there.

21          (Recess taken.)

22     BY MR. VOKE:

23          (Exhibit No. 9 marked for identification.)

24          MR. VOKE:  I marked the rest of the notes that's

1      in that folder as just a group Exhibit No. 9.

2      Q.    Are those more notes?

3            (Witness reviews document.)

4      A.    Yeah, I was looking at this.  These were some

5      measurements of the Barcol readings on the side rails.

6      Q.    Was this on the back of one of these?

7      A.    Yes, it was.

8      Q.    It's on the back of Exhibit 8B.  And say that

9      again.

10     A.    The hardness readings.

11     Q.    The hardness readings.  Okay.  Anything wrong

12     with the hardness?

13     A.    Some of them were kind of low.  I mean, the

14     average is just above the minimum, the minimum being

15     50 for the standard.  There were some low readings,

16     47s, 46s.  There were a couple of 42s on the one rail.

17     Well, this was actually all off the rear rail, the

18     right rear rail.  So there were a couple of really low

19     numbers.  But the average does come out to be above

20     the minimum.

21     Q.    Is that what you're looking for, the average?

22     A.    You like to see more of them up higher, I mean,

23     but per the code, the code says that the minimum --

24     well, when you look at the code, the code then refers

```
 1        to ASTM, and the ASTM says the minimum -- or the
 2        average should be, and that's what this is, the
 3        average.
 4        Q.    Okay.  So the hardness codes fell within the ASTM
 5        Standard?
 6        A.    When you take the average, yes.
 7        Q.    All right.  The rest of your file is, what,
 8        documents produced in discovery and the depositions?
 9        A.    Pretty much, yeah.
10        Q.    Anything else?
11        A.    That's it.  The videos.
12        Q.    You've got disks with different cameras?
13        A.    Yeah, this was -- this was when I did my
14        videotape of the testing, I shot with two different
15        cameras, and this was the video from my inspection.
16        Q.    Okay.  Would you agree to make me copies of the
17        CDs?
18        A.    If I can get better copies of the one that was
19        sent to me.  I mean, I've got like a third or fourth
20        generation VHS of what Mr. Bartnicki's testing was.
21        I'd like a better copy of that.  I mean, we're talking
22        digital versus -- I mean, this was over somebody's
23        home movies.  I mean, it was pretty poor quality.
24              MR. VOKE:  Off the record.
```

1    (Discussion off the record.)

2    BY MR. VOKE:

3    Q.    What testing do you say that Werner should have

4    done with respect to the FS108 ladder that it did not

5    do?

6    A.    Really more of what they started to do.  You

7    know, there was -- you know, there were various drop

8    tests, and I think there was the pushing-across-the-

9    floor test and things of that nature, which I feel

10   like Mr. Bartnicki seemed to indicate was maybe why

11   the rail started to crack, because he was obviously

12   critical in his deposition of that practice of the

13   pushing the ladders around that Marina Bay employees

14   did.

15        Certainly they should have done more

16   testing -- like to see more testing in that regard to

17   establish if that's indeed what's going on.  And

18   certainly it suggests and indicates that they're aware

19   of this is how people use ladders and that it can

20   result in cracking of the bottoms of the ladder; and,

21   therefore, all ladders should be bolstered more in

22   that regard, certainly ones that I think as were

23   referred to in the topper card that came with this

24   ladder, the advertising literature, that, you know,

1    this was a heavy-duty ladder made for -- well, let me

2    give the exact quote for the record.  Are you holding

3    what was marked as my report, Mr. Voke, because that's

4    where I referenced it?

5    Q.   I'm holding my copy.  Your copy is in Exhibit 9

6    somewhere, I believe.

7         (Witness reviews document.)

8    A.   Again, looking at page 4 of my report, which

9    makes reference to various Werner information, "This

10   is a heavy-duty, industrial-use, fiberglass ladder,

11   heavy-duty construction for demanding frequent use,

12   ideal for heavy maintenance, repair, and commercial

13   jobs."  And it says, "Rugged bracing on top and bottom

14   steps and horizontals."

15        I don't feel as though this ladder really

16   had as rugged a bracing as it should have, and

17   certainly, in addition to not giving the consumer the

18   information that fiberglass ladders require a greater

19   degree of care than wooden and aluminum ladders, it

20   also presents it as a heavy-duty, industrial-use,

21   fiberglass ladder designed for heavy-duty construction

22   and demanding frequent use, heavy maintenance, repair,

23   and commercial jobs.  That sounds to me like it's

24   describing what takes place at Marina Bay.

```
1        Q.   Do you have the advertising literature that was
2        supplied with the Gormley ladder?
3        A.   I have what was given to us in discovery, which I
4        think consists of just the drawings of what's on the
5        topper card.  I don't know what this is.  This is some
6        advertising literature of some kind.  I don't know
7        what the context of that is, where it comes from.
8        But, I mean, you're welcome to look again at my file
9        materials.  Everything that I got from Mr. Swartz's
10       office is here.
11       Q.   I asked you what testing you say that Werner
12       should have provided on the ladder, and you -- I don't
13       think you really answered my question, so I'm going to
14       ask it again.
15            What testing do you say that Werner should
16       have conducted on the FS108 stepladder before
17       releasing it for sale?
18       A.   If I may --
19       Q.   Can you sit here and tell us, without looking at
20       any documents, what testing you say the ladder should
21       have undergone before it was released for sale by
22       Werner?
23       A.   They apparently did a small amount of their own
24       pushing and pulling testing of the ladder in an open
```

```
1      position.  And I think from that test they looked at
2      it and they said, Well, the ladder didn't sustain any
3      damage as a result of this test, and they were done
4      with it.  Yet, on the other hand, the flavor that I
5      got from Mr. Bartnicki's deposition, if not
6      specifically, is that he believes that the damage on
7      the ladder was a result of what he's calling abuse in
8      the way that they use the ladder moving it around.
9              What I'm saying is apparently they are aware
10     that people use the ladders in this fashion, because
11     they conducted a test of that nature in the first
12     place.  It's documented in the materials I received.
13     But they should have done more to see what degree of
14     that kind of pushing around may result in this kind of
15     damage that we see in Mr. Gormley's ladder.
16     Q.    Have you come up with a testing protocol?
17     A.    Well, they've already got a protocol.
18     Q.    Have you come up with a testing protocol?
19     A.    No, I have not.
20     Q.    Have you come up with a test method?
21     A.    No, I have not.
22     Q.    Okay.  Have you come up with any written tests
23     that you say should have been conducted?
24     A.    Well, again, I've got my own testing that I've
```

```
 1       conducted relative to the walking, which is a
 2       completely different issue.  But we can talk about
 3       that again, if you'd like.
 4       Q.   Have you come up with any written tests that you
 5       say Werner should have conducted?
 6       A.   Well, I'll go with their protocol, but to take it
 7       a step further and to do more of it.
 8       Q.   How much more or what tests should have been
 9       done?
10       A.   Well, for example -- and, again, you said -- and
11       you told me to go from memory?
12       Q.   Yes, go from memory.  What tests should have been
13       conducted and how much more of it?
14            MR. SWARTZ:  If you feel you need to refer to
15       documents.
16       Q.   Well, if you can't answer it without referring to
17       the documents, we'll go to the documents.  But I want
18       to know at least, first, if you can answer it without
19       going through any documents.
20       A.   In the documents that were provided in discovery
21       relative to testing of prototype and exemplar FS108
22       ladders, there is a test which I don't know if they
23       refer to it as a pushing/pulling test, but it
24       basically entails dragging a ladder across a surface,
```

1    like a concrete surface or something, where it's

2    subjected to various types of loadings that will

3    result from that dragging action, and then they

4    observed the product to see if there's any noticeable

5    damage to the fiberglass rails, I believe.

6    I'm saying that they are aware that people are using

7    the ladders in those fashions.

8          Certainly a ladder like Mr. Gormley's ladder

9    that was used in that fashion to service hundreds and

10   hundreds of boats over a period of time was subjected

11   to that kind of damage, that kind of use, and it

12   resulted in damage to the product. And what I'm

13   saying is Werner sees that -- was aware that that kind

14   of thing takes place, obviously from the testing

15   conducted, and that there should have been more

16   testing of that regard to simulate what could happen

17   during the useful service life of a product.

18   Q.   Okay. Are you finished?

19   A.   Yes.

20   Q.   Anything else?

21   A.   I'm not sure.

22        MR. SWARTZ:  Anything else about what?

23   Q.   From the testing that you say that Werner should

24   have conducted.

1    A.    Well, I mean, it goes back to what I did see in

2    the file.  I just don't see -- I don't see enough of

3    those types of tests to simulate long-term use in the

4    field.  It seems like there are -- at times there are

5    tests that they do that are very short in nature, very

6    quick, and that's the end of it, as if that's the

7    degree to which ladders might experience those kinds

8    of conditions out in the field.  And it seems clear to

9    me that there should be longer-term exposure tests of

10   those nature conducted on the products.

11   Q.    The Gormley ladder, you say that was used to

12   shrink-wrap hundreds and hundreds of boats?

13   A.    That, and I think maybe one other ladder that

14   they had of that type at the Marina Bay.

15   Q.    How many years was the ladder in use for?

16   A.    Off the top of my head, I don't know.  I think

17   it's, what, in the neighborhood of maybe three or

18   four, I'm guessing.

19        MR. SWARTZ:  Without guessing.

20   A.    No, I don't.

21   Q.    Well, how many years -- based upon your

22   inspection of the ladder, how many years would you say

23   it was used?

24   A.    Well, the degree to which -- the degree to which

1    a ladder exhibits wear is dependent upon not only

2    years of service but the type of service.  Is it used

3    day in and day out, or is it used once a month, once a

4    year?  This was a ladder that appears to have gotten a

5    lot of use because it -- because of what was -- not

6    only what's exhibited in the ladder -- and obviously

7    we have a range of the age.  We know when the accident

8    occurred; we know then the ladder was manufactured.

9    And beyond that, we have the description of what it

10   was used for and a sense of how often it was used,

11   based upon the numbers of boats that were handled each

12   season.

13   Q.    How many boats were handled each season?

14   A.    There were hundreds, as indicated in the

15   documents that I reviewed.

16   Q.    Is it your understanding that Mr. Gormley and

17   others would take that ladder, the Gormley ladder, and

18   just push it around the parking lot when they would

19   shrink-wrap boats?

20   MR. SWARTZ:  Objection.

21   A.    It's my understanding that the ladders were

22   pushed around on the boats as they were moved from

23   position to position.

24   Q.    Rather than being picked up and carried?

1    A.    Again, that may have occurred as well to some

2    degree, but I don't know.

3    Q.    How do you explain the difference in damage between

4    the left rear rail and the right rear rail of the Gormley

5    ladder in terms of there being a split in the right rear

6    rail and one not on the left?

7    A.    That could be from a number of different things.

8    Once a rail starts to crack, it's easier to get the crack

9    to progress during future movement of a ladder of that

10   nature.  So it seems to me as though one rail fractured

11   before the other rail fractured.  Each person might move

12   the ladder in a different fashion where maybe only one

13   leg is dragging as opposed to all four, or three might be

14   dragging as opposed to one, whatever the case might be.

15          I'm sure there are variations in the

16   manufacturing of each of the rails.  You know, they're

17   not -- although they are technically identical,

18   practically speaking, there are variations in each of the

19   two rails.

20   Q.    And what are the variations you found in the two

21   rear rails?

22   A.    Well, I didn't measure the hardness of the left rear

23   rail to compare it with the right rear rail.

24   Q.    So you didn't find any variations in the rails?

1    A.    Well, in that regard.  I don't have a record of what
2    the hardness of the left rear rail is, but, you know, I
3    noticed that some of the dimensions of the right rear
4    rail were smaller than the left rear rail.
5    So, obviously, if there's more material in one rail than
6    the other, it's likely to be more stout, stronger than
7    the other.
8    Q.    What manufacturers of fiberglass stepladders do the
9    type of testing that you have suggested that Werner
10   should have done on the FS108?
11   A.    I don't know.
12   Q.    Do you know of any?
13   A.    No, I don't.  I'm not privy to all their
14   manufacturing records.
15   Q.    The warnings that you say should have been on the
16   FS108 ladder, what other manufacturer uses the warnings
17   that you propose that Werner put on the FS108 ladder?
18   A.    Well, presuming what is published in the Werner
19   documents, the Fiberglass Tech Manual for the nature of
20   fiberglass ladders, anybody who produces a ladder that
21   fits that description ought to include some type of
22   warning on the product, that this product requires
23   additional care above and beyond what one might normally
24   give to a wooden or aluminum ladder of similar design.

1    Q.    And what manufacturer puts that label on their

2    ladder?

3    A.    I don't know.  I'm not aware of any.

4    Q.    Are you suggesting that the Fiberglass Technical

5    Manual ought to be supplied with the FS108 ladder for

6    each customer who purchases an FS108 ladder?

7    A.    What I'm suggesting is that the designer ought to

8    take into account that the materials involved here are

9    not as hardy as what exists in other types of ladders of

10   this kind and that the design should then be modified

11   ideally to account for that with the kinds of bracing

12   that we've been talking about.

13   Q.    Let me ask you this.  When you were at Werner, did

14   you think that fiberglass was as durable as wood or

15   aluminum?

16   A.    Quite honestly, I didn't give it the consideration

17   that probably I should have.

18   Q.    So, in other words, that's something that a good

19   engineer who is manufacturing the product should be aware

20   of; correct?

21   A.    Well, first of all, I was not -- I was not aware of

22   that statement in the Fiberglass Tech Manual when I was

23   with the company.

24   And secondly, most of my experience with the company was

```
1      with the other product line, specifically aluminum, and

2      not as much with fiberglass.  So I wasn't as involved with

3      the fiberglass as

4      Mr. Bartnicki was in that regard.

5      Q.    What is your degree in?  Do you have an engineering

6      degree?

7      A.    I do.

8      Q.    In what type of engineering?

9      A.    Mechanical engineering.

10     Q.    And what school is that?

11     A.    Grove City College.

12     Q.    And did you study fiberglass while you were at Grove

13     City College?

14     A.    We studied a variety of different composite

15     materials.

16     Q.    Including fiberglass?

17     A.    I believe so, to some degree.

18     Q.    And you didn't understand that there was a difference

19     between the durability of wood, fiberglass, and aluminum

20     while you were at Grove City College?

21     A.    Well, certainly the materials do exhibit different

22     mechanical specifications.

23            MR. VOKE:  That's all I have.  Thank you.

24            (Whereupon the deposition concluded at 2:30 p.m.)
```

E R R A T A   S H E E T

DEPOSITION OF:  STANLEY A. KISKA, JR.

    Upon reading and examining my testimony as herein
transcribed, I make the following additions, changes
and/or corrections, with the accompanying and
corresponding reason(s) for same:

Page    Line                Is Amended to Read

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____


                       _____
                       STANLEY A. KISKA, JR.

S I G N A T U R E    P A G E

I, STANLEY KISKA, do hereby certify that I have read the foregoing transcript of my testimony given in the aforementioned matter, and further certify that said transcript is a true, accurate and complete record of said testimony.

Signed under the pains and penalties of perjury this_____day of_____2006.

_____

STANLEY A. KISKA, JR.

C E R T I F I C A T E   P A G E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF MIDDLESEX, SS

   I, Ellen Dubie, a Professional Court Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, do hereby certify that the foregoing

deposition of STANLEY A. KISKA, JR., having been duly

sworn, on TUESDAY, MARCH 28, 2007, is true and accurate

to the best of my knowledge, skill, and ability.

   In witness whereof, I have hereunto set my hand

and Notary Seal this 3rd day of April , 2006.


_Ellen Dubie_

ELLEN DUBIE, Notary Public

My Commission Expires:  March 9, 2012


**PLEASE NOTE:  THE FOREGOING CERTIFICATION OF THIS**

**TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE**

**SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL**

**AND/OR DIRECTION OF THE CERTIFYING REPORTER.**